**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDVIN RUSIS, HENRY GERRITS, PHIL MCGONEGAL, and DAVID HO ENG, individually and on behalf of all other similarly situated individuals, ) ) ) ) ) ) | Civil Action No. 1:18-cv-08434 |
| Plaintiffs, ) ) | |
| v. ) ) | |
| INTERNATIONAL BUSINESS MACHINES CORP. ) ) ) | |
| Defendant ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION FOR ISSUANCE OF NOTICE</u>**

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND .................................................................................... 5

III.  ARGUMENT .............................................................................................................. 11

    A.  The Standard for Issuance of Notice to Potential Opt-In Plaintiffs is Lenient ............................................................................................................... 11

    B.  Plaintiffs Have Made a Modest Factual Showing that a Class of Similarly Situated Individuals Exists .......................................................................... 15

    C.  Plaintiffs' Proposed Notice is Appropriate .................................................. 21

IV.  CONCLUSION .......................................................................................................... 25

## I.    INTRODUCTION

Plaintiffs Edvin Rusis, Henry Gerrits, Phil McGonegal, and David Ho Eng have brought this case on behalf of employees of Defendant International Business Machines Corp. ("IBM") who are over the age of forty (40) and have been recently laid off or otherwise discharged (through termination or constructive discharge). As set forth in the First Amended Complaint, Plaintiffs allege that IBM has engaged in rampant age discrimination by systematically targeting its older workers for separation from employment (and then refusing to rehire those workers to open positions at IBM for which they are qualified), in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*

Under the ADEA (like the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA")), employees who wish to participate in a collective action challenging age discrimination may do so by affirmatively "opting in" to join the lawsuit.[1]  Courts typically allow notice to be issued at the outset of the case to potential class members who may want to join the case, upon a minimal showing by Plaintiffs that there exists a common class of individuals who may have suffered a similar injury who may have interest in joining the case. The standard for obtaining the Court's authorization for such notice to be issued is lenient. Typically, courts will authorize the notice at this early stage in the litigation, because the issuance of notice, followed by an opt-in period for potential plaintiffs, allows the court and the parties to know the scope of the case from the outset.

---

[1]    Plaintiffs have also alleged state law age discrimination claims under the laws of several states (including California, New Jersey, and North Carolina).  Those state law claims would be subject to the Rule 23 standard for class certification, and should state subclasses be certified under Rule 23, employees who have worked in those states would not need to individually opt in to pursue their state law claims.  Plaintiffs would move for class certification under Rule 23 at a later stage of the case, after some initial discovery.  Those state law claims are not at issue in this motion.

See Jackson v. New York Telephone Co., 163 F.R.D. 429, 430-31 (S.D.N.Y. Sept. 22, 1995). Then, the parties have the opportunity to engage in discovery, and when the case is ready for trial, Defendant will have the opportunity to move for decertification if it can show that the claims are too individualized and cannot be efficiently tried together. See Rodolico v. Unisys Corp., 199 F.R.D. 468, 480 (E.D.N.Y. March 30, 2001).

Plaintiffs now thus move this Court for permission to send notice of this action to potential opt-in plaintiffs, informing them of their right to opt in to this case under the ADEA, 29 U.S.C. § 626(b).[2]  These employees would include all IBM employees over forty (40) years of age whose employment separated (either because of layoff, discharge, or potential constructive discharge (i.e. resignation)) since July 14, 2017.[3]

As shown below, Plaintiffs have satisfied the lenient evidentiary burden required

[2]     A proposed Notice is attached hereto as Exhibit A; a proposed Opt-in Form is attached as Exhibit B.

[3]     This date is based upon the date that Plaintiff Rusis filed an administrative class charge with the EEOC alleging this discrimination, which was May 10, 2018.  For most employees (who worked in "deferral states"), they would be eligible to join this case if their employment ended within 300 days of the filing of that charge, which is July 14, 2017.  Hipp v. Liberty Nat. Ins. Co., 252 F.3d 1208, 1220-21 (11th Cir. 2001).
"Deferral states" are states that have that have local fair employment practice agencies that can review and act on discrimination claims. Adames v. Mitsubishi Bank Ltd., 751 F. Supp. 1565, 1570 (E.D.N.Y. 1990).  The vast majority of states are "deferral states". See 29 CFR 1601.74 (listing the currently approved fair employment agencies).  For employees who worked in "non-deferral states" (Alabama, Arkansas, Georgia, Mississippi, and North Carolina, as well as the territories American Samoa, Guam, Wake Island, and the Commonwealth of the Northern Mariana Islands, see Individual Field Office Webpages, available at http://www.eeoc.gov/field/ (last checked on December 19, 2018)), the time limit to file claims with the EEOC is 180 days from the date of the alleged discrimination (which would include employees whose employment ended on or after November 11, 2017).  Id.  Because there may be factual issues regarding whether employees who worked primarily in "non-deferral" states also worked at some point in "deferral states" (since many IBM employees traveled as part of their job), Plaintiffs have used the earlier potential date for notice, and the parties (or court if necessary) may later determine whether the ADEA claims of such employees are timely.  See  Sperling v. Hoffman-LaRoche, Inc., 118 F.R.D. 392, 404-07 (D.N.J. Jan. 5, 1988) (noting that the purpose of notice under the ADEA is to ensure that all possible class members who are interested can participate, which militates toward a broad notice that can later be whittled down if necessary).

for issuance of notice under 29 U.S.C. §§ 216(b) and 626(b). Courts around the country have recognized that the standard for issuance of notice under the ADEA (like the FLSA) is quite lenient, requiring plaintiffs only to make a minimal showing that similarly situated individuals exist who should be informed of the lawsuit.  See Rodolico, 199 F.R.D. at 480 (collecting cases).

This case challenges IBM's policies and practices in the last several years of systematically ending the employment of its older workers in order to build a younger workforce.  This is the type of case that lends itself to a collective action for age discrimination because, while IBM may have used different specific articulated justifications for ending the employment of any particular individual, when viewed more globally, Plaintiffs expect to show that these individual decisions were part of a concerted trend and conscious decision by the company to reduce the number of older employees in its workforce.  Even before the issuance of notice in this case and any discovery, forty-four (44) individuals (including the named Plaintiffs) have already opted in to the case from twenty (20) states and Washington D.C.,[4] and Plaintiffs have amassed a good deal of preliminary evidence that age discrimination has been rampant at IBM.[5]  Indeed, an in-depth investigative report into age discrimination by the

---

[4]     Additionally, Plaintiffs' counsel are today filing sixty (60) arbitration demands for individuals who had signed IBM's severance agreement, which included an agreement to arbitrate ADEA claims, meaning that more than one hundred (100) employees have already expressed interest in pursuing these claims.

[5]     Age discrimination cases will often be based on or supported by statistical evidence, see Carpenter v. Boeing Co., 456 F.3d 1183, 1196 (10th Cir. 2006), which is why Section 626(f) of the ADEA requires employers to disclose information to laid off workers regarding the age and position of those workers in the business unit who are not being laid off. As is explained more thoroughly in note 6 infra, IBM appears to have purposely stopped giving this information to its employees to hide its discriminatory actions. In discovery, Plaintiffs will seek this statistical information regarding the ages of workers whose employment has ended, which they expect will

publication ProPublica provides a useful overview of the problem. See Peter Gosselin

and Ariana Tobin, *Cutting 'Old Heads' at IBM*, ProPublica (March 22, 2018),

https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.   As

ProPublica reported, in IBM's systematic effort to "correct seniority mix" by eliminating

"more than 20,000 American employees ages 40 and over" over the last five years, it

"[t]argeted people for layoffs and firings with techniques that tilted against older workers,

even when the company rated them high performers," and "[c]onverted job cuts into

retirements and took steps to boost resignations and firings," as well as utilizing other

techniques to reduce its older workforce across the company. Id.[6]

     Indeed, courts have ordered that notice be issued at the outset of ADEA cases in

---

further support their claims. As is normal at this early stage in the litigation, Plaintiffs do not yet
have possession of this statistical evidence.

