# **EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDVIN RUSIS, HENRY GERRITS, PHIL MCGONEGAL, and DAVID HO ENG, individually and on behalf of all other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORP.<br><br>Defendant. | Civil Action No. 1:18-cv-08434 |

### Affidavit of Catherine A. Rodgers

1. I am an adult resident of Jacksonville, Oregon.

2. I worked for IBM from approximately September 1, 1978, to July 17, 2017, when I was terminated.

3. I am currently 64 years old, and at the time I was terminated, I was 62 years old.

4. At the time I was terminated, I held the position of IBM Vice President in the Global Engagement Office. I was IBM's Senior State Executive for the state of Nevada.

5. I believe that I was terminated as the result of having raised my concerns to my manager, Steve Welsh, as well as IBM HR director Meriam Lummis, that IBM was engaging in systematic age discrimination by utilizing several methods to eliminate thousands of its employees who were over the age of forty (40).

6. Over the two years prior to my termination, IBM implemented layoffs that it referred to as Resource Actions. Because I was Vice President in the Global Engagement Office and Senior State Executive for Nevada, I had access to the list of individuals who had been laid off in my group. All individuals who were laid off were over the age of fifty (50), and the younger workers were not affected by the layoffs. I also asked HR and IBM's governmental relations team for a list of all employees who had been laid off in Nevada so that I would have an idea of the lay-off landscape, but my request was denied.

7. As part of the Resource Action process, HR would send me a percentage of employees that my group would have to lay off, the first-line managers would select which individuals would be laid off in order to satisfy the percentage, and then those choices would be reviewed by HR and upper management.

8. My group had one of the highest percentages of older workers in the whole company.  Between two Resource Actions that occurred in my group, 60% of my group was laid off. Having spoken with peer managers from other groups with younger populations, I am aware that the percentage of employees from my group who were laid off was vastly higher than the percentage of employees who were laid off from younger groups. I was very surprised that such a high percentage of my group was laid off, because my group was running under budget and was exceeding its performance targets.

9. In April 2017, two employees within my department, who were both older than fifty (50) and had been included in a Resource Action, filed to request financial assistance from the United States Department of Labor under the Trade

Assistance Act. As a result, the Department of Labor sent me a form to fill out that asked me to state all of the employees within my group who had been laid off in the last three years and what their ages were. I listed all of the employees in my group who had been laid off, all of whom were over the age of fifty (50). I reviewed this form with IBM HR, and I was directed to delete all but one name before I submitted the form to the Department of Labor.

9. IBM's upper management encouraged us to inform the employees who were being laid off that they should use IBM's internal hiring platform to apply for other jobs within the company, but at the same time, IBM implemented barriers to those employees actually being hired for openings. For example, if a manager wanted to hire someone who had been laid off, there was a multi-layer approval process.  (This multi-layer approval process would not apply if a manager wanted to hire someone who had applied from outside IBM.)  Even as Vice President, I could not make such a hire without approval by the Global Resource Board and IBM's upper management. Those individuals who were being laid off were informed of their pending lay-off ninety (90) days prior to the date that the lay-off was effective. After the lay-off was effective, they could no longer be considered for hire through IBM's normal internal process. It was virtually impossible to obtain hiring approval for a laid-off employee within that ninety-day window. Ultimately, I ended up telling people who were laid off from my team who came to me for advice on further employment that they would be better off seeking jobs elsewhere, because IBM's internal hiring process disfavored those who were on a Resource Action list.

10. In 2016, IBM implemented a second method of reducing the number of its older employees. Despite IBM's decade-long emphasis on the effectiveness of remote work, IBM began to require many of its older employees to cease working remotely and begin reporting to an IBM office, even when the office they had to report to was relatively far from where they lived, and the nature of their work did not require their presence in the office.

11. Additionally, IBM designated "hub" locations across the country in cities such as Raleigh, North Carolina, and Austin, Texas, and began flagging older employees for mandatory relocation to those hub offices, often asking the older workers to move across the country. The employees who were selected for relocation were given the option of either relocating or transitioning to retirement. I am not aware of a single employee within my group who actually agreed to relocate.

12. It appeared to me that IBM did not actually expect those employees to agree to relocate. Even in the rare occurrence when an employee agreed to relocate, IBM took further steps to force them out of the company. For example, I was aware of one employee who was relocated to the Southberry, Connecticut, hub, agreed to relocate there, and then IBM changed her assignment to Raleigh, North Carolina, at which point that employee decided to transition to retirement instead. There were also two employees, one in my group and one Nevada-based employee, who had cancer and were selected to relocate to Raleigh, North Carolina. These relocation assignments did not make sense to me, because it would have required the employees to move away from their doctors, and their accounts were not located in the East Coast region.

4

13. With respect to the relocation process, HR director Meriam Lummis would send me a list via email of the employees in my group who had been flagged to be relocated. Then, there would be a nationwide conference call with all managers who oversaw employees who had been selected for relocation, HR director Meriam Lummis, and other individuals from HR, during which HR would train the managers on how to inform the employees that they had been selected for relocation. During these calls, several managers, including myself, raised the point that it was not realistic to expect that these employees would actually relocate across the country. During one call, I said that I did not think a single member of my team would actually agree to relocate. The only response HR gave to these comments was that the employees still had the option to transition to retirement.

14. Even though I was a Vice President and Senior State Executive for Nevada, IBM refused to provide me a list of which, if any, employees who had been flagged for relocation actually agreed to relocate.

15. The positions of those employees who had been let go (if they were not outsourced to India or Costa Rica) were usually filled by younger employees.

16. I raised my concerns that IBM was engaging in unlawful age discrimination to several managers and HR over a several year period. As I persisted in raising this issue, my treatment by IBM began to deteriorate.

17. Despite the fact that I had excellent performance evaluations for the previous ten years, and neither my performance nor productivity declined, my manager stopped representing to upper management that I was one of the best performing

employees. Indeed, in 2014 (after I began raising my concerns about age discrimination), my manager Pat Kerin gave me my first negative performance evaluation of my career, even though I had exceeded my targets. At the same time, I started being asked to pick up more and more work without a promotion or increase in pay. In the 2017 performance review cycle, I was given a mediocre performance review even though my business results far exceeded mutually agreed-to business objectives. My manager, Steve Welsh, indicated that my rating was directed from the top down by Richard Patterson, the general manager of Global Technology Services. Mr. Welsh told me that Mr. Patterson had not even looked at my business results when he directed the mediocre evaluation.

18. IBM also placed an onerous restriction on my travel, requiring that any travel be approved by IBM's upper management. This was quite onerous, because a large part of my job was traveling (often internationally) for speaking engagements. My peers did not have this requirement put in place.

19. Additionally, I was subjected to two audits of my work by IBM (one in 2014 and one in 2016) for reasons that I did not understand. During both of those audits, I raised my belief that I was being retaliated against for having raised my concerns over IBM's discrimination. The auditors told me not to pursue this argument any further.

20. I was ultimately terminated on July 17, 2017, supposedly for the results of the second audit. I am of the belief that this reason was pretextual and that I was actually terminated in retaliation for raising my concerns over IBM's

discrimination. My manager, Steve Welsh, initially wanted to document my separation as a voluntary resignation, but because I was actually terminated, I told him that it had to be recorded as an involuntary termination. I filed a charge with the Nevada Equal Rights Commission on July 25, 2017, and with the EEOC on December 20, 2017. The charge remains pending before the EEOC.

21. Based on my conversations with other current and former IBM employees, I expect that there are many employees over the age of forty (40) who have lost or will shortly lose their jobs at IBM, who would be interested in joining the case if notified of their right to do so.

Signed under the pains and penalties of perjury on __01/17/19__.

*Cathy A Rodgers*
_____
Catherine A. Rodgers