UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDVIN RUSIS, HENRY GERRITS, PHIL MCGONEGAL, and DAVID HO ENG, individually and on behalf of all other similarly situated individuals,<br><br>    Plaintiffs,<br>  v.<br><br>INTERNATIONAL BUSINESS MACHINES CORP.<br><br>    Defendant. | **1:18-cv-08434 (DAB)** |

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR ISSUANCE OF NOTICE

# TABLE OF CONTENTS

Page

I.   FACTS .................................................................................................................. 2

A.   IBM's Varying Businesses ........................................................................ 2

B.   Employees Separate From IBM in a Wide Variety of Circumstances ................. 3

C.   Named Plaintiffs ....................................................................................... 5

D.   The Opt-Ins ............................................................................................... 6

II.  PROCEDURAL HISTORY ................................................................................. 7

A.   Plaintiffs' Administrative Charges, Lawsuit, and Motion ..................... 7

B.   Arbitration Agreements and Proceedings .............................................. 8

III. LEGAL STANDARD .......................................................................................... 9

IV.  THE COURT SHOULD DENY PLAINTIFFS' MOTION ........................... 10

A.   Claims of Putative Collective Cannot Be Adjudicated on Common Proof ........ 10

     1.   Plaintiffs' Claims Require Individual Determinations ........................... 10

          (a)   Individual Determinations Related To Voluntary
                Separations ..................................................................... 11

          (b)   Individual Determinations Related to Persons Asked to
                Relocate ......................................................................... 12

          (c)   Individual Determinations Related to For-Cause
                Terminations ................................................................. 13

          (d)   Individual Determinations Related to Resource Actions ............ 14

     2.   Plaintiffs Have Not Met Their Burden ..................................... 15

B.   Notice Should Not Issue to Individuals Who Signed Arbitration
     Agreements ............................................................................................. 19

C.   Plaintiffs' Charges Do Not Encompass the Collective They Seek to Certify ...... 23

V.   PLAINTIFFS' PROPOSED NOTICE .............................................................. 25

VI.  CONCLUSION ................................................................................................... 25

In this case, four named Plaintiffs assert unrelated Age Discrimination in Employment Act ("ADEA") claims against IBM.  Edvin Rusis and Henry Gerrits worked in different businesses and were terminated in different resource actions, IBM's term for a reduction-in-force.  Philip McGonegal was not terminated.  He retired rather than relocate, but now claims that IBM constructively discharged him.  David Eng was terminated for poor performance.  A joint trial of Plaintiffs' claims would be inefficient.  It would require the jury to attempt to compartmentalize evidence and render verdicts for each Plaintiff based only on the evidence applicable to him, leading to confusion and unfair results.  These challenges to efficiency and fairness are all the more acute in view of the claims of the 68 additional individuals for whom Plaintiffs have already filed consent forms to participate in this case (the "Opt-Ins").  Among this group of disparate claimants are an individual who retired even though his boss pleaded with him not to, one who was fired for charging personal expenses to her company credit card, and another who accepted a new job to avoid having to commute to an IBM office.

Plaintiffs now seek relief that would compound these problems thousands of times over. They ask permission to invite into this case *every* former IBM employee, over the age of 40, who left the Company for *any* reason since July 2017.  This group, totaling 12,855 people, would include those who voluntarily left for other jobs, retired, were fired for gross misconduct, and were separated in diverse resource actions involving varying decision-makers and business units.

Court-facilitated notice, however, is permitted only if it would foster the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  The omnibus proceeding Plaintiffs request would not do so.  Instead, their proposal would require intensive examination of the facts and circumstances of each individual's departure from IBM.

1

Nor can Plaintiffs meet their burden of demonstrating that those whom they wish to invite were "victims of a common policy or plan that violated the law," *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010), such that their claims may be adjudicated on "common proof," *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016).  The purported backbone of Plaintiffs' motion is not evidence, but an internet article.  The Court should reject any attempt to justify notice to several thousand putative plaintiffs based on a journalist's partial depiction of IBM.  Beyond the article, Plaintiffs cite two IBM documents that do not even address workforce policies or issues, and fifteen declarations from Plaintiffs and Opt-Ins that only demonstrate the disparity among their claims and their wholesale lack of common proof.  For these reasons, and others developed below, the Court should deny Plaintiffs' Motion.

## I.   FACTS

### A.   IBM's Varying Businesses

IBM is a technology and innovation company that, in recent years, has transformed from a provider of hardware, software, and services into a leader in cloud, cognitive, and digital reinvention.  (Daly Dec. ¶¶ 4-7.)[1]  The Company's businesses offer products in emerging areas such as cloud, artificial intelligence, blockchain and cybersecurity.  (*Id.*)

IBM is divided into distinct umbrella groups – each consisting of multiple subunits and thousands of teams – that have evolved over time.  (Daly Dec. ¶¶ 5-7.)  In the past, IBM had a Software Group that typically delivered on premises products via licensing agreements.  (*Id.* at ¶ 7.)  Today, IBM has a Cloud and Cognitive Software group whose products are consumed in a completely different model – "as a service" – using new technologies that were not pervasive even five years ago.  (*Id.*)  Global Business Services ("GBS") is IBM's consulting business with

---

[1] References to "[Name] Dec. ¶" are to the declarations IBM files together with this brief and the declarations Plaintiffs submitted together with their motion.

three primary areas:  Cloud Application Innovation, Cognitive Process Transformation, and Digital Strategy.  (*Id.* at ¶ 8)  Global Technology Services ("GTS") provides IT infrastructure and platform services.  (*Id.* at ¶ 9.)  GTS has several subunits including Infrastructure Services and Technical Support Services.  (*Id.*)  Systems is IBM's hardware business, with Servers and Storage Systems as its primary subunits.  (*Id.* at ¶ 10.)  Global Markets grew out of IBM's Sales & Distribution group, and is divided along geographic, industry, and brand lines.  (*Id.* at ¶ 11.)

Each group is managed separately with its own business model, competitive pressures, markets, and industry environments.  (Daly Dec. ¶ 12.)  Each operates autonomously, under a separate Senior Vice President, managing its own budget.  (*Id.* at ¶¶ 13-14.)  The subunits also have separate General Managers and budgets.  (*Id.*)  Hiring and termination decisions are made within the subunits, typically by managers below the subunits' General Managers.  (*Id.*)

As technology and markets have changed, and IBM's businesses have evolved to keep up, the skills that each subunit needs from its employees have also changed dramatically.  (Daly Dec. ¶ 18.)  Each group and subunit is responsible for anticipating where the respective business markets are headed and for aligning employee skills to achieve future objectives and to remain competitive in their respective markets.  (*Id.* at ¶ 20.)

**B.     Employees Separate From IBM in a Wide Variety of Circumstances**

Since July 14, 2017, approximately 12,855 employees age 40 or over have separated from IBM.  (Harbol Dec. ¶ 4.)  They reported to 6,337 different managers in 6,269 departments, within 120 different business units in 14 umbrella groups.  (*Id.* at ¶¶ 10-12.)  Over 7,000 left voluntarily (*id.* at ¶¶ 28-29), for reasons unique to each person.  Of these, approximately 2,349 retired.  (*Id.* at ¶ 29.)  Opt-In Ronald Ragsdale told his manager that after 40 years it was "about time" to retire, thanking the manager for "helping with [his] retirement."  (Bruemmer Dec. ¶ 13, Ex. A.)  Still others left to accept positions at other companies.  (Harbol Dec. ¶ 28.)

3

Some were terminated for cause.  (Harbol Dec. at ¶¶ 30-33.)  Approximately 179 were terminated due to violation of IBM policies or gross misconduct.  (*Id.* at ¶¶ 30, 32.)  844 others were terminated for poor job performance, such as failing to meet sales objectives or failing to develop necessary job skills.  (*Id.* at ¶ 31.)  Others abandoned their jobs.  (*Id.* at ¶ 33.)

Still other employees separated in one of over 65 different resource actions.  (Harbol Dec. ¶ 27; Kennedy Dec. ¶ 11.)  Whether to engage in a resource action was a decision that groups and subunits made independently, based on their particular operating and financial needs and challenges.  (Daly Dec. ¶ 17 (reasons may include exiting a line of business, meeting financial objectives, or addressing workforce imbalances).)  For example, GTS has faced a market shift as customers increasingly prefer automated services, and the group's costs have risen as it works to transform its business model.  (Marx Dec. ¶¶ 10-13.)  In late 2017, GTS anticipated difficulty meeting 2018 financial targets, and its Vice President for Finance consulted with managers of GTS business units and geographies to determine whether a resource action would help teams meet the group's challenges.  (*Id.* at ¶¶ 13-18.)  Those managers decided whether to participate and the number of employees who would be selected from their respective areas.  (*Id.*)

If a group or subunit decided to engage in a resource action, local first- and second-line managers decided which employees would separate.  (Daly Dec. ¶ 17.)  A manager might select employees based on a determination that certain work could be eliminated or performed elsewhere at the Company.  (Kennedy Dec. at ¶¶ 8-9.)  On the other hand, a manager might determine that work would continue, but be spread out among the remaining employees in her area.  (*Id.* at ¶ 7.)  In those instances, the manager would decide the group(s) of employees from which selections would be made and then perform a comparative assessment among those employees of their skills and performance, applying criteria that she identified and selected in light of the department's needs and objectives.  (*Id.* at ¶¶ 5, 7; *see, e.g.,* Burdge Dec. ¶ 11.)

4

### C.   Named Plaintiffs

It is impossible to view Plaintiffs as appropriate representatives of the class to which they are seeking to provide notice.  They worked in different parts of IBM and separated under very different circumstances.  Rusis was among the lower-banded[2] IT Management Consultants on his team in the Cloud group.  (Eger Dec. ¶ 20.)  His manager concluded that lower-band employees would be subject to a resource action, but higher-band employees would not because the team could not function without them.  (*Id.*)  The manager selected Rusis because he did not have the breadth or depth of skills as other employees at his band level.  (*Id.* at ¶¶ 21-22.)

Unlike Rusis, Gerrits was one of the highest-banded Global Commodity Managers on his team in the Finance & Operations group.  (Neumar Dec. ¶ 7.)  His manager concluded that his higher-banded employees would be subject to a resource action because they were underperforming in leadership and transformative roles, such as proposing strategies for reducing costs and influencing decisions by executives at IBM and suppliers.  (*Id.* at ¶¶ 8, 14.)  The manager selected Gerrits based on a review of his performance in these areas.  (*Id.* at ¶¶ 15-17.)

Eng was not subject to a resource action.  His first-line manager informed him that his performance was unsatisfactory because he was not proficient with a proprietary IBM technology necessary for his IT Specialist position.  (Dkt. 47-7 (Eng Dec.) ¶ 5.)  When Eng's performance did not improve, the Company terminated his employment. (*Id.* at ¶ 5.)

McGonegal left IBM by choice after IBM relocated his first-line manager position from Atlanta to Raleigh.  (Dkt. 47-6 (McGonegal Dec.) ¶ 3.)  While McGonegal had accepted a relocation to Malaysia in the past, this time he elected to retire rather than accept a substantially closer move.  (*Id*. ¶¶ 2-4.)

---

[2] IBM classifies its positions into bands.  Non-executive bands range from 1 to 10, with 10 being the highest level.  (Daly Dec. ¶ 24.)

5

### D.    The Opt-Ins

There are also substantial differences among the 68 Opt-Ins.  They worked for different

managers, within different business units in different groups.  (*Compare* Bruemmer Dec. *with*

Burdge Dec.)  They held vastly different roles, ranging from front-line salesperson (Dkt. 47-13

(Lundy Dec.) ¶¶ 1, 3) and hardware technician (Bruemmer Dec. ¶¶ 7, 10) to high-level executive

(Dkt. 47-3 (Rodgers Dec.) ¶ 4).  Their ages vary.  Plaintiffs' declarants, for example, range from

42 years old to 66.  (Dkt. 47-9 (Miller Dec) ¶ 2; Lundy Dec. ¶ 4.)  Likewise, their managers'

ages vary.  (Cohen Dec. ¶ 3 (73 years old); Joyner Dec. ¶ 3 (42 years old).)

Critically, the Opt-Ins left the company for a wide range of reasons.  For example, IBM

fired Arlene Franceschi and James Rash for misconduct.  Franceschi used her corporate credit

card for personal travel while on leave.  (Wood Dec. ¶¶ 8-18.)  Rash submitted nearly $30,000 in

improper reimbursement requests.  (Taylor Dec. ¶¶ 10-14.)  On the other hand, David Reid

simply retired, even after his 73-year-old manager pleaded with him to stay because he needed

Reid's skills.  (Cohen Dec. ¶ 7.)

Meanwhile, Yong Han left when IBM discontinued technology that he supported.

(Lipner Dec. ¶¶ 10-15.)  But when there was a surplus of System Service Representatives in

Ronald Ragsdale's business unit, IBM attempted to transfer him to another unit, offering training

so that he could assume work that contractors previously performed.  (Bruemmer Dec. ¶¶ 7-11.)

Ragsdale opted to retire rather than complete the training.  (*Id.* at ¶¶ 12-13.)  And Gabriele

Avzardel happily enrolled in an early retirement program, even hand-picking his 55-year-old

successor, but later became disgruntled when he learned that his service with an international

affiliate did not count towards retirement benefits.  (Heneghan Dec. ¶¶ 10-13.)

Brian Miller quit because he was unwilling to relocate from California to Illinois.  (Miller

Dec. ¶¶ 2-3.)  But Amanda Travis quit because she was unwilling to report to an IBM office in

greater Austin, where she already lived.  (T. Cook Dec. ¶¶ 7-9.)  Sonali Bailey agreed to relocate but changed her mind when she secured a position with a competitor.  (Joyner Dec. ¶¶ 8-12.)

Jim Lundy was separated because he did not meet sales quotas after his accounts were restructured, a change he described as unwelcome.  (Lundy Dec. ¶¶ 4-5; Jannetta ¶¶ 7-10.) Jennifer Holloway was also separated because she could did not meet her quotas, but she had informed her manager that she was excited to be reassigned to larger accounts.  (Kropf Dec. ¶¶ 10-13.)  Yet other Opt-Ins left the company in separate resource actions, each grounded in the needs of their particular organizations and based upon unique selection criteria.  (Spector Dec. ¶¶ 12-13 (Cheryl Hart selected because her performance was weaker than her peers'); Burdge Dec. ¶¶ 11-13 (John Silling selected because of low client demand); Clevenger Dec. ¶¶ 13-14 (Ryan Mount selected because he was on temporary rotational assignment and his permanent organization had been reorganized); Dkt. 47-10 (Johnson Dec.) ¶ 8 (low volume of work); Dkt. 47-8 (Haupt Dec.) ¶ 8 (did not know particular coding language).)

## II.   PROCEDURAL HISTORY

### A.   Plaintiffs' Administrative Charges, Lawsuit, and Motion

Between May and July 2018, Plaintiffs Rusis and Gerrits filed separate charges of age discrimination with the EEOC.  (Marshall Dec. ¶¶ 3-4, Ex. A-B.)  They claimed that the Company was "laying off" older workers disproportionately to younger workers, without hiring the older workers into open positions.  (*Id.*)[3]  Plaintiff Eng also filed a charge, but he alleged race and national origin, *not* age, discrimination.  (*Id.* at ¶ 5, Ex. C.)

---

[3] Plaintiffs' counsel assert that Plaintiff McGonegal also submitted a charge to the EEOC.  However, what they claim is McGonegal's charge has no charge number and IBM has no record of receiving it.  In any event, it is materially identical to Rusis's and Gerrits's charges. (Marshall Dec. at ¶ 6, Ex. D.)

Plaintiffs filed a complaint on September 17, 2018, and an amended complaint on
December 11, 2018.  (Dkt. 1; Dkt. 11.)  They filed their initial Motion for Issuance of Notice on
January 17, 2019, but the Court denied it without prejudice pending mandatory mediation.  (Dkt.
27.)  The mediation was unsuccessful, and on May 6, 2019, Plaintiffs filed the instant motion.  It
requests permission to distribute notice to a collective of "all IBM employees over forty (40)
years of age whose employment separated (either because of layoff, discharge, or potential
constructive discharge (i.e. resignation)) since July 14, 2017."  (Dkt. 47 ("Mot.") 2.)

**B.      Arbitration Agreements and Proceedings**

Plaintiffs' proposed notice group includes at least 3,500 individuals who signed
agreements to arbitrate ADEA claims.  (Kennedy Dec. ¶¶ 13-14; Harbol Dec. ¶¶ 36-37.)  Each
acknowledged that their agreement was in exchange for "good and valuable consideration," that
they were signing "voluntarily" and "without any threats, coercion or duress," and they received
"adequate time to consult with a lawyer or other advisor of [his or her] own choosing."
(Kennedy Dec. ¶ 14, Ex. A at 24, Ex. B at 23, Ex. C at 25, Ex. D at 25.)

In their Complaints and original motion, Plaintiffs did not challenge enforceability of the
arbitration agreements.  To the contrary, Plaintiffs' counsel invoked arbitration rights on behalf
of 64 individuals within the scope of the proposed collective by filing demands under their
agreements.  (Mot. 14.)  Plaintiffs now assert, however, that they will challenge the agreements,
borrowing heavily from the position advanced by separate plaintiffs in *Estle et al v. IBM Corp.*,
1:19-cv-02729-PGG (S.D.N.Y. Mar 27, 2019).[4]

---

[4] The *Estle* case was initially filed as a "related case", but this Court declined the case as not related.  IBM
has requested permission from the *Estle* court to move to dismiss the case in its entirety.  (Marshall Dec. ¶ 8, Ex. F.)

## III.   LEGAL STANDARD

The ADEA prohibits age discrimination.  *See* 29 U.S.C. § 623(a)(1).  It incorporates Fair

Labor Standards Act enforcement provisions, which allow plaintiffs to bring claims on behalf of

themselves and similarly situated employees.  *See* 29 U.S.C. §§ 216(b) & 626(b).  Under these

provisions, "courts have discretion, in appropriate cases, to . . . facilitat[e] notice to potential

plaintiffs." *Hoffmann-La Roche*, 493 U.S. at 169.  Notice may be appropriate where the judicial

system would "benefit[] by efficient resolution in one proceeding of common issues of law and

fact arising from the same alleged discriminatory activity." *Id.* at 170.  To justify notice,

plaintiffs must show that they and potential opt-ins "were victims of a common policy or plan

that violated the law," *Myers*, 624 F.3d at 554 (citation omitted), such that their claims may be

adjudicated on "common proof." *Glatt*, 811 F.3d at 540; *cf. Abdu-Brisson v. Delta Air Lines,

Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (noting that age discrimination cases are "fact-intensive,"

and the pretext question in particular demands "a case-by-case approach") (citation omitted).[5]

The plaintiff's burden on a motion for notice cannot be satisfied by "unsupported

assertions." *Myers*, 624 F.3d at 555.  A plaintiff must provide "actual evidence." *Prizmic v.

Armour, Inc.*, 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006); *see also D'Anna v. M/A-

COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995) ("[b]road and vague" allegations of class-wide

discrimination are insufficient); *Roberts v. Target Corp.*, 2013 WL 5256867, at *3 (W.D. Okla.

Sept. 17, 2013) ("amorphous allegations" of "plan to purge the [d]efendant's older employees"

---

[5] To succeed on a substantive ADEA claim, a plaintiff "must prove that age was the 'but-for' cause" of an adverse employment action.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  Initially, to establish a *prima facie* case, the plaintiff must show that she:  (1) is in the protected age group, (2) is qualified for the position, and (3) experienced an adverse employment action (4) under circumstances giving rise to an inference of discrimination.  *See Graves v. Deutsche Bank Sec., Inc.*, 548 F. App'x 654, 655-56 (2d Cir. 2013).  If the plaintiff makes a prima facie case, and the employer articulates a legitimate, nondiscriminatory reason for its actions, the plaintiff must then prove that the "proffered reason was a pretext for discrimination." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (citation omitted).  The "plaintiff at all times bears the ultimate burden of proof." *Allen v. A.R.E.B.A. Casriel, Inc.*, 2017 WL 4046127, at *12 (S.D.N.Y. Sept. 12, 2017) (citation omitted).

not enough).  Issuing notice in the absence of the required showing risks "unduly burden[ing]" the employer with "a frivolous fishing expedition conducted by plaintiff at the employer's expense." *Prizmic*, 2006 WL 1662614, at *2 (quoting *D'Anna*, 903 F.Supp. at 893-94).[6]

Cases involving "very fact-specific inquiries . . . are not susceptible to a similarly-situated person analysis." *Cowell v. Utopia Home Care, Inc.*, 2016 WL 4186976, at *6 (E.D.N.Y. Aug. 8, 2016) (citation omitted).  Notice is inappropriate if the substance of the plaintiffs' discrimination claims is "different from the claims of other potential plaintiffs." *Perrin v. Greece Cent. Sch. Dist.*, 2005 WL 2293590, at *2 (W.D.N.Y. Sept. 20, 2005).  Likewise, potential plaintiffs are not similarly situated if there are material differences in their employment circumstances, such as the reasons for termination or decision-makers involved.  *See Roberts*, 2013 WL 5256867, at *4 (no "common denominator" between employees who worked at "different [locations] in different states, had different supervisors, . . . were at different levels" and were separated for different reasons); *Duffy v. Sodexho, Inc.*, 2006 WL 3025958, at *3 (E.D. Pa. Oct. 20, 2006) (no "identifiable factual nexus" where "selection decisions [were] made by a local hiring manager") (citation omitted).

## IV.    THE COURT SHOULD DENY PLAINTIFFS' MOTION

### A.    Claims of Putative Collective Cannot Be Adjudicated on Common Proof

#### 1.    Plaintiffs' Claims Require Individual Determinations

Fundamentally, the Court should deny Plaintiffs' request that it authorize notice because they have presented no evidence that they and potential opt-ins "were victims of a common policy . . . that violated the law," *Myers*, 624 F.3d at 555, or that their claims could be adjudicated by "common proof," *Glatt*, 811 F.3d at 540.  To the contrary, Plaintiffs rely on

---

[6] *See also Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941,945 (W.D. Ark. 2003) ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.").

disparate legal theories, everything from constructive discharge and pretextual terminations, to discriminatory layoffs and retaliation. *See*, *e.g.*, *Camp v. Lockheed Martin Corp.*, 1998 WL 906915, at *2-3 (S.D. Tex. Apr. 23, 1998) (plaintiff who claimed he was forced to retire was not similarly situated to employees who "chose to retire" or "resigned to accept other employment"). Even within those varying theories, collective adjudication would be impossible because putative class members worked across IBM for different decision-makers, and, critically, left IBM for individualized reasons and in individualized circumstances. *See Roberts*, 2013 WL 5256867, at *4 (notice requires "the facts and the circumstances of the case illustrate that . . . the judicial system would benefit by resolution of the common issues in one lawsuit.") (quoting *Hoffmann-La Roche*, 493 U.S. at 170).

### (a)       Individual Determinations Related To Voluntary Separations

For example, Plaintiffs' notice group would include anyone over 40 who *voluntarily* left the Company – anyone who retired or left to pursue other jobs or interests, or exited for any other personal reason. (Mot. 22.)  Plaintiffs apparently intend to argue that IBM constructively discharged all of them.  But this sort of claim requires a plaintiff to demonstrate that "her employer deliberately sought to make her working conditions so intolerable that she had no choice but to resign." *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010).  That is an inherently fact-intensive and individualized inquiry, not suitable for collective treatment. *See*, *e.g.*, *Walker v. Mountain States Tel. & Tel. Co.*, 1988 WL 1000060, at *2 (D. Colo. Sept. 26, 1988) (denying conditional certification).

To illustrate, Reid's, Ragsdale's, and Avzardel's respective managers believed that they happily retired after a career with IBM. *See* pp. 3, 6 *supra*.  Litigation of their respective claims would center on whether each belief was true.  Indeed, Reid's manager actively attempted to convince him *not* to retire. *See* p. 6 *supra*; *Miller*, 408 F. App'x at 410 (no constructive

discharge where employer tried to convince plaintiff to stay).  Whether any of these individuals –
or any other claiming constructive discharge – secretly toiled under "intolerable" conditions is
something that cannot be determined by common proof.  *See Walker*, 1988 WL 1000060, at *2.

**(b)      Individual Determinations Related to Persons Asked to Relocate**

Plaintiffs' notice group would also include all individuals who left IBM when asked to
relocate.  It is unclear whether Plaintiffs contend that these individuals were constructively
discharged or that relocation is an adverse employment action in and of itself.  *See Fahrenkrug v.
Verizon Servs. Corp.*, 2015 WL 13021890, at *13 (N.D.N.Y. May 14, 2015) (describing the fact-
specific inquiry as to whether relocation is an adverse action), *aff'd*, 652 F. App'x 54 (2d Cir.
2016).  Either way, there are material differences among these departures, and the Court's
conclusions as to any one individual would have no bearing on anyone else.

For instance, Plaintiff McGonegal previously accepted an assignment in Malaysia, but
now claims that a relocation from Georgia to North Carolina was intolerable.  *See* p. 5 *supra*; *see
also Cherchi v. Mobil Oil Corp.*, 693 F. Supp. 156, 163 (D.N.J.) (employee who previously
accepted relocation could not show that relocation was constructive discharge), *aff'd*, 865 F.2d
249 (3d Cir. 1988).  Travis quit when IBM asked her to report to an office in her own town.  *See*
pp. 6-7 *supra*; *see also Singer v. Denver Sch. Dist. No. 1*, 959 F. Supp. 1325, 1334 (D. Colo.
1997) (transfer that would add time to commute not constructive discharge).  And other
individuals initially *agreed* to relocate, only to change their minds for different stated reasons.
*See* p. 7 *supra*; *see also Moore v. West*, 2002 WL 449794, at *5 (S.D. Ind. Jan. 25, 2002) (no
adverse action where plaintiff agreed to relocate).  Gates accepted an offer *expressly conditioned*
on relocation, and then blamed his spouse when later refusing to relocate.  *See* C. Cook Dec. ¶¶
6-13; *see also Moulton v. Gates*, 292 F. App'x 829, 831 (11th Cir. 2008) (no adverse action
where plaintiff "applied for and was accepted" to position but did not report).

12

Further, the individuals asked to relocate worked in different groups under different managers, and whether any could raise a credible inference of discrimination would turn on different facts.  McGonegal and Miller each assert that younger employees on their teams were not required to relocate.  (McGonegal Dec. ¶ 7; Miller Dec. ¶ 6.)  Whether those individuals are true comparators could not be answered with common proof, nor could whether IBM had legitimate reasons for treating the alleged comparators differently.  *See Fahrenkrug*, 2015 WL 13021890, at \*18 (no discrimination where individuals not asked to relocate were not appropriate comparators); *Royster v. Laurel Highlands Sch. Dist.*, 994 F. Supp. 2d 701, 710 (W.D. Pa.) ("Determining whether [a supposed comparator] is 'similarly situated' to another individual is a case-by-case, fact-intensive inquiry.") (citation omitted), aff'd, 595 F. App'x 105 (3d Cir. 2014); *see also Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 376 (D.N.J. 1987) (collective treatment inappropriate where "pretext will turn on the circumstances of the individual class members").

### (c)   Individual Determinations Related to For-Cause Terminations

Plaintiffs' notice group also includes individuals terminated for cause.  Whether any such termination was a pretext for discrimination would also turn on individual inquiries.  *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) ("pretext inquiry . . . normally focuses upon factual questions such as whether the asserted reason . . . comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination").  Opt-Ins terminated for misconduct are illustrative.  Rash's claim that his termination (by one set of decisionmakers) for submitting improper reimbursements was pretext would involve facts unique to him.  Franceschi's claim that her termination (by a different set of decisionmakers) was not really grounded in her unauthorized use of a company credit card would involve a separate set of facts.  *See* p. 6 *supra*; *see also Lusardi*, 118 F.R.D. at

13

376.  And Rodgers' claim that her termination from an executive position was actually *retaliation* for her complaints (Rodgers Dec. ¶ 20), as opposed to her misrepresentations to an internal auditor (Welsh Dec. ¶ 14), would involve yet another set of facts.

The same holds for those terminated for poor performance.  Eng's managers terminated him from his IT Specialist position when he failed to demonstrate proficiency on a technology platform.  *See* p. 5 *supra*.  But Lundy and Holloway were salespeople in Global Markets – each reporting to different managers – who were separated after failing to meet sales quotas.  *See* p. 7 *supra*.  And even among the two of them, the Court would need to make separate assessments of (among other things) their respective managers' assignments of accounts and quotas, their particular performances against quotas, and the relative treatment of similarly situated, younger employees.  *See Duffy*, 2006 WL 3025958, at *3 (no "identifiable factual nexus" to bind claims premised on decisions of different managers).

### (d)  Individual Determinations Related to Resource Actions

Finally, Plaintiffs' notice group would include persons separated in over 65 different resource actions.  *See* p. 4 *supra*.  Each action was distinct, with a decentralized selection process and individuals chosen for reasons specific to their line managers' respective assessments of their particular business' needs and self-determined factors.  *See id*.  Whether these distinct decisions were discriminatory cannot be determined on common proof.  *See Duffy*, 2006 WL 3025958, at *3 (finding no "identifiable factual nexus" where selection decisions were "made by a local hiring manager"); *Lusardi*, 118 F.R.D. at 356 (decertifying where 65 reductions were "implemented and managed at the local level [and] differed not only from organization to organization but also from manager to manager, as well as from RIF to RIF").[7]

---

[7] The court in *E.E.O.C. v. MCI Int'l, Inc.*, 829 F. Supp. 1438 (D.N.J. 1993) aptly described the sort of putative collective action class that Plaintiffs seek in this case:

14

### 2. Plaintiffs Have Not Met Their Burden

Plaintiffs acknowledge that there are "differences" among the many thousands of people to whom they would send notice, and each claim would "focus . . . on the specific facts related to that individual." (Mot. 17-18.) Not surprisingly, therefore, Plaintiffs have failed to meet their burden to present "actual evidence," *Prizmic*, 2006 WL 1662614, at *2, that notice recipients were "victims of a common policy or plan that violated the law," *Myers*, 624 F.3d at 554, such that their claims could be adjudicated on "common proof." *Glatt*, 811 F.3d at 540.

At best, Plaintiffs vaguely assert that they would "likely rely on common evidence" in adjudicating individual claims. (Mot. 17 n.29.) But Plaintiffs' purported main support is an internet article: one author's subjective critique of IBM's efforts to strengthen and transform the Company in a rapidly changing technology market. (*Id.* at 3-6.) As Plaintiffs themselves should concede, the article is not evidence. (*Id.* at 13 n.27 (quoting *Boice v. M+W U.S., Inc.*, 130 F. Supp. 3d 677, 687 n.7 (N.D.N.Y. 2015) for the proposition that "averments in support of a Motion for Conditional Certification must be based on personal knowledge").).

In any event, the article's various contentions do not spell out any *discriminatory* policy or plan, much less one that could bind together the sprawling collective Plaintiffs wish to certify. There is nothing discriminatory, for example, about a company shifting its focus to emerging technologies. *See Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 454 (7th Cir. 2009) ("choosing to let someone go because they have an obsolete skill set" not discriminatory). Nor is

---

> What is seen here is "a monster that no one can deal with, made with a lot of individual people with specific grievances" . . . There is no single, company-wide action but, rather, layoffs by various supervisors of persons, on an employee by employee basis, of widely disparate ages, salaries, and positions over a two year period of time. The factual and/or employment setting of each person's layoff is different, many varying questions of law are raised, and the defenses posited are individual to each or small groups of those persons.

*Id.* at 1446.

there anything discriminatory about reducing headcount to meet reduced budgets, *see Martinez v. N.Y.C. Transit Auth.*, 672 F. App'x 68, 70 (2d Cir. 2016) (RIF necessitated by budget shortfall was non-discriminatory reason for layoffs), or managing underperforming employees, *see Chukwurah v. Stop & Shop Supermarket Co. LLC*, 354 F. App'x 492, 495 (2d Cir. 2009) (termination for "poor performance" non-discriminatory).  Nor is there anything discriminatory about asking employees who formerly worked from home to report to a company office, *see Fahrenkrug*, 2015 WL 13021890, at *16 (desire to have employees "side-by-side sharing job knowledge" was legitimate reason for  relocation), or increasing entry-level hiring to build a talent pipeline, *see In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1089 (W.D.N.Y. 1994) (not discriminatory "to maintain a 'pipeline' of future . . . talent" during a reduction in force); *Crawford v. Dep't of Investigation*, 324 F. App'x 139, 142 (2d Cir. 2009) (hiring of entry-level employees during a RIF not discriminatory standing alone); *Conway v. Allstate Ins. Co.*, 2016 U.S. Dist. LEXIS 147921, at *11-12 (N.D. Ill. Oct. 26, 2016) (same).

Nevertheless, Plaintiffs specifically invoke the article's claim that IBM made a "systematic effort to 'correct seniority mix'" (Mot. 3), referencing an IBM document that uses the term "seniority mix."  To begin with, the document described hiring efforts related to one position (offering manager) within one IBM group (Hybrid Cloud).  (Hughson Dec. ¶¶ 4-5, 8.) A comment about hiring into a single position in a single IBM group is not evidence of a common policy or plan.  *Brooks v. BellSouth Telecomm., Inc.*, 164 F.R.D. 561, 567 (N.D. Ala. 1995) (denying notice; no "connection" between "five year plan" for department where plaintiff did not work and alleged discrimination), aff'd sub nom. 114 F.3d 1202 (11th Cir. 1997).

More fundamentally, the comment at issue is not in the least bit discriminatory.  Black-letter law holds that it is not discriminatory to make personnel decisions based on "seniority" or any factor "other than the employee's age."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609

(1993). Here, the group at issue concluded that it did not have the right mix of inexperienced and experienced offering managers to operate efficiently, maintain a talent pipeline, and keep costs down (Hughson Dec. ¶¶ 11-15), undeniably nondiscriminatory objectives.

Beyond their internet article, Plaintiffs cite two IBM documents. (Mot. 6.) Neither relates to personnel matters. The first is a marketing document – created in 2006 by IBM's United Kingdom affiliate – describing consulting services that the affiliate offered to customers. (Marshall Dec. ¶ 7 Ex. E.) On its face, it has nothing to do with IBM's internal workforce practices. Moreover, the document does not even remotely suggest age bias. Rather, it addresses strategies for IBM UK clients to engage and retain workers past their retirement age. (*Id.* at 2 ("When [older workers] go, they take their skills and their knowledge with them, and the organization they've left behind is much the poorer.")); *Brooks*, 164 F.R.D. at 567 (disregarding "decade old" document and finding it "disingenuous" to assert that document "address[ing] the changing work force" was "evidence of an overarching policy of discrimination").

The second IBM document is a blog post about a seminar for clients on *marketing* to procurement officers and managing employees from the "millennial" generation. (Baird Dec. ¶ 13.) Again, this document has nothing to do with IBM's personnel practices, much less is it evidence of animus toward older works. *See Roberts*, 2013 WL 5256867, at *3-4 (plaintiff could not demonstrate plan to discriminate based on "marketing strategy" and other "amorphous" allegations); *Fernandez v. Sharp Mgmt. Corp.*, 2016 WL 5940918, at *3 (S.D.N.Y. Oct. 13, 2016) (marketing materials not evidence of employment policies sufficient to demonstrate common policy or plan); *cf. Duffy*, 2006 WL 3025958, at *3 ("mere speculation" to conclude from publication listing objectives including "revitalizing our management teams with younger people" that "[d]efendant therefore systematically discriminated against older workers").

Plaintiffs' only other evidence is the set of 15 declarations from Plaintiffs and Opt-Ins. (Mot. 3 (Plaintiffs "expect to show that these individual decisions were part of a concerted trend and conscious decision to reduce the number of older employees in IBM's workforce").)  As detailed above, the declarations only illustrate that the declarants' claims cannot be tried together.  *See Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255, 266 (S.D.N.Y. 2017) ("[T]he mere existence of a certain number of plaintiffs, covering a sufficiently widespread geographic area, should not be . . . legally sufficient . . . to find that plaintiffs are similarly situated across the nation absent actual evidence of a link between plaintiffs and those across the nation.") (citations omitted); *Gallender v. Empire Fire & Marine Ins. Co.*, 2007 WL 325792, at *1 (S.D. Miss. Jan. 31, 2007) (declarations of terminated employees alleging they were replaced by younger workers did not show a company plan or policy); *D'Anna*, 903 F. Supp. at 894 (identifying other employees who were terminated not sufficient to show they were similarly situated).

Plaintiffs' cited cases do not excuse their wholesale lack of evidence in support of their sweeping proposed collective.  Those cases (Mot. 13-18) establish only that, on other facts, courts have granted conditional certification and authorized notice.  None supports the sweeping notice that Plaintiffs seek here.  For example, in *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 483 (E.D.N.Y. March 30, 2001), the court conditionally certified a collective of employees who performed the same basic function in a single facility and who were laid off on the same date in the same reduction-in-force.  *See also Hyman v. First Union Corp.*, 982 F. Supp. 1, 3 (D.D.C. 1997) (collective limited to individuals with "similar job responsibilities" from single region who were separated in two RIFs in short succession); *Schwed v. Gen. Elec. Co.*, 159 F.R.D. 373, 375-77 (N.D.N.Y. 1995) (collective limited to employees in single department at a single location in a single RIF); *Abrams v. Gen. Elec. Co.*, 1996 WL 663889, *2 (N.D.N.Y. Nov. 4, 1996) (single RIF in single location); *Sperling v. Hoffmann-La Roche*, Inc., 118 F.R.D. 392, 395 (D.N.J.)

18

(single RIF); *Krueger v. New York Tel. Co.*, 1993 WL 276058, at *2 (S.D.N.Y. July 21, 1993) (disparate *impact* case challenging ranking criteria applicable to all class members).

Nor do Plaintiffs find support in *Heath v. Google Inc.*, 215 F. Supp. 3d 844 (N.D. Cal. 2016).  In *Heath*, a failure-to-hire case, the court rejected a plaintiff's request to expand the class definition to include all candidates who submitted applications, reasoning that doing so would add individuals who were not qualified for the positions, and thus were not similarly situated to the presumably qualified plaintiffs who received interviews.  *Id.* at 855-58.[8]  Likewise, Plaintiffs' reliance on *Frank v. Capital Cities Commc'ns, Inc.*, 1983 WL 643 (S.D.N.Y. Oct. 11, 1983), is unavailing.  That case was decided without the last 35 years of guidance from the Supreme Court and Second Circuit in *Hoffman*, *Myers*, and *Glatt*.  With that guidance, courts should not be willing, as the *Frank* court was, to reserve for trial the question of whether Plaintiffs' "allegations of class discrimination have substance."  *Id.* at *2; *compare Myers*, 624 F.3d at 555 ("unsupported assertions" not sufficient); *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010) (plaintiffs' showing must be "based on some substance").

Accordingly, Plaintiffs' Motion should be denied.[9]

###### B.   Notice Should Not Issue to Individuals Who Signed Arbitration Agreements

As to individuals who signed arbitration agreements, the Court should deny notice for an additional reason:  sending notice to them would be futile.  The lead case in this area is *In re JPMorgan Chase & Co.*, 916 F.3d 494 (5th Cir. 2019), the only one from a U.S. Court of Appeals.  It holds that "district courts may not send notice to an employee with a valid arbitration

---

[8] To the extent that *Heath* suggests that a collective should be certified notwithstanding the presence of individualized issues, Mot. 18 n.30, it conflicts with the Second Circuit's requirement that Plaintiffs demonstrate that their claims may be adjudicated on the basis of "common proof." *Glatt*, 811 F.3d at 540.

[9] IBM will move at the appropriate time to dismiss the 68 Opt-Ins from this case because they are not similarly situated.

agreement unless the record shows that nothing in the agreement would prohibit that employee from participating in the collective action." *Id.* at 501. As the court explained, courts have discretion to issue notice where it would promote "efficient resolution in one proceeding of common issues." *Id.* at 502 (quoting *Hoffmann-La Roche*, 493 U.S. at 170). Sending notice to "those who cannot ultimately participate in the collective," does not serve that purpose. *Id.* Instead, it "merely stirs up litigation," something "flatly proscribe[d]" by the Supreme Court. *Id.*

Plaintiffs seek precisely what the Supreme Court proscribes. They argue arbitration-signers should receive notice so they are aware of their "ability to bring the claim, be it in court or in arbitration, with willing counsel." (Mot. 4 n.6.) But notice is not an appropriate vehicle for Plaintiffs' attorneys to solicit arbitration clients; doing so would "reach[] into disputes beyond the 'one proceeding.'" *JPMorgan*, 916 F.3d at 502 (quoting *Hoffman-Laroche*, 493 U.S. at 170)*; see also Lanqing Lin v. Everyday Beauty Amore Inc.*, 2018 WL 6492741, at *4 (E.D.N.Y. Dec. 10, 2018) (denying notice where it would "waste . . . time and resources," "risk . . . confusion," and cause flood of motions to compel arbitration); *Hudgins v. Total Quality Logistics, LLC*, 2017 WL 514191, at *4 (N.D. Ill. Feb. 8, 2017) (denying notice, citing "waste of resources" and "risk [of] misleading"); *Morangelli v. Chemed Corp.*, 2010 WL 11622886, at *3 (denying notice, citing "disservice to judicial efficiency" and "prolong[ed] motion practice").

Under the *JPMorgan* framework, if there is a "genuine dispute" as to the "existence or validity" of an agreement that would preclude an employee's participation in a proposed collective, the employer's burden is to "show, by a preponderance of the evidence, the existence of a valid arbitration agreement for that employee." 916 F.3d at 502-03. The Court should "permit submission of additional evidence, carefully limited to the disputed facts, at the conditional certification stage." *Id.* at 503. If the evidence shows that the employee has entered into a valid arbitration agreement, the district court should not issue notice to that person. *See id.*

20

Here, Plaintiffs acknowledge the subset of putative collective action members who signed arbitration agreements.  (Mot. 4 n.6 ("Plaintiffs' counsel have filed arbitration demands for sixty-four (64) individuals").)  In fact, thousands did so, in exchange for valuable consideration.  *See* Section II.B *supra*.[10]  Each agreement provides that "all legal claims or disputes between you and IBM under the federal Age Discrimination in Employment Act" are to be resolved in "final and binding arbitration."  (Kennedy Dec. ¶ 14, Ex. A-D.)  Each also provides that the signatory is "not entitled to serve or participate" in a collective action.  *Id.*

These agreements are enforceable.  The Federal Arbitration Act "requires courts rigorously to enforce arbitration agreements according to their terms."  *Epic Sys. Corp. v. Lewis*, --- U.S. ---, 138 S. Ct. 1612, 1621 (2018) (internal quotes omitted); *see also 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 259 (2009) ("the ADEA does not preclude arbitration of claims"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991) (no evidence that "Congress, in enacting the ADEA, intended to preclude arbitration of claims").  Similarly, courts must rigorously enforce agreements to arbitrate using "individualized rather than class or collective action procedures."  *Epic Sys.*, --- U.S. at ---, 138 S.Ct. at 1621; *see also Lamps Plus, Inc. v. Varela*, --- U.S. ----, 139 S.Ct. 1407, 1412 (2019) (party may not be "compelled . . . to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so") (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010)).

For their part, Plaintiffs now suggest (Mot. 21 n.33) that the arbitration agreements are invalid under the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f), because IBM did not satisfy that act's requirements for obtaining "a valid waiver of 'any right or

---

[10] As stated in Section IV.A above, IBM's position is that the Court should deny Plaintiffs' motion in its entirety.  Such a ruling would moot the Company's argument here with respect to the portion of the proposed collective who signed arbitration agreements.  For that reason, IBM has not at this time submitted to the Court a list of individuals who signed arbitration agreements or copies of executed agreements.  To the extent that the Court deems this necessary, the Company is prepared to supplement its evidentiary submission.

claim' under the ADEA." *Id.* (quoting 29 U.S.C. 626(f)(1)).  Plaintiffs miss the mark.  The OWBPA imposes minimum requirements for the release of a *substantive* ADEA "right or claim."  29 U.S.C. § 626(f)(1)(A)-(H).  Its requirements do not apply to waivers of the ADEA's *procedural* provisions.  *See 14 Penn Plaza*, 556 U.S. at 259 (agreement to arbitrate did not waive a "substantive right" under the ADEA).  A collective action is a procedural mechanism.  Like a class action, it "alter[s] only how the claims are processed" leaving "parties' legal rights and duties intact and the rules of decision unchanged."  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010).  Accordingly, there is no substantive "right" to adjudicate ADEA claims collectively, and the OWBPA does not apply to collective action waivers.  *See McLeod v. Gen. Mills, Inc.*, 856 F.3d 1160, 1166 (8th Cir. 2017) (OWBPA inapplicable to 29 U.S.C. § 216(b)); *Horowitz v. AT&T Inc.*, 2018 WL 1942525, at *19 (D.N.J. Apr. 25, 2018), *clarified on den. of reconsid.*, 2019 WL 77306 (D.N.J. Jan. 2, 2019) (same).

   Plaintiffs also claim (Mot. 20-21) that *JPMorgan* is distinguishable, arguing that plaintiffs there "conceded the validity of the arbitration agreement," while here that is not so.  But as noted, *JPMorgan* establishes a framework, specifically for the conditional-certification stage, for resolving "dispute[s] as to existence or validity" of arbitration agreements.  *JPMorgan*, 916 F.3d at 502.  IBM submits that the dispute here is not *genuine*.[11]  But in any event, for the reasons described in *JPMorgan*, resolving issues of enforceability now is fully consistent with *Hoffman-Laroche*.[12]

---

[11] In their complaint and original notice motion, Plaintiffs did *not* allege or argue that putative class members' agreements were invalid.  They did so only here, after the filing of *Estle et al. v. IBM Corp.*, No. 19-cv-02729 (S.D.N.Y. filed Mar. 27, 2019), in which separate plaintiffs and attorneys seek a declaratory judgment invalidating class waivers so that they can pursue class arbitration.  Further, Plaintiffs' counsel waived their enforceability arguments with respect to the 64 individuals (Mot. 4 n.6, 21 n.34) whom they represent in arbitration. *See Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003) ("[I]f a party participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration.").

[12] Plaintiffs argue (Mot. 20) that the "recent trend" is to address enforceability after notice.  The bulk of Plaintiffs' cases pre-date *JP Morgan*, and the remainder are inapposite.  *See Camp v. Bimbo Bakeries USA, Inc.*,

**C.      Plaintiffs' Charges Do Not Encompass the Collective They Seek to Certify**

There is an additional reason that the Court should deny notice to putative class members who did not separate in a resource action:  Plaintiffs' EEOC charges do not encompass their claims.  Before pursuing an ADEA collective action, a plaintiff must first file a timely charge that describes "the nature and scope of the grievance" and provides "some indication that the grievance affects a group."  *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1054-58 (2d Cir. 1990) (citing 29 U.S.C. § 626(d)).  This administrative exhaustion requirement ensures the EEOC an opportunity – before plaintiff files suit – to resolve the matter through "conciliation, conference, and persuasion."  29 U.S.C. § 626(d).  A charge must contain enough detail to afford the EEOC and employer a meaningful opportunity to "explore conciliation *with the affected group*." *Tolliver*, 918 F.2d at 1058 (emphasis added); *see also Butts v. NYC Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1403 (2d Cir. 1993) ("boilerplate" and "vague, general allegations" are "quite incapable of inviting a meaningful EEOC response"); *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 852 n.26 (S.D.N.Y. 2013) (statement that claimant "believes that other women in similar situations have also been demoted" was insufficient); *Choi v. Chem. Bank*, 939 F. Supp. 304, 312 (S.D.N.Y. 1996) (Batts, J.) (defendants cannot respond to "mere generalizations of misconduct").

Correspondingly, an individual may opt in to a collective only if she asserts "the same discriminatory treatment" as the charge-filing plaintiff.  *Spector v. Bd. of Trustees of Cmty.-Tech. Colleges*, 2007 WL 4800726, at *11 (D. Conn. Dec. 27, 2007), *aff'd*, 316 F. App'x 18 (2d Cir. 2009) (non-filer could not rely on co-plaintiff's charge; while the claims "share[d] some events in common," "the factual basis of their complaints [were] more different than alike").  Stated

---

2019 WL 1472586, at *3-4 (D.N.H. Apr. 3, 2019) (no "evidence suggesting that at least some potential members of the collective are subject to enforceable arbitration agreements"); *Mode v. S-L Distrib. Co.*, 2019 WL 1232855, at *4 (W.D.N.C. Mar. 15, 2019) (defendant simultaneously asked the court to enforce and void arbitration agreements). Further, *Bigger v. Facebook, Inc.*, 2019 WL 1317665 (N.D. Ill. Mar. 22, 2019) is subject to an interlocutory appeal. Docket  No. 17-cv-7753 (N.D. Ill. Apr. 17, 2019) (Dkt. 81).

differently, a charge alleging one discriminatory practice cannot support a collective complaint alleging a wide range of discriminatory conduct. *See, e.g.*, *Holowecki v. FedEx. Corp.*, 644 F. Supp. 2d 338, 351 (S.D.N.Y. 2009), *aff'd*, 382 F. App'x 42 (2d Cir. 2010) (charge claiming "discriminatory application" of programs did not encompass retirees of individuals fired for "act[ing] inappropriately"); *Grant v. Morgan Guar. Tr. Co.*, 548 F. Supp. 1189, 1192 (S.D.N.Y. 1982) (charge challenging denied promotion did not support claims alleging "discrimination in compensation, assignment, transfer, training and other terms"); *see also Ulvin v. N.W. Nat. Life Ins. Co.*, 943 F.2d 862, 865-66 (8th Cir. 1991) (charge alleging defendant "demoted and subsequently fired" claimant did not encompass claims of coerced "early retirement").

Here, Plaintiffs' EEOC charges do not support the sweeping collective that they now propose. Eng's charge did not even allege age discrimination. *See*, *e.g.*, *Burgess v. NYSE*, 181 F. Supp. 2d 337, 339-40 (S.D.N.Y. 2002) (race discrimination claimant "never exhausted . . . the newly alleged claims of age discrimination, disability discrimination and retaliation"). And Rusis's and Gerrits's charges claimed only that IBM was "laying off" older employees "disproportionately to younger workers and not hiring them for open positions." *See* Section II.A *supra*. Their charges did not hint or suggest class claims on behalf of individuals who had *not* been laid off – persons who voluntarily retired or separated; or who quit rather than accepting relocation; or whom IBM terminated for performance, misconduct, or other for-cause reasons. *Id.*; *cf.* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "layoff" as a "reduction in force" and the "termination of employment at the employer's instigation . . . through no fault of the employee"). Accordingly, the charges cannot support notice to such individuals.[13] *See Ulvin*, 943 F.2d at 865-66; *Holowecki*, 644 F. Supp. 2d at 351; *Grant*, 548 F. Supp. at 1192.

---

[13] IBM acknowledges that this Court is bound by Second Circuit law, but the Company respectfully submits that the charges are insufficient to support *any* collective action. *See*, *e.g.*, *Kloos v. Carter–Day Co.*, 799 F.2d 397, 401 (8th Cir. 1986) (plaintiff must "allege class-wide age discrimination" or "claim to represent a class" );

## V.   PLAINTIFFS' PROPOSED NOTICE

Because the Court should deny Plaintiffs' motion, it does not need to reach issues related to Plaintiffs' proposed form of class notice.  However, should the motion be granted, Plaintiffs' request for approval to send notice by text message is inappropriate.  *See Brittmon v. Upreach, LLC*, 285 F. Supp. 3d 1033, 1044 (S.D. Ohio 2018) (text notice should not be approved "unless [p]laintiff can show that notice by postal and electronic mail is insufficient").  Plaintiffs' proposed form of notice is also deficient.  For example, the notice does not inform potential opt-ins of their right obtain their own counsel, *see Anjum v. J.C. Penney Co.*, 2015 WL 3603973, at *13-14 (E.D.N.Y. June 5, 2015), nor does it sufficiently inform potential opt-ins that they may be compelled to appear for depositions or provide other information in discovery.  *Compare* Dkt. 47-1 ("You may also be *asked* to be a witness or to provide evidence in this case") (emphasis added) *with Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 566 (S.D.N.Y. 2012) ("[P]otential litigants should be advised of the possibility that opt-in plaintiffs may be required to provide information, appear for a deposition, and/or testify in court").  Because of these and other deficiencies, if the motion is granted, the Court should direct the parties to meet and confer on notice content.  *See Pichardo v.Carmine's Broadway Feast, Inc.*, 2016 WL 4379421, at *12 (S.D.N.Y. June 13, 2016).

## VI.   CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Issuance of Notice should be denied.

---

*Naton v. Bank of CA*, 649 F.2d 691, 697 (9th Cir. 1981) (charge must allege class-wide discrimination and that the filers "intend[] to bring an action on behalf of themselves and others similarly situated").  Plaintiffs' charges do not assert that they represent a collective or intended to seek relief for others.

Dated: May 28, 2019
New York, New York

JONES DAY

By /s/ *Alison B. Marshall*
Matthew W. Lampe
250 Vesey Street
New York, New York 10281
Tel: 212.326.3939
Fax: 212.755.7306
mwlampe@JonesDay.com

Alison B. Marshall
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Tel: 202.879.3939
Fax: 202.626.1700
abmarshall@jonesday.com

*Attorneys for Defendant*