USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/26/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
EDVIN RUSIS, HENRY GERRITS, PHIL                    :
MCGONEGAL, and DAVID HO ENG,                        :
*individually and on behalf of all other similarly* :
*situated individuals*,                             :           18-CV-8434 (VEC)
                                       Plaintiffs,  :
                                                    :           OPINION AND ORDER
                                                    :
                   -against-                        :
                                                    :
INTERNATIONAL BUSINESS                              :
MACHINES CORP.,                                     :
                                                    :
                                       Defendant.   :
----------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

In this putative class and collective action, Plaintiffs assert claims under the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and related state claims

against their former employer, International Business Machines Corporation ("IBM"). *See* First

Amended Complaint ("FAC") ¶ 1, Dkt. 11. IBM has filed three separate motions for partial

judgment on the pleadings, one of which also seeks to compel arbitration, pursuing the dismissal

of certain individual former IBM employees who have consented to opt-in to this action (the

"opt-ins") and two Named Plaintiffs, or, at the very least, a Court ruling that certain subsets of

former IBM employees may not participate in this action. *See* Notices of Mtns., Dkt. 120; Dkt.

123; Dkt. 129. In debating IBM's motions, the parties wage a fervent battle over the proper

contours of a judicially-created exception to the ADEA's administrative exhaustion requirement

known as the single-filing rule or "piggybacking" doctrine, pursuant to which individuals who

themselves did not file an administrative charge of discrimination, and thereby failed to exhaust

their ADEA claims, may "piggyback" onto another's properly filed administrative charge to

1

advance claims in litigation.  On one side, Plaintiffs present the doctrine as a shield that ensures that any former IBM employee, 40 years and older, who wishes to challenge the termination of his or her IBM employment can participate in this case, regardless of the circumstances or timing of the person's departure from IBM.  On the other side stands IBM, which wields the piggybacking doctrine as a sword with which it can surgically remove from this case batches of putative plaintiffs who did not file their own timely administrative charges.  Although Plaintiffs contend that their interpretation best accords with the purpose of the ADEA's administrative exhaustion requirement, in reality, Plaintiffs push the Court to adopt an interpretation that no court before has endorsed and that would seemingly leave the piggybacking doctrine less an exception to administrative exhaustion and more a reduction of the exhaustion requirement to a requirement in name only.  That notwithstanding, IBM at times flagrantly attempts to use the piggybacking doctrine as a means to delimit the scope of Plaintiffs' case, in contravention of the generally lenient interpretation of the doctrine that governs in this circuit.  Accordingly, for the reasons stated below, IBM's motions are GRANTED in part and DENIED in part.

## BACKGROUND[1]

Named Plaintiffs and those they seek to represent are all former IBM employees who

---

[1]     On a motion for judgment on the pleadings, as with a motion to dismiss, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to Plaintiffs.  *See Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193 (2d Cir. 2015).  For clarity's sake, the Court refers to the parties' submissions as follows: Defendant's Memorandum of Law in Support of Motion for Partial Judgment on the Pleadings as to Arbitration Opt-Ins and to Compel Arbitration, Dkt. 121, as "Def. First Mem."; Plaintiffs' Response to IBM's Motion for Partial Judgment on the Pleadings as to Arbitration Opt-Ins and to Compel Arbitration, Dkt. 136, as "Pls. First Opp."; Defendant's Reply in Support of Motion for Partial Judgment on the Pleadings as to Arbitration Opt-Ins and to Compel Arbitration, Dkt. 142, as "Def. First Reply"; Defendant's Memorandum of Law in Support of Motion for Partial Judgment on the Pleadings as to Constructive Discharge and Pretextual For-Cause Termination Claims, Dkt. 124, as "Def. Second Mem."; Plaintiffs' Opposition to IBM's Motion for Partial Judgment on the Pleadings as to Constructive Discharge and Pretextual For-Cause Termination Claims, Dkt. 137, as "Pls. Second Opp."; Defendant's Reply in Support of Motion for Partial Judgment on the Pleadings as to Constructive Discharge and Pretextual For-Cause Termination Claims, Dkt. 143, as "Def. Second Reply"; Defendant's Memorandum of Law in Support of Motion for Partial Judgment on the Pleadings as to the ADEA Claims of Plaintiffs Who Filed Defective Charges or Fall Outside the Temporal Scope of the Named Plaintiffs' Administrative Charges, Dkt. 130, as "Def. Third Mem."; Plaintiffs' Opposition to IBM's Motion for

separated from the company at age 40 or older.  Plaintiffs allege that, in an attempt to reframe its public image and to shift into fields such as cloud services, big data analytics, mobile, and social media, IBM heavily recruited younger workers while systematically pushing out older employees.  FAC ¶¶ 1, 15.  Relying on reporting by *ProPublica* and IBM's own publications, Plaintiffs allege that IBM has engaged in a nationwide, companywide policy of eliminating employees ages 40 and older to better position itself to compete with new technology companies. *Id.* ¶¶ 15–18.

According to Plaintiffs, motivated by an overarching goal of reducing its headcount of older employees, IBM employed a number of different methods to achieve its goal: (1) engaging in "reductions in force or layoffs," known at IBM as "Resource Actions"; (2) terminating older employees for pretextual reasons; (3) constructively discharging older employees; and (4) conditioning older employees' employment on "untenable choices they [were] unlikely to accept, such as relocation."[2]  *Id.* ¶ 19.  Further, after selecting older employees for inclusion in a Resource Action, IBM allegedly thereafter refused to hire those older employees for open positions through IBM's internal hiring platform, regardless of their qualifications.  *Id.* ¶ 25.

Plaintiffs provide minimal detail on the Named Plaintiffs' respective separations from IBM other than the timing of their departures; thus, on the face of the FAC, it is not entirely clear pursuant to which method of termination each departed from IBM.  In March 2018, Named

---

Partial Judgment as to the ADEA Claims of Plaintiffs Who Filed Defective Charges or Fall Outside the Temporal Scope of the Named Plaintiffs' Administrative Charges, Dkt. 138, as "Pls. Third Opp."; Defendant's Reply in Support of Motion for Partial Judgment on the Pleadings as to the ADEA Claims of Plaintiffs Who Filed Defective Charges or Fall Outside the Temporal Scope of the Named Plaintiffs' Administrative Charges, Dkt. 144, as "Def. Third Reply."

[2]        In their papers, the parties refer to the fourth category of terminations, in which an employee was forced to choose between relocating or retiring, as part of the larger umbrella of constructive discharge.  Because it has no bearing on any of the Court's holdings in this opinion, the Court does the same.

Plaintiffs Edvin Rusis and Henry Gerrits each received notice that he would be "laid off," effective June 27, 2018.[3]  *Id.* ¶¶ 21–22.  After receiving notice of their separations but before leaving IBM, both Rusis and Gerrits applied for open positions on IBM's internal hiring platform, but neither received a response to any application.  *Id.*  Named Plaintiff David Ho Eng was "let go" by IBM on March 31, 2018.  *Id.* ¶ 24.  Although a hiring manager sought to hire Eng after he applied for an open position through IBM's internal system, Eng ultimately did not receive the job because his former manager prevented his hiring.  *Id.*  Finally, Named Plaintiff Phil McGonegal was "let go" by IBM on June 30, 2018.  *Id.* ¶ 23.

Before 2014, IBM provided to any employee who had been laid off a list that disclosed the age and position of all employees within a business unit who had and had not been laid off; IBM ceased this practice in 2014.  *Id.* ¶ 20.  Starting in 2014, however, as part of its separation agreements with terminated employees, IBM began requiring employees to agree to binding individual arbitration of any ADEA claims in exchange for a severance payment.  *Id.*  Each of the Named Plaintiffs rejected the separation agreements and therefore did not sign arbitration agreements.  *Id.*

On March 10, 2020, the Court denied Plaintiff's' motion for court-facilitated notice to potential opt-in members of their proposed ADEA collective.  *See Rusis v. Int'l Bus. Machs. Corp.*, No. 18-CV-8434, 2020 WL 1151322, at *1 (S.D.N.Y. Mar. 10, 2020).  The Court held that, having "made no showing, beyond conjecture and the individual affiants' beliefs, that a unifying scheme at IBM links the potential members of the collective to one another despite vast differences in their jobs, locations, and circumstances surrounding their departure from IBM,"

---

[3]        In their briefs, Plaintiffs seem to assume that by alleging that they were "laid off," the FAC makes clear that Rusis and Gerrits were both terminated as part of an IBM Resource Action.  *See* Pls. Third Opp. at 6.

Plaintiffs failed to meet their burden of tying all former IBM employees over the age of 40, nationwide, to a common policy or plan executed by IBM.  *Id.* at 6.   Despite the Court's refusal to facilitate notice to potential opt-ins, more than 100 former IBM employees have now consented to opt in to this action.

IBM has filed three motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  *See* Dkt. 120; Dkt. 123; Dkt. 129.  The first such motion also seeks to compel to arbitration the subset of opt-ins who signed binding arbitration agreements with IBM and have not yet arbitrated their ADEA claims.  *See* Dkt. 120.

## DISCUSSION

I.   **Legal Standards**

### A.  Legal Standard on a Rule 12(c) Motion for Judgment on the Pleadings

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim."  *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001); *see also Ashley v. Gonzalez*, No. 19-CV-6282, 2020 WL 7027501, at *2 (S.D.N.Y. Nov. 30, 2020) ("The difference between a Rule 12(b)(6) and Rule 12(c) motions is largely academic because the standard under Rule 12(c) is the same as the standard under Rule 12(b)(6)." (cleaned up)).  The Court must accept as true all material factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009).  To survive a Rule 12(c) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* at 44 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To satisfy the "plausibility" requirement, a complaint must do more than make "[t]hreadbare recitals of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678.  Rather, the elements of the cause

5

of action must be supported by well-pleaded facts that permit the Court to infer "that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"On a [Rule] 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (cleaned up). "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Id.* (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)). For a document to be "integral" to the complaint, the complaint must "rel[y] heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). "[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.* at 153.

Pursuant to Rule 12(d), when a party seeks to introduce matters outside the pleadings in support of its Rule 12(c) motion, the Court must choose to either exclude those documents from consideration or convert the motion into one for summary judgment under Rule 56. *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (applying principle in the context of a Rule 12(b)(6) motion); *Grecco v. Associated Press*, No. 16-CV-6240, 2017 WL 2913501, at *3 (S.D.N.Y. July 7, 2017) (applying principle in the context of a Rule 12(c) motion). Here, neither party has requested that the Court convert the motions to ones for summary judgment, and minimal, if any, discovery has occurred, rendering it inappropriate to convert IBM's motions at this time. *See Grecco*, 2017 WL 2913501, at *3. The Court, therefore, must exclude any

documents — as well as facts and arguments derived from those documents — that are not properly before the Court on IBM's motions for judgment on the pleadings.

### B.  Legal Standard on a Motion to Compel Arbitration

Under the Federal Arbitration Act ("FAA"), a court must compel arbitration in "any suit or proceeding" if there is "an agreement in writing for such arbitration" and "the issue involved is . . . referable to arbitration."  9 U.S.C. § 3.  In adjudicating a motion to compel arbitration, courts must determine "(1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, . . . whether Congress intended those claims to be nonarbitrable; and (4) if . . . some, but not all, of the claims in the case are arbitrable, . . . whether to stay the balance of the proceedings pending arbitration."  *Abreu v. Fairway Mkt. LLC*, No. 17-CV-9532, 2018 WL 3579107, at *2 (S.D.N.Y. July 24, 2018) (internal quotation marks omitted) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987)).  In evaluating a motion to compel arbitration, a district court applies a "standard similar to that applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  Accordingly, it is "proper (and in fact necessary) to consider [ ] extrinsic evidence when faced with a motion to compel arbitration."  *BS Sun Shipping Monrovia v. Citgo Petroleum Corp.*, No. 06-CV-839, 2006 WL 2265041, at *3 n.6 (S.D.N.Y. Aug. 8, 2006) (citing *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32–33 (2d Cir. 2001)).  In deciding the scope of an arbitration agreement, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope [must be] resolved in favor of arbitration."  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995).

## II.     IBM's Motion for Judgment on the Pleadings as to the "Arbitration Opt-Ins" and to Compel Arbitration

IBM seeks partial judgment on the pleadings as to all claims pursued by former IBM employees who signed binding separation agreements with IBM (collectively, the "Arbitration Opt-Ins"), pursuant to which they agreed to resolve any ADEA claims exclusively through individual arbitration and waived their right to participate in any class or collective action.  *See* Def. First Mem. at 1.  IBM asks the Court to dismiss with prejudice all opt-ins who have already arbitrated their claims and to compel to arbitration all opt-ins who have not yet arbitrated their claims.  *Id.* at 1–2.  In response, Plaintiffs do not dispute the existence or effect of the separation agreements, conceding that the Arbitration Opt-Ins must pursue their claims exclusively through individual arbitration.  *See* Pls. First Opp. at 1 ("Plaintiffs do not dispute that [the Arbitration Opt-Ins] must arbitrate their claims.").  Instead, Plaintiffs contend that the Arbitration Opt-Ins have consented to join this action exclusively to seek a "threshold ruling" from the Court on the enforceability of a particular provision in IBM's separation agreements *before* the Court either compels to arbitration or dismisses the Arbitration Opt-Ins' claims.  *See id.* at 3–4, 4 n.8.

Specifically, Plaintiffs seek a Court ruling that the provision in IBM's separation agreements setting the deadline for initiating arbitration does not prohibit the Arbitration Opt-Ins from piggybacking onto Named Plaintiffs' timely filed Equal Employment Opportunity Commission ("EEOC") charges *in arbitration*, or, to the extent it does, a ruling that this provision is unenforceable.  In other words, Plaintiffs press the Court to rule that the Arbitration Opt-Ins may "proceed on their [ADEA] claims — in arbitration — pursuant to the 'piggybacking rule,'" despite filing arbitration demands after the deadline established in their separation agreements.  *Id.* at 2.  While Plaintiffs want the Court to decide whether the Arbitration Opt-Ins may avail themselves of the piggybacking doctrine in arbitrating their ADEA claims, the Court

need not address that issue at this time.[4]  Instead, the Court must respect the valid and

enforceable class and collective action waiver found in each Arbitration Opt-In's separation

agreement with IBM, which prevents the Court from adjudicating the Arbitration Opt-Ins' claims

in this putative class and collective action.[5]

　　　　Pursuant to IBM's separation agreements, a terminated employee's deadline for

submitting a demand for arbitration is "no later than the expiration of the statute of limitations . .

---

[4]　　　Although the Court does not reach the issue on which Plaintiffs seek a threshold ruling, because Plaintiffs raise the possibility of filing individual actions involving the same issue and pursuing consolidation and referral of those actions to this Court, the Court notes its skepticism of Plaintiffs' arguments.  For starters, Plaintiffs press a misguided articulation of the issue.  The piggybacking doctrine, discussed extensively below, is a judicially-created exception to the ADEA's statutory requirement that each individual seeking to litigate ADEA claims in court must first file a charge of discrimination with the EEOC.  Contrary to Plaintiffs' assertion, the piggybacking doctrine neither "tolls" the statute of limitations nor is it intended to permit otherwise time-barred claims to proceed in litigation.  *See Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1059 (2d Cir. 1990).  Former employees who wished to pursue ADEA claims in arbitration pursuant to IBM's separation agreements were not required to file a charge of discrimination with the EEOC.  Plainly, then, the piggybacking doctrine is wholly inapplicable in the arbitration context.  Properly framed, the question is whether the piggybacking doctrine should be considered part of the "ADEA's timing scheme" so that IBM's separation agreements, which require an individual to file an arbitration demand within the time he or she could have filed his or her own EEOC charge, improperly shorten an individual's time to file a discrimination claim.  *See* Pls. First Opp. at 12, 16–17.  None of the cases Plaintiffs cite in their brief is relevant to this issue.

[5]　　　While neither party appended to its pleadings an IBM separation agreement, the Court nevertheless considers IBM's standard separation agreement to be incorporated by reference into the FAC and IBM's answer and otherwise integral to the claims of the Arbitration Opt-Ins whose claims are at issue on this motion.  *See* FAC ¶ 20 (discussing IBM's separation agreements and the requirement of "binding individual arbitration" contained in the agreements); Answer at 9, Dkt. 24 ("Any Plaintiff or individual whom Plaintiffs seek to represent who has agreed to arbitrate some or all of his or her claims against IBM is not entitled to participate in this action, consistent with the terms of any such arbitration agreement."); *see also Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2d Cir. 2000) ("Ordinarily our consideration is limited to the face of the complaint and documents attached to the complaint or incorporated by reference, but here we may also consult [plaintiff's] Cardholder Agreement, account history and monthly statements because they are integral to his claims and [plaintiff] had notice of that information."); *Perry v. N.Y. Law Sch.*, No. 03-CV-9221, 2004 WL 1698622, at *2 n.3 (S.D.N.Y. July 28, 2004) ("The arbitration agreement between the parties is integral to the complaint and the instant motion.").  Further, were it necessary, the Court could take judicial notice of the materials filed or issued in the Arbitration Opt-Ins' prior arbitration proceedings.  *See, e.g.*, *Cox v. Perfect Bldg. Maint. Corp.*, No. 16-CV-7474, 2017 WL 3049547, at *3 (S.D.N.Y. July 18, 2017) ("[C]ourts have regularly taken judicial notice of arbitration awards and collective bargaining agreements in considering a motion to dismiss or to compel arbitration.").  That Plaintiffs themselves readily cite to these materials in support of their argument further supports the Court's position.

　　　　In any event, in adjudicating the portion of IBM's motion seeking to compel arbitration, the Court has discretion to consider extrinsic evidence; accordingly, there can be no dispute that the Court may consider all these materials in considering IBM's motion to compel.  *See, e.g.*, *Shukla v. Viacom Inc.*, No. 18-CV-3522, 2019 WL 1932568, at *1 n.2 (S.D.N.Y. May 1, 2019).

. that the law prescribes for the claim . . . or, if the claim is one which must first be brought before a government agency, no later than the deadline for filing such claim." Declaration of Craig S. Freedman, Exs. A–SS, Dkt. 122-1–45; Dkt. 136-5.[6]  The separation agreements further provide that "[t]he filing of a charge or complaint with a government agency . . . shall not substitute for or extend the time for submitting a demand for arbitration." *E.g.*, Dkt. 136-5.  As is most relevant to the Court's opinion, IBM's separation agreements also contain the following class and collective action waiver:

> To the maximum extent permitted by applicable law, you agree that no Covered Claims may be initiated, maintained, heard or determined on a class action, collective action or multi-party basis either in court or in arbitration, and that you are not entitled to serve or participate as a class action member or representative or collective action member or representative or receive any recovery from a class or collective action involving any Covered Claims either in court or in arbitration.

*Id.*  In reliance on this provision, IBM argues that the Arbitration Opt-Ins may not seek relief of any kind in this putative class and collective action.  *See* Def. First Mem. at 11–14; Def. First Reply at 2–5.[7]  The Court agrees.

---

[6]     In support of its motion, IBM appended the separation agreement of each of the 45 Arbitration Opt-Ins whose dismissal it seeks.  Plaintiffs attached to its opposition brief a representative sample of IBM's separation agreements.  Both parties agree that the key terms are the same in each of the relevant IBM separation agreements, covering each of the Arbitration Opt-Ins.  *See* Def. First Mem. at 2 n.2; Pls. First Opp. at 8.

[7]     At the time IBM filed its motion, 26 Arbitration Opt-Ins had already pursued their ADEA claims to a final judgment in individual arbitration; in each proceeding, the arbitrator dismissed the Arbitration Opt-Ins' ADEA claims as untimely for failing to submit the arbitration demand within the deadline set in IBM's separation agreements.  *See* Def. First Mem. at 4–5; *see also, e.g.*, Dkt 136-6 (representative arbitration order granting IBM's motion to dismiss for failure to file a timely arbitration demand).  As to each of the Arbitration Opt-Ins who has already had his or her ADEA claims dismissed as untimely in an individual arbitration proceeding, IBM separately argues that the doctrine of *res judicata* precludes relitigation of their claims in this forum and mandates their dismissal.  *See* Def. First Mem. at 7–10.  Alternatively, by expressly invoking the arbitration clause of IBM's separation agreements and voluntarily pursuing their claims against IBM to a final decision in arbitration rather than first challenging the agreements' enforceability in court, IBM contends that these Arbitration Opt-Ins have waived their ability to challenge now the validity or enforceability of the separation agreements in this forum.  *See id.* at 9–10.  Plaintiffs oppose each argument.  *See* Pls. First Opp. at 21–23 (arguing the inapplicability of *res judicata*); *id.* at 23–25 (arguing against waiver of enforceability arguments by first pursuing claims in arbitration).

        Because the Court finds that the valid and enforceable class and collective action waiver prohibits all Arbitration Opt-Ins from seeking relief of any kind in this case, the Court need not — and, in fact, cannot, while still

In seeking a "threshold ruling" on the piggybacking issue, Plaintiffs stress that the separation agreements provide that the enforceability of the agreements is an exclusive matter for the courts, and courts commonly decide such threshold issues of enforceability or validity before compelling the parties to arbitration. *See* Pls. First Opp. at 2–5. Yet, despite appearing at times to argue otherwise, Plaintiffs expressly disclaim any attempt "to avoid arbitration *or the impact of the class action waiver*." *Id.* at 21 n.26 (emphasis added). Thus, unless the Court finds, *sua sponte*, that the class and collective action waiver is unenforceable, Plaintiffs seemingly concede that it must be given effect. In an attempt to avoid this result, however, Plaintiffs argue that, notwithstanding the class and collective action waiver, principles of judicial efficiency should persuade the Court to issue a ruling on the piggybacking issue as to the Arbitration Opt-Ins' separation agreements. *Id.* at 4–5. This, Plaintiffs contend, would avoid the unnecessary result of many repetitive individual actions challenging the separation agreements, which, ultimately, will likely be consolidated and referred to this Court as related to the present action. *Id.* Finally, Plaintiffs make a halfhearted attempt to argue that by seeking only a "threshold ruling," the Arbitration Opt-Ins' actions fall outside of the scope of the class and collective action waiver. *Id.* at 4 n.8. [8]

---

affording the waiver its operative effect — consider IBM's arguments concerning *res judicata* or waiver of the right to challenge the arbitration agreement.

[8]     Plaintiffs also argue that, by bringing this motion, IBM seeks to prevent the Arbitration Opt-Ins from pursuing their claims in any forum. *See id.* at 1, 11. This argument is patently absurd. Throughout their brief in opposition to IBM's motion, Plaintiffs conveniently ignore that the simplest way in which the Arbitration Opt-Ins could have avoided this entire issue would have been to file timely arbitration demands in the first instance; Plaintiffs do not identify any obstacle, let alone one imposed by IBM, that prevented the Arbitration Opt-Ins from filing an arbitration demand on their ADEA claims within the 180- or 300-day deadline established by the separation agreements. Had the Arbitration Opt-Ins done so, there would be no need to resort to a (far-fetched) argument that the piggybacking doctrine saves their untimely demands, and they could have received any relief to which they were entitled in an individual arbitration, as contemplated by IBM's separation agreements. While IBM plainly seeks to employ procedural roadblocks to consideration of the merits of the Arbitration Opt-Ins' ADEA claims, the Court does not countenance Plaintiffs' attempts to set the fault at IBM's feet when they need look no further than their own counsel for the appropriate locus of blame. *See id.* at 8 (noting that Plaintiffs' counsel is responsible for having

First, the Court adopts in full the reasoning and holding from a recent opinion issued by a sister court finding the class and collective action waiver in IBM's separation agreements to be valid and enforceable.  *See Estle v. Int'l Bus. Machs. Corp.*, No. 19-CV-2729, 2020 WL 5633154 (S.D.N.Y. Sept. 21, 2020).  In *Estle*, plaintiffs sought a declaratory judgment invalidating the same class and collective action waiver at issue here, arguing that the waiver was not "knowing and voluntary" under the ADEA and the Older Workers Benefit Protection Act ("OWBPA"). *See id.* at *1–2.  The *Estle* court rejected the plaintiffs' attempt to have it declare the class and collective action waiver unenforceable, holding that "the right to bring a collective action is not a substantive right."  *See id.* at *3–7.  Finding *Estle* to be well-reasoned and thorough, and absent any argument from Plaintiffs to the contrary, the Court agrees that the class and collective action waiver in IBM's separation agreements is fully enforceable.

Plaintiffs' attempt to remove the Arbitration Opt-Ins' present maneuver from the scope of the class and collective action waiver is too cute by half.  By signing the separation agreements, the Arbitration Opt-Ins agreed "that no Covered Claims may be initiated, maintained, heard, or determined on a class action, collective action, or multi-party basis," and that they are "not entitled to serve or participate as a class action member or representative or collective action member or representative."  Dkt. 136-5 at 25.  They further agreed that if they are "included within any class action or collective action in court or in arbitration involving a Covered Claim, [they] will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be."  *Id.*  This clear and unambiguous language plainly covers the situation in which the Arbitration Opt-Ins now find themselves: pressing their ADEA claims in a putative class and

---

filed the arbitration demands for the Arbitration Opt-Ins).  Moreover, the Arbitration Opt-Ins had no obligation to pursue relief in this putative class and collective action, in clear contravention of their separation agreements.

collective action after having consented to opt in.  *See, e.g.*, Dkt. 109-1 at 2 (representative Opt-In Consent Form filed by Arbitration Opt-In William Chastka).  Even if their true intent in opting in was only to obtain a threshold ruling on an issue of enforceability, they agreed not to do so. Moreover, the complaint setting the parameters of this action contains no request for declaratory relief, nor do any of the Arbitration Opt-Ins' consent forms delineate the limited purposes for which they have purportedly opted in.  *See, e.g.*, *id.*  Instead, the Arbitration Opt-Ins have placed themselves in the same position as those opt-ins expressly seeking relief on their ADEA claims. Neither the broadly worded class and collective action waiver nor the circumstances of the Arbitration Opt-Ins' putative participation in this case warrant straying from the clear effect of the waiver, which prohibits their participation in this action for any and all purposes.

The cases Plaintiffs cite for the proposition that courts often have to decide the validity of an arbitration agreement or the enforceability of a provision in an agreement before compelling the parties to arbitration — even when the plaintiffs do not expressly seek any declaratory relief — are inapposite.  Plaintiffs fail to identify a single case in which the court ignored an enforceable and fully applicable class and collective action waiver to first issue a "threshold ruling" on the enforceability of the arbitration agreement containing the waiver before effectuating the waiver's command.  The closest Plaintiffs come is *Castellanos v. Raymours Furniture Co.*, 291 F. Supp. 3d 294 (E.D.N.Y. 2018), in which the court assessed the enforceability of a limitations period in the operative arbitration agreement before enforcing the class action waiver and compelling the plaintiffs to individual arbitration.  But in *Castellanos*, the court also granted defendant's motion to strike the class allegations, rendering the case a multi-plaintiff action, in which it was arguably appropriate for the court to first consider the enforceability of the arbitration agreement that each named plaintiff had signed before

compelling them to individual arbitration.  *See id.* at 298–302.  Unlike in *Castellanos*, here, the Court may not give credence to the Arbitration Opt-Ins' class and collective action waiver by striking the class claims, then decide the common issue of enforceability before compelling individual arbitration.  Instead, this action will continue as a putative class and collective action regardless of any Court ruling on the arbitration-related issue.  In short, there is no way for the Court to issue any "threshold ruling" while still giving effect to the terms of the Arbitration Opt-Ins' class and collective action waiver.

Finally, regardless of whether it would be more convenient for the Court to decide the piggybacking issue at this juncture, the valid class and collective action waiver in the Arbitration Opt-Ins' separation agreements must be given effect, and Plaintiffs cite no authority to the contrary.  *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018) ("In the Federal Arbitration Act, Congress has instructed federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings."); *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 296 (2d Cir. 2013) ("In *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013), the [Supreme] Court recently reminded lower courts to 'rigorously enforce arbitration agreements according to their terms, including terms that specify with whom [the parties] choose to arbitrate their disputes, and the rules under which that arbitration will be conducted.'" (quoting *id.* at 233)).  This Court is unaware of any "judicial convenience" exception to a valid class and collective action waiver and rejects Plaintiffs' invitation to create one.

Accordingly, IBM's motion for judgment on the pleadings as to the Arbitration Opt-Ins is GRANTED.  Any former IBM employee who has signed a separation agreement with IBM containing a class and collective action waiver may not opt in to this action for any purpose,

whether to seek declaratory relief concerning the scope or enforceability of their separation agreement or to seek substantive relief on their ADEA claims.  The Court therefore dismisses all Arbitration Opt-Ins who have already pursued their ADEA claims in individual arbitration; to the extent these individuals wish to challenge an arbitrator's final judgment dismissing his or her ADEA claims and such a challenge is not time-barred, he or she must do so by means of an individual court action.[9]  The Court need not reach IBM's motion to compel to arbitration those opt-ins who have not yet arbitrated their ADEA claims.  Instead, by granting IBM's motion for judgment on the pleadings as to all Arbitration Opt-Ins for the same reason — an enforceable class and collective action waiver in their separation agreements — like the Arbitration Opt-Ins who have already arbitrated their claims, the Court simply dismisses those Arbitration Opt-Ins who have not yet arbitrated their claims, as they are not, under any circumstances, entitled to participate in this action.[10]

---

[9]        Although IBM filed motions for partial judgment on the pleadings, the primary relief they seek is dismissal of individual opt-ins (and two Named Plaintiffs).  The Court may grant such relief on a Rule 12(c) motion, as the distinction between a Rule 12(b)(6) and a Rule 12(c) motion is largely one of timing.  *See Patel*, 259 F.3d at 126 (holding that a motion nominally under Rule 12(b) filed after the close of pleadings should be construed by the district court as a motion for judgment on the pleadings under Rule 12(c) given that the standard on a Rule 12(c) motion is the same as on a Rule 12(b)(6) motion); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 353 F. Supp. 264, 268 (S.D.N.Y. 1972) ("However, even though the 12(b)(6) defense is asserted through the procedural device of a 12(c) motion, the standards employed in determining the motion will be the same as if the defense had been raised prior to the closing of the pleadings."), *aff'd*, 495 F.2d 228, 231 n.2 (2d Cir. 1974); *see also Sprint Telephony PCS, L.P. v. County of San Diego*, 311 F. Supp. 2d 898, 903 (S.D. Cal. 2004) ("Because [Rule 12(b)(6) and Rule 12(c)] motions are analyzed under the same standard, a court considering a motion for judgment on the pleadings may give leave to amend and may dismiss causes of action rather than grant judgment.  The mere fact that a motion is couched in terms of Rule 12(c) does not prevent the district court from disposing of the motion by dismissal rather than judgment." (cleaned up)).  Other circuits have explicitly held that, where dismissal is sought based on an affirmative defense, Rule 12(c) is the procedurally proper means of dismissing a case or claim, not Rule 12(b)(6).  *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 n.1 (7th Cir. 2012) ("Though district courts have granted Rule 12(b)(6) motions on the basis of affirmative defenses and this court has affirmed those dismissals, we have repeatedly cautioned that the proper heading for such motions is Rule 12(c), since an affirmative defense is external to the complaint.").

[10]        The Court's decision not to reach IBM's motion to compel arbitration is bolstered by the fact that the Arbitration Opt-Ins may be entitled to declaratory relief on the enforceability or validity of the arbitration filing deadline provision in IBM's separation agreement prior to arbitrating their claims.  Thus, to the extent compelling them to arbitration may in any way inhibit their ability to obtain that judicial relief in a properly filed, individual action seeking declaratory judgment, the Court does not seek to improperly erect such a boundary.  Nevertheless, whether seeking preemptive judicial relief in an individual action is procedurally proper is a decision left to the

### III. Threshold Issues on IBM's Motions for Judgment on the Pleadings Concerning the Scope of the Piggybacking Doctrine

While the Court declines Plaintiffs' invitation to dive into issues concerning the

piggybacking doctrine on IBM's motion for judgment on the pleadings as to the Arbitration Opt-

Ins, IBM's other two motions squarely present all manner of piggybacking-related issues before

the Court, many of which are ripe for adjudication.  In both motions, IBM pursues the dismissal

of two Named Plaintiffs and certain subsets of opt-ins on account of their failure to satisfy the

ADEA's administrative exhaustion requirement.  While some opt-ins appear to have filed their

own EEOC charges and therefore need not piggyback to exhaust their claims, a significant

number of opt-ins did not file timely EEOC charges.  Those Plaintiffs are subject to dismissal for

failure to exhaust unless there is an exhausted claim onto which they can piggyback.  As to each

subset of opt-ins who failed to file their own EEOC charges, IBM argues piggybacking is not

available to rescue them from their failure to exhaust their claims.[11]

Although the parties largely agree that the overriding purpose of the ADEA's

administrative exhaustion requirement is to provide the EEOC — and the employer[12] — notice

of the complained-of conduct to permit prompt resolution of the issue through conciliation,

conference, and persuasion, without resorting to litigation, *see* 29 U.S.C. § 626(d)(2), the parties

---

sound discretion of whichever district court receives any subsequently filed individual actions, to the extent any are filed.

[11]    As addressed below, IBM's position concerning the two Named Plaintiffs also entails a preliminary argument that both Eng's and McGonegal's own EEOC charges failed to exhaust their ADEA claims, requiring them to piggyback on another's timely-filed charge to pursue their ADEA claims in court.  For multiple reasons, IBM then contends that both Eng and McGonegal are unable to avail themselves of the piggybacking doctrine.

[12]    Plaintiffs seek to frame the operative inquiry in terms of whether "*the agency* received sufficient notice of the allegations" in the EEOC charge, minimizing the importance of notice to the employer.  *See* Pls. Second Opp. at 1, 13.  As IBM notes, such a framing is in direct contradiction with Plaintiffs' own authority and this circuit's well-established precedent that emphasizes the importance of both the agency and the employer receiving notice of the alleged discrimination in an attempt to resolve the issue.  *See* Def. Third Reply at 6 (collecting cases).

vehemently dispute whose interpretation of the judicially-created piggybacking doctrine best accords with that purpose.  Plaintiffs contend that IBM's motions are a naked attempt to elevate form over substance, employing technical arguments that inappropriately wield the exhaustion requirement as a means of trimming down Plaintiffs' case.  In contrast, IBM argues that Plaintiffs' proffered interpretation of the piggybacking doctrine would essentially vitiate the ADEA's administrative exhaustion requirement entirely, with the exception threatening to swallow the rule.  The parties ultimately raise a number of issues concerning the scope of the piggybacking doctrine that appear to be rarely, if ever, addressed in the context of class and collective actions, especially in this circuit.  Before delving into the multitude of issues concerning the scope of the piggybacking rule that the parties' briefs raise, some background on the relevant principles is in order.

Under the ADEA, "[n]o civil action may be commenced by an individual . . . until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]."  29 U.S.C. § 626(d)(1).  The ADEA further requires that an EEOC charge be filed within 180 days, or 300 days for a deferral state,[13] "after the alleged unlawful practice occurred."  *Id.*  Thus, while a putative plaintiff is not required to receive authorization to sue from the agency prior to commencing litigation — unlike in the Title VII context — the ADEA nevertheless sets out a statutory administrative exhaustion requirement prior to filing suit.  *See, e.g.*, *Holland v. City of New York*, No. 10-CV-2525, 2011 WL 6306727, at *4 (S.D.N.Y. Dec. 16, 2011).  The purpose

---

[13]     "A deferral jurisdiction is a state, like New York, that has a law prohibiting age discrimination and an administrative agency empowered to remedy it.  Complainants in deferral jurisdictions cannot bring a civil action under the ADEA until 60 days after they have filed a charge with the state agency and the EEOC.  29 U.S.C. §§ 633(b), 626(d).  A complainant in a deferral jurisdiction ordinarily has 300 days to file a charge with the EEOC."  *Brodsky v. City Univ. of N.Y.*, 56 F.3d 8, 9 (2d Cir. 1995) (footnote omitted).  Because Named Plaintiffs and opt-ins in this action hail from both deferral and non-deferral states, the Court refers to various deadlines as being either 180 or 300 days from the date of the alleged discriminatory conduct.

of this requirement is articulated in the statute itself, which provides that, after receiving a charge, the EEOC "shall promptly notify all persons named in such charge as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." 29 U.S.C. § 626(d)(2). Courts routinely emphasize the remedial purpose of the statute's administrative exhaustion requirement in adjudicating claims under the ADEA. *See, e.g.*, *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1057 (2d Cir. 1990); *see also Holowecki v. Fed. Exp. Corp.*, 440 F.3d 558, 564 (2d Cir. 2006) ("*Holowecki II*") ("[P]roviding the EEOC with an opportunity to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of the ADEA through informal methods of conciliation, conference, and persuasion, is an essential element of the ADEA's statutory scheme." (cleaned up)).

In addition to claims that are expressly alleged, a timely filed EEOC charge also satisfies the exhaustion requirement for any claims that are "reasonably related" to conduct alleged in the EEOC charge. *See Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1403 (2d Cir. 1993), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072; *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001). Thus, pursuant to the "reasonably related" doctrine, an EEOC charge exhausts not only those claims expressly included in the EEOC charge but also all claims based on conduct that would fall within the scope of the EEOC investigation that can reasonably be expected to grow out of the EEOC charge.[14] *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158 (2d Cir. 2008)

---

[14]    The Second Circuit has also "recognized two other types of claims that are reasonably related to the claims asserted in an EEOC complaint: (1) a claim 'alleging retaliation by an employer against an employee for filing an EEOC charge,' and (2) a claim where the plaintiff 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" *Deravin v. Kerik*, 335 F.3d 195, 201 n.3 (2d Cir. 2003) (quoting *Butts*, 990 F.2d at 1402–03).

(quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359–60 (2d Cir. 2001)).  As the Second Circuit has described it, the doctrine is "essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering."  *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (cleaned up).  "In determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'"  *Id.* (quoting *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)).

The single-filing rule, commonly referred to as the piggybacking doctrine, is a judicially-created exception to the ADEA's administrative exhaustion requirement, permitting plaintiffs who have not filed their own EEOC charges to "piggyback" onto the timely filed charge of another plaintiff to satisfy the exhaustion requirement.  *See Holowecki II*, 440 F.3d at 564.  Whether a subsequent plaintiff may piggyback on another's EEOC charge depends on the size and scope of the "grievances" asserted in the charge.  *See Tolliver*, 918 F.2d at 1057–58.  Under the broadest test, applied by the Second Circuit in most circumstances, "the claims of the administrative claimant and the subsequent plaintiff [need only] arise out of the same circumstances and occur within the same general time frame."  *Id.* at 1057.  Under this test, the subsequent plaintiff must demonstrate only that he was "similarly situated and received the same discriminatory treatment" as the charge-filing individual.  *Snell v. Suffolk County*, 782 F.2d 1094, 1101 (2d Cir. 1986) (citation omitted).  "[W]here the grievances are alleged to arise throughout a large group," however, the Second Circuit has imposed an additional requirement that there be "some indication that the grievance [asserted in the timely filed charge] affects a group of

19

individuals defined broadly enough to include those who seek to piggyback on the claim," such that "sufficient notice [has been provided] to the employer to explore conciliation with the affected group." *Tolliver*, 918 F.2d at 1058.  While the charge need not "specify that the claimant purports to represent a class or others similarly situated," the charge must convince the court that "no conciliatory purpose would be served by filing separate EEOC charges." *Id.* at 1058–59 (quoting *Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C. Cir. 1981)).

With that background in mind, before addressing IBM's specific contentions in each of its motions, the Court must first address a number of threshold issues that bear on the parties' arguments raised throughout the briefing on both motions.  It is firmly established that "the timely filing of an administrative charge by a named plaintiff in a class action satisfies the charge filing obligation of all members of the class." *Id.* at 1056.  Accordingly, in class and collective actions, disputes concerning the piggybacking doctrine almost always revolve around the substantive and temporal scope of the charge or charges filed by one or more of the named plaintiffs — in other words, whether those seeking to join the action faced similar discrimination in a similar time frame as that alleged in the named plaintiff's charge and whether the charge's asserted grievances were articulated broadly enough to encompass the claims of other class or collective members.  IBM's motions based on the exhaustion requirement fit neatly within this framing.  Plaintiffs' opposition, however, seeks to move far beyond that framework, asserting a number of additional bases pursuant to which the Court should find that the opt-ins that have consented to participate in this action have satisfied the exhaustion requirement.  Unsurprisingly then, the parties raise a number of issues of first impression in this circuit.

### A.  The Basis and Scope of the Court's Analysis

Plaintiffs repeatedly urge this Court to exercise caution in adjudicating IBM's motions, claiming that administrative exhaustion is generally not an issue amenable to resolution on a

Rule 12 motion given the fact-intensive nature of the inquiry involved.  *See* Pl. Second Opp. at

12; Pl. Third Opp. at 1, 10–11.  Yet courts may, and often do, resolve at the motion to dismiss

stage claims of a failure to exhaust where the failure is clear on the face of the complaint.  *See,*

*e.g.*, *Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 299 (S.D.N.Y. 2016) ("[I]f

nonexhaustion is clear from the face of the complaint (and incorporated documents), a motion to

dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted." (citation omitted));

*Collins v. City of New York*, 156 F. Supp. 3d 448, 455 & n.4 (S.D.N.Y. 2016) (comparing

plaintiff's EEOC charge, which the court deemed incorporated by reference and integral to

plaintiff's complaint, to the complaint to reject argument that claims were reasonably related to

EEOC charge).

      Plaintiffs also object to the Court considering documents that IBM has submitted as

exhibits to its motions.  *See, e.g.*, Pls. Third Opp. at 6 n.3.  IBM, on the other hand, asserts that

the Court must be able to consider certain internal IBM documents, communications with opt-

ins, and affidavits submitted by Plaintiffs in connection with other motions in this litigation,

regardless of whether these documents were incorporated into or were integral to the complaint,

because they are critical to determining the timeliness of the opt-ins' claims and whether a given

opt-in satisfied the exhaustion requirement.  *See* Def. Third Mem. at 5 n.3.  Otherwise, IBM

argues, Plaintiffs may evade a meritorious motion for judgment on the pleadings simply by

avoiding referring to certain documents in their complaint or attaching them as exhibits to the

complaint.  *See* Def. Third Reply at 4.

      Because of the posture of this case — Rule 12(c) motions for judgment on the pleadings

— the Court is mindful to limit its consideration to facts and documents properly before it at this

juncture.  The Court is also cognizant that additional information may come to light in the course

of discovery or as matters external to this action unfold and thus seeks to limit its holdings to propositions of law that will remain unaffected by any subsequent developments.

The Court clearly may consider the EEOC charges filed by Named Plaintiffs:  They are incorporated into the FAC, and Plaintiffs rely on them to satisfy the ADEA's time limit requirements.  *See* FAC ¶ 30 ("Several of the Plaintiffs timely filed Class Charges of Discrimination with the EEOC."); *Holowecki II*, 440 F.3d at 565 ("In reviewing the Rule 12(b)(6) ruling, it is proper for this court to consider the plaintiffs['] relevant filings with the EEOC . . . , none of which were attached to the complaint, because the Holowecki plaintiffs[] rely on these documents to satisfy the ADEA's time limit requirements."); *Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198, 204 (E.D.N.Y. 2006) ("Courts in this Circuit have repeatedly held that when EEOC charges are expressly referred to in the pleading, they may be considered incorporated by reference.").  While the EEOC charges filed by certain opt-ins and relied on by Plaintiffs are neither incorporated by reference into nor integral to the FAC, the Court may still take judicial notice of documents filed with the EEOC as public records.  *See, e.g.*, *Muhammad*, 450 F. Supp. 2d at 204–05 ("[P]laintiff's EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice.").  For the same reason, the Court may take judicial notice of the August 2020 EEOC's Determination Letter, discussed below, pertaining to an EEOC investigation into IBM's alleged age discrimination.  *See, e.g.*, *Frederick v. Jetblue Airways Corp.*, No. 14-CV-7238, 2016 WL 1306535, at *5 (E.D.N.Y. Mar. 31, 2016) ("[C]ourts in this Circuit have routinely taken judicial notice of EEOC determinations without converting 12(b)(6) motions into summary judgment motions."); *Sternkopf v. White Plains Hosp.*, No. 14-CV-4076, 2015 WL 5692183, at *4 (S.D.N.Y. Sept. 25, 2015) (collecting cases).

The Court, however, declines to consider IBM's affidavits, internal IBM documents,

alleged communications with opt-ins, and references to Plaintiffs' affidavits submitted in connection with their motion for court-facilitated notice to potential opt-in members of the ADEA collective, *unless* it is clear that the document was incorporated into or relied on by Plaintiffs in drafting the FAC. *Compare, e.g.*, *Hewitt v. N.Y.C. Dep't of Health and Mental Hygiene*, No. 09-CV-5705, 2010 WL 5071996, at *1 n.1 (E.D.N.Y. Dec. 7, 2010) (considering documents attached to defendants' motion "for the purpose of determining the timeliness of her claims" where documents are integral to the complaint), *with, e.g.*, *Bethea v. Equinox Fitness Club*, No. 07-CV-2018, 2007 WL 1821103, at *4 (S.D.N.Y. June 21, 2007) (declining to consider defendants' affidavit purporting to "set forth the dates of each plaintiff's employment with defendants" where "the specific dates of each plaintiff's employment do not appear on the face of the Complaint"). To do otherwise would require the Court to convert this motion to one for summary judgment, which neither party seeks at this time.

In light of the foregoing, the Court will also refrain from applying its rulings to particular opt-ins, as the only basis on which the Court may determine to whom the holding applies derives from information submitted by IBM that is not now appropriately before the Court. Following entry of this opinion, the Court will permit the parties to engage in discovery, if necessary, to ascertain which opt-ins, if any at this stage, are legally precluded from participating in this action.

**B.  Named Plaintiffs David Ho Eng and Phil McGonegal**

Each of the four Named Plaintiffs in this action filed his own charge of discrimination with the EEOC. *See* Declaration of Alison B. Marshall ("Marshall Decl."), Exs. A–D, Dkt. 125. IBM concedes that Named Plaintiffs Rusis and Gerrits each filed a timely EEOC charge that

fully exhausted his own ADEA claims (together, the "Rusis/Gerrits charges").[15]  IBM argues,

however, that the EEOC charges of Named Plaintiffs Eng and McGonegal are defective, each for

its own independent reason; accordingly, IBM argues, neither Eng nor McGonegal properly

exhausted his ADEA claims before commencing this action.  IBM further contends that, under

Second Circuit precedent, by filing his own EEOC charge, Eng and McGonegal each are barred

from piggybacking on to another's timely filed charge.

For the reasons stated below, the Court agrees with the general principle that one who

files her own EEOC charge may not thereafter piggyback onto another's charge to proceed in

court on her ADEA claims.  The Court also agrees that Eng's EEOC charge fails to exhaust his

ADEA claims.  Accordingly, the Court finds that IBM is entitled to a dismissal of Eng's ADEA

claims.  As to McGonegal, however, the Court is unable to determine on the face of the

complaint and documents incorporated or integral to it that his EEOC charge was defective and

therefore denies IBM's motion for judgment on the pleadings as to McGonegal's ADEA claims.

IBM may, of course, move for summary judgment on a more developed factual record that

would permit the Court to decide whether his charge exhausted his ADEA claims.

### 1. Whether Piggybacking Is Limited to Individuals Who Did Not File Their Own EEOC Charge

According to IBM, this matter is a simple one:  In *Holowecki II*, the Second Circuit held

that "[a]n individual who has previously filed an EEOC charge cannot piggyback onto someone

else's EEOC charge."  *Holowecki II*, 440 F.3d at 564.  The Second Circuit has never qualified

that unequivocal holding to apply only to certain situations, and it is consistent with the holdings

of sister circuits, all of which have held that "where a plaintiff has filed an individual EEOC

---

[15]     As discussed below, the Rusis/Gerrits charges are identical with only minor exceptions; as such, the Court refers to them collectively.

charge, such a plaintiff should be required to rely upon his or her own EEOC charge, and cannot reasonably rely upon [another] claimant's charge." *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 558 (11th Cir. 1997); *see also Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1223–24 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  The Court agrees.

Plaintiffs, however, highlight the policy arguments underpinning the *Holowecki II* court's holding and urge this Court not to endorse a *per se* rule that an individual may never piggyback on another's charge if he or she has already filed his or her own charge.  Pls. Third Opp. at 15–19.  According to Plaintiffs, the Second Circuit in *Holowecki II* was concerned solely with preventing misuse of the piggybacking doctrine to operate as an end-run around the consequences of an individual failing to timely file suit after receiving a right-to-sue letter.  *Id.* at 16–17.  Where those concerns are not present, like here, Plaintiffs argue that the *Holowecki II* rule is inapplicable.

While Plaintiffs may be correct about the animating purposes behind the *Holowecki II* holding, this Court is unconvinced that the case should be limited to its specific facts.  The *Holowecki II* court's holding contains no limiting language, and nowhere does the court seek to limit its statement that "individuals who have previously filed an EEOC charge cannot piggyback onto someone else's EEOC charge" to only certain situations.  *See Holowecki II*, 440 F.3d at 564–65 (cleaned up).  While the policy reasons behind the holding may be most applicable to scenarios involving individuals who seek to avail themselves of the piggybacking doctrine after neglecting to file suit within the 90-day limitations period, those policy concerns are similarly applicable to other situations in which an individual who filed his own charge later seeks to piggyback onto someone else's charge.  *Id.* at 565 ("[A]llowing an individual who has

previously filed a charge to abandon that charge and piggyback onto the charges of another individual would too often frustrate the EEOC's statutorily-mandated efforts to resolve an individual charge through informal conciliation.").  Similarly, the cases on which *Holowecki II* relied assert this rule in the broadest possible terms, and the Second Circuit clearly embraced their broad holdings.  *See Snell*, 782 F.2d at 1100 (stating that "*non-filing plaintiffs*" can take advantage of the piggybacking rule (emphasis added)); *see also Mooney*, 54 F.3d at 1223–24 ("The employee, by failing to assert a particular allegation in his charge, has necessarily excluded himself from the class of persons purportedly covered by the charge of another.").  Cases subsequent to *Holowecki II* also assert the rule in such an unqualified manner.  *See, e.g.*, *Richmond v. Gen. Nutrition Ctrs., Inc.*, No. 08-CV-3577, 2011 WL 2493527, at *9 (S.D.N.Y. June 22, 2011) ("[T]he 'piggyback' or 'single filing' doctrine to which they refer is not available to individuals who have filed their own EEOC charges." (citing *Holowecki II*, 440 F.3d at 564)).  Further, although subsequent cases have dealt primarily with plaintiffs seeking to escape the consequences of their own failure to sue within the limitations period, *Holowecki II* has not been relied on so narrowly within this circuit.  *See, e.g.*, *Friedman v. Columbia Univ.*, No. 12-CV-9275, 2014 WL 1041032, at *3 (S.D.N.Y. Mar. 13, 2014); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 831, 852 (S.D.N.Y. 2013); *Johnson v. Locke*, No. 10-CV-3105, 2011 WL 1044151, at *10 (S.D.N.Y. Mar. 14, 2011).

Accordingly, the Court finds that "where the party wishing to piggyback has filed his own EEOC charge, he is bound by the parameters of his own EEOC charge," and he may not thereafter piggyback on someone else's charge.  *Holowecki II*, 440 F.3d at 565 (cleaned up).  Despite the "irony that results from permitting a plaintiff who has not filed an EEOC charge to 'piggyback' on another employee's charge, but . . . denying the 'piggyback' option to a plaintiff

who has exercised somewhat more diligence by initiating an EEOC charge," *Piasecki v. Shinseki*, No. 10-CV-208A, 2011 WL 2516513, at *3 (W.D.N.Y. June 23, 2011), the Court does not see any reason to stray from the clear holding articulated in *Holowecki II*.

### 2. Named Plaintiff Eng

Named Plaintiff David Ho Eng was terminated from IBM on March 31, 2018.  FAC ¶ 24. On April 26, 2018, Eng dual-filed a charge of discrimination with the EEOC and the California Department of Fair Employment and Housing.  *See* Eng EEOC Charge, Dkt. 125-3.  In his charge, Eng checked the boxes for race and national origin discrimination but did not check the box for age discrimination.  *See id.*  In the charge particulars, Eng asserted that he believed he was "discriminated against because of [his] race, Asian, and national origin, Chinese," in violation of Title VII.  *Id.*  Eng alleged no facts concerning any discrimination based on his age.

Plainly then, Eng's charge failed to exhaust his ADEA claims, and he may not pursue his ADEA claims in court based on that charge.  *See, e.g.*, *Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 458 (2d Cir. 2009) (affirming dismissal of sexual harassment claims where EEOC charge alleged only racial discrimination); *Collins*, 156 F. Supp. 3d at 455–56 (dismissing age discrimination claim where EEOC charge alleged only retaliation for refusing to discriminate against students with disabilities and "*nothing* in [plaintiff's] charge provided the EEOC with notice of possible age discrimination").[16]  Further, in accordance with the Court's holding above, Eng may not now piggyback onto another's EEOC charge to exhaust his ADEA claims.  *See Holowecki II*, 440 F.3d at 564.  The Court's confidence in its holding is bolstered by the fact that

---

[16]     Although Plaintiffs fail to cite to it, the Court has identified a single case, discussed further below, in which a court within this circuit has found that a plaintiff's racial discrimination claim was reasonably related to his EEOC charge, even though the EEOC charge failed to allege facts describing racial discrimination.  *See Robinson v. Locke*, No. 11-CV-2480, 2012 WL 1028814, at *4–5 (S.D.N.Y. Mar. 28, 2012).  Although the facts in that case resemble those here in some important respects, ultimately, the Court concludes that *Robinson* does not support a finding that Eng's age discrimination claim is reasonably related to the claims he asserted in his EEOC charge.

Plaintiffs fail to cite to any case in which a court has permitted piggybacking in similar

circumstances, *i.e.*, where an individual filed a charge alleging certain claims and thereafter was

permitted to piggyback onto another's charge asserting different claims.  Accordingly, Named

Plaintiff Eng's ADEA claims are dismissed with prejudice.

### 3.  Named Plaintiff McGonegal

On June 30, 2018, Named Plaintiff Phil McGonegal separated from IBM.  FAC ¶ 23.

McGonegal, represented by Plaintiffs' counsel, filed a charge with the EEOC on July 2, 2018,

via fax.  *See* McGonegal EEOC Charge, Dkt. 136-4.  As IBM notes, McGonegal's EEOC charge

bears "no charge number, file stamp, or any other indication that it was received by the EEOC or

served on IBM."  Marshall Decl. ¶ 5.  That is the extent of the information concerning

McGonegal's separation from IBM and the circumstances surrounding the filing of his EEOC

charge that the Court may consider at this stage.

In their papers, both parties allude to the fact that the EEOC did not receive McGonegal's

charge when filed by fax on July 2, 2018.  *See* Def. Third Mem. at 5; Pls. Second Opp. at 9.

Both parties also cite to a recent email purportedly from the EEOC to Plaintiffs' counsel

asserting that the EEOC would process McGonegal's charge as having been received on July 2,

2018, despite his filing by fax — "not the ideal way" to submit a charge.  *See* Dkt. 125-5.  The

Court declines to consider any dispute over the timeliness of McGonegal's EEOC charge based

on his submission via fax and the EEOC's alleged lack of contemporaneous receipt.  This issue

is not apparent on the face of the complaint, and the only information the Court has before it on

these motions is an email seemingly excerpted from a longer chain and submitted without

context.  This document is neither incorporated into nor integral to the FAC, and even if it were,

the Court is unable to determine that "no dispute exists regarding the authenticity or accuracy of

the document."  *Sternkopf*, 2015 WL 5692183, at *4 (citation omitted).  Accordingly, the Court

may not dismiss McGonegal's ADEA claims on these motions based on IBM's argument that the claims were not exhausted because EEOC and IBM never received proper notice of his charge.[17]

In seeking dismissal of McGonegal's ADEA claims, IBM also asserts in its motions additional facts concerning his separation.  Specifically, IBM contends that McGonegal was given the option either to relocate or to participate in IBM's Transition to Retirement Program; IBM annexes to its motions several documents that support that contention and that establish the date on which he was given that choice.  *See* Def. Third Mem. at 5.  IBM also provides the reasons he purportedly gave for opting not to relocate, the date on which he allegedly chose to participate in the Transition to Retirement program, and information concerning his subsequent, unsuccessful attempt to seek an exception to the relocation requirement.  *See id.*  Based on these alleged facts, IBM argues that McGonegal's charge was untimely, regardless of whether the EEOC accepts his charge as having been received on July 2, 2018, because his claim accrued well more than 180 days before July 2, 2018.  *See id.* at 15–17.

All of the factual information IBM cites in support of its argument derives either from an affidavit that McGonegal submitted in support of Plaintiffs' motion for issuance of notice, *see* Dkt. 47-6, or from emails appended to IBM's motion that McGonegal allegedly sent while he was still employed at IBM, *see* Dkt. 131-6.  Neither the affidavit nor the emails appear to have been incorporated by reference into the FAC or integral to it.  In their complaint, Plaintiffs allege

---

[17]      Even were the Court to consider the circumstances surrounding the filing of McGonegal's EEOC charge, assuming that the EEOC decided to accept it as having been received on July 2, 2018 — and considering IBM's failure to cite any case law which would suggest the Court should not give credence to the EEOC's determination — the Court would not be inclined to find McGonegal's charge defective on this account.  The Second Circuit recently had occasion to consider a similar issue and recognized that "whether the charge is 'filed' on the date that the plaintiff faxes the complaint to the EEOC or on the date that the EEOC officially stamps the complaint 'received' . . . is an issue of first impression in this Circuit." *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 579 (2d Cir. 2020).  The Second Circuit, however, declined to consider the issue as plaintiff's claims were time-barred under either formulation.  *Id.*  This Court need not consider the issue at this time.

that McGonegal "was let go by IBM on June 30, 2018," and that termination supplies the basis for his ADEA claims. FAC ¶ 23. While the facts developed during discovery may support IBM's contention that McGonegal's charge accrued well before the date of his actual termination, nothing on the face of the complaint or in his EEOC charge reveals that the charge was untimely when filed, even if the Court accepts that it was filed on July 2, 2018.[18]

Even were the Court willing to consider these documents on IBM's motions, the Court is unwilling to delve into a factual inquiry concerning the timing of McGonegal's claims on a motion for judgment on the pleadings based on facts selectively chosen by the Defendant that are not evident from the complaint. The parties' papers reveal a dispute as to McGonegal's theory of discrimination, with IBM contending that his attempt to appeal his selection for IBM's relocate-or-retire program has no bearing on when his claim for an alleged constructive discharge accrued, whereas Plaintiffs allege that McGonegal's theory of discrimination is more encompassing than just being forced to choose between relocating and retiring and is mainly concerned with the fact that his younger colleagues who were also faced with that choice received exceptions while he did not.[19] *See* Def. Third Mem. at 15–17; Pls. Third Opp. at 11–15.

---

[18] The cases IBM cites in encouraging the Court to consider documents establishing the date on which McGonegal decided to separate from IBM are largely unhelpful. *See* Def. Third Mem. at 5 n.3. For instance, in *Vosburgh v. Burnt Hills - Ballston Lake Cent. Sch. Dist.*, No. 18-CV-1003, 2019 WL 315054, at *4 (N.D.N.Y. Jan. 24, 2019), the court found that the documents establishing the timeliness of plaintiff's claims were integral to the complaint and that plaintiff relied on them in drafting the complaint. IBM has failed to show that the documents it cites are integral to the complaint or were relied on by Plaintiffs in drafting the complaint. The Court recognizes that its inability to decide this issue on these motions arises largely from Plaintiffs' failure to provide any meaningful detail concerning McGonegal's separation in the complaint. Nevertheless, the Court is unwilling to ascribe to Plaintiffs a bad faith attempt to avoid a potentially meritorious Rule 12 motion. The Court warns Plaintiffs' counsel, however, that the absence of any detail or context in its filings with the EEOC and this Court does its clients no favors.

[19] Although the facts of McGonegal's separation are not properly before the Court on these motions, the Court notes that Plaintiffs' proffered theory of discrimination as to McGonegal's separation appears to be different from that proffered by former IBM employees who were selected for a Resource Action and thereafter sought to find a different job within IBM. Because the latter theory of discrimination appears on the face of the complaint, the Court may, and does, consider the parties' arguments on that issue below.

To decide this issue without the benefit of a full record would not be appropriate.  *See Sec. & Exch. Comm'n v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (stating that on Rule 12(c) motion, proper inquiry is, "[i]f, after accepting the complaint's factual allegations as true and drawing all inferences in favor of the plaintiff, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,] the complaint must be dismissed" (cleaned up)).

In short, based on the information properly before the Court at this time, IBM's motion for judgment on the pleadings as to Named Plaintiff McGonegal's ADEA claims is DENIED. Upon a more fully developed record, the Court may ultimately find McGonegal's EEOC charge to be untimely, but the Court may not reach that conclusion on IBM's Rule 12(c) motions.[20]

### C.  May Individuals Piggyback onto the EEOC Charge of Someone Other than a "Named Plaintiff"?

Because IBM's motions operate on the premise that the EEOC charges of Named Plaintiffs Eng and McGonegal are defective and therefore do not provide a charge onto which opt-ins may piggyback, IBM's memoranda focus exclusively on whether opt-ins may piggyback onto the Rusis/Gerrits charges, not whether any other EEOC charge supports piggybacking.  In response, Plaintiffs contend that opt-ins may piggyback onto the Rusis/Gerrits charges, but even if they cannot, there are EEOC charges other than those filed by the Named Plaintiffs that serve as charges onto which the opt-ins can piggyback.[21]  Plaintiffs' opposition briefs and IBM's reply

---

[20]     Because the Court holds that an individual who filed his own defective EEOC charge may not piggyback onto another EEOC charge, should the Court later find McGonegal's charge to be untimely such that it failed to exhaust his ADEA claims, he will not be able to piggyback onto any other EEOC charge, and his ADEA claims will be subject to dismissal.  Critically, the Court also notes that those opt-ins who hold out hope of piggybacking onto McGonegal's charge will not be able to do so if the Court finds it was untimely.

[21]     As noted, Plaintiffs also oppose IBM's arguments that the EEOC charges of Named Plaintiffs Eng and McGonegal are defective — although the Court rejects Plaintiffs' arguments with respect to Eng — and contend that opt-ins may also piggyback onto McGonegal's charge.

briefs,[22] therefore, raise the issue of whether an opt-in may piggyback onto the timely EEOC

charge of a former IBM employee who is not a Named Plaintiff in this action — and, perhaps,

not a named plaintiff[23] at all.

According to IBM, non-filing individuals may piggyback only on the administrative

charge of a named plaintiff who has timely filed an EEOC charge and timely filed a lawsuit that

the non-filing individual can join. *See* Def. Third Reply at 7.  IBM seems to further argue that,

"in the context of class and collective actions," piggybacking is limited to the EEOC charge of

the "named plaintiff representing a collective."  Def. Second Mem. at 10–11.  As IBM sees it,

permitting an individual to piggyback onto any EEOC charge regardless of whether the charging

party has initiated litigation which the opt-in may join would inappropriately expand the

piggybacking rule beyond its proper scope and essentially eliminate the administrative

exhaustion requirement from the ADEA.  *See* Def. Third Reply at 7.

Plaintiffs, on the other hand, contend that the piggybacking doctrine, as interpreted by the

Second Circuit, permits non-filing individuals to fulfill their administrative exhaustion

obligations by piggybacking onto *any* other timely filed charge that alleges similar

discrimination claims against the same employer, regardless of whether the charge-filing party

ever commenced litigation in reliance on his or her charge.  *See, e.g.*, Pls. Second Opp. at 3–4, 4

---

[22]     The general rule in this circuit is that issues may not be raised for the first time in reply papers.  *See Rowley v. City of New York*, No. 00-CV-1793, 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30, 2005) (collecting cases). Nevertheless, the Second Circuit has held that it is appropriate for courts to consider "*arguments* raised in response to arguments made in [a responsive] brief."  *United States v. Bari*, 599 F.3d 176, 180 n.6 (2d Cir. 2010) (per curiam).  As such, the Court finds it appropriate to consider the issue of whether an opt-in may satisfy the exhaustion requirement by piggybacking onto the claim of someone other than a Named Plaintiff in the present action.  The Court also finds IBM's opening briefs to have raised this issue, if not explicitly then at least implicitly, by arguing that only Named Plaintiffs' charges may be piggybacked and by arguing that opt-ins who cannot piggyback onto the charges of the Named Plaintiffs must, therefore, be dismissed.

[23]     The Court uses the lowercase term "named plaintiff" to refer generally to an individual who commenced a suit in his or her own name, either individually, in a multi-plaintiff action, or on behalf of a class or collective.

n.2.  Accordingly, Plaintiffs contend that the opt-ins may piggyback onto any EEOC charge filed against IBM that provided the agency with notice to investigate age discrimination claims against IBM within the relevant time frame.  *See id.*

This appears to be an issue of first impression in the Second Circuit.  Other circuits, however, have uniformly found IBM's position to be correct.  As the Fifth Circuit has held, "the individual who filed the EEOC charge *must actually file a suit* that the piggybacking plaintiff may join" in order for a putative plaintiff to piggyback onto that charge.  *Bettcher v. Brown Schs., Inc.*, 262 F.3d 492, 494–95 (5th Cir. 2001) (emphasis added); *see also Anderson v. Unisys Corp.*, 47 F.3d 302, 308–09 (8th Cir. 1995).  In so holding, the Fifth Circuit found that "no circuit court has ever authorized piggybacking on an EEOC charge when the individual who filed the charge never actually filed suit."  *Id.* at 495.  Although 20 years have passed since the decision in *Bettcher*, this Court is unaware of a single case in the intervening years in which a court broke from the *Bettcher* court's holding, nor do Plaintiffs cite any.[24]

Within this circuit, in discussing the piggybacking doctrine, courts speak uniformly in terms of EEOC charges filed by other "plaintiffs."  For instance, in *Snell*, the first case in which the Second Circuit adopted the single-filing rule (in the Title VII context), the court defined the rule as "where one *plaintiff* has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims 'aris[e] out of similar discriminatory treatment in the same time frame.'"  *Snell*, 782 F.2d at 1100 (quoting *Ezell v. Mobile Hous. Bd.*, 709 F.2d 1376, 1381 (11th Cir. 1983)); *see also Holowecki II*, 440 F.3d at 564 (reiterating the *Snell* articulation

---

[24]  The only case within this circuit to address the issue, of which this court is aware, is the district court's initial decision in *Holowecki*, in which the court cited *Bettcher* for the proposition that "no circuit has ever authorized piggybacking on an EEOC charge when the individual who filed the charge never actually filed suit." *See Holowecki v. Fed. Express Corp.*, No. 02-CV-3355, 2002 WL 31260266, at *5 n.3 (S.D.N.Y. Oct. 9, 2002), *rev'd in part, vacated in part*, 440 F.3d 558.  The Second Circuit did not consider this issue on appeal.  *See Holowecki II*, 440 F.3d 558.

of the piggybacking doctrine in ADEA case).[25]  In each of the cases Plaintiffs cite from this circuit — including those which Plaintiffs assert support their exceptionally broad reading of the piggybacking doctrine — the court has employed a similar definition and applied the piggybacking doctrine only to individuals seeking to piggyback on a *named plaintiff's* EEOC charge.  *See, e.g.*, *Barrett v. Forest Lab'ys, Inc.*, 39 F. Supp. 3d 407, 458 (S.D.N.Y. 2014); *Cronas v. Willis Grp. Holdings Ltd.*, No. 06-CV-15295, 2007 WL 2739769, at *3–5 (S.D.N.Y. Sept. 17, 2007).

Plaintiffs, however, would have the Court adopt a formulation of the piggybacking rule that requires only that "**a** charge notifying the EEOC of the complained[-]of discrimination has been filed."  Pls. Second Opp. at 16.  In pressing for this interpretation, Plaintiffs stress that the purpose of the administrative exhaustion requirement is "simply to notify the EEOC of the unlawful discrimination," and they highlight the supposed breadth of the Second Circuit's discussion of the piggybacking doctrine in *Tolliver*.  *See id.* at 16–17.  Pursuant to *Tolliver*, then, Plaintiffs argue that "<u>any</u> EEOC charge filed against IBM that provided the agency with notice to investigate [alleged age discrimination] may be piggybacked on by opt-ins to fulfill the administrative exhaustion requirement here."  *Id.* at 4 n.2.  This Court is unwilling to go where seemingly no court has gone before and is unwilling to expand the doctrine that broadly.

Nor is the Court willing to ascribe to *Tolliver* as broad a reading as Plaintiffs press.  Undoubtedly, the *Tolliver* court sought to broaden the scope of the piggybacking doctrine within

---

[25]    Although there may be some limited differences in the application of the single-filing rule in the context of claims under the ADEA as compared to Title VII, courts frequently rely on cases arising under Title VII in applying and analyzing the piggybacking doctrine in ADEA cases, and vice versa.  *See generally Tolliver*, 918 F.2d at 1055–57; *Cronas v. Willis Grp. Holdings Ltd.*, No. 06-CV-15295, 2007 WL 2739769, at *3–5 (S.D.N.Y. Sept. 17, 2007); *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221 n.10 (11th Cir. 2001) ("The purposes underlying ADEA and Title VII, specifically their respective requirements that employees file charges of discrimination with the EEOC so that the employer can attempt to resolve the issue through conciliation, are similar.  We therefore look to Title VII cases as well as ADEA cases in examining [the single-filing rule].").

this circuit.  In doing so, the court paid deference to the EEOC's lenient interpretation of the

ADEA's charge-filing requirements, pursuant to which those requirements are "satisfied 'so long

as the matter complained of was within the scope of [a] previously filed charge, regardless of

who filed it.'"  *Tolliver*, 918 F.2d at 1057 (quoting 43 Fed. Reg. 138, 139 (1983)).  Describing

the purpose of the administrative charge requirement as "afford[ing] the agency the opportunity

to 'seek to eliminate any alleged unlawful practice by informal methods of conciliation,

conference, and persuasion,'" the *Tolliver* court found that "[i]f the agency charged with that task

is satisfied that a timely filed administrative charge affords it sufficient opportunity to discharge

these responsibilities with respect to similar grievances, it serves no administrative purpose to

require the filing of repetitive ADEA charges . . . ."  *Id.* (quoting 29 U.S.C. § 626(d)).

Notwithstanding the breadth of this language, the "primary issue" in *Tolliver* was

"whether the administrative charges . . . filed by *named plaintiffs* in a suit instituted as a class

action under the [ADEA] satisfy the claim filing obligations of individual plaintiffs alleging

similar grievances, despite decertification of the class."  *Id.* at 1054 (emphasis added); *see also*

*id.* at 1057 (describing in similar terms the three subsidiary issues the court had to decide).  The

*Tolliver* court focused its inquiry on whether an individual seeking to piggyback on the charge of

a *named plaintiff* in one action had to join that action or could file his or her own lawsuit while

satisfying the exhaustion requirement by piggybacking on the charge of the named plaintiff in

the other suit.  Although Plaintiffs assert that the Second Circuit has aligned itself with the

"'broadest' interpretation of the single-filing rule," *Cronas*, 2007 WL 2739769, at *6 (quoting

*Tolliver*, 918 F.2d at 1057), given subsequent case law both within and outside this circuit, the

Court is unconvinced that the scope of the piggybacking doctrine is so broad as to permit an

individual to piggyback on any charge that may have put the EEOC on notice of discriminatory

35

conduct, regardless of whether the charge-filer ever filed suit.

As courts to consider this issue have found, permitting a non-charge-filing individual to piggyback on "the charge of a party that has not filed suit . . . would allow the single filing exception to consume the statutory rule, which clearly requires all ADEA plaintiffs to file a charge before filing a lawsuit." *Bettcher*, 262 F.3d at 495. Limiting the charges onto which a non-charge-filer can piggyback to those filed by named plaintiffs also prevents the unwieldy scenario in which a court could never be certain whether to dismiss a plaintiff for failing to exhaust her claims, based on that plaintiff's assertion that there *must* surely be a timely EEOC charge out there somewhere onto which she can piggyback. Properly understood, then, the single-filing rule requires more than the existence of an EEOC charge, floating somewhere in the ether, onto which an individual may piggyback — it requires also the existence of a named plaintiff pressing her ADEA claims in court after having exhausted those claims by virtue of that EEOC charge. In short, the Court holds that an individual who has failed to file her own timely administrative charge may piggyback only onto the properly filed charge of an individual who subsequently commenced a suit in reliance on that charge — i.e., a *named plaintiff*.

Finally, the Court sees no reason to distinguish between charge-filers who never pursue litigation in any respect and those who do not commence their own litigation but instead consent to be bound by another's action by opting in to a collective. While the Second Circuit permits individuals to avail themselves of the piggybacking doctrine in their own individual actions instead of joining the original charge-filer's existing action, the Court understands there to be an implicit requirement that there be some *existing* action which an individual may, although need not, join. *See Tolliver*, 918 F.2d at 1057 (addressing the question of "whether the single filing rule may be used to permit an ADEA plaintiff to file his or her own lawsuit, rather than to join in

a previously filed suit, either as co-plaintiff or intervenor"); *see also, e.g.*, *Lawrence v. Town of Irondequoit*, 246 F. Supp. 2d 150, 171 (W.D.N.Y. 2002) ("[A] plaintiff who never filed an EEOC charge may still litigate his or her claim as part of a previously filed law suit so long as those claims fall within the scope of timely filed charges of the named plaintiffs."); *Clark v. United Techs. Corp.*, No. 97-CV-438, 1997 WL 573431, at *3 (D. Conn. Sept. 3, 1997) ("However, under limited circumstances, plaintiffs who have not [filed a timely EEOC claim] are permitted to 'piggyback' *onto the suit of someone else* who has filed an administrative charge alleging class-wide discrimination." (emphasis added)); *Libront v. Columbus McKinnon Corp.*, No. 83-CV-858E, 1987 WL 13879, at *3 (W.D.N.Y. July 13, 1987) ("The intervening plaintiffs who have not personally complied with section 626(d) are limited to the claims raised by the representative plaintiffs."). Even in the case Plaintiffs cite repeatedly for the proposition that the Second Circuit has adopted the broadest possible interpretation of the doctrine, the court seemed to consider it an implicit assumption that the charge-filer had filed a suit in her own name. *See Cronas*, 2007 WL 2739769, at *3–4 (noting that the single-filing rule has been applied in the class action context to permit plaintiffs to "'piggyback' their otherwise untimely claims on to those of timely filed named plaintiffs" and otherwise discussing the issue as whether to permit a plaintiff "to initiate a new lawsuit rather than join a preexisting one").

Thus, the Court holds that, just as a non-charge filer cannot piggyback onto the charge of a charge-filer who does not litigate at all, a non-charge filer also cannot piggyback onto the charge of a charge-filer who seeks to opt-in to a collective. An incidental benefit of this holding is that it prevents a situation in which plaintiffs in a putative collective action can create a piggybacking chain of near-infinite length and scope by seeking out new opt-ins who have filed more recent or broader EEOC charges who can then save others in the action who would

otherwise be unable to piggyback onto the charges of the named plaintiffs.[26]

### D.  EEOC Determination Letter

Having found that non-charge filers can only piggyback on to EEOC charges filed by named plaintiffs, the Court now turns to the primary circumstance in this action implicating such a finding.  On August 31, 2020, after IBM had filed its motions but before Plaintiffs had responded, the EEOC issued a Letter of Determination ("EEOC Determination Letter") based on charges filed by 58 former IBM employees.  *See* EEOC Determination Letter, Dkt. 137-1.  The letter articulates the EEOC's conclusion that IBM "conducted Resource Actions . . . between 2013 and 2018 that had an adverse impact on employees [40 years of age or older]."  *Id.* According to the letter, the EEOC's "investigation uncovered top-down messaging from [IBM's] highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires," with "primarily older workers (85.85%) in the total potential pool of those considered for layoff."  *Id.*

As one might expect, Plaintiffs view the EEOC's Determination Letter as their "golden ticket."  Plaintiffs repeatedly contend that the letter conclusively demonstrates that the EEOC was more than simply on notice of rampant age discrimination at IBM, it was actively

---

[26]      A subsidiary issue that IBM's motions appear to raise is whether piggybacking by other named plaintiffs and opt-ins in a putative class and collective action is limited to the charges of the named plaintiffs *in that action* or whether an opt-in plaintiff in one class or collective action may piggyback onto the charges of a named plaintiff in another action.  There is markedly little guidance on this issue, as in nearly every class or collective action invoking the single-filing rule, the parties agree that the scope of the case is dictated by the EEOC charge or charges of the named plaintiffs in that action.  The Second Circuit in *Holowecki II* acknowledged this issue but refrained from addressing it.  *See Holowecki II*, 440 F.3d at 565 (noting the piggybacking plaintiffs' argument that "they can piggyback onto timely EEOC charges filed by parties to a separate Florida lawsuit that was dismissed prior to the initiation of [that action] because the charges filed by those individuals put the EEOC and [the employer] on notice about its allegedly nationwide discriminatory practices").  Because the Court's holding that opt-ins may piggyback only onto the charges of a named plaintiff renders this subsidiary issue irrelevant to these motions, at least for the time being, it need not address this issue.  That said, as a matter of normal litigation practice, the named plaintiffs in litigation control the scope of the litigation based on the injury they allegedly suffered.  It would be odd if piggybacking could be used to expand the scope of litigation beyond that delineated by the named plaintiffs.

investigating it.[27]  Accordingly, Plaintiffs argue that the EEOC determination letter reveals that

the purpose of the ADEA's administrative exhaustion requirement has been satisfied, so IBM

cannot reasonably argue that the EEOC has not had an adequate opportunity to investigate and

conciliate the age discrimination claims of the Named Plaintiffs and opt-ins in this case.

Plaintiffs further argue that, to the extent the Court finds that an individual opt-in or group of

opt-ins may not piggyback onto the charges of the Named Plaintiffs in this action, some of the 58

charges underlying the EEOC Determination Letter may provide an additional basis for

piggybacking, and, thus, it would be inappropriate for the Court to dismiss those opt-ins on these

motions, as it is clear from the face of the letter that the underlying charges likely assert the same

theories of broad-based discrimination against IBM within the same time frame as Plaintiffs

allege in this case.

On these motions, the Court does not find the EEOC Determination Letter to be as

helpful to Plaintiffs as they suggest, even if the letter and the investigation it documents may

ultimately assist some opt-ins in exhausting their ADEA claims.  First, as the Court addresses

below, it does not find the EEOC Determination Letter to reveal the existence of an investigation

that extends beyond IBM's Resource Actions.  For this reason, the letter provides little assistance

to opt-ins who are pressing constructive discharge or pretextual termination claims and who are

seeking to piggyback into this action.

Second, because the Court has found that non-charge filers can only piggyback onto

named plaintiffs' charges, Plaintiffs' argument that the opt-ins in this action may be able to

piggyback on to one of the 58 charges filed by those whose charges underlie the EEOC

---

[27]      As discussed below, Plaintiffs also assert that the EEOC Determination Letter supports their argument that
former IBM employees asserting any theory of discrimination — including constructive discharge and pretextual
termination — should be permitted to piggyback, given the alleged breadth of the EEOC's investigation.

Determination Letter would be meritorious only if Plaintiffs could show that at least one of those 58 charge-filing individuals ultimately filed suit.  If that occurred, then opt-ins *may* be able to piggyback onto that person's charge.  On this record, the Court limits its holding to the general proposition that those seeking to opt-in may not piggyback onto the charges underlying the EEOC's Determination Letter unless the charge-filing individual subsequently commenced litigation.[28]

Nevertheless, at this stage of the case, the Court cannot rule out the possibility that the EEOC's investigation into age discrimination at IBM may allow certain opt-ins to demonstrate exhaustion of their ADEA claims.  Courts within this circuit have been willing to apply more flexibly the reasonably related and piggybacking doctrines in cases in which it is clear that the EEOC and employer were on notice of alleged discrimination, even if not necessarily alleged in the EEOC charge on which a plaintiff relied to exhaust his claims.  For instance, in *Virgo v. Local Union 580*, the court found that a plaintiff's claims of discrimination, although not included in his EEOC charge, were "within the scope of the EEOC investigation that reasonably could be expected to grow out of" the EEOC charge because of an ongoing EEOC investigation into the employer, such that plaintiff's claims of discrimination were "not likely to have caught the EEOC by surprise."  107 F.R.D. 84, 89 (S.D.N.Y. 1985).

Similarly, in *Robinson v. Locke*, in issuing a report and recommendation to the district court, Magistrate Judge Freeman considered whether a plaintiff who filed an EEOC charge alleging discrimination based on his employer's use of minor criminal records to screen applicants and thereafter commenced suit claiming racial discrimination could be deemed to

---

[28]      As noted in note 26, the Court refrains from deciding at this time whether the named plaintiff to whose case an individual opts in must be the same named plaintiff on whose claim that individual piggybacks.

have exhausted his race-based claims despite not raising them in his EEOC charge.  No. 11-CV-

2480, 2012 WL 1029112, at *1 (S.D.N.Y. Feb. 1, 2012), *report and recommendation adopted*,

No. 11-CV-02480, 2012 WL 1028814 (S.D.N.Y. Mar. 28, 2012).  Around the same time that

Robinson had filed his EEOC charge, other individuals had commenced a class action suit

against the employer, alleging that it used minor criminal offenses as a means of discriminating

against black and Hispanic individuals.  *Id.* at *8–9.  Magistrate Judge Freeman recommended

that, considering the "unusual facts" of the case, despite what would otherwise be a

straightforward application of the principles guiding the exhaustion requirement, the district

court find that the plaintiff's racial discrimination claims were reasonably related to his EEOC

charge because "both the [employer] and the EEOC could have been expected to consider and

investigate the question of whether Plaintiff may have been adversely impacted by [his

employer's] screening policy because of his race."  *Id.* at *7–9.  The district court adopted the

report and recommendation on that ground, finding plaintiff's employer and the EEOC to have

been "sufficiently on notice" to conduct the necessary investigation into plaintiff's racial

discrimination claims.  *See Robinson*, 2012 WL 1028814, at *4–5.

While the district court did not reach the issue, Magistrate Judge Freeman also

recommended an alternative ground for finding that the plaintiff exhausted his racial

discrimination claims:  The court could excuse the exhaustion requirement based on the equities

presented.  *Robinson*, 2012 WL 1029112, at *10; *see also id.* at *7 (finding that, while the

administrative exhaustion requirement is an essential element of Title VII's statutory scheme,

federal courts are still empowered to waive the exhaustion requirement where "equity warrants"

(cleaned up)).  Magistrate Judge Freeman analogized the situation to that which exists when

courts permit plaintiffs to rely on the piggybacking doctrine to excuse their own failure to file

41

timely charges of discrimination.  *Id.* at *10–11 (citing *Snell*, *Tolliver*, and *Cronas*).  Ultimately, Magistrate Judge Freeman stated, "as in the cases where the single-filing rule has been invoked, this is a case where both the employ[er] and the EEOC had ample notice of the broad disparate-impact claim that Plaintiff now seeks to raise, and they should have known to investigate that claim."  *Id.* at *12.  Thus, "the logical underpinnings of the single-filing rule are equally applicable here, and dictate that Plaintiff should be permitted to proceed with his race-discrimination claim, even though he never mentioned 'race' in his administrative filing."  *Id.*

Given the unusual circumstances in this case as a result of what appears to be a contemporaneous EEOC investigation into IBM's alleged age discrimination, this Court may have reason to more flexibly apply the strictures of the reasonably related and piggybacking doctrines, or to otherwise excuse an opt-in's failure to exhaust.  At this stage of the case, however, the Court has far too little information about the EEOC's investigation to make any such determination.  For that reason, the Court is unwilling to foreclose any individual opt-in's participation in this action on these motions inasmuch as subsequent information about the EEOC's investigation into IBM may operate to absolve seeming failures to exhaust.[29]

## IV.   IBM's Motion for Partial Judgment on the Pleadings as to Constructive Discharge and Pretextual For-Cause Termination Claims

The Court now turns to the goal of IBM's second motion: the dismissal of Named Plaintiffs McGonegal and Eng and all opt-ins who assert constructive discharge and pretextual for-cause termination claims under the ADEA.  As discussed, IBM's position is that the Rusis/Gerrits charges — as the only timely charges filed by representative Named Plaintiffs —

---

[29]     As discussed below in the context of IBM's motion pertaining to the substantive scope of the Rusis/Gerrits charges, however, the Court does not believe that the EEOC's investigation will permit those asserting constructive discharge or pretextual termination claims to piggyback or participate as opt-in plaintiffs in this action.

are the sole charges onto which any opt-in in this action may piggyback.  IBM further contends

that the Rusis/Gerrits charges support piggybacking only for those IBM employees who were

terminated by way of a "layoff."  Accordingly, in IBM's view, all former IBM employees

asserting ADEA claims pursuant to constructive discharge or pretextual termination theories of

discrimination who did not exhaust their claims through their own timely-filed EEOC charge

must be dismissed from this action.

      In opposition to IBM's motion, Plaintiffs argue that the Rusis/Gerrits charges are

sufficiently broad to permit piggybacking by any former IBM employee asserting *any* theory of

age discrimination, but even if they are not, there are a number of other EEOC charges onto

which opt-ins asserting constructive discharge and pretextual termination claims may piggyback.

Specifically, Plaintiffs argue that charges underlying the EEOC Determination Letter support

piggybacking for opt-ins asserting claims for constructive discharge and pretextual termination.

*See* Pls. Second Opp. at 19–20.  Plaintiffs also contend that, at the very least, opt-ins asserting

constructive discharge claims may piggyback onto McGonegal's EEOC charge or the charge of

opt-in Karen Kersting.  *Id.* at 24–25.

      For the reasons stated below, the Court finds that the Rusis/Gerrits charges permit

piggybacking only for former IBM employees who were terminated as part of an IBM Resource

Action — *i.e.*, a layoff.  As such, should the Court ultimately limit the scope of the ADEA

collective to those who can piggyback onto the Rusis/Gerrits charges (and those who timely filed

their own EEOC charges asserting age discrimination), those opt-ins asserting constructive

discharge and pretextual termination claims who did not file their own timely EEOC charges will

be dismissed from this action.  Nevertheless, the Court does not believe that it would be

appropriate to dismiss any individual opt-ins at this stage.  First, while the Court agrees with

IBM that constructive discharges and pretextual for-cause terminations are factually and legally

distinct from discriminatory layoffs, the Court cannot ascertain on the record before it on this

motion which opt-ins are asserting which theories of discrimination.  Thus, while the Court

agrees that an opt-in who, for example, was given the choice between relocating or retiring, or an

opt-in who was nominally terminated for poor performance, may not piggyback onto the

Rusis/Gerrits charges, to determine which opt-ins assert which claim would require the Court to

consider facts and materials that go beyond the scope of those properly considered on a Rule

12(c) motion.

Second, although the Court finds that an individual may only piggyback onto the claim of

a named plaintiff, because Plaintiffs have identified at least the possibility of an EEOC charge

other than the Rusis/Gerrits charges that may permit piggybacking for opt-ins asserting

constructive discharge or pretextual termination claims, the Court agrees with Plaintiffs that it

would be premature to dismiss individual opt-ins on this motion.  The possibility remains,

although perhaps remote, that opt-ins may piggyback onto one of the charges underlying the

EEOC Determination Letter or McGonegal's charge — or the EEOC investigation into IBM will

itself exhaust opt-ins' ADEA claims.[30]

### A.  Rusis/Gerrits Charges

Named Plaintiffs Rusis and Gerrits filed nearly identical charges almost exactly two

months apart.  *See* Rusis Charge, Dkt. 136-2; Gerrits Charge, Dkt. 136-3.  In fact, the charge

particulars are identical, with the sole difference being each man's age.[31]  The Rusis/Gerrits

---

[30]     Because opt-ins may not piggyback onto charges filed by non-named plaintiffs, opt-ins asserting
constructive discharge claims may not piggyback onto the charge of opt-in Karen Kersting.

[31]     This is perhaps unsurprising because Plaintiffs' counsel appears to have drafted both.  The only other
distinction, other than personal identifying information, is the date each provided as the earliest date discrimination

charges state, in full:

> IBM is discriminating against its older workers, both by laying them off disproportionately to younger workers and not hiring them for open positions. Indeed, over the last several years, IBM has been in the process of systematically laying off its older employees in order to build a younger workforce.  IBM has laid off at least 20,000 employees over the age of forty in the last five years.  I am 59 [or 67] years old, and I am being laid off by IBM effective June 27, 2018.  Since receiving notice of my layoff, I have applied for several other open positions within IBM, for which I am eminently qualified, but I have not been hired for any of these positions, despite my lengthy service and successful experience as an employee for IBM.  I believe that I and thousands of other employees have been discriminated against by IBM on the basis of age.

Rusis Charge; Gerrits Charge.

IBM interprets the Rusis/Gerrits charges to encapsulate IBM's allegedly discriminatory conduct relating exclusively to "layoffs," which IBM deems synonymous with its Resource Actions.  Plaintiffs, however, argue that the Rusis/Gerrits charges are sufficiently broad to have put the EEOC on notice of a multi-year, companywide scheme, so that any opt-in may piggyback on the charges regardless of the manner in which IBM operationalized its allegedly unlawful age discrimination as to that specific opt-in.  As Plaintiffs view it, any method pursuant to which IBM achieved its overarching goal of eliminating its older workforce in favor of younger employees is "reasonably related" to the Rusis/Gerrits charges.  Because, in Plaintiffs' view, any claim of age discrimination at IBM arises from the same circumstances and occurred in the same time frame, the Rusis/Gerrits charges provided EEOC notice of the breadth of the allegations. *See, e.g.*, Pls. Second Opp. at 3–4.  The question for the Court, then, is whether, on their face, the Rusis/Gerrits charges are broad enough to provide notice to the EEOC and IBM to explore conciliation with employees who separated from IBM in ways other than as part of an IBM

occurred, with Rusis saying March 2018 and Gerrits providing a specific date, March 29, 2018.  This information is relevant only to IBM's motion concerning the temporal scope of the Rusis/Gerrits charges, discussed below.

Resource Action.  *See Tolliver*, 918 F.2d at 1058.

The Court is unpersuaded by Plaintiffs' argument; it is clear from the face of the

Rusis/Gerrits charges that the scope of the discrimination alleged is limited to IBM's program of

layoffs or Resource Actions.  In determining the scope an administrative charge, the Second

Circuit instructs district courts to focus on the "factual allegations made in the EEOC charge

itself, describing the discriminatory conduct about which a plaintiff is grieving."  *Ximines*, 516

F.3d at 158 (cleaned up).  The Rusis/Gerrits charges speak exclusively of "layoffs" and failure to

hire employees slated for layoff into open positions; there is nothing in the factual allegations

that even remotely suggests a complaint of constructive discharge, pursuant to which an

employee necessarily leaves her own volition, or of pretextual *for-cause* termination.  This is

true even with respect to the charges' broadest statements describing IBM's company-wide

practice of discrimination.  *See* Rusis Charge ("IBM has been in the process of systematically

laying off its older employees in order to build a younger workforce.").  Plaintiffs' only hope,

therefore, is that the term "layoffs," and general complaints about discrimination against older

employees, are broad enough to encompass constructive discharge and pretextual termination

claims, such that the EEOC could have been expected to investigate IBM beyond its Resource

Actions.  Otherwise, because the charges describe only discriminatory mass layoffs, they do not

administratively exhaust or permit piggybacking for claims based on constructive discharge or

pretextual termination.  *See, e.g.*, *Holowecki v. Fed. Exp. Corp.*, 644 F. Supp. 2d 338, 351

(S.D.N.Y. 2008) ("*Holowecki III*") (prohibiting piggybacking where individuals' claims of

discrimination involved different theories and factual settings); *Miles v. N.Y. Health & Racquet

Club Found., Inc.*, No. 84-CV-3610, 1987 WL 9431, at *4 (S.D.N.Y. Apr. 7, 1987) (finding a

claim concerning denial of employee benefits to be "significantly factually different from a claim

of discriminatory hiring or of discriminatory sales of memberships," despite a "commonality of motivation," such that piggybacking was not appropriate); *see also Ulvin v. Nw. Nat'l Life Ins. Co.*, 943 F.2d 862, 865–66 (8th Cir. 1991) (holding that a charge complaining of demotion and subsequent firing because of age was "too narrow to support the discrimination claims of the early retirees" who complained of being coerced into accepting early retirement).[32]

Plaintiffs argue that the charge allegations — such as "I and thousands of other employees have been discriminated against by IBM on the basis of age" — "bluntly put the EEOC on notice as to the breadth of IBM's unlawful discrimination" so that "[a]ll manners of age discrimination that led to the separation of employment for older IBM workers fall within the scope of the conduct alleged in the [Rusis/Gerrits] charges." Pl. Second Opp. at 1, 3 (quoting Rusis Charge). The Court is not persuaded. General statements asserting only that IBM engaged in widespread age discrimination are patently insufficient to put the EEOC or IBM on notice of future claims alleging constructive discharge or pretextual termination. *See Butts*, 990 F.2d at 1403 (stating that, with respect to an allegation that plaintiff was "denied promotional opportunities and consideration based on my race and sex," "[w]ere we to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response, to define the scope of the EEOC investigation and thereby predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and Title VII's investigatory and mediation goals would be defeated."); *Bloomberg*, 967 F. Supp. 2d at 852 n.26 (deeming the statement that plaintiff "believes that other women in similar situations have also been demoted" insufficient to

---

[32]     In arguing that the legal theories underlying reductions in force, constructive discharge, and pretextual terminations are not actually distinct, especially when plaintiffs allege a "top-down discrimination strategy," Plaintiffs cite two cases, one of which considered only whether to issue notice, and the other which the Court has already deemed unhelpful and reliant on an overly lenient, outdated standard. *See* Pls. Second Opp. at 23 (citing *Allen v. Marshall Field & Co.*, 93 F.R.D. 438 (N.D. Ill. 1982), and *Heagney v. Eur. Am. Bank*, 122 F.R.D. 125 (E.D.N.Y. 1988)). The Court also finds unavailing Plaintiffs' attempts to distinguish the cases cited above.

permit others in putative collective to piggyback).  The Court also disagrees that Plaintiffs'

allegation that a single invidious motive underlay various types of employment actions at IBM

means it would have been "inefficient" or unnecessary for opt-ins who experienced adverse

employment actions other than layoffs to have filed a separate EEOC charge.  Pl. Second Opp. at

21; *see also Miles*, 1987 WL 9431, at *4 (looking past "commonality of motivation" despite

different acts of racial discrimination being "analytically linked" where there were significant

factual differences in the type of discriminatory conduct alleged).

The Court agrees with IBM that the term "layoffs" as used here refers exclusively to

IBM's Resource Actions.  As IBM asserts, "layoffs," both colloquially and in technical legal use,

almost always describe reductions in force, or programs akin to IBM's Resource Actions, in

which a group of employees are selected in bulk for separation.  *See* Def. Second Mem. at 13–14

(citing Black's Law Dictionary (10th ed. 2014) (defining "layoff" as a "reduction in force" and

the "termination of employment at the employer's instigation . . . through no fault of the

employee")); Def. Second Reply at 1–2 (citing *Price v. Bd. of Educ. of Chi.*, Nos. 11-CV-4463,

11-CV-4974, 11-CV-9322, 2013 WL 1914325, at *6 (N.D. Ill. May 8, 2013); *Duffy v. Sarault*,

702 F. Supp. 387, 391 n.1, 393 (D.R.I. 1988)).  Plaintiffs fail meaningfully to distinguish IBM's

authority and do not cite any compelling cases of their own.[33]  *See* Pls. Second Opp. at 20–24.

Most fundamentally, however, even under the definition of "layoffs" that Plaintiffs press, it is

clear that the term cannot encompass the multitude of factual scenarios underlying theories of

---

[33]      As IBM notes, the cases Plaintiffs cite stand for the proposition that multiple legal causes of action may
arise out of the same set of facts alleged in an administrative charge.  *See, e.g.*, *Rasmy v. Marriott Int'l, Inc.*, No. 16-
CV-4865, 2017 WL 773604, at *7 (S.D.N.Y. Feb. 24, 2017); *see also Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191,
1199 (10th Cir. 2004).  These cases are of no moment here, because the Rusis/Gerrits charges do not include any
*factual allegations* out of which charges of constructive discharge or pretextual termination could grow.

constructive discharge and pretextual terminations.[34]  *See O'Hara v. Memorial Sloan-Kettering Cancer Ctr.*, 27 F. App'x 69, 70 (2d Cir. 2001) ("There must be some factual or legal nexus between the substance of the allegations contained in the administrative charge and the new cause of action.").

As this Court wrote when denying Plaintiffs' request for the issuance of notice, discriminatory layoffs, constructive discharges, and pretextual terminations are both legally and factually distinct, and the Court need not consider the opt-ins' individual circumstances to reach this conclusion.  *See Rusis*, 2020 WL 1151322, at *3.  Plaintiffs' own use of the term "layoffs" and their description of IBM's alleged conduct adds ample support to the Court's conclusion. Plaintiffs readily acknowledge that IBM allegedly employed several *distinct methods* for terminating older employees, even if each method was intended to achieve the same top-down goal of eliminating its older workforce.  *See, e.g.*, Pl. Second Opp. at 6 (stating that "IBM employed several methods to reduce its population of older workers," then describing Resource Actions, constructive discharge, and pretextual for-cause terminations as distinct methods). Plaintiffs' argument — that determining whether constructive discharge and pretextual termination claims are factually distinct from IBM's Resource Actions is an inappropriate factual determination at this stage of the case — is, therefore, demonstrably false given the way in which Plaintiffs themselves have described these distinct "methods" of discriminatory terminations in their pleadings and papers.  Similarly, Plaintiffs themselves use the term "layoffs" as synonymous with reductions in force, or IBM's Resource Actions, and as distinct from other

---

[34]    Even if the Court were to look beyond the factual allegations contained in the Rusis/Gerrits charges themselves to the facts specific to Rusis' and Gerrits' separations from IBM, the Court's analysis would be the same.  Rusis and Gerrits were each laid off as part of a Resource Action, so any investigation into their specific circumstances could be expected to extend only to IBM's Resource Actions.

theories of discrimination.  *See, e.g.*, FAC ¶ 1 (stating IBM has discriminated against older employees "both by laying them off (*or terminating or constructively discharging them*) disproportionately to younger workers" (emphasis added)); *id.* ¶ 19 ("Many older employees have been *laid off* through reductions in force *or layoffs*, which IBM refers to as 'Resource Actions.' . . . IBM has also reduced its population of older workers by terminating older employees for pretextual reasons, or by constructively discharging them . . . ." (emphasis added)); Pl. Third Opp. at 5 (describing the "several methods" that IBM used to separate older workers, distinguishing "reductions in force or layoffs" from constructive discharges and pretextual terminations).[35]

The Rusis/Gerrits charges describe, at best, a pattern of discriminatory layoffs targeted at older employees, and the Court holds that Plaintiffs cannot shoehorn theories of constructive discharge or pretextual termination into these charges.[36]  As the *Tolliver* court stated, "[i]n assessing the adequacy of a charge for purposes of the single filing rule, the question is whether 'it can fairly be said that no conciliatory purpose would be served by filing separate EEOC charges.'"  *Tolliver*, 918 F.2d at 1058 (quoting *Foster*, 655 F.2d at 1322).  In this case a conciliatory purpose would have been served by having employees who are asserting constructive discharge or pretextual termination claims file EEOC charges in addition to those that were filed by Rusis and Gerrits.

In short, only those opt-ins who were separated from IBM as part of a "layoff" — an

---

[35]      In at least one instance, Plaintiffs themselves characterize the Rusis/Gerrits charges as alleging "(in addition to broader allegations) that IBM systematically laid off its older workforce through strategic [Resource Actions]."  Pls. Second Opp. at 2.

[36]      The Court notes that the Second Circuit's description of the reasonably related doctrine as "essentially an allowance of loose pleading" is "based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel."  *Ximines*, 516 F.3d at 158 (cleaned up).  Here, the Rusis/Gerrits charges were filed by Plaintiffs' counsel, so arguments pressing for a lenient interpretation of the charges ring hollow.

IBM Resource Action — may piggyback onto the Rusis/Gerrits charges.

**B. EEOC Determination Letter**

In opposing IBM's arguments that opt-ins who raise constructive discharge and pretextual termination claims should be dismissed from this action, Plaintiffs contend that the EEOC Determination Letter bolsters their argument against dismissal in at least two ways. First, Plaintiffs argue that the EEOC Determination Letter demonstrates that, over the past several years, EEOC has conducted a broad investigation of the allegedly wide-ranging age discrimination scheme carried out by IBM. Thus, Plaintiffs argue, the revelation of IBM's "top-down messaging" and widespread discriminatory conduct dating back to 2013 supports a finding that any broadly worded EEOC charge alleging age discrimination by IBM, including the Rusis/Gerrits charges, permits piggybacking as to any employment action that could be taken to achieve that goal. Second, and for precisely the same reasons, Plaintiffs contend that the EEOC Determination Letter reveals that the charges underlying the letter must be broad enough to permit piggybacking for constructive discharge and pretextual termination claims.

The Court does not find that the EEOC Determination Letter alters its analysis concerning the Rusis/Gerrits charges in any meaningful way. Contrary to Plaintiffs' arguments, it appears clear from the face of the EEOC Determination Letter that the EEOC investigated *only* IBM's Resource Actions, not any other method of age discrimination. The letter plainly states that the EEOC's "investigation reveals that [IBM] conducted *Resource Actions* analyzed by the EEOC between 2013 and 2018 that had an adverse impact on" older employees and that "it was primarily older workers (85.85%) in the total potential pool of those considered for *layoff*." EEOC Determination Letter at 2 (emphasis added). Further, IBM's cited defense in the letter is that the "Charging Parties were discharged *as part of a series of Resource Actions* designed to reduce headcount and decrease costs," and that IBM "offered various reasons for selection for

*layoff*." *Id.* at 1 (emphasis added). That appears to leave little doubt that the EEOC was focused on IBM's Resource Actions.[37]

Plaintiffs' attempts read into the EEOC Determination Letter references to or an investigation of constructive discharges or pretextual terminations are entirely unavailing. There is nothing about the terms "top-down messaging" or "aggressive approach" that suggests in any way that the EEOC broadened its investigation to employment actions beyond Resource Actions. *Id.* at 2. The appropriate reading of these terms, in the broader context of the EEOC Determination Letter, is that the EEOC found that IBM's Resource Actions were guided by discriminatory "top-down messaging" and an "aggressive approach" to reduce its older workforce. Plaintiffs also argue that the statement in the letter that "older employees who were laid off and told that their skills were out of date, only to be brought back as contract workers," reveals that the EEOC must have investigated pretextual for-cause terminations. *See* Pls. Second Opp. at 19–20 (quoting EEOC Determination Letter at 2). The Court disagrees. It is clear that "outdated skills" were one of the criteria IBM purportedly used to select employees who were subject to Resource Actions. *See* EEOC Determination Letter at 2 (noting that these same employees were subsequently "brought back as contract workers," undermining any argument that these separations involved pretextual *for-cause* terminations). As Plaintiffs themselves highlight, Named Plaintiff Rusis was included in an IBM Resource Action "purportedly for not possessing the required skillset." Pl. Second Opp. at 8. Finally, Plaintiffs' assertion that the EEOC Determination Letter reveals that the EEOC "had ample opportunity to investigate pretextual for[-]cause termination and constructive discharges" and must have done so is purely

---

[37] Plaintiffs themselves refer to the EEOC Determination Letter as "confirm[ing] Plaintiffs' theory that IBM's [Resource Actions] disproportionately targeted older employees for lay-off." Pls. Second Opp. at 7.

speculative, without any support in the letter itself.  *Id.* at 20.  By Plaintiffs' own estimation, although the Rusis/Gerrits charges "are not explicitly included in the EEOC's class-wide investigation, they assert the exact same theory that the EEOC addressed in its determination." *Id.* at 9.  This only reinforces the Court's finding that neither the Rusis/Gerrits charges nor the EEOC Determination Letter contain any indication of discriminatory conduct involving constructive discharges or pretextual for-cause terminations.

The preceding analysis notwithstanding, it would not be appropriate at this stage to hold as a matter of law that the opt-ins asserting constructive discharge and pretextual termination claims may not piggyback onto any of the charges underlying the EEOC Determination Letter based on the fact that the letter, on its face, reveals only an investigation of IBM's Resource Actions.[38]  Although the Court finds that the letter demonstrates that the EEOC's investigation was almost certainly limited to IBM's Resource Actions, the letter also notes that there are differences among the underlying charges themselves.  *See* EEOC Determination Letter at 1 ("Individual Charging Parties also alleged discrimination based on national origin, sex, race, retaliation, and disability.").  Thus, the possibility exists that at least one of the 58 charges underlying the letter employed language broadly worded enough that it would provide notice to the EEOC of the class of former IBM employees complaining of constructive discharges and pretextual terminations, even if the EEOC did not ultimately investigate those claims or at least did not address them in the letter.  Given the Second Circuit's admonition to rely on the factual allegations in the charges themselves to determine their scope, it would seem premature to grant

---

[38]   As observed *supra* at pp. 39–40, this presumes that at least one of the 58 former IBM employees whose charges underlie the EEOC Determination Letter subsequently sued, and, if so, that the Court ultimately finds that an individual seeking to opt-in to a collective action may piggyback on charges of a named plaintiff who is not a Named Plaintiffs in this action.

Defendant's motion for judgment on the pleadings as to affected opt-ins without the Court (or apparently Plaintiffs) ever having seen those charges.

## C. McGonegal's EEOC Charge

Having decided that the Court may not consider the timeliness of McGonegal's EEOC charge on these motions, there is an additional issue concerning his charge that the Court is called upon to consider.  McGonegal's EEOC charge is substantively identical to the Rusis/Gerrits charges.  *See* Dkt. 136-4.  As with the Rusis/Gerrits charges, McGonegal's charge speaks exclusively in terms of "layoffs."  *Id.*  Accordingly, it would seem appropriate to construe McGonegal's charge in precisely the same manner as the Rusis/Gerrits charges, limiting piggybacking, to the extent his charge is timely, to those who were separated as part of a Resource Action.  This is the position IBM advances.  *See* Def. Second Reply at 7.

In response, Plaintiffs, relying on the factual allegations concerning the specific circumstances of McGonegal's departure from IBM that they contend are not now properly before the Court, contend that McGonegal's charge must be read to have put the EEOC on notice of constructive discharge claims because McGonegal himself was constructively discharged. Pls. Second Opp. at 24–25.  It cannot be said, therefore, that his constructive discharge claim would not arise in the scope of an EEOC investigation into his allegations.  *Id.*  The Court will not consider those facts at this stage, but it does note that the parties' arguments raise two interrelated issues that may require resolution at some point should the Court find McGonegal's charge to have been timely filed.

First, "[i]n determining whether a particular claim is reasonably related to the plaintiff's EEOC complaint, [courts] look not merely to the four corners of the often inarticulately framed charge, but take into account the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Gomes v. Avco Corp.*, 964 F.2d 1330,

1334 (2d Cir. 1992) (cleaned up).  In conducting this assessment, courts must look to whether

"the *factual allegations made in the administrative complaint* can be fairly read to encompass the

claims ultimately pleaded in a civil action."  *Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir.

2008) (cleaned up).  It seems, therefore, that the Court's analysis should focus on the allegations

contained in the *text* of the administrative charge.  This, however, might lead to a nonsensical

result where, *for example*, an employee alleges in his EEOC charge that he was laid off as part of

a discriminatory reduction in force even though, in fact, he was constructively discharged as part

of a mandatory relocation program.  With respect to that individual's claims of discrimination

raised in an individual action, it would seem relatively uncontroversial for a court to conclude

that his EEOC charge exhausted his own constructive discharge claim; the scope of any EEOC

investigation into *his* separation would necessarily include an examination of the actual

circumstances of his separation.  The real rub, however, lies in the interrelation of the reasonably

related and piggybacking doctrines.  Even if a court deems the individual's constructive

discharge claim reasonably related to the allegations in his EEOC charge, can other employees

piggyback onto that charge, which, on its face, provides no notice to the EEOC or the employer

that its scope includes a group of individuals asserting constructive discharge claims?[39]

Ultimately, the Court leaves this issue for another day.  Because the Court may not

consider any of the factual circumstances surrounding McGonegal's termination beyond those

that appear on the face of the complaint, the Court refrains from determining whether opt-ins

asserting constructive discharge can piggyback onto McGonegal's charge.  Similarly, because

---

[39]    While not directly on point, the Court is aware of at least one case in which the court found that, even though a plaintiff's charge resulted in an agency's review of alleged discrimination on a class-wide basis, the charge itself was too individualized to permit piggybacking.  *See DeBose v. FedEx Corp.*, No. 08-CV-7042, 2009 WL 1542572, at *2 (S.D.N.Y. June 2, 2009) (striking class claims because plaintiff's charge would not have put employer on notice that others suffered similar discrimination even though state agency did ultimately review employer's city-wide hiring practices for age discrimination based on the plaintiff's charge).

the Court does not have occasion to determine whether McGonegal's charge is timely, it need not decide issues that may never arise in this matter.[40]  The Court does note, however, that this issue arises entirely due to poor lawyering and could have been avoided with a modicum of effort or attention to detail.  McGonegal's charge was drafted by Plaintiffs' counsel in this action.  *See* Dkt. 136-4.  Yet, despite the alleged factual differences surrounding the separations of Rusis and Gerrits on the one hand and McGonegal on the other, counsel opted simply to repeat the same allegations as in the Rusis/Gerrits charges.  In fact, the cover letter submitted to the EEOC with McGonegal's charge reveals that counsel failed to replace Gerrits' name with McGonegal's in at least one instance.  *See id.*  The reasonably related doctrine exists to assist employees who submit charges without the benefit of counsel, not to rescue sloppy lawyers.

## V.        Motion for Partial Judgment as to Opt-Ins Who Fall Outside the Temporal Scope of Named Plaintiffs' Administrative Charges

In addition to the substantive scope of an EEOC charge, the claims of an individual seeking to piggyback must also have arisen within the same time frame as the conduct alleged in the charge.  *See Snell*, 782 F.2d at 1100.  This "temporal scope" requirement forms the basis of IBM's third and final motion for judgment on the pleadings.  IBM's arguments concerning the temporal scope of the piggybacking doctrine are twofold.  IBM's first argument is that a non-filing individual may not piggyback onto another's EEOC charge if she could not have timely filed her own administrative charge on the date on which the proper charge was filed.  IBM therefore argues that an individual whose claims accrued either (a) 180 or 300 days before the date on which Rusis filed his EEOC charge or (b) after the date on which Gerrits filed his EEOC

---

[40]        It is worth noting that, based on the rest of the Court's findings on these motions, should the Court find that McGonegal's charge was untimely, opt-ins asserting constructive discharge claims are highly unlikely to be able to piggyback into this action.  Those odds are even longer for those alleging pretextual for-cause terminations.

charge may not piggyback onto the Rusis/Gerrits charges.[41]  IBM's second argument is based on

its interpretation of the phrase "in the same time frame"; pursuant to IBM's interpretation, opt-

ins whose claims accrued before March 2018 cannot be considered as falling within the same

time frame as the Rusis/Gerrits charges, because those charges provide March 2018 as the

earliest date of discrimination.  Similarly, opt-ins whose claims accrued after June 2018 cannot

piggyback because the Rusis/Gerrits charges provide June 2018 as the latest date of

discrimination.

　　　For the following reasons, the Court agrees with IBM's first argument as to the *rearward*

temporal scope but disagrees with the argument in the context of the forward temporal scope.

The Court also disagrees with IBM's second argument concerning the proper interpretation of

the "same time frame" requirement under the single-filing rule.[42]

### A. Principle that Opt-Ins Must Have Been Able to File a Timely Charge on the Date on Which the To-Be Piggybacked Charge Was Filed Applies Only in the Rearward Context

　　　The central issue raised by IBM's first argument is whether an individual seeking to

piggyback onto a given EEOC charge must have been able to file her own timely EEOC charge

on the filing date of the charge onto which she seeks to piggyback.  IBM treats this issue as

largely one and the same in both the rearward and forward scope contexts.  In actuality, this rule,

---

[41]　While Rusis' and Gerrits' charges are substantively identical, they were filed two months apart: Rusis' in May 2018, Gerrits' in July 2018. *See* Rusis Charge; Gerrits Charge.  As such, IBM contends that the date on which Rusis filed his charge sets the rearward cutoff date for temporal scope purposes, and the date on which Gerrits filed his charge sets the forward cutoff date for temporal scope purposes.  The Court agrees with this formulation as it pertains to whether an opt-in may piggyback onto the Rusis/Gerrits charges.  As discussed, however, this does not, at this stage, determine whether an opt-in may piggyback into this action, although the Court ultimately may adopt this formulation to set the scope of the collective.

[42]　Whether McGonegal's EEOC charge is ultimately found to support piggybacking for any opt-ins has little bearing on this piece of IBM's motions.  McGonegal allegedly submitted his charge via fax on July 2, 2018, seemingly in between the dates on which Rusis and Gerrits filed their respective charges, and the alleged timeframe of discrimination in his charge is May 2018 through June 30, 2018, which would only extend IBM's purported forward cut-off date by three days, were the Court to accept IBM's argument (which it does not).

to the extent it exists, is motivated by different purposes when applied to these two contexts.

IBM's argument also requires answering two different questions.  First, is the rule urged by IBM

a function of the single-filing doctrine itself, such that the principle applies with equal force in

class or collective actions as in individual actions?  Second, if not, is the rule a special feature of

the application of the single-filing rule in the class or collective context?  The Court finds that

the rule urged by IBM applies in the rearward context as an application of the single-filing rule

itself but, at least in this circuit, does not apply in the forward context.

### 1.  Rearward Scope

While Second Circuit precedent expressly requires only that the claims of an individual

seeking to piggyback arise within the same general time frame as the conduct alleged in the

properly filed charge, there is a separate timing requirement followed by courts both within and

outside this circuit.  The parties' discussion of this rule centers on its articulation in a case out of

the Eleventh Circuit, *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001).  In

*Hipp*, the court limited the beneficiaries of the single-filing rule to those who could have filed

timely EEOC charges on the date on which the representative plaintiff filed his charge.  *Id.* at

1221 (citing *Thiessen v. Gen. Elec. Cap. Corp.*, 996 F. Supp. 1071, 1076–77 (D. Kan. 1998)).

As such, the court held that "the rearward scope of an ADEA opt-in action should be limited to

those plaintiffs who allege discriminatory treatment within 180 or 300 days before the

representative charge is filed," finding that other courts to address the issue had reached the same

conclusion.  *Id.* at 1220–21.

IBM would have the Court apply the rule articulated in *Hipp* to the present motion so that

any opt-in who could not have filed a timely EEOC charge on the date on which Rusis filed his

charge, May 10, 2018, may not piggyback onto the Rusis/Gerrits charges.  In opposing IBM's

motion, Plaintiffs argue that the Second Circuit's adoption of the "broadest" interpretation of the

piggybacking rule mandates a more flexible approach, pursuant to which the Court should refrain from setting a hard-cutoff date before which opt-ins whose claims accrued may not piggyback. Plaintiffs' argument misses the mark.  The rule articulated in *Hipp* and otherwise applied by courts in this circuit is primarily a feature of the ADEA's statute of limitations rather than an interpretation of the piggybacking doctrine.  The Court therefore agrees with IBM:  Opt-ins whose claims accrued more than 180 or 300 days before May 10, 2018, may not piggyback onto the Rusis/Gerrits charges.[43]

*Hipp*, as a decision out of the Eleventh Circuit, is not binding on this Court, nor has the Second Circuit clearly said whether *Hipp* or some other rule applies in similar situations. Plaintiffs do not concede that *Hipp* controls this issue and urge the Court to reject its application. At the notice stage, however, Plaintiffs argued that the rearward cutoff date for this action should be 300 days prior to the date on which Rusis filed his EEOC charge, stating that former IBM employees "would be able to join this case if their employment ended within 300 days of the filing of that charge," citing to *Hipp*.  *See* Pls. Mem. at 2 n.3, Dkt. 47; *see also id.* at 22 n.36. Plaintiffs now contend that their citation to *Hipp* was strictly a matter of convenience, as the principle from *Hipp* helps set a manageable cutoff point for a collective.  *See* Pl. Third Opp. at 20 n.16.  While their citation to *Hipp* in the context of the issuance of notice does not now estop

---

[43]     The parties seem to agree that May 10, 2018, is the date on which Rusis filed his EEOC charge and that July 10, 2018, is the date on which Gerrits filed his EEOC charge.  As far as the Court can tell this, the date on which Rusis filed his charge derives from the date of the cover letter Plaintiffs' counsel submitted with his charge. *See* Dkt. 136-2.  The date on which Gerrits filed his charge seems to come from a fax "timestamp" in the version of his charge that IBM appended to its motions.  *See* Dkt. 125-2.  There seem to be some minor discrepancies in the versions of the Gerrits' charge filed by the parties, however.  *Compare id.* (containing an Agency Charge Number, Gerrits' physical signature, and a signature date of July 10, 2018), *with* Dkt. 136-3 (containing a cover letter bearing the date July 2, 2018, no Agency Charge Number, Gerrits' digital signature, and a signature date of July 2, 2018). The Court will accept May 10, 2018, and July 10, 2018 as the operative filing dates for the Rusis/Gerrits charges at this time.  To the extent there is any subsequent dispute over the date on which either Rusis or Gerrits filed his charge, such that the precise date determines whether or not a specific opt-in may piggyback, the Court will consider additional evidence in the record at a later stage of this case.

Plaintiffs from arguing that *Hipp* is inapplicable, the Court finds that their willingness to rely on the framework articulated in *Hipp* in that context largely eviscerates their argument that the *Hipp* ruling is not in accord with Second Circuit precedent.

Further, the Court finds this rule to be in sync with the Second Circuit's articulation of the piggybacking doctrine.  In its decisions, the Second Circuit has held that the single-filing rule does not exist to save the claims of those who otherwise fail to meet the statutory timing requirements under the ADEA.[44]  *See, e.g.*, *Levy v. U.S. Gen. Acct. Off.*, Nos. 97-CV-4016, 97-CV-4488, 1998 WL 193191, at *3 (S.D.N.Y. Apr. 22, 1998) ("In *Tolliver,* the Second Circuit specifically foreclosed the possibility that the single filing rule could operate to exempt a plaintiff from the requirement that he file suit in federal court within the limitations period."). Although the *Tolliver* court itself refrained from deciding "whether the single filing rule would be available to revive the claim of a plaintiff discharged more than 300 days prior to the filing of the administrative claim on which he seeks to piggyback," *Tolliver*, 918 F.2d at 1058 n.3, both before and after *Tolliver*, courts within this circuit have applied the same timing rule articulated in *Hipp*.[45]  For instance, in *Barrett*, a case on which Plaintiffs rely, the court stated that, "[a]lthough similarly-situated plaintiffs may 'piggyback' off other plaintiffs' EEOC charges,

---

[44]     This is also in accord with the Supreme Court's general jurisprudence concerning the purposes of limitations periods for employment discrimination claims.  *See, e.g.*, *Del. State Coll. v. Ricks*, 449 U.S. 250, 256–57 (1980) ("The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past.").

[45]     As discussed in *Bowers v. Xerox Corp.*, Nos. 94-CV-6093T, 94-CV-6261T, 1995 WL 880773, at *3–4 (W.D.N.Y. May 5, 1995), Congress amended the statute of limitations for ADEA claims in 1991, shortly after *Tolliver* was decided.  Prior to the amendment, the statute of limitations for ADEA claims was two years from the date of discrimination (or three years for willful violations); the amendment eliminated the "absolute deadline for filing an action" and set the statute of limitations as 90 days after receipt of a right-to-sue letter.  *Id.*  In *Tolliver*, the Second Circuit cited the ADEA's then-absolute statute of limitations as a reason for adopting the single-filing rule, noting that it would "provide[] adequate assurance that stale claims will not remain viable."  *Id.* (quoting *Tolliver*, 918 F.2d at 1059).  The *Tolliver* court thus had less reason to worry about setting a firm rearward cutoff point than exists today given the elimination of the absolute two-year statute of limitations.

individuals may only 'piggyback' if they could have filed a timely charge at the time of the earliest class representative's charge." *Barrett*, 39 F. Supp. 3d at 458.  The court therefore held that "the putative class should be restricted to those individuals employed by Defendants within 300 days (for those in deferral states) or 180 days (for non-deferral states) of the earliest-filed representative [EEOC charge]." *Id.*  A number of other courts within the Second Circuit have held similarly in both individual and class or collective contexts.  *See, e.g.*, *Holowecki III*, 644 F. Supp. 2d at 351 ("Because these three plaintiffs could not have filed a timely charge at the time of [the representative] charge, *i.e.*, because each of these plaintiffs' 300 days had already run, they cannot piggyback onto [the representative] charge.  Indeed, if the piggybacking rule were permitted to allow a time-barred plaintiff's claim to be revived each and every time a subsequent plaintiff files a charge, the 300–day cutoff for filing an EEOC charge would be rendered a nullity." (internal citation omitted)); *Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 255 (S.D.N.Y. 2007) ("A class representative can only represent those individuals who have either filed a timely EEOC charge or could have filed one at the time the class representative's charge was filed."); *Shapiro v. William Douglas McAdams, Inc.*, No. 94-CV-4424, 1995 WL 313120, at *2–3 (E.D.N.Y. May 16, 1995) ("[T]he single filing rule is available only to employees who could have filed a timely charge on the date the named plaintiffs filed their charge."); *Pandis v. Sikorsky Aircraft Div. of United Techs. Corp.*, 431 F. Supp. 793, 798 (D. Conn. 1977) ("Claims that were time-barred on the date that plaintiff filed his suit cannot be revived by the commencement of a putative class action.  Under Title VII [and the ADEA] a class action plaintiff cannot represent persons who could not have filed a charge with the EEOC at the time he filed his charge."); *see also* 45C Am. Jur. 2d *Job Discrimination* § 2145, Westlaw (database updated Feb. 2021) ("In a class under the Age Discrimination in Employment Act (ADEA), the

courts have uniformly limited the ability to opt-in to those persons who may not have, but could have, filed timely administrative charges, based on the filing date of the charge that forms the basis for the class action." (footnotes omitted)).  The Court therefore finds that opt-ins whose claims accrued more than 180 or 300 days before the Rusis EEOC charge was filed may not piggyback onto that charge.

This holding leaves open the question, disputed by the parties, of the date on which certain opt-ins' claims accrued.  Plaintiffs argue that their theory of discrimination entails more than the termination of older employees; it also includes the fact that IBM thereafter refused to hire these older individuals for open positions, despite their qualifications.  *See* Pls. Third Opp. at 20–21.  As such, the date on which an individual's claim accrued is not necessarily the date on which she was notified of her separation from IBM; Plaintiffs argue a more fact-intensive inquiry is required to determine the proper date of accrual of each individual's ADEA claims.  *See id.* Plaintiffs further press that such a factual inquiry is wholly inappropriate at this stage, on an incomplete record.  *Id.* at 21.  While IBM recognizes that certain opt-ins' claims include not only wrongful termination but also refusal to hire for open positions, it asserts that this is irrelevant to the question of when those opt-ins' *discriminatory termination claims* accrued.  *See* Def. Third Mem. at 19–20; Def. Third Reply at 5–6.  According to IBM, Plaintiffs' error is conflating termination and failure to hire claims, a legal error that does not require a factual inquiry to resolve.  The Court agrees.[46]

---

[46]        The Court notes that it will refrain from wading into any factual disputes concerning the date on which a specific opt-in's claims accrued.  The Court does, however, consider whether, as a matter of law, Plaintiffs' theory of discrimination pled in the FAC can be considered part of a single discriminatory act, such that claims may not have accrued until after an opt-in had reason to believe that she was not being considered for open IBM positions because of her age, or whether these are necessarily two separate claims, such that opt-ins' termination claims accrued on the date they were notified of their separation, and their refusal to hire claims accrued at some point in the future.  Because the Court finds that only those opt-ins who were separated as part of an IBM Resource Action may piggyback onto the Rusis/Gerrits charges, the Court's analysis on this issue is limited to those former IBM

In the FAC, Plaintiffs allege that older workers who were "laid off through [IBM's] Resource Actions" were prohibited from consideration for other positions through IBM's internal hiring platform, and IBM "has used this type of technique to prevent its older workers who have been laid off from obtaining new positions within the company." FAC ¶ 25. As pled, the Court finds that termination and failure to hire claims asserted by those who were selected for an IBM Resource Action and were thereafter not hired for an open position are necessarily distinct legal claims and must be treated as such for piggybacking purposes. Courts repeatedly have found that termination and failure to hire constitute discrete acts, and this conclusion is unaffected by whether the failure to hire claim is related in some way to the termination claim or whether the failure to hire stems from the employer's alleged encouragement of the plaintiff to apply for new positions after the discriminatory termination. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (describing termination and refusal to hire as "[d]iscrete acts" which each "constitute[] a separate actionable 'unlawful employment practice'"); *Bernstein v. N.Y.C. Dep't of Educ.*, No. 19-CV-11816, 2020 WL 6564809, at *5 (S.D.N.Y. Nov. 9, 2020) (affirming *Morgan*'s continuing relevance for the proposition that termination and refusal to rehire are discrete acts and that if one such discrete act is time barred, it is not actionable, even if it relates to acts alleged in the timely filed charge); *Farnum v. Swiss Bank Corp.*, No. 85-CV-157, 1986 WL 1172, at *2 (S.D.N.Y. Jan. 23, 1986) ("[Defendant's] refusal to reconsider its decision to terminate [plaintiff] does not magically transform that isolated incident into an ongoing discriminatory practice. If it did, any Title VII claimant could revive a time-barred complaint simply by asking the defendant to reconsider an allegedly

---

employees who were selected for layoff in a Resource Action and applied for open IBM positions in the period before their separation from IBM became effective.

discriminatory decision or action."); *see also Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25–

26 (2d Cir. 1985) (describing failure to rehire and discriminatory discharge as "separable" and

noting that the more recent failure to rehire claim would not "delay the running of the time

period as to the earlier claim of discriminatory discharge").  Nothing on the face of Plaintiffs'

complaint reveals that an individual's inclusion in a Resource Action and subsequent inability to

obtain new employment at IBM should not constitute two discrete acts of discrimination, for

which a former IBM employee may assert two distinct claims.

Even if IBM's alleged "blacklisting of individuals on the Resource Action list from

consideration for . . . internal positions was part of the discriminatory conduct that has been

alleged," Pl. Third Opp. at 21 n.18, that does not turn discrete acts into a single continuing

violation or combine the discrete occurrences into a single discriminatory act.  *See Morgan*, 536

U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are

related to acts alleged in timely filed charges."); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135,

157 (2d Cir. 2012) ("Discrete acts of this sort, which fall outside the limitations period, cannot be

brought within it, even when undertaken pursuant to a general policy that results in other discrete

acts occurring within the limitations period."); *see also Barrett*, 39 F. Supp. 3d at 459–60 (citing

*Morgan* and *Chin* for the conclusion that, at least in the Second Circuit, the Supreme Court's

holding in *Morgan* that the continuing violation doctrine does not apply to discrete acts applies

even in "pattern-or-practice cases," in which discriminatory acts are undertaken pursuant to a

general discriminatory policy).

As such, the discriminatory *termination* claims of opt-ins included in a Resource Action

accrued on the date on which the opt-in received notice of inclusion in the Resource Action,

regardless of whether the person sought to be hired to another IBM position after being so

notified and even if she did so at the encouragement of IBM management.[47]  *See Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 579 (2d Cir. 2020) (holding that a plaintiff's claim for discriminatory termination accrued on the date she "received her notice of termination," not on the date of her separation); *see also Trenchfield v. Dupont Photomasks, Inc.*, No. 96-CV-1135, 1997 WL 53238, at *6 (S.D.N.Y. Feb. 7, 1997) ("[C]ourts have uniformly concluded that an unambiguous notice of termination is not made less definitive merely because it is accompanied by the employer's hope that the employee might be able to find another position within the company."); *Cole v. CBS, Inc.*, 634 F. Supp. 1558, 1562 (S.D.N.Y. 1986) ("The fact that CBS held out the hope that [plaintiff] might be able to obtain other employment at CBS did not in any way detract from the unequivocal nature of his termination from that position.").[48]  On the other hand, opt-ins' claims for *failure to hire* based on IBM's refusal to consider them for internal positions after their inclusion in a Resource Action accrued when they had reason to know that they had not been hired to an open IBM position for which they applied. *See, e.g.*, *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *6 (S.D.N.Y. Mar. 26, 2014) (holding that a plaintiff's failure to hire claim "accrued when Plaintiff was

---

[47]    To the extent there is a factual dispute concerning the date on which an opt-in received notice sufficient to inform her that she would be included in a Resource Action, discovery may be necessary to shed light on that issue. The Court notes, however, that Plaintiffs' assertion that employees could not have known that their inclusion in a Resource Action was motivated by discrimination until after they were blocked from other IBM positions is in direct conflict with established precedent. *See, e.g.*, *Lugo-Young v. Courier Network, Inc.*, No. 10-CV-3197, 2012 WL 847381, at *5 (E.D.N.Y. Mar. 13, 2012) ("[A]n employee has notice of his injury on the date that the employer has clearly communicated to the employee its decision to terminate him.  It is not a prerequisite to accrual that an employee have information necessary to decide whether the injury is due to . . . wrongdoing by the defendant." (cleaned up)).  In all events, the Court's holding can be applied easily to those opt-ins who *separated* from IBM more than 180 or 300 days before the date on which the Rusis charge was filed; those former employees may not piggyback their termination or failure to hire claims onto the Rusis/Gerrits charges.

[48]    Plaintiffs argue that IBM's reliance on cases like *Trenchfield* and *Cole* is unavailing because, unlike in those cases, IBM's discriminatory conduct included blacklisting employees on the Resource Action list from consideration for open positions.  As demonstrated in cases like *Chin* and others cited above, however, Plaintiffs' argument is itself unavailing and fails to distinguish meaningfully IBM's cited authority.  That IBM's discrimination extended to refusing to hire terminated older employees into open positions does not change whether the termination and the refusal to hire were discrete acts of discrimination, each subject to its own limitations period.

informed or had reason to know of the failure to hire").

In short, opt-ins asserting termination claims that accrued more than 180 or 300 days before the Rusis/Gerrits charges were filed may not piggyback their *termination* claims onto those charges; opt-ins asserting failure to hire claims (in addition to termination claims) that accrued more than 180 or 300 days before the Rusis/Gerrits charges were filed may not piggyback their *failure to hire* claims onto those charges.[49]

### 2.  Forward Scope

Having determined that, in the rearward context, to piggyback on an EEOC charge, an opt-in must have been able to file her own timely charge on the date on which the to-be piggybacked charge was filed, the Court must determine whether that same principle determines the *forward* cutoff date for piggybacking purposes.  The Court concludes that it does not; an individual may piggyback onto another's EEOC charge even if her claims accrued after the date on which the charge was filed.  This, however, does not resolve the inquiry; the Court must also determine whether, even though this is not a limiting principle on the single-filing rule in this circuit, it exists as the operative cutoff point for piggybacking in class or collective actions.  Put differently, is the forward scope of an opt-in class determined by the date on which the last representative charge was filed?  The Court is unwilling to endorse that as a *per se* rule on these motions.

As with the rearward scope of the piggybacking doctrine, the Second Circuit does not

---

[49]  Plaintiffs' argument that IBM's formulation, largely adopted by the Court, defies common sense is unconvincing.  In essence, Plaintiffs argue that it would be illogical or unreasonable to require an IBM employee to file an EEOC charge after having received notice of inclusion in a Resource Action while she was applying to other positions at IBM before her separation became effective.  *See* Pls. Third Opp. at 20 n.17.  Yet, as pled in the FAC and based on the date he filed his EEOC charge, that is precisely what Rusis did.  *See* FAC ¶ 21 (alleging Rusis received notice in March 2018 of his inclusion in Resource Action and his separation became effective June 27, 2018); Rusis Charge (filing date of May 10, 2018).  Plaintiffs' argument that Rusis failed to obtain another position is entirely irrelevant to whether it was unreasonable for him to file an EEOC charge while seeking another IBM job.

appear to have spoken with a clear voice as to the proper principle dictating the forward scope of the doctrine, especially in the context of class and collective actions.  In fact, this issue appears to be far less probed by courts within this circuit than its backward-facing counterpart.  Neither party cites to any cases within this circuit to support their arguments about the forward scope of the piggybacking doctrine, whether in individual or collective actions.

As discussed, in the context of the rearward-facing scope of the piggybacking doctrine, courts within this circuit have routinely held that "the single filing rule is available only to employees who could have filed a timely charge on the date the named plaintiffs filed their charge." *Shapiro*, 1995 WL 313120, at *2.  Having adopted that principle in the context of the rearward scope of the piggybacking doctrine, there would seem to be some justification for the Court to apply it in the forward-facing context as well.  A straightforward application of that rule would dictate that an individual whose ADEA claims had not yet accrued when the representative charge was filed could not have filed a timely charge on that date and therefore cannot piggyback onto that charge.  The application of this principle in the rearward context, however, is primarily a function of the ADEA's statute of limitations, in that the single-filing rule cannot be used to save the claims of those who failed to file a charge of discrimination within the required 180 or 300 days after the discriminatory conduct.  *See, e.g.*, *Holowecki III*, 644 F. Supp. 2d at 351.  That principle has significantly less weight applied in the context of claims that accrued *after* the representative charge was filed.

In opposing IBM's attempt to set the forward scope of an opt-in class as the date on which the last named plaintiff filed his EEOC charge, Plaintiffs argue — as they did in the rearward-facing context — that IBM seeks to impose a bright-line rule that conflicts with the Second Circuit's edict in *Tolliver*, which requires only that "the claims of an individual seeking

to piggyback arise 'within the same general time frame' of the original charge."  Pls. Third Opp.

at 24 (quoting *Tolliver*, 918 F.2d at 1057).  Plaintiffs, therefore, contend that "clearly ongoing

discrimination . . . of the same nature complained of in the original charge" is exhausted by the

original charge for piggybacking purposes.  *Id.*  Seemingly seeking to avoid limiting themselves

to the operative framework of ADEA class and collective actions, Plaintiffs' argument is framed

more generally about the scope of the piggybacking doctrine itself and less about the scope of an

opt-in class in which opt-ins seek to piggyback on a named plaintiff's representative charge.

Although Plaintiffs do not explicitly argue in these terms or cite to any case articulating

the proposition, their argument appears to implicate an element of the Second Circuit's

"reasonably related" doctrine.  In *Almendral v. N.Y. State Office of Mental Health*, the Second

Circuit found that, where "defendants' alleged subsequent acts [were] essentially the same as the

earlier allegedly wrongful conduct contained in the EEOC complaint," and where the EEOC

charge "plainly stated that the acts of discrimination were on a 'continuing' basis," the

"subsequent acts were 'reasonably related' or could 'reasonably [have been] expected to grow

out of the [EEOC] charge of discrimination,'" and it was therefore error for the district court to

refuse to consider allegations that occurred after the plaintiff had filed her EEOC charge.  743

F.2d 963, 967 (2d Cir. 1984).  The Second Circuit subsequently classified this concept of

"discrimination carried out in precisely the same manner alleged in the EEOC charge" as one of

three situations in which claims not alleged in the EEOC charge can be deemed "sufficiently

related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such

claims in a civil action."  *Butts*, 990 F.2d at 1402–03 (citing *Almendral*, 743 F.2d at 967).

While courts frequently apply this aspect of the reasonably related doctrine in the context

of a single plaintiff's claims of discrimination to permit that plaintiff to press claims that arose

after the charge was filed, few courts in this circuit appear to have applied this concept in the context of the single-filing rule. The limited few that have, however, have permitted piggybacking for plaintiffs asserting claims that accrued after the date the other's charge was filed. For instance, in *Cronas*, the court advocated for a more lenient interpretation of the "same time frame" requirement, noting that "the very nature of piggybacking necessarily means that the plaintiff is bringing suit *at a later date*, and therefore, that the discriminatory conduct alleged in the suit was not limited to the time frame in the original charge."[50] *See Cronas*, 2007 WL 2739769, at *8. In *Barrett*, the court permitted three named plaintiffs to piggyback onto the charge of another named plaintiff despite the fact that the claims of the non-filing plaintiffs accrued one to two years after the claims of the charge-filing plaintiff — and at some point after the charge itself was filed.[51] *Barrett*, 39 F. Supp. 3d at 454. Citing to *Cronas*, the court found that the Second Circuit has "adopted a relaxed view of the requirements that events occurred within the same time period," and noted that "[e]xact duplication of a time frame is unnecessary to satisfy the single-filing rule; instead, mere similarity of grievances within the same *general* time frame suffices to permit the operation of the single filing rule." *Id.* (quoting *Cronas*, 2007 WL 2739769, at *8); *see also EEOC v. Mavis Disc. Tire*, No. 12-CV-741, 2013 WL 5434155, at

---

[50]     While *Cronas* demonstrates a court's willingness to permit piggybacking even for claims arising after a another's charge was filed, *Cronas* otherwise provides little guidance on this issue. In *Cronas*, a "pattern and practice discrimination" case, the court examined a plaintiff's claims that a manager sexually harassed her and other female employees. *See Cronas*, 2007 WL 2739769, at *8. Invoking *Almendral*, the *Cronas* court found that "the proper inquiry is not whether [plaintiff's] claims occurred in the same time frame as those in the [representative] charge, but whether [plaintiff's] claims plainly state that the acts of discrimination were on a continuing basis in such a way as those acts could reasonably [have been] expected to grow out of the [representative] charge." *Id.* (cleaned up). Plainly, then, *Almendral* has significantly more currency in the context of continuing pattern and practice discrimination cases than in those alleging discrete acts of discrimination, such as terminations. *See id.* ("[E]xact temporal similarity in pattern and practice discrimination claims is impractical, as the discriminatory conduct alleged in such claims is not a discrete, isolated event.").

[51]     *See* No. 12-CV-5224, Dkt. 28-10 (representative charge filed February 2011); *Barrett*, 39 F. Supp. 3d at 454 (noting that piggybacking plaintiffs complained of retaliation in 2011 and 2012).

*3–4 (S.D.N.Y. Sept. 30, 2013) (permitting two plaintiffs to piggyback on the third plaintiff's

EEOC charge because their claims all arose "out of similar discriminatory treatment in the same

time frame" (cleaned up)).[52]

Accordingly, while perhaps uncommon and primarily arising in the context of pattern and

practice cases, courts within this circuit do not appear to have limited the availability of the

single-filing rule to those asserting claims that accrued *before* the date on which the to-be

piggybacked charge was filed.  The Court agrees with Plaintiffs, then, that, as applied in the

Second Circuit, the piggybacking doctrine is not limited to claims that accrued before the filing

date of the relevant charge.

Nevertheless, a secondary inquiry requires the Court to determine whether, in this circuit,

the forward cutoff date for a piggybacking opt-in class must be set as the date on which the

named plaintiff's charge was filed.  At least one or two other circuits to consider this issue have

determined that to be the case.  In *Hipp*, the Eleventh Circuit held that "[t]he forward scope of an

opt-in class ends on the date the representative charge is filed."  *Hipp*, 252 F.3d at 1225.  The

*Hipp* court noted that "[a] single charge cannot be expected to put the EEOC and employer on

notice that general policies as applied to different individuals in different offices are being

challenged indefinitely."  *Id.* at 1226.  The Fifth Circuit appears to follow a similar rule.  *See*

*Anson v. Univ. of Tex. Health Sci. Ctr. at Hous.*, 962 F.2d 539, 543 (5th Cir. 1992) ("We hold

simply that a district court does not err in denying intervention to one whose claim had not yet

arisen at the time of the filing by another of an administrative charge which alleges only past

---

[52]    Interestingly, outside this circuit, courts appear to have limited *Almendral* and its holding to cases involving a single plaintiff alleging continuing discrimination.  The Fifth Circuit, for instance, distinguished *Almendral* in the context of the single-filing rule because *Almendral* was concerned with whether "further claims from a *particular plaintiff*" could be considered included within that plaintiff's charge, "not the addition of further plaintiffs."  *Anson v. Univ. of Tex. Health Sci. Ctr. at Hous.*, 962 F.2d 539, 543 (5th Cir. 1992) (emphasis added).

personal complaints regarding one who employs as many as 2,500 people."); *see also* 45C Am. Jur. 2d *Job Discrimination* § 2145 ("[T]he forward scope of an opt-in class ends on the date when the representative charge is filed.").

Whereas the *Hipp* court's decision to set the rearward scope of an ADEA opt-in collective as 180 or 300 days before the representative charge was filed was animated by statute of limitations principles, the Eleventh Circuit's decision with respect to the *forward* scope of an opt-in collective was not. *See Hipp*, 252 F.3d at 1220 (noting that the concern in the rearward context was "that plaintiffs would be able to revive stale claims for which they failed to file EEOC charges"). The Eleventh Circuit's setting of the forward scope as the date on which the representative charge was filed was a product of its interpretation of the policies behind the exhaustion requirement and the piggybacking doctrine. *See id.* at 1225. As the *Hipp* court viewed it, it is not "'useless' for plaintiffs with claims arising after the representative charge is filed to file their own charges." *Id.* The court dismissed the plaintiffs' arguments that subsequent claims were either related to or grew out of the allegations in the representative charge, finding distinguishable the plaintiffs' authority because it did not "establish that one plaintiff may opt into an action because his claims of discrimination relate to allegations made in an EEOC charge filed by another plaintiff." *Id.* at 1226. As discussed above, however, in the Second Circuit, courts *have* permitted piggybacking where the subsequent plaintiff's claims accrued after the date on which the representative charge was filed. Further, the *Hipp* court noted that "[w]here the representative charge clearly alleges a continuing, concrete policy that is illegal, . . . it might be fair to assume the company has knowledge of later-arising claims challenging the same policy"; in other words, "[w]hen plaintiffs so clearly meet the 'similar discriminatory treatment' requirement, . . . courts can afford to be somewhat more lenient with

respect to the 'in the same time frame' requirement, without sacrificing fairness to the employer." *Id.* at 1226 & n.22.

In light of the above, the Court is unwilling to adopt a *per se* rule which sets the forward cutoff date of an ADEA opt-in collective as the date on which the representative charge was filed.[53] The Court is especially hesitant to do so in this case in view of the EEOC Determination Letter and the investigation it documents. To the extent the EEOC was investigating IBM's Resource Actions in the period post-dating the filing of the Rusis/Gerrits charges, there may have been little reason to require those separated as part of a Resource Action subsequent to July 2018 to file their own EEOC charge. *See Tolliver*, 918 F.2d at 1058 (asking whether "no conciliatory purpose would be served by filing separate EEOC charges" (cleaned up)). Although *Hipp* may be correct that, in most situations, where it is far less likely that the agency or the employer would be on notice of continuing discrimination of the same type as alleged in the representative charge, the filing of subsequent administrative charges would be anything but futile, that is not universally true, and this case may be that rare exception contemplated in *Hipp*.

In short, the Court is unwilling at this stage to prohibit opt-ins whose claims accrued after July 10, 2018, from piggybacking onto the Rusis/Gerrits charges or otherwise participating in a collective. Based on the information that comes out during discovery about the EEOC's investigation and other relevant information, the Court may still choose to set the forward cutoff date of any opt-in collective as the date on which Gerrits filed his EEOC charge; at this juncture, however, it is premature to determine whether that would be appropriate.[54]

---

[53]     A simple hypothetical illustrates the point. Assume IBM gave notice to 100 employees over the age of 40 of their inclusion in a Resource Action on July 11, 2018, one day after Gerrits filed his EEOC charge. There is no reading of *Tolliver* or subsequent precedent within this circuit that would support precluding those 100 individuals from piggybacking on the Gerrits charge, as a matter of law.

[54]     Opt-ins may not piggyback on the charges of opt-ins Brian Haupt and Phil Monson because neither is a named plaintiff. Even were the Court to consider them, it has significant concerns about the propriety of permitting

**B. The Earliest and Latest Dates of Discrimination Listed on the Rusis/Gerrits Charges Do Not Set a Rearward or Forward Cutoff Date for Piggybacking Purposes**

The Court next turns to IBM's additional attempt to impose an even more circumscribed time period within which opt-ins' claims must have accrued in order to piggyback on the Rusis/Gerrits charges. IBM argues that the Court should dismiss opt-ins whose ADEA claims accrued before the earliest date of discrimination and after the latest date of discrimination specified in the Rusis/Gerrits charges. *See* Def. Third Mem. at 20–22, 23–24; Def. Third Reply at 8, 9. As IBM sees it, because the Second Circuit requires the claims of non-filing individuals to have arisen in the "same time frame" as those of the charge-filing plaintiff, all opt-ins whose claims accrued before March 1, 2018, and after June 27, 2018, may not piggyback onto the Rusis/Gerrits charges. Def. Third Mem. at 20–21, 23–24 (quoting *Holowecki II*, 440 F.3d at 565). IBM contends this is especially so with respect to the forward scope of the Rusis/Gerrits charges, because neither Rusis nor Gerrits selected the "continuing action" box on the EEOC charge form, which would have indicated that IBM's discrimination continued past the date of their separations. *Id.* at 23. While Plaintiffs do not disagree with the general proposition that opt-in claims must arise within the same time frame as the claims on which they are piggybacking, they oppose IBM's "overly[ ]narrow" interpretation of the earliest and latest dates of discrimination specified in the Rusis/Gerrits charges. Pls. Third Opp. at 22. On this point, the Court agrees with Plaintiffs. IBM employs an intentionally crabbed view of the Rusis/Gerrits charges that cannot be squared with the purposes behind the ADEA's administrative exhaustion requirement.

In addition to providing a blank space for the "particulars" of the charge, the EEOC's

---

Plaintiffs to continue adding subsequent opt-in plaintiffs with later-filed charges to extend, seemingly without limit, the scope of the claims that were asserted in 2018 in this lawsuit.

standard "Charge of Discrimination" form also includes a field titled "Date(s) Discrimination Took Place," with a blank space provided under "Earliest" and "Latest," and an additional option to select "Continuing Action."  *See, e.g.*, Rusis Charge.  In his charge, Rusis stated "March 2018" under the "Earliest" option; Gerrits stated "March 29, 2018."  *See id.*; Gerrits Charge. They each provided "June 27, 2018 (effective date of layoff)" under the "Latest" option.  *See* Rusis Charge; Gerrits Charge.  Neither checked the option for "Continuing Action."  Despite delimiting the dates of discrimination as such, in detailing the charge particulars, the Rusis/Gerrits charges state that "over the last several years, IBM has been in the process of systematically laying off its older employees," and that "IBM has laid off at least 20,000 employees over the age of forty in the last five years."  *E.g.*, Rusis Charge.

According to IBM, the Rusis/Gerrits charges specify a four-month period, March 2018 through June 2018, during which IBM allegedly carried out its discriminatory layoffs, and, therefore, any opt-ins whose claims accrued before March 1, 2018, or after June 27, 2018, may not piggyback onto these charges.  *See* Def. Third Mem. at 20–22.  The more general statements in the charge particulars, IBM contends, provide context only and do not broaden the temporal scope of discrimination alleged.  *See* Def. Third Reply at 8.  Ultimately, IBM argues, based on the Rusis/Gerrits charges, it could not have been on notice of discriminatory conduct predating March 1, 2018, or post-dating June 27, 2018.  Def. Third Mem. at 21–24.

IBM's argument barely makes it past the straight-faced test.  Its interpretation of the phrase "same time frame" does not accord with the policy in this circuit of employing a "relaxed view of the requirements that the events occurred within the same time period."  *Barrett*, 39 F. Supp. 3d at 454 (citing *Cronas*, 2007 WL 2739769, at *8); *see also Mavis Disc. Tire*, 2013 WL 5434155, at *4.  IBM fails to cite any case within this circuit in which a court interpreted the

scope of a charge so narrowly so that the date listed as the earliest or latest date of discrimination was treated as an inflexible cutoff point.[55] *Cf. Daly v. Westchester Cnty. Bd. of Legislators*, No. 19-CV-4642, 2021 WL 229672, at *5 (S.D.N.Y. Jan. 22, 2021) ("'[I]t is well-settled that merely checking a box, or failing to check a box[,] does not necessarily control the scope of' the EEOC Charge." (quoting *Jones v. N.Y.C. Dep't of Educ.*, 286 F. Supp. 3d 442, 448 (E.D.N.Y. 2018)); *Mohamed v. NYU*, No. 14-CV-8373, 2015 WL 3387218, at *13 (S.D.N.Y. May 21, 2015) (holding that failure to select box for "Retaliation" on EEOC form was "not dispositive of whether [plaintiff's] current claim of retaliation can be viewed as reasonably related to his other allegations"). The factual allegations made in the Rusis/Gerrits charges plainly invoke a much longer timespan than the limited period of months provided in the box requesting the filer to provide the "Date(s) Discrimination Took Place." That is especially so in this case, where any concern about whether the EEOC or IBM were on notice of discriminatory conduct predating March 1, 2018, appears to be resolved, at least with respect to IBM's Resource Actions, by the existence of the EEOC investigation into IBM. As such, even if the Rusis/Gerrits charges provided notice to IBM and the EEOC of discrimination only within the four-month period specified, IBM cannot reasonably argue that neither it nor the EEOC were on notice of discrimination beyond that limited time frame.

In short, the Court holds that opt-ins whose claims accrued before March 1, 2018, or after June 27, 2018, are not, as a matter of law, barred from piggybacking onto the Rusis/Gerrits charges. They are, however, still subject to the temporal scope limitations based on the dates on which the Rusis/Gerrits charges were filed, discussed above, and they are still subject to the

---

[55]     *Adams v. N.Y. State Educ. Dep't*, 752 F. Supp. 2d 420, 467 (S.D.N.Y. 2010), the only case IBM cites from the Second Circuit on this point, states only that generalized assertions of vague similarities in discriminatory treatment occurring at different points in time are insufficient to support piggybacking.

overarching requirement that their claims must have arisen in the "same time frame" as those of Rusis/Gerrits.

## CONCLUSION

For the reasons stated above, IBM's motions for judgment on the pleadings are GRANTED in part and DENIED in part. Named Plaintiff Eng's ADEA claims are dismissed with prejudice. The Arbitration Opt-Ins are dismissed without prejudice. The Court will permit the parties to engage in discovery, if necessary, to determine which opt-ins must be dismissed as a result of this opinion. Not later than **April 23, 2021**, the parties must meet and confer to coordinate a proposed schedule for discovery — including a potentially bifurcated discovery schedule pursuant to which the parties first engage in discovery concerning the EEOC's investigation into IBM and the factual circumstances surrounding certain opt-ins' and Named Plaintiff McGonegal's separations — and for any subsequent motion practice, including Plaintiffs' contemplated renewed motion for conditional certification of a proposed collective, any contemplated motion for decertification of the collective by IBM, and whatever other motion practice the parties anticipate will be necessary to define the proper scope of the ADEA opt-in collective in this action. Because the Court denied Plaintiffs' initial motion for issuance of notice to potential opt-ins, the Court did not set a deadline for individuals to opt in to this action, as it would have if the Court had granted Plaintiffs' request for issuance of notice. Plaintiffs requested a 90-day notice period, which is standard in this district. Given that more than two-and-a-half years have passed since Plaintiffs commenced this action and more than one year has passed since the Court denied Plaintiffs' request for issuance of notice, the Court finds that former IBM employees have had ample time in which to opt in to this action. As such, the Court sets the date of this opinion as the deadline for former IBM employees to opt in to this case.

Should the Court grant any subsequent renewed motion for issuance of notice, the Court will consider reopening the opt-in period at that time.

The Clerk of Court is respectfully directed to terminate the open motions at Dkt. 120, Dkt. 123, and Dkt. 129.

**SO ORDERED.**

**Date:  March 26, 2021**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**