UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDVIN RUSIS, HENRY GERRITS, PHIL MCGONEGAL, DAVID HO ENG, BRIAN HAUPT, PHILIP MONSON, CLAUDIA ZIEGLER, SALLY GEHRING, and JOHN MASON, individually and on behalf of all other similarly situated individuals, <br><br>        Plaintiffs, <br><br>  v. <br><br>INTERNATIONAL BUSINESS MACHINES CORP. <br><br>        Defendant. | **1:18-cv-08434 (VEC)** |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT AS TO OPT-INS ASSERTING CONSTRUCTIVE DISCHARGE OR
<u>PRETEXTUAL FOR-CAUSE TERMINATION CLAIMS</u>**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.      NAMED PLAINTIFFS.................................................................................................. 2

        A.      Named Plaintiff John Mason ........................................................................... 2

        B.      Named Plaintiff Phil McGonegal..................................................................... 3

        C.      Named Plaintiffs Edvin Rusis, and Henry Gerrits ................................................ 4

        D.      Named Plaintiff Brian Haupt ........................................................................... 4

        E.      Named Plaintiff Sally Gehring......................................................................... 5

        F.      Named Plaintiffs Philip Monson and Claudia Ziegler ............................................ 5

II.     Lawsuit and Procedural History........................................................................................ 6

III.    Opt-Ins ............................................................................................................................ 8

        A.      Thirteen Opt-Ins Voluntarily Resigned or Retired From IBM. ........................... 9

        B.      Eight Opt-Ins Were Asked To Relocate and Decided to Either Retire Or
                Resign From IBM. ......................................................................................... 11

        C.      Five Employees Were Terminated From IBM For Various Reasons
                Including Gross Misconduct or Failure to Follow Company Policy. .................. 13

        D.      Five Employees Were Terminated Because They Were Unable to Find
                New Projects or Positions Within IBM After their Earlier Projects or
                Assignments had Concluded............................................................................. 14

        E.      Thirteen Employees Were Terminated From IBM Because of Their Poor
                Performance. .................................................................................................. 15

ARGUMENT .................................................................................................................... 17

I.      Separation Reason Opt-Ins Cannot Piggyback on to the Charges of any of the
        Named Plaintiffs. ........................................................................................................... 17

        A.      Separation Reason Opt-Ins Cannot Piggyback on to the Charges of Edvin
                Rusis, Henry Gerrits, Brian Haupt, David Ho Eng or John Mason. .................. 17

        B.      Separation Reason Opt-Ins Cannot Piggyback on McGonegal's Charge............ 18

        C.      Separation Reason Opt-Ins Cannot Piggyback On Sally Gehring's Charge. ...... 19

        D.      Opt-Ins Cannot Piggyback on to the Charges of Philip Monson and
                Claudia Ziegler............................................................................................... 21

II.     Opt-Ins Cannot Piggyback on The Charges of Named Plaintiffs in Other Lawsuits
        or the charges Underlying the EEOC Investigation........................................................... 24

III.    CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. New York State Educ. Dep't,*
    752 F. Supp. 2d 420 (S.D.N.Y. 2010)........................................................................17

*Brooks v. BellSouth Telecommunications, Inc.,*
    164 F.R.D. 561 (N.D. Ala. 1995)............................................................................19

*Butts v. NYC Dep't of Hous. Pres. & Dev.,*
    990 F.2d 1397 (2d Cir. 1993),...........................................................................18, 21

*Coghlan v. Peters,*
    555 F.Supp.2d 187 (D.D.C. 2008) ........................................................................17

*DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.,*
    11 F. Supp. 3d 387 (E.D.N.Y. 2014) ....................................................................18

*Ebewo v. Fairman,*
    460 F. App'x 67 (2d Cir. 2012) ............................................................................17

*Grant v. Morgan Guar. Tr. Co.,*
    548 F. Supp. 1189 (S.D.N.Y. 1982)......................................................................19

*Grayson v. K Mart Corp.,*
    79 F.3d 1086 (11th Cir. 1996) ..............................................................................22

*Holowecki v. FedEx. Corp.,*
    644 F. Supp. 2d 338 (S.D.N.Y. 2009)....................................................................19

*Miles, v. New York Health and Racquet Club Found., Inc.,*
    No. 84 Civ. 3610 (RWS), 1987 WL 9431 (S.D.N.Y. Apr. 7, 1987)......................19

*Rusis v. Int'l Bus. Machines Corp.,*
    529 F. Supp. 3d 178 (S.D.N.Y. 2021)............................................................. passim

*Spector v. Bd. of Trustees of Cmty.-Tech. Colleges,*
    2007 WL 4800726 (D. Conn. Dec. 27, 2007).......................................................20

*Tolliver v. Xerox Corp.,*
    918 F.2d 1052 (2d Cir. 1990).........................................................................21, 22

*Ulvin v. Nw. Nat'l. Life Ins. Co.,*
    943 F.2d 862 (8th Cir. 1991) ................................................................................19

## TABLE OF AUTHORITIES

**Page**

STATUTES

ADEA ......................................................................................................................... passim

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072....................................................18

**INTRODUCTION**

The Court should enter judgment in IBM's favor on the Age Discrimination in Employment Act ("ADEA") claims of the 44 Opt-ins who joined this action to pursue constructive discharge or pretextual "for-cause" termination claims ("Separation Reason Opt-Ins").  None of these 44 individuals filed administrative charges and thus did not satisfy the ADEA's administrative exhaustion requirements.  Under certain circumstances, a non-filing claimant can "piggyback" on a procedurally proper charge of a similarly situated named plaintiff in that action, but those circumstances do not exist here.

Currently, there are nine Named Plaintiffs in this action.  None of them provide a basis for piggybacking by the Separation Reason Opt-Ins.  Named Plaintiff John Mason never even filed a charge.  The Court previously dismissed with prejudice the ADEA claim of Named Plaintiff David Eng because he did not include an age claim in his charge.  And Named Plaintiff Philip McGonegal's charge was untimely, and improperly filed, and thus cannot support piggybacking.

The remaining six Named Plaintiffs – Edvin Rusis, Henry Gerrits, Brian Haupt, Sally Gehring, Philip Monson, and Claudia Ziegler – separated pursuant to resource actions (IBM's term for reduction-in-force).  None of their charges provide meaningful notice to either IBM or the Equal Employment Opportunity Commission ("EEOC") of any class claims of constructive discharge or for-cause termination.  This Court has already held that the Rusis and Gerrits' charges give notice – and thus permit piggybacking – only of claims of "former IBM employees who were terminated as part of an IBM Resource Action — i.e., a layoff."  *Rusis v. Int'l Bus. Machines Corp.*, 529 F. Supp. 3d 178, 214 (S.D.N.Y. 2021).  The Court's decision applies with equal force to Brian Haupt's charge because it is verbatim the same.  Sally Gehring's charge, which included age, sex, race and national origin discrimination claims, alleges that she was

1

forced to train employees from other protected statuses and then terminated – this too does not provide notice of constructive discharge and for-cause termination claims.

Finally, Monson and Ziegler both allege in their charges that they were laid off.  As this Court has previously recognized, layoffs are not the same action, that is, they are factually and legal distinct and thus not "similar discriminatory treatment" as constructive discharges or for-cause terminations.  Therefore, because the claims of the Separation Reasons Opt-Ins do not arise out of the same alleged discriminatory conduct that was the basis of Monson's and Ziegler's own claims, they are not sufficiently similar to permit piggybacking.  Moreover, neither Monson nor Ziegler were original Named Plaintiffs in this case and indeed, neither one of them even filed charges until after the lawsuit was filed and they had already opted in.  Under these circumstances, allowing opt-ins to piggyback off of their charges would circumvent the Court's prior ruling that a non-charge filer cannot piggyback on the charge of an opt-in in order to "prevent[]…a piggybacking chain of near-infinite length."  *Rusis*, 529 F. Supp. 3d at 211.

Because none of the Named Plaintiffs' charges put IBM and the EEOC on meaningful notice of potential constructive discharge and pretextual for-cause termination claims and/or are procedurally defective, the Separation Reasons Opt-Ins pursuing these theories of liability cannot piggyback on their charges and judgment should be entered in IBM's favor as to their ADEA claims.

## BACKGROUND

### I.    NAMED PLAINTIFFS[1]

The following facts are undisputed.

### A.    Named Plaintiff John Mason

---

[1] Named Plaintiff David Ho Eng's ADEA claims have already been dismissed with prejudice.  *Rusis*, 529 F. Supp. 3d at 204.

In March 2018, Named Plaintiff John Mason received notice of his selection in a resource action (IBM's term for a reduction-in-force).  (Defendant's 56.1 Statement of Material Undisputed Facts in Support of its Motion for Summary Judgment as to Opt-Ins With Constructive Discharge or Pretextual For-Cause Termination Claims ("SMF") ¶1.)  In June 2018, Mason separated from IBM.  (SMF ¶2.)  IBM has no record of receiving a charge filed by Mason with the Equal Employment Opportunity Commission ("EEOC") or another state agency, and Mason has not produced a charge.  (SMF ¶3.)

**B.     Named Plaintiff Phil McGonegal**

On May 2, 2017, IBM notified McGonegal of his eligibility for the Transition to Retirement program.  McGonegal Dep.  (SMF ¶4.)  Under the terms of this program, employees would work a reduced schedule for one year, and then separate from IBM.  (SMF ¶5.)  On May 12, 2017, IBM presented McGonegal with an alternative option: to relocate from Atlanta, Georgia to Raleigh, North Carolina and continue working full-time.  (SMF ¶6.)  McGonegal sought a family medical exception to the relocation offer, citing the need to stay in Atlanta to care for his mother-in-law.  (SMF ¶7.)  The exception was subsequently denied.  (SMF ¶8.)  On May 31, 2017, McGonegal elected to participate in IBM's Transition to Retirement Program, knowing that this decision was irrevocable.  (SMF ¶9.)  On June 30, 2018, McGonegal separated from IBM.  (SMF ¶10.)  McGonegal's charge filed with the EEOC contained language similar to that in other Named Plaintiffs' charges, i.e., IBM was engaged in unlawful discrimination by "systematically laying off" older workers to build a younger workforce.  (SMF ¶11.)

IBM advised Plaintiffs' counsel that IBM had never received agency notice of McGonegal filing a charge of discrimination with the EEOC or any analogous state agency, first in its Opposition to Plaintiffs' Motion for Issuance of Notice, which it filed on May 28, 2019 (Dkt. 50, at 7 n.3) and then again in counsel's letters dated April 15, 2020 and June 30, 2020.

3

(SMF ¶¶12.)  On August 13, 2020, Plaintiffs' counsel produced a document that shows that Plaintiffs' counsel submitted a charge of discrimination to the EEOC on behalf of McGonegal on July 2, 2018, by improper means.  (SMF ¶¶13.)  Because the charge was not submitted pursuant to the EEOC's recommended procedure, neither the EEOC nor IBM received notice of McGonegal's charge at that time.  The EEOC first received notice of McGonegal's allegations on August 6, 2020 – more than three years after he elected retirement and more than two years after he left the Company.  (SMF ¶14.)  As of August 6, 2020, the EEOC agreed to process McGonegal's charge as being received on July 2, 2018.  (SMF ¶15.)

### C.      Named Plaintiffs Edvin Rusis, and Henry Gerrits

In March 2018, Named Plaintiffs Edvin Rusis and Henry Gerrits, each received notice that they had been selected for separation from IBM pursuant to a resource action.  (SMF ¶16.)  In June 2018, both individuals separated from IBM.  (SMF ¶17.)

Rusis and Gerrits filed separate (but materially identical) charges of age discrimination with the EEOC.  (SMF ¶18.)  Both claimed only that IBM was engaged in unlawful discrimination by "systematically laying off" older workers at a higher rate than younger workers, and then not hiring those laid off workers for open positions.  *Id.*

### D.      Named Plaintiff Brian Haupt

Named Plaintiff Brian Haupt was notified of his selection in a resource action in March 2018, and then terminated in June 2018.  (SMF ¶19.)  He opted into this lawsuit by notice dated December 10, 2018.  (SMF ¶20.)  Then, with the assistance of Rusis' counsel, on February 28, 2019, he dual-filed a charge with the EEOC and the Massachusetts Commission Against Discrimination ("MCAD").  (SMF ¶21.)  Like Rusis and Gerrits, Haupt also claims that IBM was "systematically laying off" older workers at a higher rate than younger workers, and then not hiring those laid off workers for open positions.  (SMF ¶22.)

4

### E.    Named Plaintiff Sally Gehring

In March 2016, Named Plaintiff Sally Gehring received notice that she had been selected for layoff in a resource action.  (SMF ¶24.)  She then separated on May 31, 2016.  (SMF ¶25.)  On November 9, 2016, Gehring filed an EEOC charge claiming discrimination based on race, sex, national origin, and age.  (SMF ¶26.)  Gehring alleged that she was forced to train workers who were not from her race and were male, under the age of 40, and of non-American national origin and was then terminated.  (SMF ¶27.)  She further claimed that upon her separation from IBM, her job duties were assumed by employees outside her "protected statuses" and that many employees in her "protected statuses" were terminated and not hired.  (SMF ¶28.)

### F.    Named Plaintiffs Philip Monson and Claudia Ziegler

Named Plaintiff Philip Monson separated from IBM in a resource action in September 2019.  (SMF ¶29.)  Monson dual-filed his charge with the MCAD and the EEOC on November 26, 2019.  (SMF ¶30.)  Monson opted into this lawsuit on January 22, 2020.  (SMF ¶33.)  By notice dated May 13, 2020, the MCAD dismissed his charge noting that it had been withdrawn.  (SMF ¶34.)  The EEOC issued a right-to-sue ("RTS") notice dated September 22, 2020, noting that Monson was pursuing his claims in another forum.  (SMF ¶35.)  Plaintiffs moved to amend the complaint to add Monson as a Named Plaintiff more than 90 days later, on June 11, 2021.  (SMF ¶36.)

Named Plaintiff Claudia Ziegler received notice of her selection in a resource action on November 17, 2020, and she separated from IBM on December 17, 2020.  (SMF ¶37.)  With the assistance of Rusis' counsel, she filed a charge on December 17, 2020, more than two years after this lawsuit was filed.  (SMF ¶38.)  She opted into the lawsuit on January 6, 2021, less than 60 days after her charge was filed.  (SMF ¶39.)  Plaintiffs moved to amend the complaint to add Ziegler as a Named Plaintiff on June 11, 2021.  (SMF ¶40.)

Both Monson's and Ziegler's charges allege that they were laid off and that they believe it was because of their age.  (SMF ¶42.)  They also include statements asserting that IBM is also otherwise discharging and constructively discharging its older workforce.  (SMF ¶43.)

## II.   LAWSUIT AND PROCEDURAL HISTORY

Plaintiffs Rusis, Gerrits, and McGonegal initiated this lawsuit on September 17, 2018 (Dkt. 1) and, together along with newly-added Plaintiff Eng, filed an amended complaint on December 11, 2018 (Dkt. 11) alleging age discrimination under the ADEA as well as California, North Carolina, and New Jersey law.  *See* Dkt. 11, First Amended Class and Collective Action Complaint ¶¶ 31-39.  In addition to the original Named Plaintiffs, a number of other individuals filed consent forms to participate in this case (the "Opt-Ins").

On May 6, 2019, Plaintiffs filed a Motion for Issuance of Notice (Dkt. 46), seeking conditional certification of a putative ADEA collective.  Plaintiffs maintained that the collective should consist of all former IBM employees over the age of 40 whose employment ended "either because of layoff, discharge, or voluntarily – and thus may have been constructively discharged." *See* Dkt. 47, at 25.  On March 10, 2020, the Court denied Plaintiffs' Motion.  *See* Dkt. 97, Mar. 10, 2020 Order.  The Court noted that the scope of Plaintiffs' proposed collective included potential claimants with distinct legal theories, each supported by allegations of different discriminatory treatment.  *Id.* at 6-7.  The Court specifically observed that "Plaintiffs' proposed collective would pull into a single lawsuit a multitude of distinct decisions . . . The decisions referenced by Plaintiffs' affiants alone implicate a variety of legal theories, including constructive discharge, adverse employment actions, pretextual 'for-cause' terminations, mass layoffs, and retaliation."  *Id.*  Because Plaintiffs had "made no showing, beyond conjecture and the individual affiants' beliefs, that a unifying scheme at IBM links the potential members of the collective to one another," the Court denied the Motion.  *Id.* at 6 (finding Plaintiffs had failed to

meet "even the lenient evidentiary burden for issuing notice" to the proposed collective).

On August 14, 2020, IBM moved for judgment on the pleadings as to the claims of Named Plaintiffs Eng and McGonegal and 33 Opt-Ins alleging constructive discharge and pretextual "for-cause" termination claims. *See* Dkt. 123. In its March 26, 2021 decision, the Court found that "constructive discharges and pretextual for-cause terminations are factually and legally distinct from discriminatory layoffs." *Rusis*, 529 F. Supp. 3d at 214. However, the Court did not dismiss the Opt-Ins on those grounds, as doing so "would require the Court to consider facts and materials that go beyond the scope of those properly considered on a Rule 12(c) motion." *Id.*

In the same decision, the Court dismissed Eng's ADEA claims with prejudice. *Id.* at 204. Regarding McGonegal, the Court deferred a ruling as to whether his claim was timely as it was "unwilling to delve into a factual inquiry concerning the timing of McGonegal's claims on a motion for judgment on the pleadings." *Id.* at 206. Nevertheless, it noted that IBM could move for a "summary judgment on a more developed factual record." *Id.* at 202. The Court further cautioned that if McGoengal's charge were untimely, "opt-ins asserting constructive discharge claims are highly unlikely to be able to piggyback" on the charge and that the "odds are even longer for those alleging pretextual for-cause terminations." *Id.* at 234 n. 40.

As to Rusis and Gerrits' charges, the Court noted that "only those opt-ins who were separated from IBM as part of a "layoff" — an IBM Resource Action — may piggyback onto [their] charges." *Id.* at 218. The Court reasoned that because these charges "describe, at best, a pattern of discriminatory layoffs targeted at older employees," Opt-Ins could not "shoehorn theories of constructive discharge or pretextual termination into these charges." *Id.*

The Court also considered whether the Opt-Ins alleging constructive discharge or

pretextual for-cause termination could piggyback on the charges underlying the EEOC's investigation that culminated in the Letter of Determination dated September 3, 2020 ("LOD"). *Id.* at 211. The Court found that, the LOD itself did not refer to "conduct involving constructive discharges or pretextual for-cause terminations" and it was "clear from the face of the [LOD] that the EEOC investigated only IBM's Resource Actions." *Id.* at 219-220. Regardless, the Court noted that "the possibility exists that at least one of the . . . charge[s] underlying the [LOD] employed language broadly worded enough that it would provide notice to the EEOC of the class of former IBM employees complaining of constructive discharges and pretextual terminations." *Id.* at 220. Thus, the Court declined to hold as a "as a matter of law that the opt-ins asserting constructive discharge and pretextual termination claims may not piggyback onto any of the charges underlying the [LOD]." *Id*.

In sum, the Court set forth certain parameters that would govern in this action and then permitted "the parties to engage in discovery . . . to determine which opt-ins must be dismissed as a result of this opinion." *Id.* at 234. That discovery has now occurred.

On June 11, 2021, Plaintiffs moved for leave to file a second amended complaint and on July 22, 2021, they filed it. (SMF ¶44.) In this second amended complaint, they added five additional Named Plaintiffs – Haupt, Gehring, Mason, Monson, and Ziegler – as well as additional state law claims under New York and Massachusetts law. (SMF ¶45.)

III.  **OPT-INS**

Currently, there are 148 Opt-Ins who have filed consent forms to participate in this case. (SMF ¶46.) Of the 148, there are 44 Opt-Ins who did not separate from IBM under a resource action or another group termination program, referred to herein as the Separation Reasons Opt-Ins. Forty-three Separation Reason Opt-Ins did not submit EEOC charges; only one of the forty-

four filed an administrative charge.[2]  (SMF ¶47.)

The Separation Reasons Opt-Ins left IBM for various reasons.  Some retired or voluntarily resigned, while others were fired for gross misconduct or poor performance.  Others were unable to find jobs at IBM after they came back from leave or after  prior projects or assignments ended.  Yet, others were asked to relocate but decided instead to leave IBM.

### A.    Thirteen Opt-Ins Voluntarily Resigned or Retired From IBM.

1. **Gabriele Avzaradel:** In May 2017, Gabriele Avzaradel received an email offering him a chance to participate in the Transition to Retirement program – a voluntary retirement program that acts a bridge to retirement.  (SMF ¶48.)  Employees in the program work 60% of their regular hours and receive 70% of their regular pay for a period of one year.  (SMF ¶49.)  At the end of the year, the employee retires from IBM.  (SMF ¶50.)  Avzaradel expressed his interest in and excitement about the program to his manager.  (SMF ¶51.)  Avzaradel applied, and on June 20, 2017, his application was approved.  (SMF ¶52.)

2. **Anne Belt:** In early 2018, Belt's manager, Devan Reddy, informed her of his intention to put her on a performance improvement plan ("PIP").  (SMF ¶53.)  Shortly thereafter, Belt took a medical leave that lasted from January to April 2018 and then a second medical leave in July 2018.  (SMF ¶54.)  On August 12, 2018, Belt emailed her manager informing him that "due to [her] series of ongoing medical issues," she had decided "to retire from IBM effective 8/14/2018."  (SMF ¶55.)

3. **Thomas Caldwell:** On January 25, 2019, Thomas Caldwell emailed his manager informing him of "his plan to retire from IBM" effective March 31, 2019.  (SMF ¶56.)

---

[2] Opt-In Walter Bayerle filed an EEOC charge but his charge was untimely.  *See* IBM's Motion for Summary Judgment as to the Plaintiffs Who Filed Untimely Charges, An Untimely Lawsuit, or Fall Outside the Temporal Scope of the Representative Administrative Charges ("Timeliness Motion"), filed simultaneously herewith. *See* Mem. In. Supp. of Timeliness Motion at 15.

4. **William Chaplin:** Chaplin's manager, Jack Neville, put him on a PIP.  (SMF ¶57.)  Around April 2019, Chaplin resigned from IBM and claims that he was constructively discharged. (SMF ¶58.)

5. **David Edley:** On June 18, 2018, David Edley informed his manager, Bruce Kettle, that he was resigning from IBM and that his "final day of work" will be July 31, 2018.  (SMF ¶59.)

6. **Judy Ghea:** In December 2017, Ghea's manager, Mary Anguay, placed Ghea on a PIP. (SMF ¶60.)  On May 30, 2018, Ghea emailed Anguay informing her that she was retiring from IBM effective May 31, 2018.  (SMF ¶61.)

7. **David Hamel:** Hamel participated in the voluntary Transition to Retirement program and separated from IBM in June 2018.  (SMF ¶62.)

8. **Cynthia Keefer:** On January 9, 2018, Keefer informed her manager, Robert Kennedy, that she would like to retire from IBM and that she would be eligible for the same as of January 25, 2018.  (SMF ¶63.)  Keefer separated from IBM in July 2018.  (SMF ¶64.)

9. **Diane Prater:** Prater applied to the Transition to Retirement Program and her application was accepted on June 20, 2017.  (SMF ¶65.)  Prater separated from IBM in March 2018. (SMF ¶66.)

10. **Ronald Ragsdale**: On November 26, 2018, Ragsdale emailed his manager, Karen Bruemmer, informing her that he was retiring and his last day at IBM would be December 31, 2018.  (SMF ¶67.)  He informed Bruemmer that he had been at IBM for "40 years" and that it was "about time" to retire, though it was "hard to" do so as he "loved [his] job with IBM."  (SMF ¶68.)

11. **David Reid:** Reid separated from IBM in March 2018 when he participated in the Transition to Retirement program.  (SMF ¶69.)  Reid's manager, Robert Cohen, encouraged Reid to

stay because he believed that Reid "had a lot of skills," was able to "perform complicated work on IBM's higher-end equipment," was "very likeable," and "worked well with the rest of the team." (SMF ¶70.) Reid retired anyway. (SMF ¶71.)

12. **John Stapleton:** John Stapleton joined IBM when IBM acquired Verizon's cloud service business. (SMF ¶72.) In June 2018, Stapleton asked to retire from IBM in order to retain Verizon's retirement benefits. (SMF ¶73.) Stapleton separated from IBM in July/August 2018. (SMF ¶74.)

13. **Christopher Stevenson:** On October 24, 2017, Stevenson emailed his manager, Paul Ambraz, informing him that he "decided to depart IBM." (SMF ¶75.) Stevenson informed Ambraz that he wanted to train his replacement and stated that he "had an enlivening and enriching experience during [his] tenure at IBM." (SMF ¶76.) Stevenson resigned from IBM in October 2017. (SMF ¶77.)

      **B.**     **Eight Opt-Ins Were Asked To Relocate and Decided to Either Retire Or Resign From IBM.**

1. **Anne Bellew:** IBM asked Bellew to relocate in January 2018. (SMF ¶78.) She declined, so she separated from IBM effective July 31, 2018. (SMF ¶79.)

2. **Diane Delaney:** On February 6, 2017, Delaney was notified that her role would be moving from Omaha, Nebraska, to New York City. (SMF ¶80.) Delaney was given an option to either relocate to New York or retire. (SMF ¶81.) For various personal reasons, she decided not to relocate to New York and chose to retire instead. (SMF ¶82.)

3. **John Gates:** Around January 2017, Gates reached out to a colleague, Chris Cook, asking him if he could join Cook's Personal Development Tool ("PDT") team. (SMF ¶83.) Cook subsequently gave an offer to Gates to join the PDT team conditioned on Gates' agreement to relocate to Poughkeepsie, New York. (SMF ¶84.) Gates accepted the offer in 2017. (SMF

11

¶85.)  After delaying the move for various reasons, Gates informed Cook that he was no longer willing to relocate.  (SMF ¶86.)  Gates continued work for the PDT team through the end of 2017 until his retirement from IBM on December 31, 2017.  (SMF ¶87.)

4. **Craig Grills:** Grills' manager, Pat Boltin, asked him to relocate to Raleigh-Durham, North Carolina, from Tampa, Florida.  (SMF ¶88.)  At first, Grills agreed to commute to Raleigh-Durham but soon decided to retire by participating in the Transition to Retirement program as he could not "tolerate the strain of commuting."  (SMF ¶89.)

5. **Sonali Bailey Perkins:** In 2017, Perkins was asked to relocate to Boston, Massachusetts. (SMF ¶90.)  She did not appeal the decision, and instead applied for and received an extension for the move to Boston.  (SMF ¶91.)  IBM offered her the option of moving to Raleigh, North Carolina, even though this was not ideal for IBM.  (SMF ¶92.)  On March 8, 2017, Perkins emailed her manager, Beth Sherden, expressing her willingness to relocate to Boston and confirming that she had until July 1, 2018 to make the move.  (SMF ¶93.) However, in August 2017, she resigned from IBM and joined Oracle, one of IBM's competitors.  (SMF ¶94.)

6. **Danny Peterman:** In November 2018, Peterman was asked to relocate to another city. (SMF ¶95.)  He declined and separated from IBM in November 2018.  (SMF ¶96.)

7. **Rene Ramos:** In May 2017, Ramos was asked to relocate to Research Triangle Park, North Carolina.  (SMF ¶97.)  Ramos did not appeal the decision.  (SMF ¶98.)  Instead of relocating, he then participated in the Transition to Retirement program and separated from IBM in June 2018.  (SMF ¶99.)

8. **Thomas Warthen:** In February 2017, Warthen was asked to relocate to Austin, Texas. (SMF ¶100.)  Warthen did not appeal the decision and initially agreed to move to Austin.

(SMF ¶101.)  Around November 2017, Warthen requested that he be relocated to Atlanta, Georgia instead.  (SMF ¶102.)  Even though IBM approved the request, Warthen did not move to Austin or Atlanta and separated from IBM in December 2017.  (SMF ¶103.)

### C.   Five Employees Were Terminated From IBM For Various Reasons Including Gross Misconduct or Failure to Follow Company Policy.

1.  **Mark Bauer:** On May 19, 2017, Bauer emailed the employees on his team telling them that they had a "goal to reduce [overtime]" and "should not claim [overtime]."  (SMF ¶104.)  On June 14, 2018, Bauer's manager, Ed Fung, informed him that he had received an investigative report stating that Bauer instructed IBM employees to refrain from reporting more than 40 hours a week.  (SMF ¶105.)  Fung further informed Bauer that because Bauer's said conduct was in violation of IBM Business Conduct Guidelines, IBM was terminating Bauer immediately.  (SMF ¶106.)

2.  **Melody Faeizi:** Faeizi was terminated from IBM on October 17, 2016, for "creating a hostile environment."  (SMF ¶107.)

3.  **Arleen Franceschi:** Franceschi went on leave of absence from IBM from on or about March 6, 2018, through September 5, 2018.  (SMF ¶108.)  Franceschi had a corporate American Express ("AmEx") credit card, which was to be used only for business-related expenses. (SMF ¶109.)  During the leave, Franceschi incurred some personal expenses on her AmEx credit card, including airline tickets for Franceschi's emergency contact.  (SMF ¶110.)  When her manager, Lisa Wood, was notified about these charges, she reached out to Franceschi for an explanation.  (SMF ¶111.)  IBM determined that Franceschi was not truthful in her responses regarding use of her corporate AmEx card.  (SMF ¶112.)  Subsequently, Wood advised her that she was being terminated for her conduct.  (SMF ¶113.)

4.  **James Rash:** In 2017, Rash was in London for a project.  (SMF ¶114.)  In March 2018, IBM

discovered questionable lodging, air travel, meal, and rental car expenses submitted by Rash and referred the matter to the Internal Audit team.  (SMF ¶115.)  The Internal Audit team conducted an independent review of Rash's expense account and concluded that Rash had submitted, and been reimbursed for, various expenses in violation of IBM's expense reimbursement policies.  (SMF ¶116.)  The Internal Audit team recommended and Rash's manager agreed that Rash should be terminated for improper expense termination.  (SMF ¶117.)  In April 2018, Rash was informed that he was being terminated from IBM for gross misconduct.  (SMF ¶118.)

5. **Bunyan Tadlock:**  Tadlock violated IBM pricing procedures three separate times.  (SMF ¶119.)  He had released pricing information to a customer without getting the proper approvals, and he had made commitments to customers before getting the correct approvals. (SMF ¶120.)  After his third unauthorized pricing commitment, his manager, Michael Ivancich, notified Tadlock that he being was terminated for gross misconduct.  (SMF ¶121.)

> **D.**   **Five Employees Were Terminated Because They Were Unable to Find New Projects or Positions Within IBM After their Earlier Projects or Assignments had Concluded.**

1. **Demostenes Gonzalez:** Gonzalez was unable to find a project on which to work and was thus idle between May 22, 2017, and his separation four months later.  (SMF ¶122.)  On August 24, 2017, his manager notified him that he would be terminated unless he found another project.  (SMF ¶123.)  Gonzalez did not find another project, so IBM terminated him effective September 22, 2017.  (SMF ¶124.)

2. **Mark Grill:** Around April 2017, Grill returned to the United States from an international assignment.  (SMF ¶125.)  After Grill's arrival, IBM asked him to find another position in the company.  (SMF ¶126.)  He did not find another position.  (SMF ¶127.)  Consequently, Grill separated from IBM in August 2017.  (SMF ¶128.)

14

3. **Mark Mastel:** After a long term assignment ended, Mastel was expected to find another assignment. (SMF ¶129.) He was unable to do so and separated from IBM. (SMF ¶130.)

4. **Peter Kondis:** Kondis was on leave from IBM and returned around August 2018. (SMF ¶131.) Upon his return, Kondis applied for several jobs at IBM. (SMF ¶132.) He did not find another position, and separated from IBM effective November 2018. (SMF ¶133.)

5. **Michael Shattuck:** Shattuck was on leave and upon his return to IBM, he was expected to find another job at IBM. (SMF ¶134.) Because he was unable to find a job at IBM, Shattuck separated from IBM. (SMF ¶135.)

      **E.**    **Thirteen Employees Were Terminated From IBM Because of Their Poor Performance.**

1. **Walter Bayerle:** In July 2017, IBM placed Bayerle on a PIP. (SMF ¶136.) Rather than improve his performance, he requested severance. (SMF ¶137.)

2. **Steven Black:** IBM placed Black on PIP in 2017. (SMF ¶138.) He failed to meet expectations under the PIP, so IBM terminated his employment later that year. (SMF ¶139.)

3. **Vincent Daukas:** In 2018, Daukas' manager, Valerie Bennett, put him on a PIP, listing three separate areas of needed improvement. (SMF ¶140.) In January 25, 2019, Bennett emailed Daukas informing him that his "performance did not improve to the level required while [he was] on the [PIP]" and that "[a]s a result, [he was] being separated from IBM effective January 31, 2019." (SMF ¶141.)

4. **Phillip Emma:** IBM placed Emma on a PIP in November 2016. (SMF ¶142.) IBM later informed him that he failed to meet expectations under the PIP and that he was terminated effective December 2016. (SMF ¶143.)

5. **John Gray:** In March 2017, Gray's manager, Richard Skuse, put him on a PIP. (SMF ¶144.) Subsequently, he was notified that he was being terminated for failing to meet the terms of

the PIP.  (SMF ¶145.)

6. **Rose Kapor:**  On April 30, 2014, IBM terminated Kapor after notifying her of her poor performance, specifically her failure to meet quotas.  (SMF ¶146.)

7. **Raymond Otto Kulisch**: In 2017, Kulisch's manager, Judith Dwyer, put him on a PIP. (SMF ¶147.)  Under the PIP, Kulisch was expected to be "fully billable at least 40 hours per week for two weeks" over the next 30 days "with an assignment of at least 8 weeks long." (SMF ¶148.)  Dwyer determined that Kulisch was unable to meet the requirements of the PIP as he "could not find a billable project" and failed to "meet the utilization target."  (SMF ¶149.)  Kulisch eventually separated from IBM on December 15, 2017.  (SMF ¶150.)

8. **Charles (Jim) Lundy:** On March 30, 2017, Lundy was placed on a PIP for failing to achieve over 50 percent of his sales target for the last two halves (January through June 2016 and July through December 2016).  (SMF ¶151.)  In order to satisfy the terms of the PIP, Lundy was required to reach 70 percent attainment of his sales target over the next six months. (SMF ¶152.)  Because Lundy failed to close any deals, he did not meet the terms of the PIP and separated from IBM on August 31, 2017.  (SMF ¶153.)

9. **David Ogilbee:** In July 2017, Ogilbee's manager, Alberto Rodriguez, put him on a PIP. (SMF ¶154.)  Per the terms of the PIP, Ogilbee was expected to work on his accounts to accomplish the goals listed in his PIP including generating pipeline and signing new business.  (SMF ¶155.)  He was subsequently notified that he was being terminated from IBM for failing to meet the PIP.  (SMF ¶156.)

10. **Chohreh Partovian:** On November 13, 2017, Partovian's manager, Ching-Hua Chen, sent him a formal warning letter informing Partovian that he had engaged in disrespectful workplace behavior.  (SMF ¶157.)  In 2018, Chen put Partovian on a PIP and thereafter,

Partovian was notified that he was being terminated from IBM for failing to meet the terms of the PIP.  (SMF ¶158.)

11. **Michael Rudge:** In February 3, 2020, Rudge's manager, Joseph Wallace, put him on a PIP until March 31, 2020.  (SMF ¶159.)  Rudge separated from IBM in June 2020 and his separation was characterized as a retirement.  (SMF ¶160.)

12. **Brian Schaaff:** In December 2015, IBM informed Schaaff that he was terminated because of his poor performance, specifically his failure to implement IBM Cloud.  (SMF ¶161.)

13. **Eric Selcov:** IBM placed Selcov on a PIP in August 2014.  (SMF ¶162.)  He failed to meet expectations under the PIP, so IBM terminated his employment effective December 2014.  (SMF ¶163.)

## ARGUMENT

Since the Court's March 26, 2021 Order, the parties have exchanged discovery, and as explained above, there are 44 Opt-Ins who separated from IBM for various reasons – some resigned or retired; some were terminated for poor performance or misconduct; some did not want to relocate; and others were unable to find a position at IBM.  All but one failed to file their own EEOC charge and the one who did, failed to file it in a timely fashion.  (SMF ¶47.)  None of the Separation Reason Opt-Ins claim that they were discharged from IBM in a group action and each claims that they were terminated on pretextual grounds or were constructively discharged. Accordingly, summary judgment should be granted on the Separation Reason Opt-Ins as they have failed to administratively exhaust their claims.

## I.     SEPARATION REASON OPT-INS CANNOT PIGGYBACK ON TO THE CHARGES OF ANY OF THE NAMED PLAINTIFFS.

### A.     Separation Reason Opt-Ins Cannot Piggyback on to the Charges of Edvin Rusis, Henry Gerrits, Brian Haupt, David Ho Eng or John Mason.

The Court has already unequivocally held that "[t]he Rusis/Gerrits charges describe, at

17

best, a pattern of discriminatory layoffs targeted at older employees," and that "Plaintiffs cannot shoehorn theories of constructive discharge or pretextual termination into these charges." *Rusis*, 529 F. Supp. 3d at 218.  The language in Haupt's charge is materially identical to the language in Rusis and Gerrits' charges, and thus, the Separation Reason Opt-Ins cannot piggyback on Haupt's charge either.[3]  (SMF ¶¶18, 22.)

The Court previously dismissed Named Plaintiff Eng's ADEA claims as he failed to include a claim of age discrimination on his charge.  *Rusis*, 529 F. Supp. 3d at 204.  Since Plaintiff Eng failed to exhaust his own ADEA claims (*id.*), none of the Opt-Ins can piggyback on to his charge.  Likewise, Named Plaintiff Mason never filed a charge, and thus, Opt-Ins cannot piggyback on his claims either.

### B.  Separation Reason Opt-Ins Cannot Piggyback on McGonegal's Charge.

The Separation Reason Opt-Ins also cannot piggyback on McGonegal's charge for several reasons including the fact that his charge was untimely filed.  *See, e.g., Adams v. New York State Educ. Dep't*, 752 F. Supp. 2d 420, 467 (S.D.N.Y. 2010) ("other plaintiffs cannot piggyback on an invalid, untimely" administrative charge), aff'd sub nom. *Ebewo v. Fairman*, 460 F. App'x 67 (2d Cir. 2012); *Coghlan v. Peters*, 555 F.Supp.2d 187, 201 (D.D.C. 2008) (non-filing plaintiffs could not piggyback onto other plaintiff's 2004 administrative complaint because it was untimely).  Indeed, this Court has already stated that, if McGonegal's charge were found to be untimely, "opt-ins asserting constructive discharge claims are *highly unlikely* to be able to piggyback into this action" and that "those odds are even longer for those alleging pretextual for-cause terminations."  *Rusis*, 529 F. Supp. 3d at 234 n. 40 (emphasis added).

---

[3] They also cannot piggyback on Haupt's charge because Haupt did not become a Named Plaintiff within 90 days of receiving his right to sue notice (SMF ¶¶ 23, 44-45), as further explained in Timeliness Motion. *See* Mem. In. Supp. of Timeliness Motion at 24-25.

Specifically, McGonegal did not file his charge within 180 days from the date he signed up for Transition to Retirement fully knowing that he could not revoke the decision.  (SMF ¶¶9-11.); *see* Mem. In. Supp. of Timeliness Motion at 13-15.  Consequently, his charge is untimely, and none of the Separation Reason Opt-Ins can piggyback on his charge.  Moreover, even if the Court were to find that McGonegal's charge is somehow timely, it still cannot provide the basis for piggybacking.  *First*, the allegations in his charge are identical to those in the Rusis, Gerrits and Haupt charges, albeit for a slightly different time frame.  Thus, on its face, it provided no notice to the EEOC that he would be seeking to pursue claims of constructive discharge or for-cause termination.  *Second*, McGonegal's charge was improperly submitted to the EEOC, because of which, the EEOC never processed it and never sent notice of it to IBM.  It was not until August 6, 2020, that the EEOC issued a notice stating that it would deem McGonegal's charge as having been filed as of July 2, 2018.  (SMF ¶¶13-15.)  Accordingly, his charge did not satisfy the purposes underlying the exhaustion requirement sufficient to support piggybacking.[4]

**C.    Separation Reason Opt-Ins Cannot Piggyback On Sally Gehring's Charge.**

Nor can the Separation Reason Opt-Ins piggyback on Sally Gehring's charge.  Non-charge filing individuals can invoke the single-filing doctrine and piggyback on to claims that "were either contained in the EEOC charge or are 'reasonably related' to claims in the charge." *DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.*, 11 F. Supp. 3d 387, 393 (E.D.N.Y. 2014). Claims are "reasonably related" if they "would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge.'"  *Butts v. NYC Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402–03 (2d Cir. 1993), *superseded by statute on other grounds*,

---

[4] In any event, even if the Court were to conclude that IBM and the EEOC were somehow on notice of McGonegal's claims before August 6, 2020, at the most, only other opt-ins who separated after being asked to co-locate and refusing, like McGonegal, would be allowed to piggyback.  Thus, the 36 opt-ins who separated for other reasons should still be dismissed.

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072.

Courts have concluded, however, that a non-charge filer cannot piggyback on a charge alleging a different type of discriminatory practice.  For example, in *Holowecki v. FedEx. Corp.*, 644 F. Supp. 2d 338, 350-51 (S.D.N.Y. 2009), the Court held that individuals claiming forced retirement could not piggyback on a charge claiming age-based "discriminatory application" of performance and compensation programs.[5]

Here, as in *Holowecki*, the Separation Reason Opt-Ins cannot piggyback on Gehring's charge to assert constructive discharge or pretextual termination because her charge involves an entirely different type of discriminatory practice.  In her charge, Gehring references various protected statuses including age, national origin, race and gender and alleges that she "was forced to train a new employee outside [her] protected statuses," and that her "job duties were taken over by workers outside all of [her] protected statuses."  (SMF ¶¶26-28.)  Gehring's charge does not even hint at claims of individuals who voluntarily retired or separated or whom IBM terminated for performance, misconduct, or other for-cause reasons.

Nor could the claims of the Separation Reason Opt-Ins be said to reasonably relate to an investigation that would grow out of Gehring's charge.  Like the other Plaintiffs, Gehring separated from IBM under a resource action.  (SMF ¶24.)  Thus, at best, only individuals who separated in resource actions may be able to piggyback on her charge.  *See, e.g., Brooks v.*

---

[5] Other courts have reached similar results.  *See Miles, v. New York Health and Racquet Club Found., Inc.,* No. 84 Civ. 3610 (RWS), 1987 WL 9431, at *4 (S.D.N.Y. Apr. 7, 1987) (non-filing plaintiffs could not piggyback claims of discriminatory hiring onto filing plaintiff's EEOC charge alleging only discriminatory denial of employee benefits, explaining "[b]ecause these different factual issues were not raised administratively, there was no administrative 'opportunity for conciliation'"); *Grant v. Morgan Guar. Tr. Co.*, 548 F. Supp. 1189, 1191-92 (S.D.N.Y. 1982) (charge challenging denied promotion did not support putative class claims alleging "discrimination in compensation, assignment, transfer, training and other terms"); *Ulvin v. Nw. Nat'l. Life Ins. Co.*, 943 F.2d 862, 865-66, n.2 (8th Cir. 1991) (charge alleging defendant "demoted and subsequently fired" claimant as part of "a general pattern and practice of discrimination against individuals over the age of 40" did not encompass ADEA claims of coerced "early retirement").

*BellSouth Telecommunications, Inc.*, 164 F.R.D. 561, 570 (N.D. Ala. 1995) (only individuals "who, like the plaintiff, were involuntarily terminated for cause" could piggyback on plaintiff's charge, as claims based on "early retirement plans" had not been properly exhausted), *aff'd sub nom. Brooks v. Bellsouth*, 114 F.3d 1202 (11th Cir. 1997).  As none of the Separation Reason Opt-Ins fall into that category, they cannot benefit from her charge.

> **D.      Opt-Ins Cannot Piggyback on to the Charges of Philip Monson and Claudia Ziegler.**

Despite the fact that both Monson and Ziegler were terminated in resource actions (SMF ¶¶29,37), their charges purport to include pretextual discharge and constructive discharge allegations in parentheticals.  (SMF ¶¶41-43.)  Both Ziegler and Monson became Named Plaintiffs in July 2021 (SMF ¶¶44-45), *after* the Court had already ruled that "constructive discharges and pretextual for-cause terminations are factually and legally distinct from discriminatory layoffs" and that non-charge filers with such claims cannot piggyback on to Rusis and Gerrits' charges.  *Rusis*, 529 F. Supp. 3d at 214.

These after-the-fact efforts to find a charge for the Separation Reason Opt-Ins to piggyback on should be rejected.  Setting aside Plaintiffs' counsel's blatant gamesmanship in attempting to expand the scope of the case by filing differently worded charges and then adding those individuals as Named Plaintiffs *after* the Court's March 2021 ruling, the Separation Reason Opt-Ins cannot piggyback on these new Named Plaintiffs' charges for multiple reasons.

*First,* the claims of the Separation Reasons Opt-Ins are not sufficiently similar to those of Monson and Ziegler to allowing piggybacking on their charges.  Individuals can piggyback only if they "were similarly situated and received the same discriminatory treatment" as the charge-filing named plaintiff.  *Spector v. Bd. of Trustees of Cmty.-Tech. Colleges*, 2007 WL 4800726, at *11 (D. Conn. Dec. 27, 2007) (quoting *Snell v. Suffolk Cty.*, 782 F.2d 1094, 1100 (2d Cir. 1986))

(non-filer could not rely on co-plaintiff's charge; while the claims "share[d] some events in common, the factual basis of their complaints [were] more different than alike"), *aff'd*, 316 F. App'x 18 (2d Cir. 2009).  Ziegler and Monson were selected in resource actions.  (SMF ¶¶29, 37.)  None of the Separation Reasons Opt-Ins even allege that they were selected in resource actions and claim to have been either pretextually or constructively discharged.  Because their claims are distinct from Monson and Ziegler, they cannot piggyback on to those charges.  *See Rusis,* 529 F. Supp. 3d at 214 ("constructive discharges and pretextual for-cause terminations are factually and legally distinct from discriminatory layoffs").

Nor do the vague and conclusory assertions related to constructive discharge or pretextual termination claims in Ziegler's and Monson's charges provide adequate notice of those claims. The Court has already ruled that "[g]eneral statements asserting only that IBM engaged in widespread age discrimination are patently insufficient to put the EEOC or IBM on notice of future claims alleging constructive discharge or pretextual termination." *Id.* at 216.  By cramming all possible termination theories into one charge, Plaintiffs fail to adequately describe "the nature and scope of the grievance," in a way that affords the EEOC and the employer with a meaningful opportunity to "explore conciliation with the affected group." *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1054-58 (2d Cir. 1990); *see Butts,* 990 F.2d at 1403 ("boilerplate" and "vague, general allegations" are "quite incapable of inviting a meaningful EEOC response").  In *Butts,* the Second Circuit Court explained that "to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response to define the scope of the EEOC investigation and therefore predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and [the statute's] investigatory and mediation goals would be defeated." *Id.* Just like *Butts*, here, the allegations pertaining to other types of terminations are too vague to

"invit[e] a meaningful EEOC response" and thus cannot provide a basis for piggybacking.

*Second,* neither Monson or Ziegler were original Named Plaintiffs (SMF ¶45), and thus cannot be the basis for piggybacking.  *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1108 (11th Cir. 1996) ("putative plaintiffs should be allowed to piggyback only on the timely filed EEOC charge of an original named plaintiff of class action.").  Moreover, Monson did not initiate a "suit filed in [his or] her own name" within 90 days of receiving his right-to-sue-notice, and cannot be a representative plaintiff for that reason as well.[6]  (SMF ¶¶34, 44-45)  *See Rusis*, 529 F. Supp. 3d at 210 (observing that courts have recognized that being an named plaintiff is an "implicit" requirement to piggybacking); *see also* Mem. In. Supp. of Timeliness Motion at 24-25.

*Third*, to "prevent[] a situation in which plaintiffs in a putative collective action can create a piggybacking chain of near-infinite length," the Court has already held that a non-charge filer cannot piggyback on to the charge filed by an Opt-In.  *Rusis*, 529 F. Supp. 3d at 211.  By selectively adding Monson and Ziegler (who filed their charges in November 2019 and December 2020 respectively) (SMF ¶¶30, 38), as Named Plaintiffs in this case three years into the litigation (SMF ¶¶44-45), Plaintiffs are doing exactly that – attempting to create an infinite chain of piggybacking.  This clear attempt to circumvent the Court's March 2021 Order should not be permitted.  Indeed, if plaintiffs were permitted to simply amend their complaints to add additional Named Plaintiffs at any time, it would completely eviscerate the Court's ruling that non-charge filers cannot piggyback on Opt-Ins.

---

[6] Monson, Ziegler and Haupt also each withdrew their charges (SMF ¶¶23, 34, 41) and thus provided neither the EEOC nor IBM with an opportunity to conciliate.  Allowing the Timeliness Opt-Ins to piggyback on their charges would be inappropriate for this reason as well.  *See Tolliver*, 918 F.2d at 1058 (charge must allege more than "an isolated act of discrimination and afford sufficient notice to the employer to explore conciliation with the affected group").

*Finally*, even if the Monson and Ziegler charges provided adequate notice of constructive discharge and pretextual termination claims (which they do not), the 41 Separation Reason Opt-Ins who terminated 300 days (180 days for deferral states) before November 26, 2019 – the date Monson filed his charge (SMF ¶30) – cannot piggyback on his charge.  The Court has already held that "termination claims that accrued more than 180 or 300 days before the [Named Plaintiffs'] charges were filed may not piggyback their termination claims onto those charges." *Rusis*, 529 F. Supp. 3d at 228.  Forty of the 44 Separation Reasons Opt-Ins separated prior to January 30, 2019 – the 300 days cut-off.  (SMF ¶31.)  Another Opt-In – Thomas Caldwell, who worked in North Carolina (deferral state) separated on March 31, 2019, prior to the 180 days cutoff.  (SMF ¶32.)  Accordingly, at the very minimum, the claims of at least 41 Separation Opt-Ins are time barred.

## II.   OPT-INS CANNOT PIGGYBACK ON THE CHARGES OF NAMED PLAINTIFFS IN OTHER LAWSUITS OR THE CHARGES UNDERLYING THE EEOC INVESTIGATION.

Because they cannot piggyback on the charges of any of the Named Plaintiffs in this case, the Separation Reason Opt-Ins may argue that they can piggyback on the claims of a plaintiff in a different lawsuit or on the EEOC investigation.  However, neither provides a basis for piggybacking.

To the extent Plaintiffs claim that the Separation Reasons Opt-Ins subject to this Motion can piggyback on the charge of a named plaintiff in another lawsuit, they cannot.  As the Court noted, "in nearly every class or collective action invoking the single-filing rule, the parties agree that the scope of the case is dictated by the EEOC charge or charges of the named plaintiffs in *that* action." *Rusis*, 529 F. Supp. 3d at 234 n. 26 (emphasis added).  The Court further noted that "as a matter of normal litigation practice, the named plaintiffs in litigation control the scope of the litigation based on the injury they allegedly suffered[and] [i]t would be odd if piggybacking

could be used to expand the scope of litigation beyond that delineated by the named plaintiffs." *Rusis*, 529 F. Supp. 3d at 234 n. 26.  Moreover, numerous courts to consider the issue have found that non-charge filers can only piggyback on the claims of plaintiffs in the *same* litigation.  *See* Mem. In. Supp. of Timeliness Motion at 22.

The Court also left open the possibility that Opt-Ins could piggyback on one of the charges included in the EEOC Letter of Determination.  The Court reasoned that a "possibility exists that at least one of the . . . charges underlying the [LOD] employed language broadly worded enough that it would provide notice to the EEOC of the class of former IBM employees complaining of constructive discharges and pretextual terminations."  *Rusis*, 529 F. Supp. 3d at 220.

However, after having engaged in a period of discovery on the EEOC investigation, it is clear that the Separation Reasons Opt-Ins cannot piggyback on to any of the charges listed in the LOD.  All the 62 charging parties underlying the LOD separated in resource actions or other group termination programs (SMF ¶165) and their charges do not provide notice of constructive discharge or pretextual termination claims.  Accordingly, because the Separation Reason Opt-Ins cannot piggyback on the charges underlying the EEOC Letter of Determination, summary judgment must be granted on their claims.

## III.   CONCLUSION

For the reasons stated above, the Court should grant IBM's Motion for Summary Judgment as to the Separation Reason Opt-Ins, who each failed to administratively exhaust their claims.

Dated: December 21, 2021
New York, New York

JONES DAY

By */s/ Matthew W. Lampe*
    Matthew W. Lampe
    Kristina A. Yost
    Ira Handa
    250 Vesey Street
    New York, New York 10281
    Tel: 212.326.3939
    Fax: 212.755.7306
    mwlampe@jonesday.com
    kyost@jonesday.com
    ihanda@jonesday.com

    Alison B. Marshall
    51 Louisiana Ave., N.W.
    Washington, D.C. 20001
    Tel: 202.879.3939
    Fax: 202.626.1700
    abmarshall@jonesday.com

    *Attorneys for Defendant IBM*