UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDVIN RUSIS, HENRY GERRITS, PHIL MCGONEGAL, DAVID HO ENG, BRIAN HAUPT, PHILIP MONSON, CLAUDIA ZIEGLER, SALLY GEHRING, and JOHN MASON, individually and on behalf of all other similarly situated individuals,

Plaintiffs,

v.

INTERNATIONAL BUSINESS MACHINES CORP.

Defendant.

**1:18-cv-08434 (VEC)**

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO ADEA WAIVER OPT-INS AND ARBITRATION AGREEMENT OPT-INS**

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. THE ADEA WAIVER OPT-INS ..... 2

A. Opt-Ins Who Signed ADEA Waivers ..... 2

B. The ADEA Waivers ..... 5

II. THE ARBITRATION AGREEMENT OPT-INS ..... 7

ARGUMENT ..... 9

I. SUMMARY JUDGMENT SHOULD BE GRANTED ON THE CLAIMS OF THE 11 OPT-INS WHO SIGNED VALID ADEA WAIVERS. ..... 10

A. THE INDIVIDUAL SEPARATION AGREEMENTS FULLY COMPLIED WITH THE OWBPA AND ARE ENFORCEABLE. ..... 10

1. Individual Separation Agreements Complied with the OWBPA. ..... 10

2. These Individual Separations Were Not Exit Incentive or Other Group Layoff Programs that Required OWBPA Disclosures. ..... 13

B. THE GROUP SEPARATION AGREEMENT FULLY COMPLIED WITH THE OWBPA AND IS ENFORCEABLE ..... 15

II. SUMMARY JUDGMENT SHOULD BE GRANTED ON THE CLAIMS OF THE 15 ARBITRATION AGREEMENT OPT-INS BECAUSE EXTRINSIC EVIDENCE ESTABLISHES THAT THEY AGREED TO ARBITRATE AND WAIVE CLASS AND COLLECTIVE ACTION CLAIMS. ..... 17

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Suozzi*,
433 F.3d 220 (2d Cir. 2005)....................17

*Aylaian v. Town of Huntington*,
762 F. Supp. 2d 537 (E.D.N.Y. 2011) ....................13

*Bachiller v. Turn On Prods., Inc.*,
No. 00 Civ. 8701, 2003 WL 1878416 (S.D.N.Y. Apr. 14, 2003), *aff'd*, 86 Fed. App'x 465 (2d Cir. 2004) ....................13

*Barnes v. Hershey Co.*,
No. 12-CV-01334, 2015 WL 4129573 (N.D. Cal. July 9, 2015)....................14

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981)....................10

*Dependable Lists, Inc. v. Malek*,
98 A.D.2d 679 (N.Y. App. Div. 1983) ....................18

*Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*,
349 Fed. App'x 551 (2d Cir. 2009)....................17

*Epic Sys. Corp. v. Lewis*,
138 S.Ct. 1612 (2018)....................19

*Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.*,
661 N.Y.S.2d 948 (N.Y. Sup. Ct. 1997) ....................18

*Host America Corp. v. Ramsey*,
947 A.2d 957, 962 (Conn. App. Ct. 2008)....................18

*Love v. Spector*,
627 NY.S.2d 87, 87 (NY. App. Div. 1995) ....................17

*Lynch v. Savarese*,
629 N.Y.S.2d 804 (N.Y. App. Div. 1995) ....................17

*McCormack v. IBM*,
145 F. Supp. 3d 258, 271 (S.D.N.Y. 2015)....................12, 13

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*McPheeters v. McGinn, Smith & Co.*,
953 F.2d 771 (2d Cir. 1992)....................17

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 15 (1983)....................17

*Nicosia v. Muller*,
229 A.D.2d 964, 645 N.Y.S.2d 385 (N.Y. App. Div. 1996) ....................18

*Oubre v. Entergy Operations, Inc.*,
522 U.S. 422 (1998)....................10

*Reid v. IBM Corp.*,
No. 95 Civ. 1755, 1997 WL 357969 (S.D.N.Y. June 26, 1997)....................13

*Ridinger v. Dow Jones & Co. Inc.*,
651 F.3d 309 (2d Cir. 2011)....................13

*Sheridan v. McGraw-Hill Cos.*,
129 F. Supp. 2d 633 (S.D.N.Y. 2001)....................13

*Wright v. Eastman Kodak Co.*,
445 F. Supp. 2d 314 (W.D.N.Y. 2006) ....................10

**STATUTES**

29 U.S.C. § 626(f)(1) (2009) ....................11, 12, 15, 16

**OTHER AUTHORITIES**

29 C.F.R. § 1625.22(f)(1)(iii)(B) (2014) ....................14

Federal Rule of Civil Procedure 56 ....................1, 9

S. Rep. No. 101-263....................14, 15

S. Rep. No. 101-263 (1990) ....................14

## INTRODUCTION

Under Federal Rule of Civil Procedure 56, Defendant International Business Machines Corporation ("IBM") moves this Court for summary judgment as to the following 26 individuals who have opted into this action: Anne Bellew, Steven Black, Demostenes Gonzalez, Mark Grill, Peter Kondis, Walter Bayerle, Phillip Emma, Rose Kapor, Brian Schaaf, Eric Selcov, Nancy Odom, Robert Bees, David Cabassa, Dayle Feingold, Craig Feldhak, Michael Hamilton, Bryan Mitchell, Oscar Molina, Michael Morris, Mark Perillo, Torrey Price, Steven Richard, Rodney Sassaman, Amelia Voglino, Robert West, and Yvette Wilson.

Eleven of the Opt-Ins explicitly waived any claim they might have against IBM under the Age Discrimination in Employment Act ("ADEA"). The enforceability of those waivers is governed by the Older Workers Benefit Protection Act ("OWBPA"). Ten of the Opt-Ins separated on an individual basis for poor performance or other individualized reasons. Their agreements must satisfy seven of the OWBPA requirements—and they do. Only one of the 11, Opt-In Odom, was terminated as part of a group exit, thus triggering the OWBPA's additional disclosure requirements. Those too were met. In sum, these 11 Opt-Ins (hereinafter, "ADEA Waiver Opt-Ins") knowingly relinquished any entitlement to relief they might have under the ADEA; and, accordingly, the Court should enter judgment in IBM's favor as to their claims.

Another 15 Opt-Ins each admit that, in exchange for severance, they signed a separation agreement; but those agreements are now missing. The agreements they signed were standardized and contained an agreement to arbitrate ADEA claims on an individual basis and to waive all class and collective action claims, which can be established through extrinsic evidence. Thus, the Court should enter judgment in IBM's favor as to the claims of these 15 Opt-Ins (hereinafter "Arbitration Agreement Opt-Ins") who agreed to arbitrate their ADEA claims and to waive their class and collective action claims.

## BACKGROUND

IBM seeks judgment as to the ADEA Waiver Opt-Ins and the Arbitration Agreement Opt-Ins.[1]

### I. THE ADEA WAIVER OPT-INS

#### A. Opt-Ins Who Signed ADEA Waivers

Eleven Opt-Ins signed valid, enforceable waivers of any claims under the ADEA. Ten of the 11 separated for individual reasons as follows:

**(1) Anne Bellew**. IBM asked Bellew to relocate in January 2018. (IBM's 56.1 Statement in Support of its Motion for Summary Judgment as to ADEA Waiver Opt-Ins and Arbitration Agreement Opt-Ins ("SMF") ¶1.) She declined, so she separated from IBM effective July 31, 2018. (SMF ¶2.) Nevertheless, IBM offered Bellew a severance package, which she accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶3.) She admits that she signed this agreement. (SMF ¶4.)

**(2) Steven Black**. IBM placed Black on a performance improvement plan ("PIP") in 2017. (SMF ¶5.) He failed to meet expectations under the PIP, so IBM terminated his employment later that year. (SMF ¶6.) IBM offered Black a severance package, which he accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶7.) He admits that he signed this agreement. (SMF ¶8.)

[1] IBM seeks summary judgment on the claims of the Arbitration Agreement Opt-Ins so that they can be dismissed from this case and pursue individual arbitration to the extent permitted under the terms of the arbitration agreements. IBM has moved for summary judgment rather than moving to compel them to arbitration to remain in line with the Court's March 2021 Order regarding the other arbitration agreement signers. (*See* Dkt. 156 at 15 ("[T]he Court simply dismisses those Arbitration Opt-Ins who have not yet arbitrated their claims, as they are not, under any circumstances, entitled to participate in this action.").)

**(3) Demostenes Gonzalez**. Gonzalez was unable to find a project on which to work and was thus idle between May 22, 2017, and his separation four months later. (SMF ¶9.) On August 24, 2017, his manager notified him that he would be terminated unless he found another project. (SMF ¶10.) Gonzalez did not find another project, so IBM terminated him effective September 22, 2017. (SMF ¶11.) IBM offered Gonzalez a severance package, which he accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶12.) He admits that he signed this agreement. (SMF ¶13.)

**(4) Mark Grill**. Grill's most recent position at IBM was on an international assignment outside the U.S. (SMF ¶14.) When Grill returned to the U.S. in April 2017, he was expected to look for another position in the company. (SMF ¶15.) On June 27, 2017, Grill's manager told him that he had 60 days to find another position. (SMF ¶16.) He did not find another position. (SMF ¶17.) Therefore, Grill terminated from the company in August 2017. (SMF ¶18.) IBM offered Grill a severance package, which he accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶19.) He admits that he signed this agreement. (SMF ¶20.)

**(5) Peter Kondis**.[2] Kondis was on leave from IBM and returned around August 2018. (SMF ¶22.) IBM asked him to find another position in the company. (SMF ¶23.) He did not find another position, so IBM terminated him effective November 2018. (SMF ¶24.) IBM offered Kondis a severance package, which he accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶25.) He admits that he signed this agreement. (SMF ¶26.)

**(6) Walter Arthur Bayerle, Jr.** IBM placed Bayerle on a PIP in July 2017. (SMF ¶27.) Rather than improve his performance, he requested severance instead. (SMF ¶28.) Accordingly, IBM offered Bayerle a severance package, which he accepted in exchange for a release of all

[2] IBM notes that Kondis passed away and that his RFA responses were prepared by the executor of his estate. (SMF ¶21.)

claims, including ADEA claims. (SMF ¶29.) He admits that he signed this agreement, and that he was represented by counsel during the negotiation and execution of the agreement. (SMF ¶30.)

**(7) Phillip Emma**. IBM placed Emma on a PIP in November 2016. (SMF ¶31.) IBM later informed him that he failed to meet expectations under the PIP and that he was terminated effective December 2016. (SMF ¶32.) That said, IBM offered Emma a severance package, which he accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶33.) He signed this agreement on January 17, 2017. (SMF ¶34.)

**(8) Rose Kapor**. On April 30, 2014, IBM terminated Kapor because of her poor performance, specifically her failure to meet quotas. (SMF ¶35.) IBM offered Kapor a severance package, which she accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶36.) She admits that she signed this agreement. (SMF ¶37.)

**(9) Brian Schaaff**. In December 2015, IBM informed Schaaff that he was being terminated because of his poor performance, specifically his failure to implement IBM Cloud. (SMF ¶38.) IBM offered Schaaff a severance package, which he accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶39.) He admits that he signed this agreement. (SMF ¶40.)

**(10) Eric Selcov**. IBM placed Selcov on a PIP in August 2014. (SMF ¶41.) He failed to meet expectations under the PIP, so IBM terminated his employment effective December 2014. (SMF ¶42.) IBM offered Selcov a severance package, which he accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶43.) He signed this agreement on December 12, 2014. (SMF ¶44.)

The eleventh Opt-in separated in a group exit and received the full disclosures required by the OWBPA:

**(11) Nancy Odom**. IBM selected Odom for a group exit in July 2013, and her last day was in January 2014. (SMF ¶45.) IBM offered Odom a severance package, which she accepted in exchange for a release of all claims, including ADEA claims. (SMF ¶46.) Attached to the agreement was a document entitled, "Age and Title Information (OWBPA Report)," which listed the job titles and ages of every other employee in Odom's decisional unit that was selected in the same resource action as Odom. (SMF ¶47.) The OWBPA Report specifies that the layoff applied to the Software Group Marketing unit. (SMF ¶48.) It also notes that individuals were selected "on the basis of one or more of the following criteria (based on the particular situations involved)": (1) work elimination, or (2) staff reduction and restructuring, satisfying the requirement that the disclosures specify any eligibility factors for the program. (SMF ¶49.) It then lists the titles and ages of every employee who was and was not selected for the resource action. (SMF ¶50.) Odom admits that she signed this agreement. (SMF ¶51.)

**B. The ADEA Waivers**

Except as otherwise noted, all of the separations agreements signed by the ADEA Waiver Opt-Ins contain identical terms.

Each agreement begins with a simple, summary introductory paragraph:

> You are being offered payments and benefits as part of the Individual Separation Allowance Plan that you otherwise would not have been entitled to receive. You will receive and be entitled to keep these payments and benefits only if you accept and do not timely revoke this Agreement. This Agreement requires you to release IBM and related parties from any claims you may have as described below.
>
> You should thoroughly review and understand the effect of this agreement before you sign it.

(SMF ¶52.) Emma's Agreement contains a similar introductory paragraph, but it also specifies the dollar amount of his severance payment. (SMF ¶53.)

The agreements also clarify that the word "release" refers to the "waiver of claims as specified below." (SMF ¶54.)

Next, Section 2, captioned, "**WHAT YOU RELEASE BY ACCEPTING THIS AGREEMENT**," states that the ADEA Waiver Opt-Ins were agreeing to waive all employment-related claims they might have against IBM, including those arising under ADEA:

> BY SIGNING THIS AGREEMENT YOU RELEASE IBM FROM ALL CLAIMS THAT YOU MAY HAVE AGAINST IBM AT THE TIME YOU SIGN THIS AGREEMENT, EXCEPT FOR THE CLAIMS SPECIFICALLY IDENTIFIED IN SECTION 3.
>
> - The claims you are releasing include, without limitation:
>
> * * *
>
>   - All claims arising under federal, state, local or foreign law dealing with or regulating employment, including, but not limited to: (1) laws prohibiting discrimination and/or harassment based on . . . age (including all claims under the Age Discrimination in Employment [Act]) . . . .

(SMF ¶55 (emphasis in original).) Emma, Kapor, Schaaff, Selcov, and Odom's agreements contain an identical section except that they use the word "signing" instead of "accepting" and spell out the full name of the statute, the Age Discrimination in Employment Act of 1967. (SMF ¶56.)

Then, Section 3, captioned, "**WHAT YOU DO NOT RELEASE BY SIGNING THIS AGREEMENT**," emphasizes that the ADEA Waiver Opt-Ins did *not* waive "[a]ny claims . . . that arise after the date" of acceptance. (SMF ¶57 (emphasis in original).)

All of the agreements gave the ADEA Waiver Opt-Ins at least 21 days to consider the terms before accepting. (SMF ¶¶58–60.)

The agreements also gave the ADEA Waiver Opt-Ins seven days to revoke the agreements after signing. (SMF ¶61.) None of them claim to have revoked their agreements. (SMF ¶¶4, 8, 13, 20, 26, 30, 34, 37, 40, 44, 51.)

Finally, every agreement concludes by urging the ADEA Waiver Opt-ins to seek the advice of legal counsel before accepting:

**YOU ARE ADVISED TO CONSULT WITH A LAWYER BEFORE YOU SIGN THIS AGREEMENT**

(SMF ¶62 (emphasis in original).)

## II. THE ARBITRATION AGREEMENT OPT-INS

Fifteen other Opt-Ins—Robert Bees, David Cabassa, Dayle Feingold, Craig Feldhak, Michael Hamilton, Bryan Mitchell, Oscar Molina, Michael Morris, Mark Perillo, Torrey Price, Steven Richard, Rodney Sassaman, Amelia Voglino, Robert West, and Yvette Wilson—signed separation agreements containing arbitration clauses and class and collective action waivers when they left IBM. (SMF ¶¶63–91, 94–95)

Fourteen of the 15 were laid off as part of resource actions, which is IBM's term for headcount reductions. (SMF ¶63.)

In connection with every resource action program, IBM offers a standardized separation agreement and benefits to each individual who terminates as a result of that particular program.[3] (SMF ¶65.) IBM has attached Amelia Voglino's signed agreement, along with the standardized separation agreements provided to these 14 Arbitration Agreement Opt-Ins, to the declaration of IBM's Manager, NA Workforce Restructuring Diane Kennedy, who has authenticated them and attested that those reflect the agreements each Arbitration Agreement Opt-In would have signed.

[3] Indeed, in dismissing the other 45 opt-ins who agreed to arbitrate, the Court noted in its March 26, 2021, Opinion and Order that "the parties agree[d] that the key terms [were] the same in each of the relevant IBM separation agreements . . . ." (ECF No. 156 at 10 n.6).

(SMF ¶¶63–65.) Although IBM cannot produce the signed separation agreements at issue here (aside from Voglino's), Kennedy attests that each of the Arbitration Agreement Opt-Ins received agreements containing the same key terms as the standardized agreements. (SMF ¶¶63–87.)

The fifteenth Arbitration Agreement Opt-In, Robert Bees, was laid off as part of a skills transformation action; and he admits that he received and signed a Skills Transformation Plan Separation Agreement. (SMF ¶¶ 88–89.) This agreement, too, was standardized; and the form agreement is attached as Attachment F to Kennedy's declaration. (SMF ¶90.) The terms of the Skills Transformation Plan Separation Agreement are virtually identical to those in the standardized separation agreements used in resource actions. (SMF ¶91.)

The standardized agreements signed by the Arbitration Agreement Opt-Ins were straightforward and written in ordinary, unambiguous language. The first two paragraphs provide a summary:

> You are being offered payments and benefits as part of a resource action that you otherwise would not have been entitled to receive. You will receive and be entitled to keep these payments and benefits only if you sign and comply with all terms of this Agreement. **This agreement requires you to release IBM and related parties from claims you may have as described below. This Agreement also requires you to arbitrate certain claims that are not released on an individual basis.**
>
> By accepting this Agreement and the benefits and payments it provides, you agree that if you choose to pursue certain claims that are not released under this Agreement, then such claims must be submitted to arbitration on an individual basis as provided below and not pursued in court.

(SMF ¶92 (emphasis added).)

The agreements further encouraged the Arbitration Agreement Opt-Ins—in all-capital letters—to obtain legal advice before signing and gave them 21 days to decide whether to sign.

(SMF ¶¶93–94.) By signing the Separation Agreement and accepting the severance package, they agreed to arbitrate ADEA claims and to waive class and collective claims:

> **You agree that any and all legal claims or disputes between you and IBM under the federal Age Discrimination in Employment Act of 1967 . . . will be resolved on an individual basis by private, confidential, final and binding arbitration** according to the IBM Arbitration Procedures and Collective Action Waiver . . . and under the auspices of JAMS, or if there is no JAMS office within 100 miles of your most recent assigned IBM office location, then an arbitration forum provider to be mutually agreed to by the parties. . . . **You understand and agree that you are giving up your right to a court action for Covered Claims, including any right to a trial before a judge or jury in federal or state court.**
>
> **You further agree that if you are included within any class action or collective action in court involving a Covered Claim, you will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be.**

(SMF ¶95 (emphasis added).) In sum, each Arbitration Agreement Opt-In admits to signing a standardized separation agreement, and admits that they received severance, in amounts up to $82,225, in exchange for signing the separation agreement. (SMF ¶¶96–111.)

## ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). And here, there is no genuine dispute that (1) the ADEA Waiver Opt-Ins signed valid ADEA waivers that complied with the OWBPA, and (2) the Arbitration Agreement Opt-Ins agreed to arbitrate their ADEA claims and to waive their class and collective action claims. The Court should therefore enter judgment in IBM's favor as to their claims.

## I. SUMMARY JUDGMENT SHOULD BE GRANTED ON THE CLAIMS OF THE 11 OPT-INS WHO SIGNED VALID ADEA WAIVERS.

The separation agreements signed by the 11 ADEA Waiver Opt-Ins contain clear and easily understood written waivers that satisfy all of the OWBPA requirements. Accordingly, the Court should enter judgment against the ADEA Waiver Opt-Ins.

### A. THE INDIVIDUAL SEPARATION AGREEMENTS FULLY COMPLIED WITH THE OWBPA AND ARE ENFORCEABLE.

#### 1. Individual Separation Agreements Complied with the OWBPA.

The Older Workers Benefit Protection Act regulates employee waivers and releases under the ADEA. In brief, the OWBPA "creates a series of prerequisites for knowing and voluntary waivers and imposes affirmative duties of disclosure and waiting periods." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998). That said, "Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims." *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.13 (1981); *see also Wright v. Eastman Kodak Co.*, 445 F. Supp. 2d 314, 317 (W.D.N.Y. 2006) ("[I]t is well-settled that stipulations of settlement are favored by the courts, and are not to be lightly cast aside.") (internal citations omitted).

Under the OWBPA, ADEA waivers made on an individual basis must satisfy seven requirements:

> **(f) Waiver**
>
> > **(1)** An individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum—
> >
> > > **(A)** the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

> **(B)** the waiver specifically refers to rights or claims arising under this chapter;
>
> **(C)** the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> **(D)** the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> **(E)** the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> **(F)(i)** the individual is given a period of at least 21 days within which to consider the agreement; or **(ii)** if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;
>
> **(G)** the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired[.]

29 U.S.C. § 626(f)(1)(A)–(G) (2009).

Here, the agreements signed by the ADEA Waiver Opt-Ins satisfy each of the seven basic OWBPA requirements.

*First*, the separation agreements are written using plain language and in a manner that is easily understood. *See* 29 U.S.C. § 626(f)(1)(A). The separation agreements begin with an introductory paragraph summarizing the terms, including the fact that the Opt-Ins were receiving severance payments in exchange for their release of certain claims. (SMF ¶¶52–53.) The next section then clarifies that the word "release" means a "waiver of claims." (SMF ¶54.)

*Second*, Section 2 of the agreements specifically refers to a waiver of rights or claims under the ADEA. (SMF ¶¶55–56.) *See* 29 U.S.C. § 626(f)(1)(B).

*Third*, Section 3 of the agreement specifically states that the releases only waive existing rights or claims, not claims that arise after the date the individual executes the waivers. (SMF ¶57.) *See* 29 U.S.C. § 626(f)(1)(C).

*Fourth*, the very first sentence of the separation agreements states that IBM was offering the Opt-Ins a severance payment in consideration for their agreement, a benefit that they "otherwise would not have been entitled to receive." (SMF ¶¶52–53.) Thus, the ADEA Waiver Opt-Ins' waivers were in exchange for consideration—money—to which they were not already entitled. *See* 29 U.S.C. § 626(f)(1)(D).

*Fifth*, the agreements conclude, in bold and all-caps, that IBM advises the individual to consult with an attorney before signing. (SMF ¶62.) *See* 29 U.S.C. § 626(f)(1)(E).

*Sixth*, because the waiver was not part of an exit incentive or other employment termination program (*see infra* Part I.A.2), each agreement gave the Opt-Ins at least 21 days—sometimes more—to consider it. (SMF ¶¶58–60.) *See* 29 U.S.C. § 626(f)(1)(F).

*Finally*, each agreement gave the Opt-Ins seven days after signing to revoke. (SMF ¶61.) *See* 29 U.S.C. § 626(f)(1)(G). But none of them did.

Simply put, the Opt-Ins' ADEA waivers were knowing and voluntary.

Indeed, other courts have already found that IBM's separation agreement satisfies the OWBPA requirements. For example, in *McCormack v. IBM*, Judge Karas of this District concluded that, "on their face, the Separation Agreements comply with the first seven requirements mandated by the OWBPA":

> The Separation Agreements are written plainly; they specifically refer to claims under the ADEA; they provide that Shelton and Lingl do not waive any claims that might "arise after the date [they] sign[ed] the Agreement"; and Shelton and Lingl were "offered payments and benefits as part of the resource action that [they] otherwise would not have been entitled to receive."

> Moreover, the Separation Agreements advised Shelton and Lingl to consult an attorney before signing the agreement, gave them 45 days to consider the Agreements, and allowed them to revoke the Agreements seven days after they signed it.

145 F. Supp. 3d 258, 271 (S.D.N.Y. 2015) (alterations in original) (internal citations omitted). And other courts in the Second Circuit have enforced similar ADEA waivers. *See, e.g.*, *Sheridan v. McGraw-Hill Cos.*, 129 F. Supp. 2d 633, 637 (S.D.N.Y. 2001) ("A plain reading of plaintiff's waiver and release of claims reveals that it precludes the filing of this lawsuit."); *Bachiller v. Turn On Prods., Inc.*, No. 00 Civ. 8701, 2003 WL 1878416, at *2–5 (S.D.N.Y. Apr. 14, 2003) ("The Release is valid and enforceable and Plaintiff is barred from bringing this action."), *aff'd*, 86 Fed. App'x 465 (2d Cir. 2004); *Reid v. IBM Corp.*, No. 95 Civ. 1755, 1997 WL 357969, at *5 (S.D.N.Y. June 26, 1997); *see also Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 313 (2d Cir. 2011) (minor and inconsequential word-processing error did not affect enforceability); *Aylaian v. Town of Huntington*, 762 F. Supp. 2d 537, 543 (E.D.N.Y. 2011). Thus, like Judge Karas and other courts within this Circuit, this Court should conclude that IBM's separation agreements readily meet the OWBPA requirements relevant to individual separations.

**2. These Individual Separations Were Not Exit Incentive or Other Group Layoff Programs that Required OWBPA Disclosures.**

Plaintiffs have indicated that they intend to argue that the ADEA Waiver Opt-Ins were separated as part of group exit programs or actions, rather than individual terminations. If true, the OWBPA would have required IBM to provide them with (1) additional time to consider the agreement and (2) disclosures about the details of the termination program. This claim, however, is belied by the ADEA Waiver Opt-Ins' own factual admissions about the individual circumstances and nature of their terminations. Accordingly, no further disclosures were required under the OWBPA.

In enacting the OWBPA, Congress recognized "a fundamental distinction between individually tailored separation agreements and employer programs targeted at groups of employees." *See* S. Rep. No. 101-263, at *1537 (1990). On one hand, "[i]ndividual separation agreements are the result of actual or expected adverse action against an *individual employee*." *Id.* (emphasis added). On the other, employer programs are offered "to two or more employees." *See* 29 C.F.R. § 1625.22(f)(1)(iii)(B) (2014). They are marked by "a standardized formula or package of benefits," the terms of which "generally are not subject to negotiation between the parties." *Id.* "In addition, employees affected by these programs have little or no basis to suspect that action is being taken based on their individual characteristics. Indeed, the employer generally advises them that the termination is not a function of their individual status." S. Rep. No. 101-263, at *1538; *see also Barnes v. Hershey Co.*, No. 12-CV-01334, 2015 WL 4129573, at *10 (N.D. Cal. July 9, 2015) ("[A]n individual termination is directed at an single employee who understands that the termination is directed at him or her for *personalized reasons* . . . . On the contrary, an employee who is subject to a group termination is told that he or she is being terminated through no individual fault, but rather as part of a quick and wholesale reduction of a group or department.") (emphasis added).

Here, there can be no dispute that the ten ADEA Waiver Opt-Ins left IBM for individualized reasons. Specifically, four—Black, Bayerle, Emma, and Selcov—were terminated because they failed to improve their performance after being put on *individual* performance improvement plans, which they each admitted. (SMF ¶¶5–6, 27–28, 31–32, 41–42.) Likewise, Kapor and Schaaff were also terminated for individualized performance reasons: Kapor failed to meet her quotas, and Schaaff failed to implement IBM Cloud, facts which both of them also admitted. (SMF ¶¶35–36, 38.) Gonzalez, Grill, and Kondis were also terminated for

personalized reasons—namely that they all failed to find another project after being told they needed to, which they, too, readily admitted. (SMF ¶¶9–11, 14–18, 22–24.) And Bellew was terminated because she was asked to change locations and refused, which she likewise admitted. (SMF ¶¶1–2.)

In short, the ADEA Waiver Opt-Ins separated for individualized reasons unique to them: individual performance, failure to obtain another position, or a personal decision not to relocate. They were not terminated as part of group layoff programs, much less were they told that their layoffs were *not* the result of their individual status—to the contrary, they each *admit* that their separations expressly *were* based on their individual status. *See* S. Rep. No. 101-263, at *1538. Accordingly, IBM was under no obligation to provide them with OWBPA disclosures or more time to consider the agreements.

### B. THE GROUP SEPARATION AGREEMENT FULLY COMPLIED WITH THE OWBPA AND IS ENFORCEABLE

Odom is the only ADEA Waiver Opt-In who IBM laid off as part of a resource action, which is a group layoff program. As such, two additional requirements apply for her ADEA waiver to be valid: First, the waiver must give the employee "at least 45 days"—not 21—"to consider the agreement." 29 U.S.C. § 626(f)(1)(F)(ii). And second, the employer must provide the employee with details about the termination program, including "the job titles and ages of" those selected and not selected:

> **(H)** if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to--

> **(i)** any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and
>
> **(ii)** the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

*Id.* § 626(f)(1)(H).

The undisputed record shows that Odom received both. Attached to her separation agreement was a document entitled, "Age and Title Information (OWBPA Report)." (SMF ¶47.) This document meets all the requirements set forth by 29 U.S.C. § 626(f)(1)(H). In particular, it: (i) specifies that the layoff applied to the Software Group Marketing unit, satisfying the requirement that the disclosures specify the class, unit, or group impacted by the layoff; (ii) notes that individuals were selected "on the basis of one or more of the following criteria (based on the particular situations involved)": (1) work elimination, or (2) staff reduction and restructuring, satisfying the requirement that the disclosures specify any eligibility factors for the program; and (iii) lists the titles and ages of every employee who was and was not selected for the resource action. (SMF ¶¶48–50.) Thus, IBM satisfied the requirement that "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program" be provided. *See* 29 U.S.C. § 626(f)(1)(H)(ii). Accordingly, the Court should find that Odom, too, knowingly and voluntarily waived her ADEA claim.

## II. SUMMARY JUDGMENT SHOULD BE GRANTED ON THE CLAIMS OF THE 15 ARBITRATION AGREEMENT OPT-INS BECAUSE EXTRINSIC EVIDENCE ESTABLISHES THAT THEY AGREED TO ARBITRATE AND WAIVE CLASS AND COLLECTIVE ACTION CLAIMS.

IBM's summary judgment motion should also be granted on the claims of the Arbitration Agreement Opt-Ins because they each admit that they were terminated as part of a resource action and that, in exchange for the severance that they acknowledge receiving, they signed standardized separation agreements, the content which can be established through extrinsic evidence.

"The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-–25 (1983). And "[w]hen contract formation is at issue in an FAA case, [courts] generally apply state-law principles." *Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005); *see also McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771, 772 (2d Cir. 1992) ("Where the disputes concerns an issue of contract, the application of federal law simply comprises generally accepted principles of contract law.") (internal citations omitted); *Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 Fed. App'x 551, 555 (2d Cir. 2009) (applying New York contract law to assess whether the terms of a missing arbitration agreement were established).

In New York, "[t]he loss or destruction of a written instrument does not deprive it of effect under the Statute of Frauds." *See Lynch v. Savarese*, 629 N.Y.S.2d 804, 804 (N.Y. App. Div. 1995). Rather, a party can prove the "existence of the contents of the lost writing 'by parol and circumstantial evidence.'" *Love v. Spector*, 627 NY.S.2d 87, 87 (NY. App. Div. 1995) ((quoting *Taft v. Equitable Life Assurance Soc'y of U.S.*, 569 N.Y.S.2d 660, 661 (N.Y. App. Div.

1991). "The parol evidence may consist of the admission of an adversary or the testimony of others who have first-hand knowledge of the existence of the writing and its terms." *Nicosia v. Muller*, 229 A.D.2d 964, 645 N.Y.S.2d 385 (N.Y. App. Div. 1996) (internal citations omitted); *see also Dependable Lists, Inc. v. Malek*, 98 A.D.2d 679, 680 (N.Y. App. Div. 1983) (holding that the Statute of Frauds poses no barrier if the opposing party admits to the existence of the writing).

In *Host America Corp. v. Ramsey*, for example, the Appellate Court of Connecticut found enough secondary evidence to establish the existence and terms of lost employment agreements. 947 A.2d 957, 962 (Conn. App. Ct. 2008). Like New York, Connecticut law requires the proponent of a missing contract to "demonstrate both (a) the former existence and the present unavailability of the missing document, and (b) the contents of the missing documents." *See id.* at 961 (internal citations omitted); *Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.*, 661 N.Y.S.2d 948, 950–51 (N.Y. Sup. Ct. 1997) (holding that the proponent of a missing contract must establish its existence and terms by a preponderance of the evidence). To meet its burden, the defendants in *Host America* submitted "an email from the attorney who prepared the" missing employment "agreements, indicating that the agreements existed and were final . . . ." 947 A.2d at 856. The defendants also introduced replacement agreements that were substantially similar to the originals, though not identical. *Id.* All in all, the Appellate Court agreed with the trial judge that this "evidence was sufficient to show the content of the lost agreements." *Id.*

Here, IBM has clearly shown through parol and circumstantial evidence the existence and terms of the separation agreements. Just like in *Host America*, although the agreements themselves here are missing (aside from Amelia Voglino's), IBM has established that the 15

Arbitration Agreement Opt-Ins signed standardized separation agreements with individual arbitration provisions and class and collective action waivers. (SMF ¶¶63–96.) Indeed, each *admits* to signing a separation agreement and to receiving severance in amounts up to $82,225. (SMF ¶¶96–111.) IBM, in turn, has submitted evidence in the form of a declaration attesting to the fact that it provided *every* individual terminated in those resource actions and skills transformation actions—including the Arbitration Agreement Opt-Ins—with standardized separation agreements that contained arbitration clauses applicable to any claims arising under the ADEA, as well as class and collective action waivers. (SMF ¶¶63–96.) Thus, IBM has proven, using competent secondary evidence, that these 15 Arbitration Agreement Opt-Ins agreed to arbitrate their ADEA claims and to waive their class and collective claims.

What's more, IBM has produced Voglino's signed agreement—no secondary evidence is needed. (SMF ¶¶64, 92–96.) The Court must therefore "rigorously" enforce the arbitration provision and class and collective action waiver. *See Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1621 (2018) (the FAA "requires courts rigorously to enforce arbitration agreements according to their terms" and to "respect and enforce the parties' chosen arbitration procedures") (internal citations omitted). Indeed, the Court *already* ordered that other opt-ins who signed virtually identical agreements should be dismissed. (Dkt. 156 at 14–15 ("[T]he valid class and collective action waiver in the Arbitration Opt-Ins' separation agreements must be given effect, and Plaintiffs cite no authority to the contrary.").) Here too, the Arbitration Agreement Opt-Ins signed separation agreements with the same class and collective waiver **and** an agreement to arbitrate their ADEA claims. Accordingly, the Court should enter judgment against the Arbitration Opt-Ins "as they are not, under any circumstances, entitled to participate in this action." (*See id.* at 15.)

## CONCLUSION

For the reasons above, IBM respectfully asks the Court to enforce the unambiguous terms of the parties' agreements and dismiss with prejudice the following 26 Opt-Ins: Anne Bellew, Steven Black, Demostenes Gonzalez, Mark Grill, Peter Kondis, Walter Bayerle, Phillip Emma, Rose Kapor, Brian Schaaf, Eric Selcov, Nancy Odom, Robert Bees, David Cabassa, Dayle Feingold, Craig Feldhak, Michael Hamilton, Bryan Mitchell, Oscar Molina, Michael Morris, Mark Perillo, Torrey Price, Steven Richard, Rodney Sassaman, Amelia Voglino, Robert West, and Yvette Wilson.

Respectfully submitted,

Dated: December 21, 2021

JONES DAY

By: */s/ Matthew W. Lampe*

Matthew W. Lampe
Kristina A. Yost
Ira Handa
JONES DAY
250 Vesey Street
New York, NY 10281
mwlampe@jonesday.com
kyost@jonesday.com
ihanda@jonesday.com

Alison B. Marshall
JONES DAY
51 Louisiana Ave, N.W.
Washington, D.C. 20001
abmarshall@jonesday.com

*Attorneys for Defendant IBM*