**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDVIN RUSIS, HENRY GERRITS, PHIL MCGONEGAL, DAVID HO ENG, BRIAN HAUPT, PHILIP MONSON, CLAUDIA ZIEGLER, SALLY GEHRING, and JOHN MASON, individually and on behalf of all other similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORP. <br><br> Defendant | Civil Action No. 1:18-cv-08434 |

**PLAINTIFFS' OPPOSITION TO IBM'S MOTION FOR SUMMARY JUDGMENT AS TO ADEA WAIVER OPT-INS AND ARBITRATION AGREEMENT OPT-INS**

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND ................................................................................. 2

III.  LEGAL STANDARD .......................................................................................... 6

IV.  ARGUMENT ....................................................................................................... 7

    A.    Summary Judgment Should Be Denied as to the "ADEA Waiver
        Opt-Ins".............................................................................................. 7

        1.    Overview of OWBPA Requirements ..................................................... 7

        2.    Evidence in the Record Strongly Supports Plaintiffs' Claim That
            IBM Was Engaged in Widespread, Company-wide Age
            Discrimination By Terminating Older Employees Through
            Various Means, While Simultaneously Hiring Younger Workers ......... 8

        3.    Additional Discovery Should Be Ordered on the Issue of
            Whether the "ADEA Waiver Opt-Ins" Actually Lost Their Jobs
            as Part of Resource Actions or Other Group Terminations ................. 9

    B.    Summary Judgment Should Be Denied as to the "Arbitration
        Agreement Opt-Ins" ............................................................................ 12

V.  CONCLUSION ................................................................................................... 16

# TABLE OF AUTHORITIES

## Cases

A.F.L. Falck, S.p.A. v. E.A. Karay Co., Inc.
  722 F.Supp. 12 (S.D.N.Y.1989), *on reargument*, 131 F.R.D. 46 (S.D.N.Y.1990)..... 13

Abbey House Media, Inc. v. Simon & Schuster, Inc.
  869 F.3d 53 (2d Cir. 2017) ............................................................. 6

Bandler v. BPCM NYC, Ltd.
  2014 WL 5038407 (S.D.N.Y. Sep 29, 2014) ..................................... 13, 14

Bobcar Media, LLC v. Aardvark Event Logistics, Inc.
  354 F. Supp. 3d 375 (S.D.N.Y. 2018) ........................................... 13

Butcher v. Gerber Prod. Co.
  8 F. Supp. 2d 307 (S.D.N.Y. 1998) .............................................. 8

Cadle Co. v. Hayes
  116 F.3d 957 (1st Cir. 1997) ..................................................... 7

Chan v. New York University Downtown Hospital
  2004 WL 1886009 (S.D.N.Y. Aug. 23, 2004) ................................. 11

Chandler v. International Business Machines Corp.
  C.A. No. 21-CV-6319-JGK (S.D.N.Y.) ......................................... 4

Chen-Oster v. Goldman, Sachs & Co.
  293 F.R.D. 557 (S.D.N.Y. 2013) ............................................... 11

Crawford v. Franklin Credit Mgmt. Corp.
  2015 WL 1378882 (S.D.N.Y. Mar. 26, 2015) ................................. 13

Dependable Lists, Inc. v. Malek
  98 A.D.2d 679 (N.Y. App. Div. 1983) ......................................... 13

Elliott v. Cartagena
  2020 WL 4432450 (S.D.N.Y. July 31, 2020) ................................. 14

Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.
  661 N.Y.S.2d 948 (N.Y. Sup. Ct. 1997) ..................................... 13

Green v. Sears, Roebuck & Co.
  434 F. Supp. 2d 1025 (10th Cir. 2006)....................................... 7

Hines v. Overstock.com, Inc.
    380 F. App'x 22 (2d Cir. 2010) ................................................................. 12

Host America Corp. v. Ramsey
    947 A.2d 957 (Conn. App. Ct. 2008) ................................................ 13, 14

In Re: IBM Arbitration Agreement Litigation
    C.A. No. 21-CV-6296 (S.D.N.Y.) ............................................................... 4

In Re: Second Wave IBM Arbitration Agreement Litigation
    C.A. No. 21-cv-09574 (S.D.N.Y.) ............................................................... 4

Lodi v. International Business Machines Corp.
    C.A. No. 21-CV-06336 (S.D.N.Y.) .............................................................. 4

Lohnn v. International Business Machines Corp.
    C.A. 21-CV-6379 (S.D.N.Y.) ................................................................... 4, 5

Lohnn v. International Business Machines Corp.
    Case No. 22-32 ........................................................................................... 5

Love v. Spector
    627 NY.S.2d 87 (NY. App. Div. 1995) ..................................................... 13

Lynch v. Savarese
    629 N.Y.S.2d 804 (N.Y. App. Div. 1995) ................................................ 13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.
    475 U.S. 574 (1986) ................................................................................... 6

Mitchell v. National Railroad Passenger Corp.
    208 F.R.D. 455 (D.D.C.2002) .................................................................. 11

Nicosia v. Muller
    229 A.D.2d 964, 645 N.Y.S.2d 385 (N.Y. App. Div. 1996) ...................... 13

Opals on Ice Lingerie v. Bodylines Inc.
    320 F.3d 362 (2d Cir. 2003) .................................................................... 13

Oubre v. Entergy Operations, Inc.
    522 U.S. 422 (1998) ................................................................................... 7

Tavenner v. International Business Machines Corp.
    C.A. No. 21-CV-6345 (S.D.N.Y.) ............................................................... 4

Tolbert v. Smith
    790 F.3d 427 (2d Cir. 2015) ...................................................................... 6

U.S. Postal Serv. v. Aikens
   460 U.S. 711 (1983) ............................................................................................. 7

Wards Cove Packing Co. v. Atonio
   490 U.S. 642 (1989) ........................................................................................... 11


**Statutes**

29 C.F.R. § 1625.22 ............................................................................................. 8

29 U.S.C. § 626 .................................................................................................... 8

Civil Rights Act of 1991
   Pub.L. No. 102–166, 105 Stat. 1074 .................................................................. 11

N.Y. Gen. Oblig. Law § 5–701 ............................................................................. 13


**Other Authorities**

Josh Eidelson, IBM Emails Show Millennial Workers Favored Over 'Dinobabies'
   BLOOMBERG, Feb. 11, 2022 ................................................................................ 6

Noam Scheiber, Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force
   N.Y. TIMES, Feb. 12, 2022 .................................................................................. 6


**Rules**

Fed. R. Civ. P. 1004 .............................................................................................. 2

Fed. R. Civ. P. 56 .......................................................................................... 1, 6, 10

Fed. R. Evid. 1004 ......................................................................................... 14, 15

## I.    INTRODUCTION

In its Motion for Summary Judgment as to ADEA Waiver Opt-Ins and Arbitration Agreement Opt-Ins, Dkt. 222, Defendant International Business Machines Corp. ("IBM") asks the Court to grant judgment in its favor on the claims of two groups of employees who have joined this proposed collective action in order to pursue their claims of age discrimination against IBM.  As discussed below, IBM has not established that it is entitled to judgment for either group.

First, IBM contends that summary judgment should be granted as to the so-called "ADEA Waiver Opt-Ins".  This group consists of eleven (11) employees who IBM contends were laid off through individual employment terminations.  IBM asserts that these employees released their claims under the Age Discrimination in Employment Act ("ADEA") because IBM was not required to provide these employees with the disclosures that the Older Workers Benefit Protection Act ("OWBPA") requires be given to employees separated through group terminations.  Evidence in the record belies IBM's proffered explanation, however.  Plaintiffs have substantial evidence that IBM *was* engaged in a company-wide, systematic effort to oust older workers in order to make room for a younger workforce, and that included terminating older workers through purported individual performance-based terminations, such as occurred to these plaintiffs.  Thus, this group has established a genuine dispute of material fact as to whether they were actually separated as part of a group action, which would have required disclosures under the OWBPA in order for IBM to obtain an enforceable release.  Moreover, Plaintiffs requested and were previously denied discovery that would shed additional light on the true nature of the terminations of the "ADEA Waiver Opt-Ins".  Pursuant to Fed. R. Civ. P. 56(d), the Court should order IBM to produce the information Plaintiffs requested before ruling on summary judgment as to this group.

Second, IBM contends that summary judgment should be granted with respect to fifteen (15) so-called "Arbitration Agreement Opt-Ins", who IBM asserts signed

agreements to arbitrate their ADEA claims, ***even though IBM has failed to produce the signed agreements***.  As explained below, the discovery that has been conducted to date has shown that IBM has used a number of different forms of its separation agreement over the years, some of which did not contain arbitration provisions.  See infra p.15.  Moreover, IBM's attempt to rely on secondary evidence, such as affidavits from IBM employees, must be rejected under Fed. R. Civ. P. 1004, because IBM has offered no explanation for why it cannot produce the agreements that these "Arbitration Agreement Opt-Ins" allegedly signed.  Summary judgment must be denied as to this group as well.[1]

## II.    FACTUAL BACKGROUND

Plaintiffs allege that they lost their jobs as the result of IBM's discriminatory efforts to systematically reduce its employment of older workers in order to build a younger workforce. To that end, IBM pushed out thousands of older workers while hiring younger workers in order to better compete with younger technology companies, such as Google, Facebook, Amazon, and others. Some workers were pushed out of the company through layoffs or "resource actions" while others were told their terminations were based on performance reasons; however, Plaintiffs contend these alleged performance-based terminations were likewise part of a companywide, concerted effort to terminate older workers.  See Plaintiffs' Statement of Material Facts ¶ 112.

These allegations are supported by the findings of the Equal Employment Opportunity Commission ("EEOC"), which engaged in a wide-ranging multi-year investigation of IBM for age discrimination.  See Plaintiffs' Statement of Material Facts ¶ 113.  As part of that investigation, the EEOC consolidated claims of age discrimination

---

[1]     Plaintiffs also note that IBM did not move to compel arbitration at the outset of these plaintiffs joining the case, but rather simply seeks judgment in its favor on the claims of the "Arbitration Agreement Opt-Ins", even though discovery has not revealed the existence of the arbitration agreements that IBM contends are controlling.

brought by 62 former employees who alleged they were separated from the company because of their age.  See id. ¶ 114.   Several lead plaintiffs and opt-in plaintiffs in this case, including Sally Gehring, Robert Gasiorowski, Mark Johnson, and Andrew Peavy, were charging parties in the EEOC investigation of IBM that led to its September 3, 2020, determination that found reasonable cause to believe that ***IBM engaged in classwide age discrimination***.  See id. ¶ 115.

The EEOC's investigation resulted in a determination finding reasonable cause to believe that IBM discriminated against older employees during a multi-period, including 2013 to 2018.  See id. ¶ 117.   In its determination letter, the EEOC stated:

> The Commission's investigation … uncovered top-down messaging from Respondent's highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires. Analysis shows it was primarily older workers (85.85%) in the total potential pool of those considered for layoff. Evidence uncovered older employees who were laid off and told that their skills were out of date, only to be brought back as contract workers, at a lower rate of pay with fewer benefits. EEOC received corroborating testimony from dozens of witnesses nationwide supporting a discriminatory animus based on age.

See id. ¶ 118.   In conjunction with the EEOC investigation, IBM maintained that "there was no centralized decision-making, and that each individual manager was responsible" for making the termination decisions based on considerations of "performance, relevant skills, utilization, and consolidation of services." Id. However, the EEOC rejected this contention, stating that IBM's "asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that [IBM] has discriminated against Charging Parties and others on account of their age." Id.[2]

---

[2]   While IBM may argue that the EEOC's letter refers specifically to "Resource Actions", Plaintiffs' counsel have obtained evidence that IBM has considered employees who separated for other reasons to count toward its numerical goals of eliminating employees through Resource Actions.  Counsel have obtained this evidence in arbitration, but IBM contends that evidence adduced in arbitration is confidential and cannot be used elsewhere.  Plaintiffs' counsel are challenging that argument in multiple lawsuits in this district.  See In Re: IBM

Former Vice President at IBM, Cathy Rodgers, who worked at IBM for nearly 40 years until mid-2017, has explained that discussions about the need to aggressively recruit young Millennial talent were commonplace at IBM during former CEO Ginni Rometty's tenure. Rodgers describes how IBM attempted to compete with its newer, younger, and hipper competitors such as Google, Facebook, and Amazon by bringing in younger workers and trying to "put the cool back in Blue." See id. ¶ 122.  Rodgers describes how IBM's Ginni Rometty announced that IBM would be bringing on 25,000 "Early Professional Hires" and "new collar" workers in the U.S. over a several year period, which Rodgers and her peers across the company recognized meant displacing and replacing older workers. She describes how IBM accomplished this program of "displace and replace" by implementing "resource actions", directed by HR, whereby selections of who would be terminated were purportedly based upon performance reviews by first-line managers, but in reality, they were part of a broader scheme to reduce the company's population of older workers. See id. ¶ 123.   Rodgers describes that IBM implemented a new performance management system in 2016, which resulted in more vague assessments that could be used to justify terminations. Rodgers viewed this change as part of IBM's efforts to terminate older workers through pretextual performance-based terminations. See id. ¶ 124.[3]

Rodgers' testimony is further corroborated by high level executive communications that demonstrate animus against older workers and an open desire by

---

Arbitration Agreement Litigation, C.A. No. 21-CV-6296 (S.D.N.Y.) (consolidating 27 matters); In Re: Second Wave IBM Arbitration Agreement Litigation, C.A. No. 21-cv-09574 (S.D.N.Y.) (consolidating 50 matters); Chandler v. International Business Machines Corp., C.A. No. 21-CV-6319-JGK (S.D.N.Y.); Tavenner v. International Business Machines Corp., C.A. No. 21-CV-6345 (S.D.N.Y.); Lohnn v. International Business Machines Corp., C.A. 21-CV-6379 (S.D.N.Y.); Lodi v. International Business Machines Corp., C.A. No. 21-CV-06336 (S.D.N.Y.).

[3]     Plaintiffs' Rule 56.1 Statement of Material Facts cites a declaration from Ms. Rodgers that provides more fulsome details regarding the age discrimination Ms. Rodgers observed at IBM than the declaration from Ms. Rodgers that the Court previously considered (filed at Dkt. 21-3).

IBM's senior executives to have a majority Millennial workforce.  See id. ¶ 126.   For instance, one email chain involving senior executives discussed that IBM's proportion of millennials employees is much lower than at a competitor firm.  One points to an article stating that "72% of ACN ee's are millenials [sic]."  See id. ¶ 127.   Another responds, "Last year, millennials made up 42% of our workforce and 81% of new hires . . . . we can refresh the numbers for YTD 2016- and see what makes sense to use in future opps." Id.  The first then responds curtly, "42 is a far cry from 72." Id.[4]

In another email, a top IBM executive describes IBM's "***dated*** maternal ***workforce*** – ***this is what must change***.  They really don't understand social or engagement.  Not digital natives.  *A real threat for us*." See id. ¶ 129.   In yet another email, an executive applauds the use of the disparaging term "Dinobabies" to describe the older IBM employees and praises another executive's plan to oust them from IBM's workforce; a plan to "accelerate change by inviting the dinobabies" (new species) to leave" and make them an "Extinct species" is jokingly discussed. See id. ¶ 130.   In another email, explains to that the percentage of millennials at IBM will increase once certain of IBM"s "resource action" (layoff) programs are complete: " – more on this issue of % millennials. The math will improve when Saturn/Solitaire employees move on, and when we bring onboard our early professionals and interns in the summer…" See id. ¶ 132.

Plaintiffs' claim that their terminations were not just individualized incidents, but rather part of IBM's broader scheme to eliminate older workers from the workforce, is further bolstered by the widespread media coverage of these emails.  Following publication in the *New York Times*, news outlets around the world roundly recognized

---

[4]    Descriptions of these documents were made public in Lohnn v. IBM, Case No. 21-cv-6379 (S.D.N.Y.) (Dkt. 59) (following IBM's unsuccessful appeal to the Second Circuit to keep them under seal, see Lohnn v. International Business Machines Corp., 2d Cir. Case No. 22-32). The District Court (Judge Liman) is now considering whether to allow the names of the executives who sent these emails to be revealed.  See Lohnn, Dkt. 53 at 3.

that the emails demonstrated intentional discrimination against IBM's older workforce at the executive level.  See, e.g., Noam Scheiber, Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force, N.Y. TIMES, Feb. 12, 2022 (Ex. 5 to Declaration of Shannon Liss-Riordan) (filed concurrently) ("Liss-Riordan Decl."); Josh Eidelson, IBM Emails Show Millennial Workers Favored Over 'Dinobabies', BLOOMBERG, Feb. 11, 2022 (Ex. 17 to Liss-Riordan Decl.).

One method by which IBM is alleged to have ousted a number of older workers is by requiring employees (who have long been permitted to work from home) to relocate to a different part of the country and work out of an IBM office.  Plaintiffs contend that this strategy was adopted with the specific goal of ensuring that older employees would resign from the company. See id. ¶ 135.   Evidence demonstrates that IBM knew that acceptance rates for relocation offers would be as low as 8-10% and that these forced relocations were used with employees who would otherwise have been subject to a Resource Action as a way to create the impression that employees chose to end their employment at IBM.  See id.  Rodgers also explains that IBM's relocation effort was implemented to reduce the numbers of older workers at IBM, and that IBM did not actually expect older workers to agree to be relocated across the country.  See Affidavit of Catherine A. Rodgers, Dkt. 21-3, at ¶¶ 10-14.

## III.   LEGAL STANDARD

Rule 56 dictates that summary judgment should be granted only if the movant shows that there is "no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Abbey House Media, Inc. v. Simon & Schuster, Inc., 869 F.3d 53, 55 (2d Cir. 2017) (citing Fed. R. Civ. P. 56(a)). "In determining whether summary judgment is appropriate, [a court] must resolve all ambiguities and draw all reasonable inferences against the moving party."  Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "Only if the record, viewed in that manner and without regard to credibility

determinations, reveals no genuine issue as to any material fact may the court enter summary judgment."  Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

It has been long recognized that employment discrimination cases are ill-suited to summary judgment, given that such claims often necessitate a fact-intensive inquiry. See U.S. Postal Serv. v. Aikens, 460 U.S. 711, 716 (1983) ("[T]he question facing triers of fact in discrimination cases is both sensitive and difficult.").  In ADEA cases, "[a] ruling which deprives a party of a determination of the facts by a jury should be cautiously and sparingly granted."  Green v. Sears, Roebuck & Co., 434 F. Supp. 2d 1025 (10th Cir. 2006) (internal quotations omitted).

## IV.   ARGUMENT

### A. Summary Judgment Should Be Denied as to the "ADEA Waiver Opt-Ins"

#### 1. Overview of OWBPA Requirements

IBM seeks judgment in its favor on the claims of 11 so-called "ADEA Waiver Opt-Ins" whom IBM contends separated through individual termination actions, rather than through Resource Actions.  According to IBM, this means that it was not required to provide certain disclosures under the Older Workers Benefit Protection Act ("OWBPA") to these Opt-Ins.  As the U.S. Supreme Court has recognized, the OWBPA was "designed to protect the rights and benefits of older workers."  Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998).  The statute sets out "a strict, unqualified statutory stricture on waivers… Congress delineated these duties with precision and without qualification: An employee 'may not waive' an ADEA claim unless the employer complies with the statute. Courts cannot with ease presume ratification of that which Congress forbids."  Id.

The OWBPA mandates that an employer cannot obtain a release of an ADEA claim from an employee who is terminated through an individual employment action unless certain information and rights are provided to the employee.  See 29 U.S.C. §

626(f)(1)(A)–(G) (requiring, *inter alia*, that the individual be informed about their rights under ADEA, that the individual be advised of their right to consult an attorney, that the individual have a certain period of time to consider the release, and that the individual have at least 7 days to revoke the agreement).

An employer cannot obtain a release of ADEA claims from employees who are terminated through layoffs or group terminations, however, unless the employer provides information that would allow the individual to assess whether they may have been the victim of age discrimination. Specifically, the employer must provide information showing "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who [were considered but] who are not eligible or selected for the program." 29 C.F.R. § 1625.22(f)(1)(ii). If the employer does not provide such disclosures, then any purported waiver of ADEA claims is not valid. Butcher v. Gerber Prod. Co., 8 F. Supp. 2d 307, 315 (S.D.N.Y. 1998) ("Failure to comply with the provisions of [OWPBA] requiring detailed information about the ages of those affected by the group termination, renders a purported release invalid as a defense to an ADEA claim.").

### 2. Evidence in the Record Strongly Supports Plaintiffs' Claim That IBM Was Engaged in Widespread, Company-wide Age Discrimination By Terminating Older Employees Through Various Means, While Simultaneously Hiring Younger Workers

IBM asserts that it is undisputed that 10 of the 11 so-called "ADEA Waiver Opt-Ins" were not terminated through Resource Actions and thus did not need to receive the additional OWBPA disclosure required for a valid release of their ADEA claims.[5] See Dkt. 224 at 1. As described above, however, Plaintiffs have substantial evidence that IBM has been engaged in long-term, systemic efforts to oust older employees from its workforce in order to make room for younger hires, through discriminatory terminations

---

[5] Plaintiffs acknowledge that one of these Opt-Ins, Nancy Odom, was terminated through an RA in 2013 and did receive the required OWPBA disclosures for group terminations. See Dkt. 224 at ECF 9. Therefore, Plaintiffs have withdrawn her from this case.

in the form of "Resource Actions" and other strategies, including re-location and trumped-up negative performance reviews.  See supra at Sec. II.  This evidence plainly establishes a genuine dispute of material fact as to whether the "ADEA Waiver Opt-Ins" were, in actuality, terminated as part of IBM's company-wide strategy to lay off older workers in order to make room to hire younger employees.  Summary judgment must be denied for this group for this reason alone.

Additionally, IBM contends that Anne Bellew was terminated because she declined an offer from IBM to relocate to a different part of the country.  Discovery revealed, however, that the offer made to her was part of a co-location program that impacted many IBM employees, see Plaintiffs' Statement of Material Facts ¶ 143, and which IBM specifically knew and intended would lead to the vast majority of the individuals who were "offered" this relocation option to resign.  Thus, at the very least, there is a dispute of fact as to whether Ms. Bellew was, in fact, terminated through a group action (and whether the individual OWBPA information that she received was sufficient to release her ADEA claims.)  Summary judgment must be denied for Ms. Bellew.

### 3. Additional Discovery Should Be Ordered on the Issue of Whether the "ADEA Waiver Opt-Ins" Actually Lost Their Jobs as Part of Resource Actions or Other Group Terminations

In discovery, Plaintiffs requested information necessary to challenge IBM's explanation that these "ADEA Waiver Opt-Ins" were terminated through individual, rather than group, actions.  Plaintiffs sought this discovery in their document requests, in which they asked for:

> All documents showing IBM's corporate planning and communications with respect to headcount for the business organizations in which each of the ADEA Waiver Dispute Plaintiffs worked (for any time since 2012), including but not limited to documents showing plans to increase or decrease headcount, plans to conduct Resource Actions in these organizations, targets for how many employees or positions would be eliminated (either by voluntary resignation or involuntary termination), documents showing the number of terminations made

(and dates), and documents reflecting whether the ADEA Waiver
Dispute Plaintiffs' terminations were counted toward Resource Action
targets.

Plaintiffs' Request for Production of Documents No. 10 (Exhibit 15 to Liss-Riordan

Decl.). IBM refused to produce the information Plaintiffs requested.

Following a discovery conference with the Court at which Plaintiffs requested the

Court to order IBM to produce the documents requested above, the Court issued an

Order requiring IBM only to produce "communications from first- and second-line

supervisors regarding the termination" and providing that "[i]f that production gives rise

to a factual basis for Plaintiffs to argue that the termination of those employees was, in

fact, part of a larger layoff that would give rise to an obligation to provide OWVPA [sic]

notices, then Plaintiffs can revisit this issue." Dkt. 191 at 2.

Plaintiffs do now have such evidence that merits the revisiting of this issue.  IBM

has consistently argued that all termination decisions were made by first- and second-

line managers, in order to try compartmentalizing these layoffs and prevent scrutiny of

the systemic efforts that were made by top executives at the company to oust older

workers in order to build a younger workforce.  But now it has been revealed, through

the documents that were unredacted in the <u>Lohnn</u> case, that these layoff decisions were

not actually made at the first- and second-line manager level at IBM, but instead at a

much higher level.  Those documents provide powerful evidence that IBM was engaged

in a large-scale scheme to eliminate older workers and that discovery at that higher

level is necessary in order to bolster Plaintiffs' claims that these employees (purportedly

terminated for individualized reasons) actually fell victim to that broader scheme.

Therefore, pursuant to Fed. R. Civ. P. 56(d), Plaintiffs hereby request that the

Court grant Plaintiffs additional discovery on this issue.  Courts have regularly found

that discovery should not be limited to documents directly concerning the plaintiff in

discrimination cases, and that "the imposition of unnecessary discovery limitations is to

be avoided."  <u>Chan v. New York University Downtown Hospital</u>, 2004 WL 1886009, at *4

(S.D.N.Y. Aug. 23, 2004).  Indeed, "courts typically apply more 'liberal civil discovery rules'" in employment discrimination cases, giving plaintiffs "broad access to employers' records in an effort to document their claims.'" Chen-Oster v. Goldman, Sachs & Co., 293 F.R.D. 557, 562 (S.D.N.Y. 2013) (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657 (1989), *superseded by statute on other grounds,* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1074.)  "As Title VII cases are particularly hard to prove in the absence of a proverbial smoking gun, such as a discriminatory comment made by a hiring official, discovery in these cases is necessarily broad." Mitchell v. National Railroad Passenger Corp., 208 F.R.D. 455, 459 (D.D.C.2002).  "Broader discovery is warranted when a plaintiff's claims are premised on a pattern or practice of discrimination at the organization-wide level, as opposed to specific allegations of discrimination made against an individual supervisor." Chen-Oster, 293 F.R.D. at 562.

The Court should now order IBM to produce documents beyond communications from the first- and second-line managers that would shed light on whether the "ADEA Waiver Opt-Ins" were actually terminated as a part of broader group terminations (despite the fact that IBM styled them as "individual" in order to cloak and compartmentalize the full extent of the actions it was taking to eliminate older workers en masse).  As explained above and in the attached Liss-Riordan Declaration, pursuant to Rule 56(d), Plaintiffs are entitled to this additional, broader discovery, as they expect that the documents they requested in RPD No. 10 would reveal facts undermining IBM's arguments that the "ADEA Waiver Opt-Ins" were separated through truly individualized decisions, rather than as part of group terminations.

Indeed, IBM previously contended in a letter to Plaintiffs' counsel dated April 21, 2022 that 17 Opt-Ins had waived their ADEA claims because they signed individual ADEA releases, but discovery revealed facts suggesting or establishing that many of them ***were actually separated through group programs***.  See Ex. 13 to Liss-Riordan

11

Decl.  IBM's Motion does not seek summary judgment against seven of these Opt-Ins who it formerly contended were part of individual terminations.  Thus, as it is clear that even the limited discovery IBM was required to produce showed that IBM's prior contentions were inaccurate, additional, broader discovery (which, as noted above, the Court recognized could be appropriate) is plainly justified as to the remaining 10 Opt-Ins against whom IBM seeks summary judgment.

The Court should thus deny summary judgment with respect to these ten opt-ins: Bellew; Black; Gonzalez; Grill; Kondis; Bayerle, Jr.; Emma; Kapor; Schaaf; and Selcov. The Court should also grant Plaintiffs' request that IBM be ordered to respond, in full, to Plaintiffs' RPD No. 10 for these individuals.

### B. Summary Judgment Should Be Denied as to the "Arbitration Agreement Opt-Ins"

IBM also seeks summary judgment on the claims of 15 "Arbitration Agreement Opt-Ins" whom it contends signed agreements to arbitrate their claims, but for whom IBM apparently cannot produce the actual signed arbitration agreements.  Because it has failed to offer any explanation for why it cannot produce these agreements, the Court must reject IBM's effort to rely on secondary evidence (in the form of Plaintiffs' discovery responses and declarations from IBM employees) in order to establish that the agreements these Opt-Ins allegedly signed contained arbitration provisions.[6]

The party seeking to prove an agreement to arbitrate bears the burden of proving the existence of that agreement.  See, e.g., Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010) ("The party moving to compel arbitration must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement in issue.").  That is because "though the presumption in favor of arbitration is strong, the law still requires

---

[6]    IBM has established that Amelia Voglino signed the Agreement. See Dkt. 227-1. Plaintiffs have thus withdrawn her from this case.

that parties actually agree to arbitration before it will order them to arbitrate a dispute." Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 369 (2d Cir. 2003).

IBM has utterly failed to meet its burden here.  IBM cites a host of case law suggesting that a party can prove the contents of an agreement with secondary evidence if the agreement is lost.  See Dkt. 224 at 17-18.[7]  But under Fed. R. Evid. 1004, the burden of proof is on IBM to establish two facts before any secondary evidence should be considered: (a) "a proper excuse for the non-production of the document and" (b) "that the original did exist."  Bandler v. BPCM NYC, Ltd., 2014 WL 5038407, *7 (S.D.N.Y. Sep 29, 2014) (citing Fed. R. Evid. 1004).  To satisfy Rule 1004, "[t]he party seeking to prove the contents of the writing must establish a proper excuse for the non-production of the document and that the original did exist.'"  Bobcar Media, LLC v. Aardvark Event Logistics, Inc., 354 F. Supp. 3d 375, 382 (S.D.N.Y. 2018) (quoting Crawford v. Franklin Credit Mgmt. Corp., 2015 WL 1378882, at *4 (S.D.N.Y. Mar. 26, 2015) (emphasis added); A.F.L. Falck, S.p.A. v. E.A. Karay Co., Inc., 722 F.Supp. 12, 16 (S.D.N.Y.1989), on reargument , 131 F.R.D. 46 (S.D.N.Y.1990) ("The party seeking to prove the contents of the writing must establish a proper excuse for the

---

[7]    Curiously, in its briefing, IBM cites a string of decisions suggesting that the Court should look to state law governing proof of the contents of lost agreements that are subject to the Statute of Frauds.  See IBM's Memorandum, Dkt. 224, at ECF 21-22.  Yet the Statute of Frauds, which requires contracts that cannot be performed within one year from the agreement to be in writing, see N.Y. Gen. Oblig. Law § 5–701, has no relevance to the issues here.  The separation agreements at issue could plainly be "performed" in less than a year; indeed, the record is clear that IBM made severance payments to the "Arbitration Agreement Opt-Ins" within the same month of these Opt-Ins' last days at IBM.  See Plaintiffs' Statement of Material Facts ¶¶ 144-157.

Moreover, none of the cases cited by IBM involved a defendant seeking to prove the existence of an agreement to arbitrate with extrinsic evidence.  See Lynch v. Savarese, 629 N.Y.S.2d 804, 804 (N.Y. App. Div. 1995) (lease agreement); Love v. Spector, 627 NY.S.2d 87, 87 (NY. App. Div. 1995) (music royalty agreement); Nicosia v. Muller, 229 A.D.2d 964, 645 N.Y.S.2d 385 (N.Y. App. Div. 1996) (pension agreement); Dependable Lists, Inc. v. Malek, 98 A.D.2d 679, 680 (N.Y. App. Div. 1983) (employment agreement); Host America Corp. v. Ramsey, 947 A.2d 957, 962 (Conn. App. Ct. 2008) (employment agreement); Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co., 661 N.Y.S.2d 948, 950–51 (N.Y. Sup. Ct. 1997) (insurance policies).

non-production of the document and that the original did exist.").[8]  Even the primary

case on which IBM relies makes clear that the threshold question before looking to

extrinsic evidence is *why* no direct evidence is available.  See Host Am. Corp. v

Ramsey, 107 Conn. App. 849, 855 (2008) ("a party [seeking to use secondary evidence

in lieu of the original document] must demonstrate both (a) the former existence and the

present unavailability of the missing document, and (b) the contents of the missing

document.").

        Its burden notwithstanding, IBM does not even *attempt* to explain its failure to

produce signed agreements for 14 of the so-called "Arbitration Agreement Opt-Ins."

Rather, IBM – which purports to be a sophisticated technology company – simply notes

that "the agreements themselves here are missing", Dkt. 224 at ECF 22, with no further

elucidation on the issue in its briefing or evidentiary submissions.  See generally IBM's

Memorandum of Law, Dkt. 224; Declaration of Diane Kennedy, Dkt. 227.  IBM has

utterly declined to satisfy its burden to show a "proper excuse for the non-production of

the document[s]", Bandler, 2014 WL 5038407 at *7, and it therefore cannot prove the

contents of those documents through secondary evidence in the form of the Plaintiffs'

discovery responses or declarations from IBM witnesses.  See, e.g., Elliott v.

Cartagena, 2020 WL 4432450, at *5 (S.D.N.Y. July 31, 2020) (finding defendants failed

---

[8]      Federal Rule of Evidence 1004 provides:

An original is not required and other evidence of the content of a writing, recording or
photograph is admissible if:
        (a) all the originals are lost or destroyed, and not by the proponent acting in bad
        faith;
        (b) an original cannot be obtained by any available judicial process;
        (c) the party against whom the original would be offered had control of the
        original; was at that time put on notice, by pleadings or otherwise, that the
        original would be a subject of proof at the trial or hearing; and fails to produce it
        at the trial or hearing; or
        (d) the writing, recording, or photograph is not closely related to a controlling
        issue.

Id.

to satisfy their burden to invoke Fed. R. Evid. 1004(a) where they did not prove documents at issue had been lost or destroyed).

Moreover, the record evidence has already revealed that some Opt-In Plaintiffs received separation agreements that did not contain arbitration provisions.  For example, Opt-In Plaintiff Mandee Ross was told by her manager that she was being terminated in a Resource Action in 2017, but her manager subsequently provided her with an Individual Separation Allowance Plan (ISAP) Separation Agreement, typically offered to those who were terminated from IBM for performance-based reasons.  See Plaintiffs' Statement of Material Facts ¶ 137.  This agreement did not contain an arbitration provision.  Id.  Similarly, in 2016, Plaintiff Marlene Valardo was initially classified as having been terminated for performance reasons, and she too received a Separation Agreement that did not contain an arbitration provision.  Id. ¶ 139.  Plaintiff Bridget Roberti was terminated in 2015 and was also provided an agreement with no arbitration provision.  Id. ¶ 141.[9]  Thus, without the actual agreement to review, the parties and the Court cannot be certain that the agreements these Opt-ins signed contained arbitration provisions.

In sum, because IBM has not even attempted to concoct an explanation for its failure to produce the agreements that it claims the "Arbitration Agreement Opt-Ins" signed, and because record evidence shows that IBM has not always included an arbitration agreement in the separation agreements it provided to employees who were laid off through RAs, IBM's Motion must be denied as to Plaintiffs Bees, Cabassa, Feingold, Feldhak, Hamilton, Mitchell, Molina, Morris, Perillo, Price, Richard, Sassaman, West, and Wilson.

---

[9]     These ADEA releases are invalid, because all three of these Opt-In Plaintiffs were actually terminated through Resource Actions, and no OWBPA disclosures were provided.  Id. ¶¶ 138, 140, 142.   IBM previously contended that these Opt-Ins should be dismissed because they signed ADEA releases, but IBM is no longer seeking to have them dismissed from this case, as discovery has revealed that they were actually part of RAs.  See Ex. 14 to Liss-Riordan Decl.

## V.    CONCLUSION

For the foregoing reasons, IBM's Motion for Summary Judgment as to ADEA Waiver Opt-Ins and Arbitration Agreement Opt-Ins must be denied.


Dated: March 1, 2022                                   Respectfully submitted,

                                                       EDVIN RUSIS, HENRY GERRITS, PHIL
                                                       MCGONEGAL, DAVID HO ENG, BRIAN
                                                       HAUPT, PHILIP MONSON, CLAUDIA
                                                       ZIEGLER, SALLY GEHRING, and JOHN
                                                       MASON, on behalf of themselves and all
                                                       others similarly situated,

                                                       By their attorneys,


                                                       /s/ Shannon Liss-Riordan
                                                       Shannon Liss-Riordan (NY Bar No. 2971927)
                                                       Thomas Fowler, *pro hac vice*
                                                       Zachary Rubin (NY Bar No. 5442025)
                                                       LICHTEN & LISS-RIORDAN, P.C.
                                                       729 Boylston Street, Suite 2000
                                                       Boston, MA 02116
                                                       (617) 994-5800
                                                       Email:  sliss@llrlaw.com, tfowler@llrlaw.com,
                                                       zrubin@llrlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2022, a true and accurate copy of the foregoing was filed via this Court's CM/ECF system.

<u>/s/ Shannon Liss-Riordan</u>
Shannon Liss-Riordan

17