**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDVIN RUSIS, HENRY GERRITS, PHIL MCGONEGAL, DAVID HO ENG, BRIAN HAUPT, PHILIP MONSON, CLAUDIA ZIEGLER, SALLY GEHRING, and JOHN MASON, individually and on behalf of all other similarly situated individuals, ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) | Civil Action No. 1:18-cv-08434 |
| v. ) | |
| INTERNATIONAL BUSINESS MACHINES CORP. ) ) | |
| Defendant ) | |

**PLAINTIFFS' OPPOSITION TO IBM'S MOTION FOR SUMMARY
JUDGMENT AS TO OPT-INS ASSERTING CONSTRUCTIVE DISCHARGE OR
<u>PRETEXTUAL FOR-CAUSE TERMINATION CLAIMS</u>**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND..................................................................... 2

III.  LEGAL STANDARD ............................................................................... 7

     A.   Summary Judgment Standard ..................................................... 7

     B.   The Applicable Legal Framework................................................. 8

IV.  ARGUMENT ........................................................................................ 11

     A.   IBM's Efforts to Artificially Categorize the Opt-In Plaintiffs at Issue Here Should Be Rejected ...................................................... 11

     B.   The "Piggybacking" Rule is not Limited to the "Original" Named Plaintiffs in this Matter................................................................ 15

         1.   The Opt-In Plaintiffs Can "Piggyback" Off Other Charges That Preceded Other Litigation ................................................. 17

            a.   Dye v. International Business Machines Corp., 1:21-cv-02548-NRN (D. Colo. 2021) ................................................... 18

            b.   McCormick v. International Business Machines Corp., Civ. Act. No. 1:20-cv-327 (S.D. Ohio 2020).................................... 19

            c.   Chiakpo v. IBM Corp., Civ. Act. No. 20-cv-11624-DJF (D. Mass. 2020)............................................................................... 19

            d.   Conrey v. IBM Corp., Civ. Act. No. 1:17-cv-00817 (D.N.J. 2017)...... 19

            e.   Horne v. International Business Machines Corp., Civ. Act. No. 7:19-cv-01563 (S.D.N.Y. 2019)..................................... 20

            f.   Liu v. International Business Machines Corp., Civ. Act. No. 1:18-cv-08609 (S.D.N.Y. 2018)..................................... 21

         2.   The Opt-In Plaintiffs Can "Piggyback" Off Ms. Gehring's Charge...... 21

         3.   The Opt-In Plaintiffs Can "Piggyback" Off Ms. Ziegler's and Mr. Monson's Charges ............................................................ 22

         4.   The Opt-In Plaintiffs Can "Piggyback" Off Mr. McGonegal's Charge............................................................................... 22

i

5.    The Opt-In Plaintiffs Should Be Able To "Piggyback" Off Other
            EEOC Charges................................................................................... 24

    C.    Plaintiffs Alternatively Request that The Court Reserve Ruling on
            IBM's Request Pending Merits Discovery ................................................ 25

V.    CONCLUSION.................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Abbey House Media, Inc. v. Simon & Schuster, Inc.</u>
   869 F.3d (2d Cir. 2017)..............................................................................................8

<u>Bale v. Nastasi</u>
   982 F. Supp. 2d (S.D.N.Y. 2013) .............................................................................13

<u>Cadle Co. v. Hayes</u>
   116 F.3d (1st Cir. 1997)..............................................................................................8

<u>Campbell v. City of Los Angeles</u>
   903 F.3d (9th Cir. 2018)...........................................................................................17

<u>Catlin v. Wal-Mart Stores, Inc.</u>
   123 F. Supp. 3d (D. Minn. 2015) .............................................................................16

<u>Chandler v. International Business Machines Corp.</u>
   C.A. No. 21-CV-6319-JGK (S.D.N.Y.) .......................................................................4

<u>Chiakpo v. IBM Corp.</u>
   Civ. Act. No. 20-cv-11624-DJF (D. Mass. 2020).....................................................19

<u>Christiansen v. Omnicom Grp., Inc.</u>
   167 F. Supp. 3d (S.D.N.Y. 2016)..............................................................................11

<u>Conrey v. IBM Corp.</u>
   Civ. Act. No. 1:17-cv-00817 (D.N.J. 2017)..........................................................19, 20

<u>Cronas v. Willis Group Holdings Ltd.</u>
   2007 WL 2739769 (S.D.N.Y. Sept. 17, 2017).......................................10, 12, 16, 23

<u>Dye v. International Business Machines Corp.</u>
   1:21-cv-02548-NRN (D. Colo. 2021) .......................................................................18

<u>Glass v. IDS Fin. Servs., Inc.</u>
   778 F. Supp. (D. Minn. 1991) .......................................................................8, 13, 25

<u>Green v. Sears, Roebuck & Co.</u>
   434 F. Supp. 2d 1025 (10th Cir. 2006) ......................................................................8

<u>Heagney v. European American Bank</u>
   122 F.R.D. 125 (E.D.N.Y. 1988) ..............................................................................12

<u>Hodge v. New York Coll. of Podiatric Med.</u>
   157 F.3d (2d Cir. 1998).............................................................................................10

Holowecki v. Federal Exp. Corp.
    440 F.3d (2d Cir. 2006).................................................................................. 1

Horne v. International Business Machines Corp.
    Civ. Act. No. 7:19-cv-01563 (S.D.N.Y. 2019)............................................. 20

In Re: IBM Arbitration Agreement Litigation
    C.A. No. 21-CV-6296 (S.D.N.Y.) .................................................................. 4

In Re: Second Wave IBM Arbitration Agreement Litigation
    C.A. No. 21-cv-09574 (S.D.N.Y) ................................................................... 4

Liu v. International Business Machines Corp.
    Civ. Act. No. 1:18-cv-08609 (S.D.N.Y. 2018)............................................. 21

Lodi v. International Business Machines Corp.
    C.A. No. 21-CV-06336 (S.D.N.Y.). ............................................................... 4

Lohnn v. International Business Machines Corp.
    C.A. 21-CV-6379 (S.D.N.Y.) ..................................................................... 4, 5

Lohnn v. International Business Machines Corp.
    Case No. 22-32 (2d Cir.)............................................................................... 5

McCormick v. International Business Machines Corp.
    Civ. Act. No. 1:20-cv-327 (S.D. Ohio 2020)............................................... 19

Prickett v. DeKalb Cty.
    349 F.3d (11th Cir. 2003)............................................................................ 16

Rasmy v. Marriot International, Inc.
    2017 WL 773604 (S.D. N.Y. 2017) ............................................................. 11

Rusis v. Int'l Bus. Machines Corp.
    529 F. Supp. 3d (S.D.N.Y. 2021)................................................................... 1

Snell v. Suffolk County
    782 F.2d (2d Cir. 1986)............................................................................... 11

Tavenner v. International Business Machines Corp.
    C.A. No. 21-CV-6345 (S.D.N.Y.) .................................................................. 4

Tolbert v. Smith
    790 F.3d (2d Cir. 2015).................................................................................. 8

Tolliver v. Xerox Corp
    918 F.2d (2d Cir. 1990).........................................................................passim

<u>Tsai v. Rockefeller U.</u>
   137 F.Supp.2d (S.D. N.Y. 2001) ............................................................... 12

<u>U.S. Postal Serv. V. Aikens</u>
   460 U.S. (1983) ...................................................................................... 8

<u>Velez v. Novartis Pharms. Corp.</u>
   2007 WL 2197800, (S.D.N.Y. July 31, 2007) ........................................... 10

**Other Authorities**

Josh Eidelson, *IBM Emails Show Millenial Workers Favored Over 'Dinobabies'*
   Bloomberg, Feb. 11, 2022 ...................................................................... 6

Noam Scheiber, *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force*
   N.Y. Times, Feb. 12, 2022 ...................................................................... 6

**Rules**

29 U.S.C. § 626(b) ...................................................................................... 16

## I.    INTRODUCTION[1]

In its Motion for Summary Judgment as to Opt-Ins Asserting Constructive Discharge or Pretextual For-Cause Termination Claims ("Motion"), Dkt. 217, IBM seeks dismissal of forty-four (44) Opt-In Plaintiffs, claiming that they failed to administratively exhaust their claims and that they are unable to avail themselves of the well-established "piggybacking" rule.  IBM's Motion should be denied in its entirety.

Under the "piggybacking" rule, adopted by this Circuit, an individual who has not satisfied the ADEA exhaustion requirement by submitting a charge of age discrimination to the Equal Employment Opportunity Commission ("EEOC") can nevertheless pursue an ADEA case in court if that individual can "piggyback" onto another timely filed charge that alleged similar age discrimination claims against the same employer.  See Holowecki v. Federal Exp. Corp., 440 F.3d 558, 565-70 (2d Cir. 2006); Tolliver v. Xerox Corp, 918 F.2d 1052, 1057-59 (2d Cir. 1990) (applying the piggyback rule to ADEA claims).  As explained below, Plaintiffs have identified *numerous* EEOC charges off of which the 44 Opt-In Plaintiffs at issue may properly "piggyback."

Yet IBM's Motion seeks to both muddy the Opt-In's claims and impose barriers to the application of the "piggybacking" rule that run contrary to established law.  These efforts should be rejected outright, and the Opt-Ins at issue should be permitted to invoke the "piggybacking" rule.

*First*, IBM's Motion is premised on a false portrayal of the Opt-Ins' separations as individual incidents and labeling of the Opt-Ins' separations as distinct from one another

---

[1]    Plaintiffs recognize that the Court previously rendered an opinion concerning the "piggybacking" doctrine when ruling on IBM's prior Motions for Judgment on the Pleadings.  See Rusis v. Int'l Bus. Machines Corp., 529 F. Supp. 3d 178 (S.D.N.Y. 2021).  Given that IBM has renewed its requests based on a more developed factual record, and particularly in light of the intervening revelations surrounding IBM's company-wide discriminatory scheme, Plaintiffs respectfully request that their arguments be considered in their totality as set forth herein.

(*e.g.* whether it was by "resource action" versus "layoff" versus pretextual "performance issue" versus "constructive discharge").  In casting the Opt-Ins' separations as distinct from the broad-based scheme at the heart of this case that is described further below, IBM seeks to set up these Opt-In Plaintiffs for dismissal.  But, as explained herein, IBM's lawyer's framing of the Opt-In's separations should ***not*** be determinative of whether individuals' claims are properly exhausted.  Rather, as stated below, the exhaustion and "piggybacking" inquiry looks at the ***conduct*** and ***facts*** before the EEOC – ***not*** an employer's attorneys' after-the-fact labeling.  And, at the very least, there are genuine issues of material fact that would preclude deciding on summary judgment that the Opt-Ins' claims are not part of the group claims that could have fallen within the EEOC's investigation of IBM's systemic scheme of discrimination against older workers.

*Second,* IBM asks the Court to establish a bright-line rule that only the "original Named Plaintiffs" to an action give rise to "piggybacking" such that the Opt-In Plaintiffs are limited to "piggybacking" off the charges of *only* the individuals identified as Named Plaintiffs at the commencement of this particular action.  But such a mandate runs wholly counter to established law, which calls for application of the doctrine not only across cases, but also when parties are added as "named plaintiffs" by subsequent amendment.  And moreover, IBM's efforts to limit the "piggybacking" doctrine to only ADEA "Named Plaintiffs" generally is an arbitrary distinction, particularly in the ADEA collective mechanism, where ***all*** litigants are equally "party plaintiffs" under the statute.  Finally, individuals should be able to "piggyback" off a charge, *regardless* of whether a subsequent lawsuit was commenced.

## II.    FACTUAL BACKGROUND

Plaintiffs allege that they lost their jobs as the result of IBM's discriminatory efforts to systematically reduce its employment of older workers in order to build a younger workforce.  To that end, IBM pushed out thousands of older workers while

hiring younger workers, which it thought would allow it to better compete with younger technology companies, such as Google, Facebook, Amazon, and others.

In its Motion, IBM attempts to arbitrarily categorize the Opt-In Plaintiffs' separations (*e.g.* whether it was by "layoff" versus pretextual "performance issue" versus "constructive discharge") in an effort to distract from the high-level scheme at issue and seek dismissal of these individuals' claims.  However, as explained below, IBM's attorneys' labeling should not be determinative of whether individuals' claims are properly exhausted, particularly where, as here, there is evidence of a top-down scheme that affected *all* Opt-In Plaintiffs at issue.  The claims of **_all_** of the Opt-In Plaintiffs at issue in IBM's Motion stem from this top-down scheme to oust older workers.  See Plaintiffs' Statement of Material Facts ¶¶ 166-191.

As an initial matter, these allegations are supported by the findings of the EEOC, which engaged in a wide-ranging multi-year investigation of IBM for age discrimination.  See Plaintiffs' Statement of Material Facts ¶ 167; Declaration of Shannon Liss-Riordan (Liss-Riordan Decl.), Exhibit 1 (EEOC Determination).   As part of that investigation, the EEOC consolidated claims of age discrimination brought by 62 former employees who alleged they were separated from the company because of their age.  See id. ¶ 168.  Several lead plaintiffs and opt-in plaintiffs in this case, including Sally Gehring, Robert Gasiorowski, Mark Johnson, and Andrew Peavy, were charging parties in the EEOC investigation of IBM that led to its August 31, 2020, determination that found reasonable cause to believe that IBM engaged in classwide age discrimination.  See id. ¶ 169.

Indeed, the EEOC's investigation resulted in a determination finding reasonable cause to believe that IBM discriminated against older employees during a multi-year period, including 2013 to 2018.  See id. ¶ 171.   The EEOC stated:

> The Commission's investigation … uncovered top-down messaging from
> Respondent's highest ranks directing managers to engage in an
> aggressive approach to significantly reduce the headcount of older
> workers to make room for Early Professional Hires. Analysis shows it was
> primarily older workers (85.85%) in the total potential pool of those

considered for layoff. Evidence uncovered older employees who were laid off and told that their skills were out of date, only to be brought back as contract workers, at a lower rate of pay with fewer benefits. EEOC received corroborating testimony from dozens of witnesses nationwide supporting a discriminatory animus based on age.

See id. ¶ 172.   In conjunction with the EEOC investigation, IBM maintained that "there was no centralized decision-making, and that each individual manager was responsible" for making the termination decisions based on considerations of "performance, relevant skills, utilization, and consolidation of services." Id. However, the EEOC rejected this contention, stating that IBM's "asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that [IBM] has discriminated against Charging Parties and others on account of their age." Id.

While IBM may argue that the EEOC's letter refers specifically to "Resource Actions," Plaintiffs' counsel have obtained evidence that IBM has considered employees who separated for other reasons to count toward its numerical goals of eliminating employees through Resource Actions.  Counsel have obtained this evidence in arbitration, but IBM contends that evidence adduced in arbitration is confidential and cannot be used elsewhere.  Plaintiffs' counsel are challenging that argument in multiple lawsuits in this district.[2]

Further, recently-revealed high-level communications demonstrate shocking animus against older workers and an open desire by IBM's senior executives to increase its proportion of Millennial employees further demonstrates the unifying scheme at issue here.  See id. ¶ 180.  For instance, one email chain involving senior

---

[2]    See In Re: IBM Arbitration Agreement Litigation, C.A. No. 21-CV-6296 (S.D.N.Y.) (consolidating 27 matters); In Re: Second Wave IBM Arbitration Agreement Litigation, C.A. No. 21-cv-09574 (S.D.N.Y) (consolidating 50 matters); Chandler v. International Business Machines Corp., C.A. No. 21-CV-6319-JGK (S.D.N.Y.); Tavenner v. International Business Machines Corp., C.A. No. 21-CV-6345 (S.D.N.Y.); Lohnn v. International Business Machines Corp., C.A. 21-CV-6379 (S.D.N.Y.); Lodi v. International Business Machines Corp., C.A. No. 21-CV-06336 (S.D.N.Y.). .

executives discussed that IBM's proportion of millennials employees is much lower than at a competitor firm.  One points to an article stating that "72% of ACN ee's are millenials [sic]."  See id. ¶ 181.   Another responds, "Last year, millennials made up 42% of our workforce and 81% of new hires . . . . we can refresh the numbers for YTD 2016- and see what makes sense to use in future opps." Id.  The first then responds curtly, "42 is a far cry from 72." Id.[3]

In another email, an IBM executive describes IBM's "**dated** maternal **workforce – this is what must change**.  They really don't understand social or engagement.  Not digital natives.  *A real threat for us*."  See id. ¶ 183.   In yet another email, an executive applauds the use of the disparaging term "*Dinobabies*" to describe the older IBM employees and praises another executive's description of IBM's plan to oust them from IBM's workforce; a plan to "accelerate change by inviting the dinobabies" (new species) to leave" and make them an "*Extinct species*."  See id. ¶ 184.   In another email, an executive explains that the percentage of millennials at IBM will increase once certain of IBM"s "resource action" (layoff) programs are complete: " – more on this issue of % millennials. The math will improve when Saturn/Solitaire employees move on, and when we bring onboard our early professionals and interns in the summer…" See id. ¶ 186.

These documents also reveal that IBM has carried out its plan to oust older workers by requiring employees (who have long been permitted to work from home) to relocate to a different part of the country and work out of an IBM office.  Plaintiffs contend that this strategy was adopted with the specific goal of ensuring that older employees would resign from the company, in furtherance of IBM's plan to oust its older

---

[3]    Descriptions of these documents were made public in Lohnn v. IBM, Case No. 21-cv-6379 (S.D.N.Y.) (Dkt. 59) (following IBM's unsuccessful appeal to the Second Circuit to keep them under seal, see Lohnn v. International Business Machines Corp., Case No. 22-32 (2d Cir.), see Liss-Riordan Decl., Exhibit 2).  The District Court (Judge Liman) is now considering whether to allow the names of the executives who sent these emails to be revealed.  See Lohnn, Dkt. 53 at 3.

workforce. See id. ¶ 189.   Evidence demonstrates that IBM *knew* that acceptance rates for relocation offers would be as low as 8-10% and that these forced relocations were used with employees who would otherwise have been subject to a Resource Action as a way to create the impression that employees voluntarily chose to end their employment at IBM.  See id.

Following the public filing of the descriptions of these documents, various news outlets around the world reported on this shameful development and the shocking descriptions of IBM executives' disparaging communications, which clearly reflected rampant age bias and planning to oust older workers.[4]  These revelations – and the widespread public denunciation of them - support Plaintiffs' claims here that – contrary to what IBM argues in its motion – a jury can easily find that the separations at issue here were not individualized incidents, but, rather, were part of a broader scheme by IBM to oust older employees from its workforce.

As further support for this widespread scheme, former Vice President at IBM, Catherine Rodgers, who worked at IBM for nearly 40 years until mid-2017, has similarly explained that discussions about the need to aggressively recruit young Millennial talent were commonplace at IBM during former CEO Ginni Rometty's tenure.  Rodgers describes how IBM attempted to compete with its newer, younger, and hipper competitors such as Google, Facebook, and Amazon by bringing in younger workers and trying to "put the cool back in Blue." See id. ¶ 176.  Rodgers describes how IBM's Ginni Rometty announced that IBM would be bringing on 25,000 "Early Professional Hires" and "new collar" workers in the U.S. over a several year period, which Rodgers and her peers across the company recognized meant displacing and replacing older workers. She describes how IBM accomplished this program of "displace

---

4       See, e.g., Noam Scheiber, *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force*, N.Y. Times, Feb. 12, 2022 (Liss-Riordan Decl., Exhibit 3); Josh Eidelson, IBM Emails Show Millenial Workers Favored Over 'Dinobabies', Bloomberg, Feb. 11, 2022 (Liss-Riordan Decl., Exhibit 4).  See Statement of Facts, ¶191.

and replace" by implementing "resource actions", directed by HR, whereby selections of who would be terminated were purportedly based upon performance reviews by first-line managers, but in reality, they were part of a broader scheme to reduce the company's population of older workers. See id. ¶ 177.  Rodgers also describes that IBM implemented a new performance management system in 2016, which resulted in more vague assessments that could be used to justify terminations for performance-based reasons. Rodgers recognized this change as part of IBM's efforts to terminate older workers through pretextual performance-based terminations. Id. ¶ 178.[5]

IBM *ignores* Plaintiffs' allegations of systemic discrimination and instead categorizes the Opt-Ins at issue here as having been subject to individualized separations, attempting to convince the Court to prevent them from invoking the "piggybacking" doctrine.  These artificial categories should be rejected.  At the very least, there are genuine issues of material fact regarding whether these workers' claims stem from the overall scheme of discrimination that Plaintiffs have uncovered and thus whether these individuals should be permitted to "piggyback" off the EEOC charges that accused IBM of discriminating against older workers in terminations.

## III.   LEGAL STANDARD

### A.  Summary Judgment Standard

Rule 56 dictates that summary judgment should be granted only if the movant shows that there is "no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Abbey House Media, Inc. v. Simon & Schuster, Inc., 869 F.3d (2d Cir. 2017) (citing Fed. R. Civ. P. 56(a)). "In determining whether summary judgment is appropriate, [a court] must resolve all ambiguities and draw all reasonable inferences against the moving party."  Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir.

---

[5]     Plaintiffs' Rule 56.1 Statement of Material Facts cites a declaration from Ms. Rodgers that provides more fulsome details regarding the age discrimination Ms. Rodgers observed at IBM than the declaration from Ms. Rodgers that the Court previously considered (filed at Dkt. 21-3).

2015) citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  "Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment."  <u>Cadle Co. v. Hayes</u>, 116 F.3d 957, 959 (1st Cir. 1997).

It has been long recognized that employment discrimination cases are ill-suited to summary judgment, given that such claims often necessitate a fact-intensive inquiry. <u>See</u> <u>U.S. Postal Serv. V. Aikens</u>, 460 U.S. 711, 716 (1983) ("[T]he question facing triers of fact in discrimination cases is both sensitive and difficult.").  In ADEA cases, "[a] ruling which deprives a party of a determination of the facts by a jury should be cautiously and sparingly granted."  <u>Green v. Sears, Roebuck & Co.</u>, 434 F. Supp. 2d 1025 (10th Cir. 2006) (internal quotations omitted).

Moreover, where, like here, the discriminatory practice that informs the "piggybacking" analysis necessitates a fact-intensive inquiry, summary judgment is *particularly* inappropriate.  <u>Glass v. IDS Fin. Servs., Inc.</u>, 778 F. Supp. 1029, 1079 (D. Minn. 1991) (denying defendant's motion for summary judgment based on timeliness grounds so that jury could decide whether and when defendant was engaged in discriminatory pattern or practice, which would inform whether plaintiffs could piggyback onto previous EEOC charges).

### B. The Applicable Legal Framework

The ADEA requires that, prior to an individual's pursuit of ADEA claims in court, "*a* charge" be filed with EEOC.  <u>See</u> 29 U.S.C. § 626(d) (emphasis added).  The purpose of the exhaustion requirement is to "afford the [Equal Employment Opportunity Commission] the opportunity 'to seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.'"  <u>Tolliver v. Xerox Corp.</u>, 918 F.2d 1052, 1057 (2d Cir. 1990) (quoting 29 U.S.C. § 626(d)).

8

Prior to the 1978 amendments to the ADEA, the statute required that the individual pursuing judicial relief first notify the Secretary of Labor; however, Congress eliminated this strict, same-person notice requirement, instead calling for the general filing of "**a** charge" with the EEOC – *whether or not* brought by the individual seeking judicial relief – so that more ADEA cases would be heard on the merits.[6]

And unlike, for example, claims arising under Title VII, an individual need not receive a "right to sue" letter from the EEOC in order to bring an ADEA claim in court. Rather, the ADEA only requires that such individuals wait 60 days after "a charge alleging unlawful discrimination has been filed" with the EEOC before seeking judicial relief. See 29 U.S.C. § 626(d)(1) ("No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission").

---

[6] As the Second Circuit has explained:

> As originally enacted, section 7(d) provided that a suit could not be commenced "by any individual under this section until *the individual* has given" at least 60 days notice to the Secretary of Labor, who was then charged with enforcement of the Act. Pub.L. No. 90–202, 81 Stat. 602, 605 (1967) (emphasis added). In 1978, Congress amended section 7(d) to eliminate the requirement that "the individual" bringing suit must have given the administrative notice and provided instead that suit could not be brought until 60 days after "*a charge* alleging unlawful discrimination has been filed with the Secretary." Pub.L. No. 95–256, § 4(a), 92 Stat. 189, 190 (1978) (emphasis added). That same year the Secretary's ADEA responsibilities were transferred to the EEOC. Reorg. Plan No. 1 of 1978, § 2, 43 Fed.Reg. 19807, 92 Stat. 3781 (1978). In changing the statutory requirement from a charge filing obligation of the individual bringing suit to the more general requirement that "a charge … has been filed," Congress pointed out that "[f]ailure to timely file the notice ... [was] the most common basis for dismissal of ADEA lawsuits by private individuals" and emphasized that ***the purpose of the amendment was "to make it more likely that the courts will reach the merits of the cases of aggrieved individuals...."*** S.Rep. No. 493, 95th Cong. 1st Sess. 12 (1977), U.S.Code Cong. & Admin.News 1978, pp. 504, 515.

Tolliver v. Xerox Corp., 918 F.2d 1052, 1056 (2d Cir. 1990) (emphasis added).

As a consequence, under the ADEA's statutory framework, "the ADEA plaintiff can sue in court even if the EEOC has not yet completed its investigation or attempts at conciliation."  Hodge v. New York Coll. of Podiatric Med., 157 F.3d 164, 168 (2d Cir. 1998).  Indeed, a court's jurisdiction over an ADEA claim does not depend "on the E'OC's actually having taken some action in response to a filed charge", as such a requirement "would establish a prerequisite to suit beyond a prospective plaintiff's control and therefore would be contrary to the spirit and purpose of the Act."  Id. (internal quotations and citation omitted).

Under the "piggybacking" rule, adopted by this Circuit, an individual who has not themselves satisfied the ADEA exhaustion requirement by submitting a charge of age discrimination to the EEOC can nevertheless pursue an ADEA case in court if that individual can "piggyback" onto another timely filed charge that alleged similar age discrimination claims against the same employer.  See Tolliver, 918 F.2d at 1057-59. The rule is meant to expand – not contract – litigants' access to the courthouse, in order to forward the remedial purpose of ADEA.  See Cronas v. Willis Group Holdings Ltd., 2007 WL 2739769, at *2 (S.D.N.Y. Sept. 17, 2017).

In evaluating what claims the underlying charge exhausts, pursuant to the "reasonably related" doctrine, an EEOC charge satisfies the exhaustion requirement not only as to the unlawful discrimination alleged in the charge itself but also all claims that "'would fall within the scope of the EEOC investigation which can be reasonably expected to grow out of the charge of discrimination.'" Cronas, 2007 WL 2739769, at *6 (quoting Velez v. Novartis Pharms. Corp., 2007 WL 2197800, at *8 (S.D.N.Y. July 31, 2007)). "The Second Circuit has described this principle as 'essentially an allowance of loose pleading.'" Id. (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 83 (2d Cir. 2001)).

Indeed, the Second Circuit applies the "broadest test" for application of the "piggybacking" doctrine: "the claims of the administrative claimant and the subsequent plaintiff [need only] arise out of the same circumstances and occur within the same

10

general time frame." Rusis, 529 F. Supp. 3d at 200 (quoting Snell v. Suffolk County, 782 F.2d 1094, 1101 (2d Cir. 1986) (citation omitted)). And where, as here, "the grievances are alleged to arise throughout a large group," there need just be "some indication that the grievance [asserted in the timely filed charge] affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim." Id. (quoting Tolliver, 918 F.2d at 1058) (alterations in original).

> As one court has explained:
> The "reasonably related" doctrine is "essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (internal quotation marks and brackets omitted). "To determine whether a claim is 'reasonably related' to a claim included in an EEOC charge, courts should focus 'on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving,' and ask the 'central question' of 'whether the complaint filed with the EEOC gave the agency adequate notice to investigate discrimination on both bases.'" Christiansen v. Omnicom Grp., Inc., 167 F. Supp. 3d 598, 610 (S.D.N.Y. 2016) (quoting Williams, 458 F.3d at 70).

Rasmy v. Marriot International, Inc., 2017 WL 773604, at *6 (S.D. N.Y. 2017).

The Court should find that the claims of the Opt-In Plaintiffs at issue are properly exhausted, as they may "piggyback" off previously-filed EEOC charges. The EEOC (and IBM) has long had sufficient notice of the conduct complained of in this case.

## IV.  ARGUMENT

### A. IBM's Efforts to Artificially Categorize the Opt-In Plaintiffs at Issue Here Should Be Rejected

As an initial matter, IBM's briefing makes sweeping categorizations of the Opt-In Plaintiffs and seeks their dismissal based on these categories – these efforts should be rejected. Indeed, IBM's categorization of a particular separation (e.g. whether it was by "layoff" versus pretextual "performance issue" versus "constructive discharge") should *not* be determinative of whether individuals' claims are properly exhausted. This is plainly not the standard. Rather, as stated above, the exhaustion and "piggybacking"

inquiry looks at the **conduct** and **facts** before the EEOC – **not** an employer's attorneys' after-the-fact labeling.  See, e.g., Cronas, 2007 WL 2739769, at *6.

Plaintiffs' theory of the case has been clear from the outset – that IBM has been engaged in a broad-based scheme to oust older workers, in violation of the ADEA.  As described above, it is of no moment that the ouster is labeled as a "layoff" ("resource action") or a pretextual for-cause termination or a "constructive discharge" – Plaintiffs allege – and a reasonable jury could indeed find – that the Opt-In Plaintiffs at issue here fell victim to the **same** underlying discriminatory plan and in the **same** time frame as the other party plaintiffs whom they seek to join in this matter.  See, e.g., Heagney v. European American Bank, 122 F.R.D. 125, 128 (E.D.N.Y. 1988) ("The workers may have left their jobs at different times via different procedural mechanisms, but the alleged unity of the discriminatory scheme they faced overwhelms those differences.").  Ending the inquiry at the label affixed by IBM ignores the *facts* underlying the claim.

The record developed thus far bears this out:  for example, the EEOC charge submitted by Luvi Dye on its face describes a pretextual discharge – specifically, she describes being "discharged" based on a pretextual "low performance rating."  See Liss-Riordan Decl., Ex. 6 (IBM_RUSIS_00018244-00018245).  And Ms. Dye's EEOC charge, filed on December 18, 2015, was investigated together with the other sixty-one (61) charges that led to the EEOC's August 31, 2020, Letter of Determination.  See Liss-Riordan Decl., Ex. 7 (IBM_RUSIS_00019013-00019028).

Critically, in responding to Ms. Dye's charge, IBM stated that Ms. Dye was terminated as part of a "reduction in force."  See Liss-Riordan Decl., Ex. 8 (IBM_RUSIS_ 18472-78). IBM's response here demonstrates the impropriety of IBM's arbitrary categorizations intended solely to set up individuals' claims for dismissal (*e.g.* "layoff" versus "performance" versus "constructive discharge").  Here, the **factual allegations** underlying Ms. Dye's charge involve pretextual performance-related critiques.  It is of no moment the vehicle for Ms. Dye's allegedly performance-related

termination was a "reduction in force" – and here, IBM contends that it selected Ms. Dye for inclusion in the "reduction in force" **precisely** because of those purported performance critiques, see id., which Ms. Dye maintains are pretext for age discrimination.  That Ms. Dye was selected for inclusion in a group layoff in no way alters her assertion that she was so selected for pretextual reasons, and IBM should not be permitted to assert "group layoff" in order to shield itself from others seeking to "piggyback" off Ms. Dye's claim.   Ms. Dye's charge – which was part of the EEOC's investigation that led to the August 31, 2020, determination, wherein the EEOC found the "top-down" messaging of discriminatory animus, see Liss-Riordan Decl., Ex. 1, and indisputably put IBM on notice of same – demonstrates that IBM attempt to silo each claim is wholly improper, and the Opt-Ins at issue should be permitted to "piggyback" off her charge. [7]  Further, as stated above, the factual inquiry involved in this analysis is a question for the jury in this case.[8]

As another example, Mr. Ndubuisi Chiakpo's filed a charge with the EEOC and the Massachusetts Commission Against Discrimination (MCAD) on June 30, 2017, wherein he described being terminated at the age of 62 for purported performance

[7]     Similarly, the EEOC charge of Ms. Janet Gelphman, filed January 18, 2018, explains that Ms. Gelphman was selected for a "Permanent Layoff" and was put on a "PIP [Performance Improvement Plan] after receiving good reviews on my year-end review to ensure that I would be unable to obtain another position in another department that were available o transfer to at the time of the layoff."  See Liss-Riordan Decl., Ex. 11 (IBM_RUSIS_00002652).  Like Ms. Dye, Ms. Gelphman was also one of the charging parties underlying the EEOC's August 31, 2020, determination, and her charge unequivocally explains IBM's use of pretextual PIPs to ensure that IBM's older workers are eliminated.  And also like Ms. Dye, the fact that Ms. Gelphman might have been separated in a layoff in no way changes her allegations surrounding IBM's use of pretextual PIPs as another mechanism to ensure the ouster of its older workers. The Opt-In Plaintiffs should be permitted to "piggyback" off Ms. Gelphman's charge.

[8]     See Glass, 778 F. Supp. at 1079; Bale v. Nastasi, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court.")

reasons that were pretext for discrimination.  See Liss-Riordan Decl., Ex. 9
(IBM_RUSIS_00018228-00018229), Ex. 10 (IBM_RUSIS_0002867).

The MCAD issued a finding of Probable Cause, and its findings illustrate why
IBM's arbitrary categorizations should not be given any weight, let alone be
determinative of the exhaustion inquiry.  Specifically, MCAD explained that IBM
asserted that Mr. Chiakpo was terminated for poor performance, and that he was also
terminated as part of a group termination program called the Incentive Management
Performance Program (IMPP).  Critically, in issuing the Probable Cause finding, the
MCAD's investigation revealed "insufficient evidence that Respondent notified
Complainant of this program or that it would impact his employment."  Id.  And the
MCAD further stated: "It should be noted that Respondent's initial position statement did
not mention that this program factored into its decision to terminate Complainant.
Respondent provided a copy of Complainant's termination letter.  This program is also
not mentioned in Complainant's termination letter."  Id.  Notably, when asked to provide
demographic information of the individuals eliminated under this IMPP program,
"Respondent asserted that 140 individuals were terminated, with 91.8% of those
terminated being over 40."  Id.

The MCAD's findings make clear that IBM's asserted reasons and/or categories
of terminations should *themselves* be scrutinized.  There, IBM's *post hoc* labeling of Mr.
Chiakpo's termination as part of the group termination program *itself* contributed to the
MCAD's probable cause finding.  And moreover, the relevant inquiry looks at the
underlying *facts* and *conduct* – IBM's attempts to categorize (and eliminate) Opt-Ins
from this case based on whether they separated under a "layoff" versus "another group
termination program" versus "constructive discharge" versus pretextual "poor
performance" is a distraction from the *underlying* discriminatory scheme that affected *all*

14

Opt-In and party plaintiffs. The Court should accordingly reject IBM's efforts to set individuals up for dismissal by artificially categorizing their separations.[9]

### B. The "Piggybacking" Rule is not Limited to the "Original" Named Plaintiffs in this Matter

IBM's Motion seeks to depart from the broad test that the Second Circuit applies to the "piggybacking" inquiry.  Indeed, IBM seeks to muddy the inquiry and impose improper barriers to application of the rule, by taking the curious position that the "piggybacking" doctrine functions to allow "piggybacking" off *only* the charges of the "original Named Plaintiffs" in *this* matter – namely, the charges of Mr. Rusis, Mr. Gerrits, and Mr. McGonegal.  See generally Mot.  Such a limitation should be rejected, as it runs counter to established precedent.

*First*, as an initial matter, the Second Circuit has *expressly* applied the "piggybacking" doctrine in the context of *separate* litigations.  Indeed, in Tolliver, the Second Circuit explained that "[t]he purpose of the charge filing requirement is fully served by an administrative claim that alerts the EEOC to the nature and scope of the grievance, regardless of whether those with a similar grievance elect to join a preexisting suit **or initiate their own**."  918 F.2d 1052, 1057 (2d Cir. 1990) (emphasis added).  In Tolliver, the court applied the piggybacking rule in an ADEA case brought by eighteen former employees of Xerox who alleged age discrimination, to permit plaintiffs to piggyback off of other individuals who filed similar EEOC charges as predicate to pursuing a *previous* (eventually decertified) class action. Id. at 1057, 1060.  See also,

---

[9]     Critically, Plaintiffs maintain that the charges of Mr. Rusis, Mr. Gerrits, and, as explained below, Mr. McGonegal, are all sufficient to exhaust the claims at issue. Indeed, Plaintiffs Rusis, Gerrits, and McGonegal, all filed class charges alleging that IBM engaged in wide-spread age discrimination in an effort to replace its aging workforce with younger Millennials, in violation of ADEA.  IBM's effectuation this goal of reducing its older workforce as claimed by the Opt-Ins at issue is "reasonably related" to these allegations (as they arise from the **same** circumstances, occurred in the **same** time-frame, and the charges provided the EEOC notice of the breadth of the allegations).  As such, the Court should properly find that these charges exhaust the claims of all of the Opt-In Plaintiffs at issue.

e.g., Cronas, 2007 WL 2739769, at *6 (permitting a plaintiff to proceed with an individual Title VII claim even though the plaintiff had not timely filed his own EEOC charge, by piggybacking from an earlier class EEOC charge).

*Second*, courts have likewise allowed "piggybacking" off the charge of an individual who was later added as a Named Plaintiff in an Amended Complaint.  See, e.g., Catlin v. Wal-Mart Stores, Inc., 123 F. Supp. 3d 1123, 1131 (D. Minn. 2015).  Thus, the limitation that IBM seeks to impose – which would disallow the application of the piggybacking rule to the charges of individuals added as Named Plaintiffs through amendment – is not supported by the case law.

*Third*, a limitation of the "piggybacking" doctrine to only ADEA "Named Plaintiffs" generally is an arbitrary distinction, particularly in the ADEA collective mechanism, where **_all_** litigants are equally "party plaintiffs" under the statute.  Indeed, as noted above, when pursuing judicial relief, ADEA litigants can bring claims either individually or as party plaintiffs in an "opt in" collective under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b).  See 29 U.S.C. § 626(b).  In such a collective action, "[n]o employee shall be a **_party plaintiff_** to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b) (emphasis added).  The statute does not differentiate between "opt in" and "Named Plaintiffs."  Rather, "by referring to them as 'party plaintiff[s]' Congress indicated that opt-in plaintiffs should have the same status in relation to the claims of the lawsuit as do the named plaintiffs."  Prickett v. DeKalb Cty., 349 F.3d 1294, 1297 (11th Cir. 2003).  As one Court described: "[a] collective action is more accurately described as a kind of mass action, in which aggrieved workers act as a collective of *individual* plaintiffs with *individual* cases—capitalizing on efficiencies of scale, but without necessarily permitting a specific, named representative to control the

16

litigation, except as the workers may separately so agree.  Campbell v. City of Los Angeles, 903 F.3d 1090, 1105 (9th Cir. 2018) (emphasis in original).[10]

*Finally,* Plaintiffs maintain that individuals should be permitted to "piggyback" off an earlier-filed charge, *regardless* of whether the individual who filed that charge later brought a case in court.  Indeed, exhaustion requires that **_a_** charge notifying the EEOC of the complained of discrimination has been filed. See Tolliver, 918 F.2d at 1056-57 ("the ADEA filing requirement[] [is] satisfied 'so long as the matter complained of was within the scope of [a] previously filed charge, regardless of who filed it.'") (quoting 43 Fed.Reg. 138, 139 (1983), and discussing legislative amendment to relax the administrative exhaustion requirement).  As discussed at length above, the exhaustion requirement concerns the notice provided to the EEOC to trigger the EEOC's investigation and conciliation efforts, see Tolliver, 918 F.2d 1052, and the "piggybacking" / single-filing doctrine is intended to capture conduct that is reasonably related to that charge.  A charging party's filing of a subsequent lawsuit is wholly separate from the notice provided to the EEOC and should not serve as a prerequisite to invoking the "piggybacking" / single-filing rule.

As explained below, the Opt-In Plaintiffs at issue may properly "piggyback" off one of *numerous* EEOC charges that concern the discriminatory scheme at issue here.

### 1. The Opt-In Plaintiffs Can "Piggyback" Off Other Charges That Preceded Other Litigation

As an initial matter, **_all_** of the Opt-In Plaintiffs whom IBM seeks to dismiss should be permitted to properly "piggyback" off the charges underlying the following actions:

---

[10]     Plaintiffs acknowledge that the Court previously disagreed with Plaintiffs' argument; however, as stated above, given that IBM has renewed its requests based on a broader record, and particularly in light of the intervening revelations surrounding IBM's company-wide discriminatory scheme, Plaintiffs respectfully request that their arguments be considered again now, and in their totality, as set forth herein.

17

### a. Dye v. International Business Machines Corp., 1:21-cv-02548-NRN (D. Colo. 2021)

The Court should find that the EEOC charge of Ms. Luvi Dye exhausts the Opt-In Plaintiffs' claims, as Ms. Dye's charge on its face describes a pretextual discharge – specifically, she describes being "discharged" based on a pretextual "low performance rating." See Liss-Riordan Decl., Ex. 6. And Ms. Dye's EEOC charge was investigated together with the other sixty-one (61) charges that led to the August 31, 2020, class-wide Letter of Determination. See Liss-Riordan Decl., Ex. 7.[11]

Here, as explained above, Ms. Dye's circumstances demonstrate the impropriety of IBM's slicing and dicing of the Opt-Ins' claims. Ms. Dye's charge describes a discharge based on pretextual performance ratings, and was included in the class-wide investigation underlying the EEOC's August 31, 2020 Letter of Determination finding that reasonable cause exists to believe that IBM has been engaged in an "aggressive" campaign over a five-year period (between 2013 and 2018) to reduce the number of its older workers and replace them with younger workers, thereby discriminating against its older workers in violation of the ADEA. This charge should satisfy the exhaustion requirement of **all** Opt-In Plaintiffs that are subject to the instant Motion.[12]

---

[11]     Ms. Dye filed suit on September 20, 2021, and the matter remained pending through December 9, 2021. See Dye, 1:21-cv-02548-NRN, Dkt. 7.
         Plaintiffs maintain that the exhaustion requirement and "piggybacking" rule concerns the notice given to the EEOC to initiate its investigation and conciliation efforts. As such, Plaintiffs maintain that a requirement of a later-filed suit following a charge, or a requirement that a suit need to "exist" at precise moment that one hoping to "piggyback" could join, runs counter to the doctrine. In any event, even if there were such a requirement, as the below makes clear, such lawsuits did "exist" continuously from at least February 7, 2017 (e.g., Ms. Conrey's suit) through November 24, 2021 (e.g., Ms. McCormick's suit), so any such requirement would be satisfied here (as all Opt-In party plaintiffs at issue joined this matter throughout this timeframe).
[12]     At minimum, even adopting IBM's improper categorizations, this charge should exhaust the claims of the eighteen (18) individuals whom IBM labels as raising pretextual performance issues, including those terminated for allegedly "gross misconduct" or "failure to follow company policy": Walter Bayerle*, Steven Black, Vincent Daukas, Phillip Emma, John Gray, Rose Kapor, Raymond Otto Kulisch, Charles (Jim) Lundy, David Ogilbee, Chohreh Partovian , Michael Rudge, Brian Schaaff, Eric

### b. McCormick v. International Business Machines Corp., Civ. Act. No. 1:20-cv-327 (S.D. Ohio 2020)

The Court should likewise find that Lynn McCormick's (former Lynn Carns) EEOC charge of August 10, 2018, exhausts the Opt-In Plaintiffs' claims. See Liss-Riordan Decl., Ex. 12 (IBM_RUSIS_00018223). Ms. McCormick received a Right to Sue letter from the EEOC, and filed suit on April 24, 2020. See Liss-Riordan Decl., Ex. 13 (IBM_RUSIS_3048). Critically, Ms. McCormick's charge sets forth that she was a "high-performing employee," but IBM put her on a pretextual Performance Improvement Plan and then terminated her, which she states is part of a "pattern and practice of gender and/or age discrimination." See Liss-Riordan Decl., Ex. 12.

Ms. McCormick's EEOC Charge alleges the *very* practice at the heart of the Opt-In Plaintiffs' claims – that IBM has unlawfully set up older workers for termination.[13]

### c. Chiakpo v. IBM Corp., Civ. Act. No. 20-cv-11624-DJF (D. Mass. 2020)

Ndubuisi Chiakpo's EEOC charge likewise exhausts the claims at issue. As explained above, on June 30, 2017, Mr. Chiakpo filed a charge with the MCAD, cross-filed with the EEOC, alleging that IBM's purported performance reasons for his termination were pretext for discrimination. See Liss-Riordan Decl., Ex. 9. Mr. Chiakpo brought suit on or about July 13, 2020, which remained pending until January 10, 2022. See Chiakpo v. IBM Corp., Civ. Act. No. 20-cv-11624-DJF. As explained above, the MCAD issued a probable cause finding, and, for the reasons described throughout, Mr. Chiakpo's charge should be deemed to exhaust the claims at issue.

### d. Conrey v. IBM Corp., Civ. Act. No. 1:17-cv-00817 (D.N.J. 2017)

Ms. Susan Conrey's EEOC Charge also exhausts the Opt Ins' claims. Here, Ms. Conrey filed her EEOC charge on March 28, 2016, stating that she likewise fell victim to

---

Selcov, Mark Bauer, Melody Faeizi, Arleen Franceschi, James Rash, and Bunyan Tadlock. As Plaintiffs' Timeliness Opposition shows, Mr. Bayele need not "piggyback."
[13] At the very least, Ms. McCormick's charge should be found to exhaust the claims of the eighteen (18) individuals whom IBM claims raise pretextual performance issues.

a pretextual termination based on purported performance issues.  See Liss-Riordan

Decl., Ex. 14 (IBM_RUSIS_18930-35) (charge); Ex. 15 (IBM_RUSIS_0019000-12)

(complaint).  Ms. Conrey received a Right to Sue letter and brought suit on February 7,

2017.  Id.  The action remained pending until July 14, 2020. See Conrey v. IBM Corp.,

Civ. Act. No. 1:17-cv-00817.  Ms. Conrey's charge detailing pretextual termination

should function to exhaust the Opt-Ins' claims.

### e. Horne v. International Business Machines Corp., Civ. Act. No. 7:19-cv-01563 (S.D.N.Y. 2019)

Similarly, Stephen Horne's EEOC charge, filed on June 5, 2018, should likewise

exhaust the Opt-In's claims.[14]  Mr. Horne filed suit on February 19, 2019, and his

Complaint details that he was terminated for pretextual performance reasons, including

being told that he "violated IBM's Business Conduct Guidelines."  Liss-Riordan Decl.,

Ex. 16 (IBM_RUSIS_00019107-12).  Just like the Opt-Ins at issue here, Mr. Horne's

Complaint specifically alleges that "over the past five or more years, Defendant IBM

began terminating such identified older employees disproportionately to its younger

employees and not offering them other open positions, and engaged in other tactics that

disproportionately affected its older employees, in an effort to create a significantly

younger workforce."  Id.  Mr. Horne's suit remained pending until December 7, 2020.

See Horne, Civ. Act. No. 7:19-cv-01563.  As stated throughout, Mr. Horne's charge

properly exhausts the claims at issue.

---

[14]    IBM did not produce Mr. Horne's EEOC charge in this case.  IBM should be directed to supplement its production with all of the charges at issue.  See Fed. R. Civ. P. 56(d).  Plaintiffs previously requested, but were denied, IBM's production of all charges, regardless of whether litigation was pending at the time of the Court's ruling. Here, as stated above, such a limitation is not contemplated in the case law and, even if it were, it should be tied to the date of the Opt-In Plaintiffs' joining the instant matter – not the date of the Court's ruling on a Motion to Compel.  For these reasons, IBM's Motion should be denied, and IBM should be directed to supplement its production.

### f.   Liu v. International Business Machines Corp., Civ. Act.
No. 1:18-cv-08609 (S.D.N.Y. 2018)

Similarly, Hsiou-Chang Liu's EEOC charge should likewise exhaust the claims at

issue.  Here, Ms. Liu filed an EEOC charge[15], received a Right to Sue letter, and

brought suit on September 20, 2018.  See Liss-Riordan Decl., Ex. 17

(IBM_RUSIS_00019297-00019304).  Ms. Liu states that in March of 2017, she was

pretextually placed on the "Bench" (purportedly meaning that there was no work for her)

and that she applied for "numerous other positions within IBM" without receiving a single

offer before being terminated by IBM.  Id.  Ms. Liu specifically states that IBM "engaged

in a pattern and practice of age discrimination in the hiring and termination of its

employees."  Id.  Ms. Liu's Complaint involves the *same* discriminatory scheme at issue

here, and her EEOC charge should properly exhaust the challenged Opt-Ins' claims.[16]

### 2.   The Opt-In Plaintiffs Can "Piggyback" Off Ms. Gehring's Charge

IBM claims that Ms. Gehring's charge is likewise insufficient, but such claims

should also be rejected.  Here, Ms. Gehring's EEOC Charge provides that she trained

workers "under age of 40" and that she was "was terminated and my job duties were

taken over by workers outside all of my protected statuses.  Many employees in my

protected statuses have been terminated and are not being hired." Liss-Riordan Decl.,

Ex. 18  (emphasis added). Ms. Gehring's charge, on its face, conveys a discriminatory

practice resulting in the termination of "many" individuals over 40 years old.  Id.  Ms.

Gehring's charge is sufficient to support the "piggybacking" of individuals who allege

that they also fell victim to this discriminatory practice – **all** of the Opt-Ins at issue.

IBM asserts that Ms. Gehring's charge will not suffice because she separated

under an IBM resource action and her charge does not describe the discriminatory

---

[15]    As with Mr. Horne, IBM did not produce the EEOC charge in this case.
[16]    At the *very* least, the five Opt-In Plaintiffs whom IBM labels as being "unable to find new projects or positions within IBM" should be able to "piggyback" off Ms. Liu's charge – namely, Demostenes Gonzalez, Mark Grill, Mark Matsel, Peter Kondis, and Michael Shattuck.

conduct at issue in the precise terms that IBM has used here to artificially categorize the Opt-Ins at issue.  But, as stated above, these arguments should be rejected.  IBM does not dictate the applicable legal standard.  Ms. Gehring's charge is plainly sufficient.

### 3. The Opt-In Plaintiffs Can "Piggyback" Off Ms. Ziegler's and Mr. Monson's Charges

IBM's arguments regarding Mr. Philip Monson's and Ms. Claudia Ziegler's charges should likewise be rejected.  Here, IBM does not dispute that Mr. Monson's and Ms. Ziegler's charges *explicitly* explain IBM's systemic age discrimination (and even use IBM's labels – *e.g.* discriminatory layoffs, terminations, and constructive discharges). Instead, IBM curiously complains that, notwithstanding the charges describing *precisely* the categories that IBM sets forth, the charges are too "vague" to suffice.  These arguments should be rejected.  Ms. Ziegler's and Mr. Monson's charges *expressly* state:

> IBM is discriminating against its older workers on a class-wide basis across the entire company, both by laying them off or otherwise discharging them (through termination or constructive discharge) disproportionately to younger workers and not hiring them for open positions.  Indeed, over the last several years, IBM has been in the process of systemically laying off (or otherwise discharging) its older employees in order to build a younger workforce.  IBM has laid off (or otherwise discharged) at least 20,000 employees over the age of forty in the last five years.

Liss-Riordan Decl., Exs. 19 & 20 .  IBM further asks the Court to ignore the plain text of these charges, complaining that because Mr. Monson and Ms. Ziegler were separated pursuant to resource actions and because they were not "original named plaintiffs," their charges are somehow insufficient.  These arguments should be rejected as well. [17]

### 4. The Opt-In Plaintiffs Can "Piggyback" Off Mr. McGonegal's Charge

---

[17]     As stated in Plaintiff's Timeliness Opposition, IBM's arguments regarding the timing of Mr. Monson's becoming a "Named Plaintiff" and the timing of the Opt-Ins' terminations vis a vis Mr. Monson's charge should likewise be rejected. Finally, Plaintiffs reiterate here that IBM's complaints about an "infinite chain of piggybacking," see Mot. at 23, are both misplaced and overblown. A collective of 148 individuals – the ***total*** number of Opt-Ins here -- is far from "infinite."  And, moreover, the period to further amend the complaint passed on June 11, 2021 (Dkt. 163).

As explained in Plaintiffs' Timeliness Opposition, Phil McGonegal was forced to retire early based on IBM's discriminatory relocation program.   Mr. McGonegal filed his charge with the EEOC on July 2, 2018, stating that "over the last several years, IBM has been in the process of systematically laying off its older employees in order to build a younger workforce. IBM has laid off at least 20,000 employees over the age of forty in the last five years" and "I believe that I and thousands of other employees have been discriminated against by IBM on the basis of age."  Liss-Riordan Decl., Ex. 21.  As explained in Plaintiffs' Timeliness Opposition, Mr. McGonegal's charge was timely filed. And moreover, it was *accepted* by the EEOC as properly filed – indeed, the EEOC chose to process the charge as received on July 2, 2018, as documented in an August 6, 2020, email to Plaintiffs' counsel. Liss-Riordan Decl., Ex. 22 (email).[18]   IBM's arguments to the contrary should be rejected.[19]

---

[18]   Even if IBM attempts to argue on reply that Mr. McGonegals' charge fails because IBM was not simultaneously notified, this argument should be rejected.  See, e.g., Holewicki 440 F.3d at 567 ("if an individual satisfactorily notifies the EEOC of her charge, she is not foreclosed from federal suit merely because the EEOC fails to follow through with notifying the employer and attempting to resolve the matter").

[19]   And while IBM asks the Court to perform a textual analysis cabined to the four corners of Mr. McGonegal's charge, such a narrow inquiry alone is plainly ***not*** the standard – instead, the Court's analysis also includes whether "'the conduct at issue would fall with the 'scope of the EEOC investigation which can be reasonably expected to grow out of the charge of discrimination.'"  Cronas, 2007 WL 2739769, at *6.  And here, there can be little doubt that, if the EEOC had interviewed Mr. McGonegal, the constructive discharge claim would clearly have arisen in the scope of the investigation. The Court should accordingly find that Mr. McGonegal's EEOC charge sufficiently exhausts the claims of **all** Opt-In Plaintiffs at issue.

At the very least, the Court should find that it sufficiently exhausts the claims of the twenty-one (21) Opt-In Plaintiffs whom IBM categorizes as alleging constructive discharge:  Gabriele Avzaradel, Anne Belt, Thomas Caldwell, William Chaplin, David Edley, Judy Ghea, David Hamel, Cynthia Keefer, Diane Prater, Ronald Ragsdale, David Reid, John Stapleton, Christopner Stevenson, Anne Bellew, Diane Delaney, John Gates, Craig Grills, Sonali Bailey Perkins, Danny Peterman, Rene Ramos, and Thomas Warthen.  And critically, IBM *concedes* that that if Mr. McGonegal's EEOC charge were timely (which it is), the eight Opt-In Plaintiffs who IBM categorizes as separating "after being asked to co-locate" would be allowed to "piggyback" on Mr. McGonegal's charge. See IBM's Motion at p. 19, fn.4.

### 5. The Opt-In Plaintiffs Should Be Able To "Piggyback" Off Other EEOC Charges

The Opt-In Plaintiffs should be permitted to "piggyback" off other EEOC charges, *regardless* of whether the individual filing that charge later sought judicial relief.  For example, the Opt-In Plaintiffs should be permitted to "piggyback" off the EEOC charge of Ms. Janet Gelphman, filed January 18, 2018, which explains that Ms. Gelphman was selected for a "Permanent Layoff" and was put on a "PIP [Performance Improvement Plan] after receiving good reviews on my year-end review to ensure that I would be unable to obtain another position in another department that were available to transfer to at the time of the layoff." See Liss-Riordan Decl., Ex. 11. Ms. Gelphman was one of the charging parties underlying the class-wide August 31, 2020, determination.  Ms. Gelphman's charge *unequivocally* describes IBM's use of pretextual PIPs to ensure the ouster of its older workers.  The Opt-In Plaintiffs should be permitted to "piggyback" off this charge.[20]

Notably, Scott Koren likewise brought an EEOC charge, filed December 26, 2017, explaining that he was "[i]nexplicably" put on a PIP that was "clearly a pretextual means to terminate my employment with IBM" and "push me out due to my age." See Liss-Riordan Decl., Ex. 24 (IBM_RUSIS_ 00018295-00018299).  Mr. Koren's charge details his observations that "[i]n addition to the suspect terms of the PIP itself, IBM as a company is making a push to aggressively recruit and promote younger employees and to transform the age profile of its workforce." Id.  Mr. Koren's charge describes receiving "various documents and internal communications that support the GBS Transformation impetus" and being on calls with consultants wherein IBM executives

---

[20]    Similarly, Rheta Daur's EEOC charge, filed January 13, 2017, states that she was "placed on Performance Improvement Plan (PIP) which I refused to sign or acknowledge because I believe them to be both discriminatory and retaliatory."  Liss-Riordan Decl., Ex. 23 (IBM_RUSIS_0018238).  Ms. Daur alleges that she was later "selected for a layoff" and "[o]ther employees not in my same protected class were not laid off." Id.  Here too, Ms. Daur's charge *explicitly* notes IBM's pretextual use of PIPs. Thus, the Opt-Ins should be permitted to "piggyback" off this charge.

discussed wanting to lower the average age of the IBM GBS Business Unit to mirror that of IBM's competitors.  Id.  These strategic documents and communications are highly similar to those that Plaintiffs' counsel has obtained in their prosecution of numerous age discrimination matters against IBM.  These documents reflect a top-down scheme to oust IBM's older workers and demonstrate that *all* of the Opt-In Plaintiffs' claims stem from this very scheme.[21]

### C. Plaintiffs Alternatively Request that The Court Reserve Ruling on IBM's Request Pending Merits Discovery

As described throughout, the Opt-In Plaintiffs' claims are united by a discriminatory scheme that is reflected in the various EEOC charges off of which Opt-In Plaintiffs may "piggyback."  The evidence already adduced shows that, at the *very least*, the issues involved in deciding IBM's Motion raise questions that are properly suited for a jury. See, e.g., Glass, 778 F. Supp. at 1079.  But if there is any doubt, the Court should defer consideration of IBM's Motion until after merits discovery, at which time Plaintiffs will have had further opportunity to build a factual record.  The Court should accordingly decline to dismiss any of the Opt-Ins at this juncture.

### V.  CONCLUSION

For the foregoing reasons, IBM's Motion should be denied in its entirety.

---

[21]  The Opt-In Plaintiffs should also be permitted to "piggyback" off fellow party plaintiff Karen Kersting's EEOC charge. Plaintiffs requested to add Ms. Kersting as a Named Plaintiff, but inadvertently did not include Ms. Kersting as a Named Plaintiff in filing the Amended Complaint, and the Court later denied Plaintiffs' request to add Ms. Kersting as untimely. Liss-Riordan Decl., Ex. 25.  As noted, "piggybacking" should not be restricted to "Named Plaintiffs" in the ADEA collective action mechanism.  And here, on May 4, 2020, Ms. Kersting filed an EEOC charge that explains IBM's discriminatory relocation policy:  "The co-location policy negatively affects older employees who are unwilling or unable to relocate because of established family situations.  I was unable to co-locate to Texas and on December 31, 2019, I was discharged."  Id.  Ms. Kersting's charge unequivocally put the EEOC (and IBM) on notice that, as part of its discriminatory scheme, IBM was engaging in constructive discharges by forcing older workers into retirement, in violation of ADEA, by alleging that she had been given an unreasonable relocation order that forced her into early retirement.

Dated: March 1, 2022

Respectfully submitted,

EDVIN RUSIS, HENRY GERRITS, PHIL
MCGONEGAL, DAVID HO ENG, BRIAN
HAUPT, PHILIP MONSON, CLAUDIA
ZIEGLER, SALLY GEHRING, and JOHN
MASON, on behalf of themselves and all
others similarly situated,
By their attorneys,


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (NY Bar No. 2971927)
Thomas Fowler, *pro hac vice*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com, tfowler@llrlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2022, a true and accurate copy of the foregoing

Opposition was filed via this Court's CM/ECF system.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan