# EXHIBIT 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
STEPHEN HORNE,

                Plaintiff,

-against-

INTERNATIONAL BUSINESS MACHINES CORP.,

                Defendant.
------------------------------------------------------------------------X

Civil Action No.

**COMPLAINT
AND DEMAND
FOR JURY TRIAL**

Plaintiff Stephen Horne, by and through his attorneys, Pollock & Maguire, LLP, complaining of International Business Machines ("IBM" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages and remedies brought under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq. in connection with Defendant IBM's unlawful and willful termination of Plaintiff Stephen Horne on the basis of age.

2. This is also a civil action for damages and remedies under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq. for failure of Defendant IBM to pay severance benefits to which Plaintiff Stephen Horne is entitled.

3. This is also a civil action for damages and remedies for breach of contract by Defendant IBM for failure to pay severance benefits to which Plaintiff Stephen Horne is entitled.

4. Defendant IBM's conduct was unlawful and Plaintiff brings this action for reinstatement of his position, compensatory money damages for lost earnings, lost wages, lost

IBM_RUSIS_00019107

benefits and other employee compensation, and money damages for emotional distress, as well as attorneys fees and other appropriate equitable and legal relief.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this controversy pursuant to the ADEA, 29 U.S.C. § 626(b), ERISA, 29 U.S.C. § 1132(e) and 28 U.S.C. §1331.

6. This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1) in that the action involves citizens of different states and an amount in controversy exceeds $75,000, exclusive of interest and costs.

7. This Court also has supplemental jurisdiction over Plaintiff's age discrimination and retaliation claims under NYSHRL §296(A) pursuant to 28 U.S.C. §1367(a).

8. The Southern District of New York is the proper venue in this action pursuant to 28 U.S.C. § 1391(b)(1) because IBM's principal place of business is in Armonk, New York.

## PARTIES

9. Plaintiff Stephen Horne is a 61-year-old individual residing at 90 Washington Avenue, Cliffside Park, New Jersey 07010. His date of birth is August 15, 1957.

10. Defendant IBM is a New York corporation with its principal place of business in Armonk, New York.

11. IBM is an American technology business that offers services and goods in computing, cloud platforms, advanced analytics tools, and other related products and services, throughout the world.

2

12. Defendant IBM was at all relevant times and is an "employer" within the meaning of the ADEA.

## PROCEDURAL REQUIREMENTS

13. On June 5, 2018, Plaintiff Horne filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and with the New York State Division of Human Rights ("NYSDHR") and was assigned an internal EEOC Charge Number of 520-2018-04236.

14. Mr. Horne's charge was filed with the EEOC within the time limits prescribed in 29 U.S.C. § 626(d).

15. More than sixty (60) days have passed since Mr. Horne filed this Charge of Discrimination.

16. On December 6, 2018, Plaintiff Horne received notice from the EEOC that his Complaint was transferred to the NYSDHR "for complaint filing and further processing and investigation," and Mr. Horne declined to consent to the further processing and investigation of his claims by the NYSDHR.

## STATEMENT OF MATERIAL FACTS

**Plaintiff Horne's Outstanding Record With IBM**

17. In 2010, Mr. Horne was employed as an "Associate Partner" of IBM Global Business Services – Business Analysis and Optimization ("IBM Global Business").

18. Mr. Horne's direct supervisor at IBM Global Business, Glenn Finch, hired Mr. Horne because he knew of Mr. Horne's accomplished work history, in particular the two years

3

IBM_RUSIS_00019109

Mr. Horne spent working with United States Congress to find a solution to the 2008 investment banking collapses.

19. At IBM Global Business, Mr. Horne was highly successful, and his evaluations were consistently positive for every year of his employment by IBM from 2010 through the month of his termination in 2018.

20. Mr. Horne exceeded the goals set for him by IBM, and he was awarded substantial performance bonuses every year of his employment until 2018.

**IBM's Systematic Efforts to Eliminate Older Workers**

21. Beginning in or about 2014, Defendant IBM, upon information and belief, began to engage in a systematic eradication of older, highly compensated employees from its workforce.

22. Upon information and belief, Defendant IBM conducted an internal analysis and study of its workforce to identify and target highly compensated employees who were over the age of fifty (50) years and determine what the exposure to IBM would be if IBM terminated such identified employees.

23. Upon information and belief, over the past five or more years, Defendant IBM began terminating such identified older employees disproportionately to its younger employees and not offering them other open positions, and engaged in other tactics that disproportionately affected its older employees, in an effort to create a significantly younger workforce, which conduct constitutes unlawful discrimination under the ADEA and state anti-discrimination laws.

4

IBM_RUSIS_00019110

24. During the first three months of 2018, several colleagues and Mr. Horne's superior, Mr. Finch, verbally noted and commented upon Mr. Horne's age, as he had just turned sixty (60) years old.

25. Upon information and belief, Mr. Horne's termination was part of this systematic IBM plan to eliminate older highly compensated employees and constitutes unlawful discrimination based on age under the ADEA and New York State Law.

**IBM's Pretextual Termination of Plaintiff Horne**

26. On or about March 16, 2018, Mr. Horne's employment was abruptly terminated by IBM.

27. On that occasion, Mr. Horne was informed that he had violated IBM's Business Conduct Guidelines because he had allegedly not responded quickly enough to an internal audit request the previous summer of 2017, and because he had allegedly not been honest when asked about his response to the internal audit request.

28. Mr. Horne's termination for cause was simply a pretext and the real basis for his termination was his age.

29. Mr. Horne had in fact responded quickly and appropriately to the internal audit request made on June 26, 2017, especially considering the extraordinary family circumstances in his life at the time of the request.

30. On June 18, 2017, Mr. Horne's father-in-law was diagnosed with throat cancer.

31. On June 26, 2017, Jannene Hamman of IBM sent Mr. Horne an email introducing herself and stating that she was "closing out" an internal investigation on the Clover GBS

5

contract and needed some input regarding a project at IBM South Africa that had resulted in a loss for IBM and another company called Aginity.

32. Mr. Horne had worked briefly on that project (the "Clover" project) beginning in September of 2014 before being promoted in March of 2015 into the IBM Analytic Division.

33. Mr. Horne received Ms. Hamman's email on June 26, 2017, over two years after he had been briefly involved with the Clover/Aginity project, while he was on a business trip in Texas.

34. Two days after receiving Ms. Hamman's email, on June 28, 2017, Mr. Horne ended his trip early to fly to Boston to see his wife and his father-in-law, who had just been diagnosed with throat cancer.

35. While Mr. Horne was traveling to Boston en route to see his dying father-in-law, he drafted answers to Ms. Hamman's emailed questions and believed he had transmitted those answers to Ms. Hamman.

36. In fact, his father-in-law died while Mr. Horne was on the plane, and after arriving in Boston, Mr. Horne spent several days mourning his father-in-law and supporting his wife.

37. Shortly afterwards, on July 2, 2017, Mr. Horne checked his email and was shocked to find another email from Ms. Hamman asking for the same information, discovered that his email drafted on the plane was still in his outbox, not actually sent, and immediately sent his drafted response to Ms. Hamman.

38. Ms. Hamman received Mr. Horne's response to her audit request within six (6) days of her initial email.

6

IBM_RUSIS_00019112

39. Responding to Ms. Hamman's inquiry within six (6) days was not unreasonable, especially considering that during that time Mr. Horne had to travel across the country, suffer the loss of his father-in-law, and help support his wife.

40. On July 3, 2017, Ms. Hamman replied to Mr. Horne's answers to her inquiry, asking Mr. Horne to provide written documentation that Aginity was going to "write down" a loss of $320,000 it had incurred on the project that was the subject of the audit.

41. On that same day, Mr. Horne responded that he had never been provided any written documentation of this "write down", despite his many requests for it, and again advised Ms. Hamman that he had not worked on the project since early 2015, prior to the time the issues Ms. Hamman was investigating arose.

42. Mr. Horne did not receive any further emails from Ms. Hamman after July 3, 2017, and believed he had fully and satisfactorily responded to inquiries addressed to him in the internal audit.

43. Six months later, on December 7, 2017, Mr. Horne was summoned by Carla Grant-Pickens, an IBM Resources Lead for Global Business Services Cognitive Process Transformation, and by Jesus Mantas, the IBM employee who was the supervisor of Glenn Finch, Mr. Horne's superior/boss.

44. At that meeting on December 7, 2017 Ms. Grant-Pickens claimed that Mr. Horne had received an email from another auditor on August 9, 2017 and that he had never responded.

45. In fact, Mr. Horne was not aware of having received such an email, and, despite Ms. Grant-Pickens' and Mr. Mantas' claims to have documentation that such email was sent, Mr. Horne was never provided with any such documentation.

7

IBM_RUSIS_00019113

46. On January 12, 2018, Ms. Grant-Pickens and Nancy LoCivita, lead investigative auditor with IBM, met with Mr. Horne to discuss the audit, and asked Mr. Horne if he had ever received an email from a "Jeanne Hammond."

47. After Mr. Horne said that he had not received such an email from a "Jeanne Hammond," Ms. LoCivita accused Mr. Horne of lying.

48. In fact, Mr. Horne never received an email from a "Jeanne Hammond."

49. Mr. Horne, who received hundreds of emails a week in the course of his work at IBM, then searched his emails for an email from "Jeanne Hammond" and found none.

50. Mr. Horne later searched his email using the "Clover" project term, and found the audit email requests, to which he had in fact responded, that came from "Jannene Hamman."

51. On March 5, 2018, Mr. Finch and Ms. Grant-Pickens informed Mr. Horne that he was found to be in violation of the Business Conduct Guidelines for allegedly not cooperating with an internal audit in a timely and forthright manner.

52. Ms. Grant-Pickens advised Mr. Horne that he could appeal this decision and that he should submit any appeal as soon as possible since his scheduled termination date was March 13, 2018.

53. Mr. Finch advised that it would be best if Mr. Horne took early retirement.

54. On March 6, 2018, Mr. Horne submitted an appeal and was advised by Ms. Grant-Pickens that it would be responded to in two business days.

55. On March 8, 2018, Ms. Grant-Pickens advised Mr. Horne that his termination was being delayed until March 16, 2018.

IBM_RUSIS_00019114

56. On March 8, 2018, Bernadette Duggan, an IBM employee who handled appeals for IBM's human resources department, contacted Mr. Horne to advise that his appeal could not be considered until after he exited the company.

57. On March 15, 2018, Ms. Grant-Pickens advised Mr. Horne that he was not eligible for any form of severance package or benefits and would be stripped of health insurance, stock options and life insurance as of the date of his termination.

58. Despite what other IBM colleagues of Mr. Horne had advised him about the appeals process, Mr. Horne was never permitted to file a formal appeal document or appear before an appeals board to present his case to overturn his termination.

59. Instead, Mr. Horne was only permitted to have a conference call on March 20, 2018 with Ms. Duggan, who admonished him not to record the call and then proceeded to question him on the circumstances of his responses to the audit emails from Ms. Hamman.

60. Ms. Duggan had no interest in the events and details of the Clover project that were the subject of the audit, and summed up the call by advising that she would bring Mr. Horne's appeal to "higher authorities" in IBM and get back to him.

61. Ms. Duggan would not disclose to Mr. Horne who those "higher authorities" were and admonished him not to discuss the appeal with any IBM colleagues or else it could negatively impact his appeal.

62. On April 4, 2018, Ms. Duggan summarily informed Mr. Horne that his appeal was denied and that he was being terminated for alleged violation of the Business Conduct Guidelines and would receive no severance package or further benefits from IBM.

9

IBM_RUSIS_00019115

63. Mr. Horne had responded to the IBM audit in a timely, thorough, and honest manner and had previously never had anything but highly positive performance reviews during his entire tenure at IBM.

64. The purported violation of IBM's Business Conduct Guidelines was a pretext and the true reason for Mr. Horne's termination was his age.

**IBM Fails to Provide Mr. Horne with Any Severance Package or Pay**

65. Upon information and belief, IBM has a regular practice based on corporate policy, tantamount to a contract with its employees, of providing severance packages to its workers, which includes but is not limited to severance pay and options to continue to receive health insurance coverage and life insurance coverage.

66. Upon information and belief, IBM's corporate practice and policy of providing severance benefits to its employees was an employee welfare benefit plan within the meaning of 29 U.S.C. 1002 and thus subject to the enforcement and other provisions of ERISA.

67. Mr. Horne detrimentally relied on this IBM policy of providing severance packages to its employees, and based his continued employment upon the benefits assured under this policy.

68. Upon his termination from employment by IBM, Mr. Horne was wrongfully denied any severance package or benefits of any kind from IBM and, on the date of his termination, Mr. Horne was also wrongfully stripped of his unvested IBM stock.

69. IBM's denial of severance benefits to Mr. Horne was arbitrary, capricious and unlawful.

10

IBM_RUSIS_00019116

70. Mr. Horne suffered damage as of result of IBM's failure to pay him severance benefits.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGE DISCRIMINATION IN VIOLATION OF THE ADEA

71. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 68 inclusive, with the same force and effect as though more fully set forth at length herein.

72. At all relevant times, Plaintiff was an "employee" under the ADEA, 29 U.S.C. § 630(f).

73. IBM is an "employer" under the ADEA, 29 U.S.C. § 630(b).

74. By its actions detailed above, IBM has unlawfully discriminated against Plaintiff on the basis of his age in violation of the ADEA.

75. By reason of the foregoing, Plaintiff has suffered monetary damages, including lost wages and bonuses, lost health insurance benefits, lost life insurance coverage, and lost retirement benefits in the amount of $4,494,000.00.

76. By reason of the foregoing, Plaintiff also suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial.

77. Upon information and belief, IBM's conduct was willful, entitling Plaintiff to liquidated damages pursuant to 29 U.S.C. § 626(b).

## AS AND FOR A SECOND CAUSE OF ACTION
## AGE DISCRIMINATION IN VIOLATION OF
## NEW YORK STATE HUMAN RIGHTS LAW

78. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

11

IBM_RUSIS_00019117

through 77 inclusive, with the same force and effect as though more fully set forth at length herein.

79. At all relevant times, Plaintiff was an "employee" for purposes of the New York State Human Rights Law.

80. IBM is an "employer" for purposes of the New York State Human Rights Law.

81. By its actions detailed above, IBM has unlawfully discriminated against Plaintiff on the basis of his age in violation of the New York State Human Rights Law.

82. By reason of the foregoing, Plaintiff has suffered monetary damages, including lost wages and bonuses, lost health insurance benefits, lost life insurance coverage, and lost retirement benefits, in the amount of $4,494,000.00.

83. By reason of the foregoing, Plaintiff suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION**
**BREACH OF CONTRACT**

84. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1through 83 inclusive, with the same force and effect as though more fully set forth at length herein.

85. At all relevant times, Plaintiff was an "employee" of IBM.

86. At all relevant times, IBM was Plaintiff Stephen Horne's "employer".

87. By its actions detailed above, IBM breached its contract with Plaintiff Horne by failing to provide Plaintiff Horne with the severance package or benefits to which he was entitled upon his termination from IBM.

12

IBM_RUSIS_00019118

88.     By reason of the foregoing, Plaintiff has suffered monetary damages, including lost wages, lost health insurance benefits, lost life insurance coverage, and loss of retirement benefits, in the amount to be determined at trial.

89.     By reason of the foregoing, Plaintiff suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial

## AS AND FOR A FOURTH CAUSE OF ACTION
## VIOLATION OF ERISA STATUTE --
## DENIAL OF SEVERANCE BENEFITS UNDER ERISA

90.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 89 inclusive, with the same force and effect as though more fully set forth at length herein.

91.     Defendant IBM's corporate practice and policy of providing severance benefits to its employees was an "employee welfare benefit plan" within the meaning of 29 U.S.C. 1002 and thus subject to the enforcement and other provisions of ERISA.

92.     Plaintiff detrimentally relied on this IBM policy to provide severance packages to its employees and based his continued employment upon the benefits assured under this policy.

93.     Upon his termination from employment by IBM, Plaintiff was wrongfully denied any severance package or benefits any kind from IBM and was wrongfully stripped of his unvested IBM stock.

94.     Defendant IBM's denial of severance benefits to Mr. Horne was arbitrary, capricious and unlawful under ERISA.

13

IBM_RUSIS_00019119

95.     By reason of the foregoing, Plaintiff has suffered monetary damages, including lost wages, lost health insurance benefits, lost life insurance coverage, and loss of retirement benefits, in an amount to be determined at trial.

96.     By reason of the foregoing, Plaintiff suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial

## JURY DEMAND

97.     Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant Judgment against Defendant as follows:

A. On Plaintiff's First Cause of Action,

   (1) Determining Defendant IBM's conduct and policies complained of herein to be in violation of the ADEA ;

   (2) Ordering IBM to reinstate Plaintiff to his most recent position and pay scale at IBM;

   (3) Awarding Plaintiff appropriate lost earnings and benefits from March 16, 2018, together with unpaid wages, with pre-judgment interest, front pay and/or severance pay in the amount of $4,494,000.00;

   (4) Awarding Plaintiff compensatory damages to be determined at the time of trial by jury;

   (5) Awarding Plaintiff punitive damages to be determined at the time of trial by jury;

   (6) Awarding Plaintiff reasonable attorneys' fees and costs incurred in prosecuting the within action, and

14

IBM_RUSIS_00019120

(7) Granting Plaintiff such other and further relief as this Court deems necessary and proper.

B. On Plaintiff's Second Cause of Action,

(1) Determining Defendant IBM's conduct and policies complained of herein to be in violation of the NYS Human Rights Law;

(2) Ordering IBM to reinstate Plaintiff to his most recent position and pay scale at IBM;

(3) Awarding Plaintiff appropriate lost earnings and benefits from March 16, 2018, together with unpaid wages, with pre-judgment interest, front pay and/or severance pay in the amount of $4,494,000.00;

(4) Awarding Plaintiff compensatory damages to be determined at the time of trial by jury;

(5) Awarding Plaintiff punitive damages to be determined at the time of trial by jury;

(6) Awarding Plaintiff reasonable attorneys' fees and costs incurred in prosecuting the within action, and

C. On Plaintiff's Third Cause of Action,

(1) Determining Defendant IBM' conduct to be in breach of its contract with Plaintiff to provide a severance package to Plaintiff upon termination of his employment.

(2) Awarding Plaintiff appropriate severance pay and benefits;

(3) Awarding Plaintiff compensatory damages to be determined at the time of trial by jury

(4) Awarding Plaintiff punitive damages to be determined at the time of trial by jury.

(5) Awarding Plaintiff reasonable attorneys' fees and costs incurred in prosecuting the within action, and

IBM_RUSIS_00019121

(6) Granting Plaintiff such other and further relief as this Court deems necessary and proper.

D. On Plaintiff's Fourth Cause of Action,

(1) Determining Defendant IBM' failure to pay Plaintiff severance benefits to be a violation of the ERISA statutes;

(2) Awarding Plaintiff appropriate severance pay and benefits;

(3) Awarding Plaintiff compensatory damages to be determined at the time of trial by jury;

(4) Awarding Plaintiff punitive damages to be determined at the time of trial by jury;

(5) Awarding Plaintiff reasonable attorneys' fees and costs incurred in prosecuting the within action, and

(6) Granting Plaintiff such other and further relief as this Court deems necessary and proper.

Dated: White Plains, New York
February 19, 2019

Respectfully Submitted,

**POLLOCK & MAGUIRE, LLP**

By: /s/ Theresa N. Maguire
_____
Theresa N. Maguire
A Member of the Firm
*Attorneys for Plaintiff Stephen Horne*
4 West Red Oak Lane, Suite 302
White Plains, New York 10604
(914) 251-1525
tmaguire@pollock-maguire.com

16

IBM_RUSIS_00019122