UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDVIN RUSIS, HENRY GERRITS, PHIL MCGONEGAL, DAVID HO ENG, BRIAN HAUPT, PHILIP MONSON, CLAUDIA ZIEGLER, SALLY GEHRING, and JOHN MASON, individually and on behalf of all other similarly situated individuals,<br><br>                Plaintiffs,<br>    v.<br><br>INTERNATIONAL BUSINESS MACHINES CORP.,<br><br>                Defendant. | **1:18-cv-08434 (VEC)** |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO
ADEA WAIVER OPT-INS AND ARBITRATION AGREEMENT OPT-INS**

**TABLE OF CONTENTS**

Page

I.    THE ADEA WAIVER OPT-INS SEPARATED FOR INDIVIDUALIZED
      REASONS AND CANNOT DEFEAT THEIR WAIVERS BY MAKING
      MERITS ARGUMENTS. ................................................................................ 2

II.   THE ARBITRATION AGREEMENT OPT-INS ADMITTED THAT THEY
      SIGNED SEPARATION AGREEMENTS, THE CONTENTS OF WHICH IBM
      HAS ESTABLISHED USING EXTRINSIC EVIDENCE ................................. 7

CONCLUSION ........................................................................................................... 10

# TABLE OF AUTHORITIES

Page

**C**ASES

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)......................................................................................... 8

*Barnes v. Hershey Co.*,
    2015 WL 4129573 (N.D. Cal. July 9, 2015)................................................... 3, 4

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
    354 F. Supp. 3d 375 (S.D.N.Y. 2018)............................................................ 9

*Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*,
    346 F.3d 360 (2d Cir. 2003)........................................................................... 8

*Crawford v. Tribeca Lending Corp.*,
    815 F.3d 121 (2d Cir. 2016)........................................................................... 8

*Dependable Lists v. Malek*,
    98 A.D.2d 679 (N.Y. App. Div. 1983) .......................................................... 9

*Doctor's Assocs. v. Alemayehu*,
    934 F.3d 245 (2d Cir. 2019)........................................................................... 8

*Elliot v. Cartagena*,
    2020 WL 4432450 (S.D.N.Y. July 31, 2020) ............................................... 9

*Frydman v. Akerman*,
    280 F. Supp. 3d 418 (S.D.N.Y. 2017)........................................................... 5

*Holtz v. Rockefeller & Co., Inc.*,
    258 F.3d 62 (2d Cir. 2001)............................................................................. 3

*LaSala v. Needham Co., Inc.*,
    399 F. Supp. 2d 421 (S.D.N.Y. 2005)........................................................... 5

*Levine v. Bd. of Educ. of City of N.Y.*,
    1998 WL 386141 (2d Cir. May 21, 1998) .................................................... 5

*Love v. Spector*,
    215 A.D.2d 733 (N.Y. App. Div. 1995) ....................................................... 9

*Lynch v. Savarese*,
    217 A.D.2d 648 (N.Y. App. Div. 1995) ....................................................... 9

*Nicosia v. Muller*,
    229 A.D.2d 964 (N.Y. App. Div. 1996) .................................................. 8

*Perez v. De la Cruz*,
    2013 WL 2641432 (S.D.N.Y. June 12, 2013) ....................................... 3

*Pucilowski v. Spotify USA, Inc.*,
    2022 WL 836797 (S.D.N.Y. Mar. 21, 2022) .......................................... 5

*Scherk v. Alberto-Culver Co.*,
    417 U.S. 506 (1974) ............................................................................. 8

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) ................................................................ 8

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
    966 F. Supp. 2d 270 (S.D.N.Y. 2013) ................................................. 3

*Suhy v. AlliedSignal*,
    44 F. Supp. 2d 432 (D. Conn. 1999) .................................................... 3

*Tasini v. N.Y. Times Co., Inc.*,
    184 F. Supp. 2d 350 (S.D.N.Y. 2002) ................................................. 2

*Vrazel v. Long Island R.R. Co.*,
    2017 WL 2559137 (E.D.N.Y. June 13, 2017) ..................................... 3

*Wilder v. World of Boxing LLC*,
    310 F. Supp. 3d 426 (S.D.N.Y. 2018) ................................................. 3

## RULES

Fed. R. Evid. 1004 ..................................................................................... 8

S.D.N.Y. L. Civ. R. 56.1(d) ....................................................................... 6

## OTHER AUTHORITIES

S. Rep. No. 101-263 (1990) ............................................................... 2, 3, 7

Q&A – Understanding Waivers of Discrimination Claims in Employee Severance Agreements,
    E.E.O.C. (July 15, 2009),
    https://www.eeoc.gov/laws/guidance/qa-understanding-waivers-discrimination-claims-employee-severance-agreements#IV ........................................................ 5

The ten ADEA Waiver Opt-Ins[1] concede that they signed separation agreements waiving their ADEA claims (Plaintiff's Response and Defendant's Reply to L.R. 56.1 Statement ("DRSMF") ¶¶ 3–4, 7–8, 12–13, 19–20, 25–26, 29–30, 33–34, 36–37, 39–40, 43–44), and admit that they separated for individualized reasons.[2]  (*Id.* ¶¶ 1–2, 5–6, 10–11, 15–18, 22–24, 27–28, 31–32, 35, 38, 41–42.)  The *only* disputed issue is whether Plaintiffs' allegation that the ADEA Waiver Opt-Ins' separations were part of an alleged scheme to terminate older workers somehow converts their individual separations into group terminations such that OWBPA disclosures were required.  The short answer is that they cannot.  These allegations of a scheme are not only unfounded, but also entirely irrelevant to whether the ADEA Waiver Opt-Ins were part of a group separation program for purposes of the OWBPA.  The relevant considerations include (a) the reasons the employer provided for their separation and (b) what the employees understood at the time of separation.  Plaintiffs here each admit that they separated for individualized reasons.  Thus, the ADEA Waiver Opt-Ins were individualized terminations that did not require OWBPA disclosures, and their claims should be dismissed.

Likewise, the 14 Arbitration Agreement Opt-Ins ignore their admissions that they signed separation agreements.[3]  And not only do IBM records reflect the precise resource actions that they separated in, but also IBM has established that *every* individual who separated in these resource actions received standardized form separation agreements with arbitration clauses.

---

[1] In this Reply, IBM refers to the same terms defined in its Memorandum in Support of Its Motion for Summary Judgment as to ADEA Waiver Opt-Ins and Arbitration Agreement Opt-Ins ("Motion" or "Mot."). (Dkt. 224.)  References to "Opposition" or "Opp'n" refer to Plaintiffs' Opposition to IBM's Motion for Summary Judgment as to ADEA Waiver Opt-Ins and Arbitration Agreement Opt-Ins.  (Dkt. 232.)

[2] Plaintiffs concede that the disclosures IBM provided to Opt-In Nancy Odom satisfied the OWBPA, so they "have withdrawn her from this case." (Opp'n at 8 n.5.)  Accordingly, there are now only ten ADEA Waiver Opt-Ins.

[3] Given that IBM located Opt-In Amelia Voglino's separation agreement, Plaintiffs have "withdrawn her from this case."  (Opp'n at 12 n.6.)  Accordingly, there are now only 14 Arbitration Agreement Opt-Ins.

Plaintiffs' only evidence in support of their argument that these individuals did not agree to arbitrate is an assertion that other individuals, not subject to IBM's Motion, received different agreements than the Arbitration Agreement Opt-Ins.  This is irrelevant to the question of what agreement the Arbitration Agreement Opt-Ins received, which IBM has established through competent evidence.  Thus, the Arbitration Agreement Opt-Ins must also be dismissed.

I.      **THE ADEA WAIVER OPT-INS SEPARATED FOR INDIVIDUALIZED REASONS AND CANNOT DEFEAT THEIR WAIVERS BY MAKING MERITS ARGUMENTS.**

It is undisputed that the individual separation agreements signed by the ADEA Waiver Opt-Ins satisfy the seven basic OWBPA requirements.  (*See* Mot. at 10–13; Opp'n at 7–9; DRSMF ¶¶ 52–62.)  There is also no genuine dispute that the ADEA Waiver Opt-Ins separated for individualized reasons: individual performance, failure to obtain another position, or a personal decision not to relocate.  (Mot. at  14–15.)  They did not separate as part of group programs, nor were they told that their separations were anything but the result of their individual status—to the contrary, they each *admit* that their separations expressly *were* based on their individual status.  *See* S. Rep. No. 101-263, at *1538 (1990).  (DRSMF ¶¶ 1–2, 5–6, 10–11, 15–18, 22–24, 27–28, 31–32, 35, 38, 41–42.)  Accordingly, the ADEA Waiver Opt-Ins signed valid individual releases, and IBM was under no obligation to provide them with OWBPA disclosures or more time to consider the agreements.  Plaintiffs' arguments to the contrary should be rejected.

*First*, despite *admitting* that they separated for individualized reasons, the ADEA Waiver Opt-Ins now contend that simply alleging that IBM was engaged in a scheme to terminate older workers somehow transforms their individual separations into group layoffs.  (Opp'n at 8–12.)[4]

---

[4] The "evidence" upon which Plaintiffs rely for these unsupported assertions is inadmissible.  Specifically, they cite press articles and a Rule 56.1 statement, filed in a different case before a different judge, that merely

Not so.  The question of whether the ADEA Waiver Opt-Ins separated for pretextual reasons is entirely irrelevant to whether they separated as part of group layoffs.  The latter question turns on what the individuals were told and understood about the reasons for their separations.  And under that standard, the ADEA Waiver Opt-Ins clearly separated for individualized reasons.

In considering "whether a termination was part of [a group] program," the " 'legislative history of the OWBPA provides clear guidance,' . . . as do EEOC regulations and case law." *Barnes v. Hershey Co.*, 2015 WL 4129573, at *9 (N.D. Cal. July 9, 2015) (quoting *Suhy v. AlliedSignal*, 44 F. Supp. 2d 432, 434–35 (D. Conn. 1999)).  Specifically, relevant considerations include what "the employee[s] *understand*[]" to be the reason for their termination and what "the employer . . . *advises* them" at the time of separation.  *See* S. Rep. No. 101-263, at *1538 (emphasis added); *Barnes*, 2015 WL 4129573, at *11 ("[T]he fact that each of these Plaintiffs was told that he or she wa[s] being terminated for individual reasons stands in stark contrast to every case on this issue of which the Court is aware.") (collecting cases).

The *Barnes* case is instructive.  There, the district court found that five of the plaintiffs separated for individualized reasons and were therefore not entitled to additional OWBPA protections.  2015 WL 4129573, at *11.  The employer informed each of these plaintiffs that they were separating for performance reasons.  *Id.* at *3–6, 11.  Even at the time of separation,

---

provide counsel's characterizations of sealed documents not before the Court.  (Opp'n at 2–6.)  "Newspaper articles are simply not evidence of anything other than the fact they were published; they are not admissible to prove the truth of the matter asserted therein."  *Tasini v. N.Y. Times Co., Inc.*, 184 F. Supp. 2d 350, 357 n.8 (S.D.N.Y. 2002) (internal citation and quotation marks omitted); *accord Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 447 n.9 (S.D.N.Y. 2018) (refusing to consider a newspaper article at summary judgment); *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 966 F. Supp. 2d 270, 281 n.7 (S.D.N.Y. 2013) ("Newspaper articles are inadmissible hearsay, and thus, cannot be used to defeat summary judgment.").  Likewise, Rule "56.1 Statements are not evidence; they are vehicles to help the Court."  *Vrazel v. Long Island R.R. Co.*, 2017 WL 2559137, at *3 (E.D.N.Y. June 13, 2017); *accord Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) ("Allowing a Local Rule 56.1 statement to substitute for the admissibility requirement . . . would be tantamount to the tail wagging the dog.") (internal citation and quotation marks omitted); *Perez v. De la Cruz*, 2013 WL 2641432, at *8 (S.D.N.Y. June 12, 2013) ("[A] Rule 56.1 Statement is not evidence . . . .").  In short, Plaintiffs have offered no admissible evidence to support their baseless claim of conspiracy, let alone evidence involving these particular Opt-Ins.

however, some were not convinced by the employer's stated justifications and instead thought that their terminations were pretext for age discrimination because of a meeting that had occurred where some of them were discussed. *Id.* But even assuming the plaintiffs' factual assertions were correct, the court concluded that the circumstances did "not support the alleged disguised en masse termination of older workers," and accordingly enforced the ADEA waivers in those plaintiffs' separation agreements. *Id.* at 11. The claim that the separations were "pretextual" had no bearing on the court's decision to enforce the releases; instead, the court looked to the actual circumstances underlying their separations to conclude that they were individualized.

This case is no different. It is undisputed that IBM informed the ADEA Waiver Opt-Ins that they were separating for individualized reasons. Opt-Ins Black, Bayerle, Emma, and Selcov were all on performance improvement plans, and IBM told them they were separating due to poor performance. (Mot. at 2–4.) Similarly, Opt-Ins Kapor and Schaaff were told they were separating due to poor performance, namely their failure to meet quotas and implement IBM Cloud, respectively. (*Id.* at 4.) Opt-Ins Gonzalez, Grill, and Kondis completed no work for several months, so IBM informed them that they would be terminated as a result. (*Id.* at 3.) They admit these facts, and that is all that is required to show they signed valid individual releases. (DRSMF ¶¶ 5–6, 9–11, 27–28, 31–32, 35, 38, 42.)

There is good reason that mere allegations of pretext are not sufficient to show that a separation was part of a group layoff. If merely alleging an age discrimination scheme was enough to call into question whether an individual separation was actually a group layoff, then the Court would have to adjudicate the merits of an ADEA claim before it could ever determine if an ADEA release is valid. That would be entirely inconsistent with the EEOC's own guidance that a court should *first* decide whether a waiver is valid *before* adjudicating the merits of a

discrimination claim.  *See* Q&A – Understanding Waivers of Discrimination Claims in

Employee Severance Agreements, E.E.O.C. (July 15, 2009),

https://www.eeoc.gov/laws/guidance/qa-understanding-waivers-discrimination-claims-

employee-severance-agreements#IV ("*Before* looking at the employee's discrimination claim, a

court first will decide whether the waiver is valid.  If a court concludes that the waiver is invalid,

it will decide the employee's discrimination claim, but it will dismiss the claim if it finds that the

waiver is valid.") (emphasis altered).

       Moreover, requiring a court to determine whether a separation is pretextual *before* ruling

on the validity of a release would eviscerate an employer's ability to obtain a valid individual

ADEA waiver.  This would be inconsistent with a well-established body of law favoring

enforcement of releases.  *Pucilowski v. Spotify USA, Inc.*, 2022 WL 836797, at * 4 (S.D.N.Y.

Mar. 21, 2022) (" 'Federal courts likewise have articulated a strong public policy in favor of

enforcing . . . releases.' " (quoting *Levine v. Bd. of Educ. of City of N.Y.*, 1998 WL 386141, at *2

(2d Cir. May 21, 1998))); *LaSala v. Needham Co., Inc.*, 399 F. Supp. 2d 421, 429 (S.D.N.Y.

2005) ("[C]ourts should encourage the voluntary resolution of disputes whenever possible.");

*Frydman v. Akerman*, 280 F. Supp. 3d 418, 426 (S.D.N.Y. 2017) ("New York law favors

enforcement of valid releases.") (internal citations and quotation marks omitted).

       *Second*, Plaintiffs erroneously assert that Opt-In Anne Bellew separated as part of a group

program that impacted other IBM employees.  (Opp'n at 9).  But the record does not support this

claim.  To the contrary, the email Plaintiffs cite supports *IBM*'s position that Opt-In Bellew

separated for individualized reasons.  (*See* Opp'n at 9 (citing Liss-Riordan Decl., Ex. 16,

Dkt. 236-16)).  As she admits, (DRSMF ¶ 2), IBM did not tell Opt-In Bellew that she was being

terminated to cut costs, or because her position was being eliminated, or for any other reason

suggestive of a "quick and wholesale reduction[]." *See* S. Rep. No. 101-263, at *1537–38. Instead, IBM told her to relocate to Maryland, where many of IBM's procurement employees *already* worked.  (Liss-Riordan Decl., Ex. 16.)  She refused (*id.*), and thus had every reason to "suspect that action [was] being taken based on [her] individual characteristics."[5]  *See* S. Rep. No. 101-263, at *1538.  In short, there is no genuine dispute that Opt-In Bellew separated on an individual basis.

*Finally*, Plaintiffs make an eleventh-hour plea for more discovery.  (Opp'n 9–12.)  But Plaintiffs have already had over six months of discovery on these issues, and IBM has produced hundreds of documents regarding the reasons for the ADEA Waiver Opt-Ins' separations. Plaintiffs failed to pursue the discovery that was available to them:  They chose not to depose *any* of the ADEA Waiver Opt-Ins' managers or HR partners, nor did they issue interrogatories on the grounds for their separations.  The Court rejected Plaintiffs' request for broad discovery designed to determine whether a discriminatory scheme applied to these Opt-Ins.  (Sept. 22, 2021 Order at 2, Dkt. 191.)  The Court, however, allowed discovery up to their first- and second-line managers; but Plaintiffs chose not to avail themselves of it fully.  (*Id.*)  Nor does Plaintiffs' reliance on generalized and sealed "evidence" from a *different case* involving completely *different issues* change the calculus.  (*See id.* (concluding that further discovery would be appropriate only "[i]f *that* production"—meaning discovery from *this* case—"gives rise to a factual basis for Plaintiffs to argue that the termination of *those* employees"—meaning these *specific* Opt-Ins—"was, in fact, part of a larger layoff") (emphasis added).)

---

[5] Plaintiffs wrongly suggest that "IBM specifically knew and intended" that "the vast majority of the individuals who were 'offered' this relocation option [would] resign."  (Opp'n at 9.)  Besides being incorrect, this assertion is not supported by any record evidence.  *See* S.D.N.Y. L. Civ. R. 56.1(d).  Nor does the fact that Opt-In Bellew inadvertently signed the wrong agreement (and then subsequently signed an individual separation agreement) change the reasons for her separation were individualized.

Likewise, Plaintiffs are wrong that further discovery is justified because IBM chose *not* to move for summary judgment as to seven *other* opt-ins.  (Opp'n at 11–12.)  Throughout this case, the Court has encouraged the litigants to cooperate and limit the issues.  (Hr'g Tr. 30:21, Dec. 10, 2021 (Court to Parties:  "The less I have to decide the better."); Hr'g Tr. 15:15–18, May 12, 2021 (Court to Plaintiffs' Counsel:  "[I]f you had started with a more focused case, we would be done by now.").)  IBM sent Plaintiffs a letter requesting that they dismiss several categories of opt-ins in April 2021,[6] right after the Court's March 2021 Order, that included individuals who had signed ADEA waivers.  Plaintiffs refused to dismiss any opt-ins other than arbitration-agreement signers.  The parties then engaged in discovery on the opt-ins who signed ADEA waivers.  IBM's decision not to burden the Court with a summary judgment motion that might not be successful at this stage has no bearing on the claims of the ADEA Waiver Opt-Ins subject to this Motion, as to whom there clearly are no disputed issues of fact.

Despite Plaintiffs' best efforts to confuse and distract from the actual issues, there is no genuine dispute that the ten ADEA Waiver Opt-Ins separated for individualized reasons.  The documents IBM produced regarding the ADEA Waiver Opt-Ins—i.e., their performance improvement plans, their resignation emails, and their individual separation agreements—fully support that they were told and understood that they were separating for individualized reasons. Further discovery is needless, and the Court should grant summary judgment in IBM's favor.

## II.    THE ARBITRATION AGREEMENT OPT-INS ADMITTED THAT THEY SIGNED SEPARATION AGREEMENTS, THE CONTENTS OF WHICH IBM HAS ESTABLISHED USING EXTRINSIC EVIDENCE.

 IBM established using competent evidence that each of the 14 Arbitration Agreement Opt-Ins signed separation agreements with arbitration clauses.  (Mot. at 17–19.)  Though these

---

[6] Plaintiffs' Opposition mistakenly states that this letter was from April 2022.  (Opp'n at 11.)

agreements are missing, the resource actions the Arbitration Agreement Opt-Ins separated in are clear.  (DRSMF ¶¶ 66, 68, 70, 72, 74, 76, 78, 80, 82, 84, 86, 88.)  And IBM's Diane Kennedy attested that each employee who separated in those resource actions was provided with standardized form separation agreements with arbitration clauses.  (Mot. at 8, 18–19.)  Thus, because there is no genuine dispute that the Arbitration Agreement Opt-Ins agreed to arbitrate their ADEA claims, summary judgment should be granted in IBM's favor.

In response, Plaintiffs wholly ignore the admissions Arbitration Agreement Opt-Ins made.  (Opp'n at 12–15.)  Instead, they merely point fingers at IBM for supposedly not explaining why the separation agreements are missing.  (*Id.*)  But IBM met its burden in all respects.

Federal Rule of Evidence 1004 explicitly provides a mechanism to introduce secondary evidence when "the original[] [is] lost or destroyed, and not by the proponent acting in bad faith."  And "[l]oss or destruction of the original, unless due to bad faith of the proponent, **is a satisfactory explanation** of nonproduction."  Fed. R. Evid. 1004 advisory committee's note to 1972 proposed rules (emphasis added).  The proponent need only prove that the original is lost "by a preponderance of the evidence."  *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 127 (2d Cir. 2016).[7]

---

[7] Plaintiffs attempt to distinguish the cases cited by IBM on the ground that they did not involve arbitration agreements, but this critique is misguided.  (Opp'n at 13 n.7.)  Arbitration is "a creature of contract," *Doctor's Assocs. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019); and in enacting the FAA, Congress sought to place "arbitration agreements 'upon the same footing as other contracts.' "  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (acknowledging "the fundamental principle that arbitration is a matter of contract").  Thus, "while the FAA creates a body of federal substantive law of arbitrability, . . . in evaluating whether the parties have entered into a valid arbitration agreement, the court must look to state law [contract] principles."  *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003) (internal citation and quotation marks omitted).

With that in mind, IBM appropriately cited various decisions from New York courts evaluating whether parties entered into valid contracts despite having lost the contracts themselves.  (Mot. at 17–18.)  All these cases support IBM's position that it can establish the existence of the lost separation agreements using extrinsic evidence.  *See, e.g.*, *Nicosia v. Muller*, 229 A.D.2d 964, 965 (N.Y. App. Div. 1996) ("A party may elicit parol evidence to prove the existence and terms of a written agreement . . . when the failure to produce the original is adequately

Here, IBM already acknowledged that the separation agreements are lost.  (Mot. at 1, 18–19.)  To be sure, it now provides *further* support through the declaration of IBM's Global Leader of AskHR IBMer Support, Robyn Hardy, who exhausted all sources of information and means of discovery in good faith.  (Reply Hardy Decl. ¶¶ 6–11.)  She attests that during the 2014-to-2016 period, managers for separated employees were instructed to fax and mail original signed separation agreements to IBM's Employee Services Center.  (*Id.* ¶ 5.)  For four of the Arbitration Agreement Opt-Ins (Rodney Sassaman, Dayle Feingold, Michael Hamilton, and David Cabassa), their managers verified that they signed resource action separation agreements, but the Employee Services Center did not receive them.  (*Id.* ¶¶ 7–11.)  Likewise, for the other Arbitration Agreement Opt-Ins, IBM does not possess their signed agreements because their managers likely did not send them to the Employee Services Center or the Employee Services Center did not receive them.  (*Id.* ¶ 6.)  At bottom, Ms. Hardy conducted an extensive and good-faith search for the agreements but was unsuccessful.  This is more than enough to establish that the agreements are, in fact, lost.[8]  *Cf. Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 354 F. Supp. 3d 375, 382–83 (S.D.N.Y. 2018) (suggesting that the proponent of a lost contract can meet its burden by

---

explained."); *Lynch v. Savarese*, 217 A.D.2d 648, 650 (N.Y. App. Div. 1995) ("[E]ven if no signed copy of the lease can be found, the appellants could still prove its existence by extrinsic evidence."); *Love v. Spector*, 215 A.D.2d 733, 733 (N.Y. App. Div. 1995) (concluding that even though the parties lost the contract, the proponent was still "entitled to the opportunity to prove, if she can, the existence and the contents of the lost writing by parol and circumstantial evidence") (internal citation and quotation marks omitted); *Dependable Lists v. Malek*, 98 A.D.2d 679, 680 (N.Y. App. Div. 1983) ("Where a proper excuse has been shown for the nonproduction of the original writing, **such as its loss** or destruction, the admissions of the adversary, whether oral or written, can be received in evidence to prove the former existence as well as the contents of the writing.") (emphasis added).

[8] Plaintiffs' reliance on *Elliot v. Cartagena*, 2020 WL 4432450 (S.D.N.Y. July 31, 2020), is inapt.  (Opp'n at 14–15.)  In that case, there was evidence suggesting that the plaintiff's then-manager last possessed the missing contract.  2020 WL 4432450, at *4.  But rather than submitting a declaration from his former manager, the plaintiff relied on declarations from three *other* individuals who merely stated that the manager *told them* that the contract was lost.  *Id.*  The court concluded that the plaintiff did not "exhaust all effort to obtain a sworn testimony by" the former manager, and thus the plaintiff failed to meet his burden under Rule 1004(a).  *Id.* at *5.  Here, on the other hand, IBM has submitted a declaration from the very individual whose job it is to maintain the separation agreements, which is what the *Elliot* court suggested should be done.

submitting a declaration that "addresses what happened to the original," and giving the proponent another "opportunity to file further submissions").

Despite this sworn testimony, Plaintiffs point to examples of other opt-ins who purportedly "received separation agreements that did not contain arbitration provisions." (Opp'n at 15.) These individuals, two of whom did not even separate in resource actions, separated as part of entirely different actions than the Arbitration Agreement Opt-Ins. (*Compare* Reply Kennedy Decl. ¶ 6 (Roberti separated in ADMI), *with* Kennedy Decl. ¶¶ 7–19, Dkt. 227 (Arbitration Agreement Opt-Ins separated in SDEV, SWNA, SWGH, SYDM, CLDD, GTGU, GTLY, GWPP, CLEE, CMEE, LYGT, and XGB5).) Accordingly, Plaintiffs' evidence concerning the agreements those individuals received is irrelevant to the question of what agreements the Arbitration Agreement Opt-Ins received.

In sum, there is no genuine dispute that the Arbitration Agreement Opt-Ins signed the same standardized form separation agreements provided to the Court by Ms. Kennedy, which all contained arbitration clauses. Indeed, the Arbitration Agreement Opt-Ins *admit* to signing separation agreements, and there is no genuine dispute about which specific resource actions they separated in. The originals were also not lost in bad faith, nor is that even alleged. Accordingly, the Court should find that IBM has established the contents of the lost agreements, enforce their arbitration clauses, and grant summary judgment for IBM.

## CONCLUSION

For these reasons, the Court should grant IBM's Motion for Summary Judgment as to ADEA Waiver Opt-Ins and Arbitration Agreement Opt-Ins.

Respectfully submitted,

Dated: April 8, 2022

JONES DAY

By: */s/ Matthew W. Lampe*
    Matthew W. Lampe
    Kristina A. Yost
    Ira Handa
    JONES DAY
    250 Vesey Street
    New York, NY 10281
    mwlampe@jonesday.com
    kyost@jonesday.com
    ihanda@jonesday.com

    Alison B. Marshall
    JONES DAY
    51 Louisiana Ave, N.W.
    Washington, D.C. 20001
    abmarshall@jonesday.com

    *Attorneys for Defendant IBM*