[6]     Prior to 2014, IBM provided lists to any workers who were laid off, which disclosed the
positions and ages of all employees laid off from their business units at the same time, as well
as a list showing the positions and ages of all those in the business units that were not being
laid off. IBM distributed this information, presumably, in order to comply with Section 626(f) of
the ADEA, which requires disclosure of this information if an employer seeks to obtain a release
of age discrimination claims from a group of employees. However, in 2014, in an apparent effort
to conceal its systematic effort to shed its older workers, IBM stopped disclosing this information
to the employees. While IBM could no longer include a release of ADEA claims in its severance
agreements with its employees as a result, it opted instead to require its employees to agree to
binding individual arbitration of those claims, in order to receive a small severance payment.
Many IBM employees who were laid off, including the named plaintiffs in this action and those
plaintiffs who have opted in to this case, rejected the severance offer and did not sign the
arbitration agreement.  As discussed below at page 14, the Court should order notice first to all
employees over age 40 whose employment ended since July 14, 2017; later it can be sorted out
who has an enforceable arbitration clause if IBM chooses to move compel arbitration for any
employees who have opted in who signed arbitration agreements. For any individuals who are
bound to arbitrate, they could then file individual arbitration claims.  As noted, today Plaintiffs'
counsel are filing arbitration demands for sixty (60) individuals bringing these same claims.
     But even those individuals who must ultimately arbitrate their claims should at least get
notice of their claims. There is no reason under the Supreme Court's decision in Hoffman-
LaRoche Inc. v. Sperling, 493 U.S. 165, 171 (1989) (explaining that the purpose of notice early
in the case is to promote enforcement of the ADEA), or the Supreme Court's narrow majority in
Epic Systems Corp. v. Lewis, 138 S. Ct. 1612 (2018) (favoring the enforcement of arbitration
agreements, even those containing class action waiver), that affected employees should not get
*notice* of a case and a claim so that they are aware of their rights and ability to bring the claim,
be it in court or in arbitration, with willing counsel prepared to advance their claims.

similar circumstances to those presented here.  See Heath v. Google Inc., 215 F. Supp. 3d 844, 853-55 (N.D. Cal. 2016); Rodolico, 199 F.R.D. at 480-84; Jackson, 163 F.R.D. at 431-33; Schwed v. General Elec. Co., 159 F.R.D. 373, 375-77 (N.D.N.Y. 1995); Sperling v. Hoffman-LaRoche, Inc., 118 F.R.D. at 404-07. Because this early "[n]otice plays an important role in facilitating a collective action and furthering ADEA's remedial purpose," Jackson, 163 F.R.D. at 431, and for the reasons set forth below, the Court should grant this motion.[7]

## II.    FACTUAL BACKGROUND

Plaintiffs in this case (who are all over the age of forty (40)) worked as employees for IBM but whose employment ended since July 2017 (see supra note 3). (FAC ¶ 1.)  Plaintiffs have alleged that they lost their jobs with IBM as a result of IBM's systematic and concerted attempt to eliminate older employees, in an effort to build a younger workforce. (FAC ¶¶ 1, 15-20.)  Plaintiffs, who consist of four (4) named plaintiffs and forty (40) individuals who have already opted into this action, were among thousands of older IBM employees to be laid off or otherwise separated from their employment in recent years, as the result of a shift in IBM's personnel focus to the generation of workers referred to as "Millennials" (which IBM defines as the generation born after 1980) that began in approximately 2012. (FAC ¶ 15.)  At that time, as

---

[7]    Time may be of the essence, and so Plaintiffs urge the Court to grant this motion quickly. While Plaintiffs believe that the filing of this lawsuit on September 17, 2018, should toll the statute of limitations under the ADEA for all potential opt-in plaintiffs, the courts are split on this issue, and the Second Circuit has not yet addressed it.  Compare Armstrong v. Martin Marietta Corp., 93 F.3d 1505, 1508 (11th Cir.1996) (filing of complaint tolls statute of limitations for ADEA opt-ins); Sperling v. Hoffman-LaRoche, Inc., 24 F.3d 463, 471-72 (3d Cir. 1994) (same); Clark v. United Technologies Corp., 1997 WL 573431, *3-4 (D. Conn. 1997) (same); In re Western Dist. Xerox Litig., 850 F. Supp. 1079, 1093-94 (W.D.N.Y. 1994) (same); with O'Connell v. Champion International Corp., 812 F.3d 393, 394 (8th Cir. 1987) (statute of limitations not tolled until opt-ins file consent forms).

Plaintiffs have alleged, IBM began a program to reform itself into a leading company in the fields of cloud services, big data analytics, mobile, security and social media; as a part of this transformation, IBM endeavored to begin heavily recruiting Millennials in order to make the face of IBM younger, while at the same time pushing out older employees. (FAC ¶ 15.)

As previously mentioned, an article published by ProPublica last year, following an in-depth investigation of IBM's employment practices, reported that "in the past five years alone, IBM has eliminated more than 20,000 American employees ages 40 and over, about 60 percent of its estimated total U.S. job cuts during those years." Peter Gosselin and Ariana Tobin, *Cutting 'Old Heads' at IBM*, ProPublica (March 22, 2018), https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.

As reported by ProPublica, IBM's shift in focus toward the Millennial workforce came as "IBM was falling behind . . . by failing to quickly devise innovative uses for the internet like its new rivals, Google, Facebook, and Amazon." Id. In response to that problem, IBM's Chief Executive Officer Virginia Rommetty "launched a major overhaul that aimed to make IBM a major player in the emerging technologies of cloud services, big data analytics, mobile security and social media, or what came to be known inside as CAMS" and "sought to sharply increase hiring of people born after 1980." Id.  IBM embraced the belief that "CAMS are driven by Millennial traits." Id.  Moreover, in 2006 one of IBM's consulting arms issued a paper that referred to workers in the "Baby Boomer" generation as "gray hairs" and "old heads," stated that "successor generations . . . are generally much more innovative and receptive to technology than baby boomers" and advised that "What businesses can't afford to do is simply rehire their

experienced workers and put them back into their old jobs." <u>See</u> The Maturing

Workforce: Innovation in Workforce Enablement, IBM Business Consulting Services,

https://www-935.ibm.com/services/uk/bcs/pdf/maturing-workforce-feus01291-1.pdf

(2006).  As another expression of IBM's shift in focus to embrace Millennials, at a 2014

IBM conference called "Reinvention in the Age of the Millennial," IBM announced its

intent to "embrace the 'Millennial mindset'" and announced that "What's good for

Millennials is good for everyone." <u>See</u> Reinvention in the Age of the Millennial,

https://ibmcai.com/2014/12/16/reinvention-in-the-age-of-the-millennial/ (Dec. 16, 2014).

     Although discovery has not yet begun, Plaintiffs have already gathered evidence

showing that IBM has used several methods in particular to reduce the population of its

older workers.  Many older employees have been laid off through reductions in force or

layoffs, which IBM refers to as "Resource Actions."  (Meanwhile, IBM shields its

youngest employees from layoff, exempting recent college graduates from reduction for

nine months from their hire date.)[8]  For those workers who are subject to Resource

Actions, IBM has typically given them approximately ninety days notice prior to their

layoff.[9]  A frequent explanation that IBM has offered to these older workers who are

discharged through Resource Actions is that IBM was undergoing a "skills

adjustment."[10]  However, these older workers have been required by IBM to continue

---

[8]    <u>See</u> Rodgers Aff. ¶¶ 6-10, Ex. C; Rusis Aff. ¶¶ 7-13, Ex. D; Gerrits Aff.  ¶¶ 6-12, Ex. E;
Haupt Aff. ¶¶ 5-11, Ex. H; Johnson Aff. ¶¶ 2-6, Ex. J; Mount Aff. ¶¶ 3-11, Ex. K; Gasiorowski Aff.
¶¶ 3-12, Ex. L; Brister Aff. ¶¶ 2-8, Ex. N.

[9]    <u>See</u> Rodgers Aff. ¶ 10, Ex. C; Rusis Aff. ¶ 9, Ex. D; Gerrits Aff. ¶ 6, Ex. E; Haupt Aff. ¶ 5,
Ex. H; Johnson Aff. ¶ 3, Ex. J; Mount Aff. ¶ 5, Ex. K; Gasiorowski Aff. ¶ 5, Ex. L; Brister Aff. ¶ 5,
Ex. N.

[10]    <u>See</u> Rusis Aff. ¶ 9, Ex. D; Gerrits Aff. ¶ 7, Ex. E; Haupt Aff. ¶ 5, Ex. H; Johnson Aff. ¶ 3,
Ex. J; Mount Aff. ¶ 5, Ex. K; Gasiorowski Aff. ¶ 5, Ex. L.

honing their skillsets (which they have done), and IBM has not offered specific information justifying what was inadequate about their skills.[11]

Another method that IBM has used to reduce its older workforce is by constructively discharging them, often by conditioning their continued employment on untenable choices that IBM is well aware they are unlikely to accept, such as relocation.[12]  Many of these older employees have been given a choice between relocating to an IBM office in a different city or state (even when they used to be allowed to work remotely) or accepting an early retirement.[13]  Plaintiffs allege that IBM does not actually expect these workers to agree to the relocation but instead has used relocation requirements as a tool to force older workers into retirement.[14]

In addition to these two methods, it appears that IBM has also reduced its population of older workers by systematically terminating older employees for a variety of pretextual reasons (but which appear to follow similar trends).[15]  For example, older IBM workers who have had strong performance evaluations in the years leading up to these terminations have been informed out of the blue that they are being terminated because their job performance has not been up to IBM's standards, despite the fact that

---

[11]    See Rusis Aff. ¶¶ 9-10, Ex. D; Gerrits Aff. ¶ 7, Ex. E; Haupt Aff. ¶¶ 5-11, Ex. H; Johnson Aff. ¶¶ 3-5, Ex. J; Mount Aff. ¶¶ 5-6, Ex. K; Gasiorowski Aff. ¶¶ 5-7, Ex. L; Brister Aff. ¶ 5, Ex. N.

[12]    See Rodgers Aff. ¶¶ 11-16, Ex. C; McGonegal Aff. ¶¶ 3-9, Ex. F; Miller Aff. ¶¶ 3-11, Ex. I; Alton Aff. ¶¶ 3-12, Ex. P; Delaney Aff. ¶¶ 2-12, Ex. Q.

[13]    See Rodgers Aff. ¶¶ 11-16, Ex. C; McGonegal Aff. ¶¶ 3-5, Ex. F; Miller Aff. ¶¶ 3-5, Ex. I; Alton Aff. ¶¶ 3-5, Ex. P; Delaney Aff. ¶¶ 3-5, Ex. Q.

[14]    See Rodgers Aff. ¶¶ 11-16, Ex. C; McGonegal Aff. ¶¶ 3-9, Ex. F; Miller Aff. ¶¶ 5-6, Ex. I; Delaney Aff. ¶ 8, Ex. Q.

[15]    See Eng Aff. ¶¶ 4-7, Ex. G;  Johnson Aff. ¶ 8, Ex. J; Lundy Aff. ¶¶ 3-7, Ex. M; Holloway Aff. ¶¶ 3-10, Ex. O.

they had received no negative feedback prior to termination.[16]  Plaintiffs contend that explanations such as these are pretext for IBM's true discriminatory motives. (FAC ¶ 19.) Plaintiffs also allege that IBM's upper management imposed quotas on the departmental managers, meaning that the lower level managers had to terminate a certain amount of employees, keeping in mind IBM's emphasis on reducing the number of older employees.[17] Therefore, when certain older workers were not subject to a Resource Action or given an ultimatum to relocate or leave the company, IBM's managers came up with pretextual reasons to terminate them.[18]

Another trend that Plaintiffs and opt-ins have observed is that IBM has often moved its older workers to certain groups that were supposedly intended to give specialized support to other groups within IBM and IBM's clients.[19]  However, in reality, IBM used such groups to train younger workers in its other groups who lacked knowledge and experience, and the older workers were ultimately phased out.[20] Indeed, IBM's older employees who lost their jobs frequently had their job duties transitioned to younger workers; the older workers were often expected to train the younger workers when necessary as a part of this transition.[21]

---

[16]     See Eng Aff. ¶¶ 4-7, Ex. G; Johnson Aff. ¶ 8, Ex. J; Lundy Aff. ¶¶ 3-7, Ex. M; Holloway Aff. ¶¶ 3-10, Ex. O.

[17]     See Rodgers Aff. ¶ 7, Ex. C; McGonegal Aff. ¶ 9, Ex. F; Haupt Aff. ¶ 7, Ex. H; Johnson Aff. ¶ 5, Ex. J; Mount Aff. ¶ 7, Ex. K; Lundy Aff. ¶ 6, Ex. M; Holloway Aff. ¶ 6, Ex. O.

[18]     See Eng Aff. ¶¶ 4-7, Ex. G; Johnson Aff. ¶ 8, Ex. J; Lundy Aff. ¶¶ 3-7, Ex. M; Holloway Aff. ¶¶ 3-10, Ex. O.

[19]     See Rusis Aff. ¶¶ 6-7, Ex. D; Mount Aff. ¶¶ 3-11, Ex. K.

[20]     See Rusis Aff. ¶¶ 6-7, 10, Ex. D; Gerrits Aff. ¶ 10, Ex. E; Mount Aff. ¶¶ 3-11, Ex. K.

[21]     See Rusis Aff. ¶¶ 6-7, 10, Ex. D; Gerrits Aff. ¶ 10, Ex. E; Haupt Aff. ¶ 6, Ex. H; Miller Aff. ¶¶ 8-9, Ex. I; Mount Aff. ¶¶ 3-11, Ex. K; Brister Aff. ¶ 6, Ex. N; Delaney Aff. ¶ 7, Ex. Q.

Plaintiffs expect to show in this case that these strategies (and likely more that may be uncovered in discovery) have been used to implement IBM's overarching policy in recent years of systematically reducing the number of its older employees in favor of Millennials. (FAC ¶ 19.)  Additionally, while older workers who lost their jobs have frequently been encouraged to use IBM's internal hiring platform to apply for other open IBM positions for which they are qualified, IBM has a general policy of not allowing workers subject to layoff to be hired into other positions.[22]  IBM has thus "gently" offered hope to its older workers who are being laid off that they may still continue their careers with IBM, while actually preventing them from obtaining new positions within the company.[23]

Plaintiffs allege, therefore, that IBM has utilized these methods as part of a companywide strategy to reduce significantly its population of older workers while at the same time aggressively courting younger workers, especially Millennials.[24]  IBM executed this strategy through such methods as widespread layoffs, constructive discharge (through such methods as mandating unrealistic relocations for older workers if they wanted to keep their jobs), and through pretextual terminations.[25]  At the same

---

[22]   See Rodgers Aff. ¶ 10, Ex. C, Rusis Aff. ¶¶ 14-15, Ex. D; Gerrits Aff. ¶¶ 8-9, Ex. E; Haupt Aff. ¶ 10, Ex. H; Miller Aff. ¶ 10, Ex. I; Johnson Aff. ¶ 7, Ex. J; Mount Aff. ¶ 11, Ex. K; Gasiorowski Aff. ¶ 10, Ex. L; Brister Aff. ¶ 7, Ex. N; Alton Aff. ¶ 9, Ex. P; Delaney Aff. ¶ 9, Ex. Q.

[23]   See Rodgers Aff. ¶ 10, Ex. C; Rusis Aff. ¶¶ 14-15, Ex. D; Gerrits Aff. ¶¶ 8-9, Ex. E; Haupt Aff. ¶ 10, Ex. H; Miller Aff. ¶ 10, Ex. I; Johnson Aff. ¶ 7, Ex. J; Mount Aff. ¶ 11, Ex. K; Gasiorowski Aff. ¶ 10, Ex. L; Brister Aff. ¶ 7, Ex. N; Alton Aff. ¶ 9, Ex. P.

[24]   See Rodgers Aff. ¶ 16, Ex. C; McGonegal Aff. ¶¶ 9-12, Ex. F; Mount Aff. ¶ 8, Ex. K; Gasiorowski Aff. ¶ 8, Ex. L; Lundy Aff. ¶ 6, Ex. M; Alton Aff. ¶ 10, Ex. P.

[25]   See Rodgers Aff. ¶ 6-16, Ex. C; Rusis Aff. ¶¶ 9-12, Ex. D; Gerrits Aff. ¶¶ 6-12, Ex. E; McGonegal Aff. ¶¶ 3-12, Ex. F; Eng Aff. ¶¶ 4-7, Ex. G; Haupt Aff. ¶¶ 5-11, Ex. H; Miller Aff. ¶¶ 3-11, Ex. I; Johnson Aff. ¶¶ 2-6, Ex. J; Mount Aff. ¶¶ 3-11, Ex. K; Gasiorowski Aff. ¶¶ 3-12, Ex. L;

time, IBM has often encouraged older workers who have lost their jobs to seek other positions within the company while at the same time instructing its managers not to hire them.[26]  Plaintiffs allege that IBM's conduct pertaining to its older employees across the country constitutes unlawful age discrimination under ADEA.

## III.    ARGUMENT

### A.    The Standard for Issuance of Notice to Potential Opt-In Plaintiffs is Lenient

Section 626(b) of the ADEA expressly incorporates the "opt in" mechanism of the Fair Labor Standards Act, 29 U.S.C. § 216(b). Jackson, 163 F.R.D. at 430. To manage ADEA collective actions at the pretrial phase, courts in the Second Circuit utilize a two-stage procedure. Rodolico, 199 F.R.D. at 480. The first step, which takes place before discovery begins, is the "notice phase."  Id. In the notice phase, the court determines whether similarly situated individuals should be notified of their right to opt in to the suit. Id.  The second stage, referred to as the "decertification phase," is triggered by an employer's motion for decertification after discovery has been concluded. Id.  At the decertification stage, the court examines the evidence produced during discovery and revisits its factual determination as to whether the claimants are sufficiently similarly situated so that their claims can be tried together. Id.; see also Hipp, 252 F.3d at 1218 (11th Cir. 2001). If the Plaintiffs and opt-ins are similarly situated, the court will allow the representative action to proceed to trial. Hipp, 252 F.3d at 1218.

---

Lundy Aff. ¶¶ 3-7, Ex. M; Brister Aff. ¶¶ 2-8, Ex. N; Holloway Aff. ¶¶ 3-10, Ex. O; Alton Aff. ¶¶ 3-12, Ex. P; Delaney Aff. ¶¶ 2-12, Ex. Q.

[26]    See Rodgers Aff. ¶ 10, Ex. C; Rusis Aff. ¶¶ 14-15, Ex. D; Gerrits Aff. ¶¶ 8-9, Ex. E; McGonegal Aff. ¶ 10, Ex. F; Eng Aff. ¶ 7, Ex. G; Haupt Aff. ¶ 10, Ex. H; Miller Aff. ¶ 10, Ex. I; Johnson Aff. ¶ 7, Ex. J; Mount Aff. ¶ 11, Ex. K; Gasiorowski Aff. ¶ 10, Ex. L; Brister Aff. ¶ 7, Ex. N; Alton Aff. ¶ 9, Ex. P.

"The key to starting the motors of a collective action is a showing that there is a similarly situated group of employees." Morgan, 551 F.3d at 1259. The similarly situated requirement is not particularly stringent, as "at this stage the evidentiary standard is lenient." Young v. County of Nassau, 2010 WL 161593, *1 (E.D.N.Y. Jan. 13, 2010). "The named plaintiff needs to make only 'a modest factual showing sufficient to demonstrate that [the named plaintiff] and potential plaintiffs together were victims of a common policy or plan that violated the law.'" Flores v. Osaka Health SPA, Inc., 2006 WL 695675, *2 (S.D.N.Y. March 16, 2006) (quoting Hoffman v. SBARRO, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

In order to demonstrate that a group of similarly situated employees exists, a plaintiff should show that the termination was part of an "institution wide practice" based on age discrimination. See Hyman v. First Union Corp., 982 F. Supp. 1, 3 (D.D.C. 1997). For example, in Hyman, the court noted that while several layers of management carried out the decisions, those decisions were infected with an age "bias on the part of top management that filtered down to decision makers." Id. at 4. The Hyman court pointed to evidence that the plaintiffs submitted of upper management mandated reductions in force, as well as statement by an upper manager of the company indicating a desire for young employees. See id. at 3-4. Similarly, the Eleventh Circuit in Hipp emphasized that the plaintiffs must allege similar, though not necessarily identical, discriminatory treatment. See Hipp, 252 F.3d at 1219. In Frank v. Capital Cities Communications, Inc., 1983 WL 643, *2-3 (S.D.N.Y. Oct. 11, 1983), the court certified a collective action even where the plaintiffs held a wide variety of jobs and alleged discriminatory conduct that was not identical, because the plaintiffs had alleged that

each opt-in plaintiff was the victim "of a plan by [defendants] to rid itself of its older employees through harassment and termination."

"[T]he 'similarly situated' requirement . . . is considerably less stringent than the requirement of [Rule] 23(b)(3) . . . ." Jackson, 163 F.R.D. at 431 (quoting Heagney v. European American Bank, 122 F.R.D. 125, 127 (E.D.N.Y. 1988)). As one court described, "[g]iven the remedial nature of the ADEA and the preliminary stage at which we are in the litigation, plaintiffs need only describe the potential class within reasonable limits and provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist." Schwed, 159 F.R.D. at 375-76.

Generally at this stage, "courts 'require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan." Rodolico, 199 F.R.D. at 480 (quoting Sperling, 118 F.R.D. at 407). Id. Courts typically rely on any pleadings submitted in the case as well as affidavits in order to establish that plaintiffs are similarly situated. See Hipp, 252 F.3d at 1219 (noting that plaintiffs in an ADEA case may meet the similarly situated requirement "by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary); Jackson, 163 F.R.D. at 431 (conditionally certifying ADEA collective action based on allegations in a complaint alone); Schwed, 159 F.R.D. at 376-77 (granting conditional certification in an ADEA case based on the complaint and two affidavits from former employees).[27]  This assessment takes place before discovery. See Young, 2010

---

[27]     The allegations contained in these affidavits need not meet traditional admissibility standards applicable to those materials offered in support of a motion for summary judgment. See, e.g., Boice v. M+W U.S., Inc., 130 F. Supp. 3d 677, 687 n.7 (N.D.N.Y. 2015) (quoting Simmons v. Valspar Corp., 2011 WL 1363988, *3 (D. Minn. Apr. 11, 2011), for the proposition

WL 161593, *1-2; Schwed, 159 F.R.D. at 375 ("[N]otice to those preliminarily identified

as potential plaintiffs prior to full discovery is appropriate as it may further the remedial

purpose of the ADEA."). Because conditional certification precedes discovery, "plaintiffs

[have] some leeway in proof at the initial stage." Pickering v. Lorillard Tobacco Co., Inc.,

2012 WL 314691, *9 (M.D. Ala. Jan. 30, 2012).

　　　　The merits of the case are not evaluated at the notice stage, nor does the court

make determinations regarding the credibility of particular affiants. See, e.g., Jackson,

163 F.R.D. at 431 ("[E]ven if plaintiffs' claims turn out to be meritless or, in fact, all the

plaintiffs turn out not to be similarly situated, notification at this stage, rather than after

further discovery, may enable more efficient resolution of the underlying issues in this

case.") (quoting Krueger, 1993 WL 276058, *2).[28]

---

that it is permissible for a court to "consider evidence that would be inadmissible in deciding motions for conditional certification," and "The only clear requirement is that averments in support of a Motion for Conditional Certification must be based on personal knowledge); Reyes v. AT & T Mobility Services LLC, 759 F. Supp. 2d 1328, 1331 (S.D. Fla. 2010) ("In light of the general leniency with which I must approach Plaintiff's underlying motion for conditional class certification, … applying Rule 56 standards to the challenged paragraphs may be too strict at this preliminary stage."); White v. MPW Indus. Servs., Inc., 236 F.R.D. 363, 368 (E.D.Tenn.2006) ("affidavits submitted in support of a motion for conditional certification pursuant to § 216(b) need not meet the standard set forth in Rule 56(e). To require more at this stage of litigation would defeat the purpose of the two-stage analysis.").

[28]　　　　As Plaintiffs explained in note 6 supra, IBM may argue that notice should not be issued because some of the potential class members may have signed arbitration agreements. However, the proper course is to issue notice and then to sort out which (if any) of the opt-in plaintiffs must arbitrate their claims (if IBM moves to compel arbitration for those opt-ins). See D'Antuono v. C & G of Groton, Inc., 2011 WL 5878045, *4 (D. Conn. Nov. 23 2011) ("the existence of other exotic dancers' arbitration agreements is . . . immaterial to the question of class certification."). At this initial conditional certification stage, courts do not evaluate the merits of plaintiffs' claims or the applicability of defenses, including arbitration agreements. See Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 262 (S.D.N.Y. 1997) ("the Court need not evaluate the merits of plaintiffs' claims in order to determine that a definable group of similarly situated plaintiffs can exist here."). Indeed, courts have routinely conditionally certified classes and ordered notice to issue to all potential opt-in plaintiffs, even where some, or even most, class members have signed arbitration agreements. See Jennings v. 2020, 4:15-cv-04080, Dkt 178 (Apr. 27, 2017) (expanding scope of collective to provide notice to individuals who signed arbitration agreements) ("The Court will not . . . at this point assume that the arbitration

Ultimately, all factual questions and issues of credibility must be resolved in

favor of the moving party in a motion for conditional certification. See Scott v. Heartland

Home Finance, Inc., 2006 WL 1209813, *3 (N.D. Ga. May 3, 2006).

## B.    Plaintiffs Have Made a Modest Factual Showing that a Class of Similarly Situated Individuals Exists

Plaintiffs have amply satisfied their modest burden of showing that a group of

similarly situated employees exists. See Schwed, 159 F.R.D. at 375-76. This standard

---

agreement [signed by some collective action members] is enforceable and can be used to prevent potential members of the collective from receiving notice, especially when the step one inquiry is so limited"); Souran v. GrubHub, No. 16-cv-6720, Dkt. 67 (N.D. Ill. Feb. 1, 2017), Dkt. 68 (N.D. Ill. Feb. 3, 2017) (granting motion for § 216(b) notice, even though most workers had signed arbitration agreements; Woods v. Club Cabaret, Inc., 140 F. Supp. 3d 775, 782-83 (C.D. Ill. 2015) (rejecting argument that the fact that some class members were subject to arbitration agreements would preclude conditional certification); Saravia v. Dynamex, 310 F.R.D. 412, 424 (N.D. Cal. 2015). ("[n]o district court in our circuit has denied conditional certification on the basis that some members of the proposed collective may be subject to valid and enforceable clauses"); Deatrick v. Securitas Security Services USA, Inc., 2014 WL 5358723, at *3 (N.D. Cal. Oct. 20, 2014) (granting conditional certification where plaintiff had opted out of arbitration agreement, and other collective action members had signed one, explaining that arbitration agreements have "little to no bearing at this point in the litigation because they relate to whether 'disparate factual and employment settings' exist"); Maddy v. General Electric Co., 59 F. Supp. 3d 675, 685 n.7. (D.N.J. 2014). ("That some service technicians have signed arbitration agreements does not preclude conditional certification of all service technicians across the United States."). See also Sylvester v. Wintrust Fin. Corp., 2013 WL 5433593, *9 (N.D. Ill. Sept. 30, 2013) (fact that some class members were subject to arbitration agreements would not preclude conditional certification); Hernandez v. Immortal Rise, Inc., 2012 WL 4369746, *5 (E.D.N.Y. Sept. 24, 2012) (existence of arbitration agreements irrelevant to conditional certification); Sealy v. Keiser Sch., Inc., 2011 WL 7641238, *3 (S.D. Fla. Nov. 8, 2011) (by invoking arbitration agreements, "Defendant is asking the Court to apply the level of scrutiny that is only appropriate for the second phase of the two-tiered approach."); Davis v. Four Seasons Hotel Ltd., 2011 WL 4590393, *4 (D. Haw. Sept. 30, 2011) ("The possibility that Four Seasons may attempt to enforce an arbitration agreement entered into by a portion of the members of the class does not stand in the way of class certification"); Whittington v. Taco Bell of Am., Inc., 2011 WL 1772401, at *6 (D. Colo. May 10, 2011) (finding pre-certification ruling on motion to compel arbitration premature); Green v. Plantation of Louisiana, LLC, 2010 WL 5256348, *1 (W.D. La. Dec. 15, 2010) (refusing to consider argument that some members of collective barred from joining by arbitration agreement "until discovery is complete"); Ali v. Sugarland Petroleum, 2009 WL 5173508 (S.D. Tex. Dec. 22, 2009)(same); Davis v. Novastar Mortg., Inc., 408 F.Supp.2d 811 (W.D. Mo. 2005) (granting conditional certification where most collective action members have signed arbitration agreements, and explaining that "if defendants choose to move to compel arbitration of certain claims, the Court will consider whether the claims are arbitrable at that time"); Villatoro v. Kim Son Restaurant, L.P., 286 F.Supp.2d 807 (S.D. Tex. 2003) (same).

15

is lenient and conditional certification is "typically granted and notice to potential

plaintiffs authorized." Poplawski v. Metroplex on the Atlantic, LLC, 2012 WL 1107711, *4

(E.D.N.Y. April 2, 2012) (citing Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363,

367 (S.D.N.Y. 2007)). At this stage, Plaintiffs need only submit "minimal evidence"

showing that others in the potential class are similarly situated. Yap v. Mooncake

Foods, Inc., 146 F. Supp. 3d 552, 560 (S.D.N.Y. 2015).

Here, forty-four (44) former IBM employees (including the named Plaintiffs) who

worked for IBM in locations across the country have already opted in to join the case,

and fourteen have submitted affidavits, providing some details in support of their claim

that they have been subjected to a policy by IBM of systematically working to reduce its

complement of older employees in order to build a younger workforce. These affidavits

have been corroborated by an affidavit from a former IBM Vice President. See Ex. C.

Moreover, today Plaintiffs' counsel are filing sixty-one (60) arbitration demands for

individuals who had signed IBM's severance agreement, which included an agreement

to arbitrate ADEA claims. Therefore, more than one hundred (100) individuals have

expressed interest in joining these claims, forty-four (44) in court and sixty (60) in

arbitration. Plaintiffs also provided some details regarding the methods that IBM used to

execute its policy, such as lay-offs, forcing older employees to choose between

untenable relocations and leaving the company, and pretextual terminations. Plaintiffs

have also alleged that IBM has refused to consider those older individuals who lost their

jobs at IBM for other positions for which they are qualified. The First Amended

Complaint and the affidavits that Plaintiffs and opt-in plaintiffs, as well as a former IBM

Vice President, have submitted provide ample preliminary evidence that there are

numerous former IBM employees over the protected age of forty (40) who have non-frivolous claims that they were victims of a concerted discriminatory IBM policy that sought to replace older workers generally with Millennials. <u>See</u> Ex. C-Q.  Additionally, the named and opt-in Plaintiffs in this case worked in various positions around the country, indicating that IBM's age discrimination is a company-wide problem, not an isolated issue in one small part of the company. This evidence is amply sufficient to support a finding that they are similarly situated.[29]

The evidence submitted in this case is similar to that in <u>Jackson</u>, where the court found that the pleadings and affidavits submitted by the named plaintiffs evidencing a company-wide "force management plan" that led to a disproportionate number of terminations for employees over the age of forty and favored younger workers created "a solid factual basis upon which authorization for notice should be granted." <u>Jackson</u>, 163 F.R.D. at 432; <u>see also</u> <u>Krueger</u>, 1993 WL 276058, *2 (also finding that pleadings and affidavits submitted by employees regarding the defendant's discriminatory force management plan sufficed to demonstrate that the plaintiffs and putative opt-in plaintiffs were similarly situated). Likewise, in <u>Sperling</u>, the court granted the plaintiffs' motion for

---

[29]   IBM may argue that the Supreme Court's decision in <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338 (2011), counsels against conditionally certifying a class in this case. In <u>Wal-Mart</u>, the Supreme Court reversed the lower court's decision to certify a Rule 23 sex discrimination class action, in which plaintiffs were women who alleged that Wal-Mart discriminated against them and 1.5 million other female employees across the country by denying them equal pay or promotions. <u>Id.</u> At 344. However, this case is distinguishable from <u>Wal-Mart</u>. In <u>Wal-Mart</u>, the plaintiffs did "not allege that Wal-Mart has any express corporate policy against the advancement of women" but instead "that their local managers' discretion over pay and promotions [was] exercised disproportionately in favor of men, leading to an unlawful disparate impact on females." <u>Id.</u> In other words, the <u>Wal-Mart</u> plaintiffs alleged a "lack" of a policy, which led to discrimination. The Plaintiffs in this case, on the other hand, are alleging – and have some evidence of – a concerted company intent to discriminate and methods by which the discrimination was accomplished.  Moreover, at this first stage of the conditional certification process, this motion must be examined under the far more lenient "similarly situated" standard, not the Rule 23 standard under which the Supreme Court decided the <u>Wal-Mart</u> case. See <u>Jackson</u>, 163 F.R.D. at 431.

conditional certification based on evidence similar to that offered in this case. See
Sperling, 118 F.R.D. at 405-07. In Sperling, the plaintiffs were pharmaceutical
employees above the age of forty who were either fired or demoted as the result of the
defendant's reduction in force. Id. at 395-396. The plaintiffs alleged that they and 600
employees had been "involuntarily discharged, laid off, terminated, downgraded, or
demoted from employment" by the defendants because of their age. Id. at 400. In
seeking conditional certification, the plaintiffs relied on "their pleadings and on a number
of affidavits . . . to allege the existence of a discriminatory purpose or impact running
through the [defendant's reduction in force] and uniting all members of their self-defined
class with a common cause of their injuries." Id. at 406. Even where the defendant
submitted affidavits disputing that the proposed opt in plaintiffs were similarly situated,
the Sperling court found that the broad remedial purpose of the ADEA and judicial
economy supported the issuance of notice. Id.

This case is also analogous to Abrams v. General Elec. Co., 1996 WL 663889,
*2 (N.D.N.Y. Nov. 4, 1996), in which the plaintiffs sought conditional certification of a
class of GE employees "who were terminated, laid off, discharged, demoted, or forced
to voluntarily retire from employment . . ." based on a plan that plaintiffs alleged was
designed to impact employees over the age of forty (40). Like in this case, the Abrams
plaintiffs also alleged that GE protected new, young hires, from termination. See id.
Relying on the plaintiffs' allegations, the court found that "these alleged policies are the
identifiable factual nexus which bind the potential class members together as victims of
alleged discrimination" and granted conditional certification. Id.  Moreover, the Plaintiffs'
allegations here that IBM's upper level managers imposed termination quotas is similar

to allegations in Rodolico, where "individual manager shad discretion in deciding whom to retain," but "a few high-level managers were responsible for the ultimate discriminatory plan." 199 F.R.D. at 482-83.  In Rodolico, the plaintiffs obtained conditional certification by alleging and supporting with affidavits a pattern or practice of discriminatory conduct that started with the defendant's top management and "permeated the company." Id. (quoting Hyman, 982 F. Supp. at 5).

In Frank, even at the more rigorous second "decertification" stage, the court found that a class of plaintiffs and opt-in plaintiffs who worked at various newspapers (all owned by the defendant) in various positions and various locales had submitted evidence that they "all work for the same employer, are over 40 years old, and claim to have been the victims of the same campaign of age-motivated harassment," which sufficed to demonstrate that they were similarly situated. As the court explained, "To deny them class treatment would be tantamount to declaring that any employer can escape ADEA class liability so long as it discriminates against a diverse group of aged employees over a wide geographic range in a number of ways, such as termination, salary, promotions, and working conditions. Frank, 1983 WL 643, *2.

Moreover, there are likely thousands of aggrieved employees, as shown by the evidence Plaintiffs here have submitted, as well as the story in ProPublica indicating that as many as 20,000 IBM employees have lost their jobs over the last five years. See Cutting 'Old Heads' at IBM, ProPublica, https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/. It would be far less efficient for them each to pursue their own claim, which would turn against the purpose of the ADEA. See Sperling, 118 F.R.D. at 406. It would also likely be much harder for individuals

proceeding alone to show discrimination, since the focus in an individual case would be on the specific facts related to that individual, which may be difficult to put into perspective, whereas more global evidence (including statistics that Plaintiffs will seek in this case and expect will reveal the full scope of IBM's systematic discrimination), will demonstrate IBM's discriminatory practices in a way that would be difficult for an individual to show. As the court in Frank, 88 F.R.D. at 676, "the experiences of other employees may well be probative of the existence vel non of a discriminatory policy . . . and the notice machinery contemplated by the ADEA, by reaching out to potential plaintiffs, may further the statute's remedial purpose."[30]

Of course, there are differences in the specifics of the stories of each Plaintiff and opt-in regarding the end of their employment at IBM, but these differences are to be expected and should not prevent the issuance of notice in this case.  Obviously their experiences are not identical, but together they paint a plausible pattern that IBM engaged in widespread and systematic age discrimination in choosing workers for layoff and working to replace its older employees over the last several years with younger employees.  It is that type of evidence that has led courts to authorize the issuance of notice in other ADEA collective actions. See, e.g., Rodolico,199 F.R.D. at 482-83; Abrams, 1996 WL 663889, *2; Jackson, 163 F.R.D. at 432; Krueger, 1993 WL 276058, *2  Sperling, 118 F.R.D. at 406. As the court in Sperling explained, "notice to absent

---

[30]     Furthermore, the fact that the Plaintiffs in this case will likely rely on common evidence to prove IBM's discrimination supports conditional certification. See Hyman, 982 F. Supp. at 5. Like in Hyman, "each plaintiff will wish to use evidence that will demonstrate that the bias which led to the alleged discrimination came from top management and permeated the company. Additionally, each plaintiff will want to rely on statistical evidence to show that [defendant] terminated a disproportionate number of employees over the age of 40. Finally, each plaintiff will want to utilize evidence that younger replacements were hired after the termination of those over forty." Id.

class members need not await a conclusive finding of 'similar situations,'" because:

> To impose such a requirement would condemn any large class claim under the ADEA to a chicken-and-egg limbo in which the class could only notify all its members to gather together after it had gathered together all its members," and from which the class could escape only by refusing entry after some unpublicized cutoff date to additional class members who thereafter stumble across the case by themselves. Such a scheme would of course violate the twin policies which [the court] earlier found to support court participation in ADEA-class notice in the first place: broad ADEA remediation and judicial economy. In addition, to allow notice before the "similarly situated" issue is decided would insure that all possible class members who are interested are present, and thereby assure that the full "similarly situated" decision is informed, efficiently reached, and conclusive.

118 F.R.D. at 406. Therefore, at this early stage, the Court should find that Plaintiffs have met their modest burden to demonstrate that they are similarly situated.[31]

### C.    Plaintiffs' Proposed Notice is Appropriate

Plaintiffs ask the Court to issue notice to all individuals who worked for IBM in the United States, who were over forty (40) years of age at the time their employment ended, and whose employment separated (either because of layoff, discharge, or constructive discharge) since July 14, 2017.[32] The early issuance of notice is desirable,

---

[31]    In a similar vein, the court in Heath conditionally certified a nationwide ADEA class of applicants to various positions at Google, despite the fact that the nationwide class could have led to individualized inquiries, because "those arguments go to the merits and are better addressed at the second stage, after discovery has closed." 215 F. Supp. 3d at 853-54.

[32]    As Plaintiffs explained in note 3 supra, Plaintiff Rusis filed his class action EEOC charge on May 10, 2018, meaning that the 300-day rearward opt-in window spans back to July 14, 2017. Hipp, 252 F.3d at 1220-21. Those employees who worked in the few non-deferral state enjoy a 180-day rearward opt-in window spanning to November 11, 2017, but at this stage, the Court should be over-inclusive and send out notice to all IBM employees over the age of forty (40) who have been terminated since July 14, 2017. It will likely be difficult at the outset of this case to determine which employees are subject to the non-deferral state opt-in window, as some individuals may have worked in different locations. After notice has issued and the opt-in period has concluded, the parties will be able to determine which plaintiffs are subject to the 180-day opt-in window.

because it "may enable more efficient resolution of the underlying issues," see Krueger, 1992 WL 276058, *2, and it "plays an important role in facilitating a collective action and furthering the ADEA's remedial purpose. See Jackson, 163 F.R.D. at 431.

Plaintiffs' proposed notice form, attached as Exhibit A, is "timely, accurate and informative." Hoffman-LaRoche, 493 U.S. at 172.  Notice serves the ADEA's "broad' and remedial" purpose, see Jackson, 163 F.R.D. at 431, and the form and content of a §§ 216(b) and 626(b) notice should be aimed at maximizing participation in the case by individuals who may have claims because, otherwise, potentially meritorious claims will diminish or expire. See, e.g., Sperling, 118 F.R.D. at 406 (noting that one important purpose of notice is to "insure that all possible class members who are interested are present"). A proposed Opt-in Form for members of the potential collective action to fill out and return is attached as Exhibit B.

The proposed notice is also appropriate in its scope.  Courts have frequently ordered that notice be issued to classes similar in scope to the proposed class here. See Lusardi v. Xerox Corp., 747 F.2d 174, 175 n.1 (3d Cir. 1984) (dismissing defendant's appeal where the district court had conditionally certified a class of employees who had been terminated or forced to retire "at any unit, division or American subsidiary of Xerox Corporation"); Heath, 215 F. Supp. 3d at 853-55 (authorizing notice to be sent to a nationwide class of potential plaintiffs who applied to work for positions at Google and were not hired); Pines v. State Farm General Ins. Co., 1992 WL 92398, *8-10 (C.D. Cal. 1992) (authorizing notice to nationwide class of individuals who applied to work in the position of trainee agent and were not hired).

IBM should be ordered to produce a list of the potential opt-in plaintiffs' names,

last-known mailing addresses, last-known telephone numbers, email addresses, work locations, dates of employment, and last position held. See Hoffman-LaRoche, 493 U.S. at 170 (holding that district courts have the authority to compel the production of contact information of employees to facilitate notice in collective actions). Courts routinely require defendants to produce this information when granting motions for the issuance of notice. See Schwed, 159 F.R.D. at 375 ("The court has discretion to facilitate notice to potential plaintiffs brought under the ADEA, and to order discovery of names and addresses of the potential class members."); Sperling, 118 F.R.D. at 405 (same).[33]

The Court should also allow Plaintiffs to send notice to class members by email and text, as well as by U.S. Mail. "With regard to the use of email to notify potential plaintiffs of this litigation, 'communication through email is [now] the norm.'" Butler v. DirectSat USA, LLC, 876 F. Supp. 2d 560, 575 (D. Md. 2012) (quoting In re Deloitte & Touche, LLP Overtime Litig., 2012 WL 340114, *2 (S.D.N.Y. Jan. 17, 2012)).[34] The

---

[33]     See also Collado v. J. & G. Transport, Inc., 2014 WL 5390569, at *5 (S.D. Fla. Oct. 23, 2014) ("Defendants shall within fourteen (14) days provide to Plaintiffs each putative class member's name, address, telephone number, fax number, e-mail address, and date of birth."); Sylvester v. Wintrust Financial Corp., 2013 WL 5433593, *6 (N.D. Ill. Sep. 30, 2013) ("the defendants should produce the names, unique employee ID numbers, addresses, and telephone numbers of all potential opt-in class members to plaintiffs' counsel"); Santiago, 2011 WL 3418252, at *5 ("Within twenty days of the date of this Order, Defendants shall provide to Plaintiff's counsel, the names, addresses, dates of employment, and telephone numbers of all [putative opt-in plaintiffs] . . . .").

[34]     See Brashier v. Quincy Prop., LLC, 2018 WL 1934069, at *6–7 (C.D. Ill. Apr. 24, 2018); Owens v. GLH Capital Enter., Inc., 2017 WL 2985600, at *5 (S.D. Ill. July 13, 2017); Landry v. Swire Oilfield Services, L.L.C., 252 F. Supp. 3d 1079, 1129 (D.N.M. 2017) ("The Court finds persuasive the Plaintiffs' argument that communication via email and text message will 'increase the chance of the class members receiving and reading the notice' . . . ."); Ziglar v. Express Messenger Sys. Inc., 2017 WL 6539020, at *7 (D. Ariz. Aug. 31, 2017) (permitting mail, email, and text message notice in FLSA collective action); Vaughn v. Rescue Rangers, LLC, 3:15-cv-0056-JAG, Dkt. 30 (Order), p. 1 (E.D. Va. Jan. 13, 2016) (ordering Defendants to produce contact information, including e-mail addresses, for potential plaintiffs); Gerges v. Enterprise Systems Software, LLC, 3:15-cv-01816-JZ, Dkt. 19, p. 2 (Order approving Stipulation for Conditional Certification) (N.D. Ohio Oct. 27, 2015) (Defendants are to provide spreadsheet

23

Court should also authorize Plaintiff to mail and email a reminder to all individuals who have not yet opted in to this matter within 45 days of the first notice mailing. It is well documented that people often disregard collective action notices. See Andrew C. Brunsden, Hybrid Class Actions, Dual Certification, and Wage Law Enforcement in the Federal Courts, 29 Berkeley J. Emp. & Lab. L. 269, 295 (2008). Courts regularly authorize reminder notices to increase the chance that workers will be informed of their rights. See Walters v. Buffets, Inc., 2016 WL 4203851, *1 (D.S.C. March 1, 2016) (permitting the issuances of reminder notices in a FLSA collective action because the broad remedial purpose of the FLSA weighs in favor of informing "as many plaintiffs as possible of their right to opt into a collective action like the one here."); Jones v. Cretic Energy Services, LLC, 149 F. Supp. 3d 761, 776 (S.D. Tex. Dec. 9, 2015); Sanchez v. Sephora USA, Inc., 2012 WL 2945753, at *6 (N.D. Cal. July 18, 2012) ("[C]ourts have recognized that a second notice or reminder is appropriate in an FLSA action since the individual is not part of the class unless he or she opts-in."). IBM has no reason to oppose a reminder notice other than that it may increase the participation rate, which is not a good reason to oppose this request. Plaintiffs will bear the cost of the mailing and reminder mailing, and it will not change the end of the notice period.

---

with contact information, including e-mails, for potential plaintiffs); Irvine v. Destination Wild Dunes Management, Inc., 132 F. Supp. 3d 707, 711 (D.S.C. 2015) (finding that "the request that notice be distributed via direct mail, email and text messaging appears eminently reasonable"); Bhumithanarn v. 22 Noodle Market Corp., 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015) (" . . . [T]he Court finds that notice via text message is likely to be a viable and efficient means of communicating with many prospective members of this collective action."); Collado, 2014 WL 5390569, *5 (S.D. Fla. Oct. 23, 2014) permitting notice by email); Gonzalez v. TZ Ins. Sols., LLC, 2014 WL 1248154, *6 (M.D. Fla. Mar. 26, 2014) ("The Court determines that it is appropriate to furnish Class Notice via first class mail and via non-TZ Insurance email."); Stuven v. Texas de Brazil (Tampa) Corp., 2013 WL 610651, *6 (M.D. Fla. Feb. 19, 2013) ("The Court is not persuaded that notice by email is too intrusive, and will permit notice to be made in this manner."); Cooper v. E. Coast Assemblers, Inc., 2013 WL 308880, *3 (S.D. Fla. Jan. 25, 2013) (approving notice by email and mail).

Finally, Plaintiffs propose that the individuals who desire to opt in be provided ninety (90) days from the date of mailing to file their consent forms. A 90-day opt-in period will be appropriate to allow sufficient time for the potential opt-in plaintiffs to receive notice and to opt in. The widespread geographical dispersal of class members is an important consideration supporting a substantial opt-in period. This request is consistent with established practice under the ADEA and FLSA.  See, e.g., Hoffman-LaRoche, 493 U.S. at 169; Sweeney v. U.S. Postal Service, 2013 WL 5744490, *16 (E.D.N.Y. Oct. 23, 2013) (noting that the court granted a 90-day opt-in period in an ADEA collective action).[35] Therefore, this Court should allow a 90-day opt-in period.

## IV.      CONCLUSION

Plaintiffs have amply shown that notice is appropriate at this stage of the case, and that they, along with the potential opt-in plaintiffs, should be allowed to pursue their claims on a collective basis. Accordingly, Plaintiffs respectfully request that the Court order, pursuant to 29 U.S.C. §§ 216(b), 626(b), that notice be issued to all individuals who worked for IBM in the United States over forty (40) years of age whose employment with IBM ended (either because of layoff, discharge, or voluntarily – and thus may have been constructively discharged) any time since July 14, 2017.

---

[35]      See Butler, 876 F. Supp. 2d at 575 (stating in the context of a FLSA collective action that "Notice periods may vary, but numerous courts around the country have authorized ninety day opt-in periods for collective actions") (citations omitted); Harris v. Performance Transp., LLC, 2015 WL 1257404, at *6 (M.D. Fla. Mar. 18, 2015) (noting in the context of a FLSA collective action that "courts routinely grant ninety-day opt-in periods."); Alequin v. Darden Restaurants, Inc., 2013 WL 3939373, at *8 (S.D. Fla. July 12, 2013) (stating in the context of a FLSA collective action that "Common practice provides an opt-in period of ninety days from the date of notice.").

Dated: January 17, 2019

Respectfully submitted,

EDVIN RUSIS, HENRY GERRITS, and
PHIL MCGONEGAL, AND DAVID HO ENG on
behalf of themselves and all others similarly
situated,

By their attorneys,


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (NY Bar No. 2971927)
Thomas Fowler,
*pro hac vice* forthcoming
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com, tfowler@llrlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2019, a true and accurate copy of the

foregoing Motion was filed via this Court's CM/ECF system.


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan