```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
EDVIN RUSIS, HENRY GERRITS, PHIL           :
MCGONEGAL, and DAVID HO ENG,               :
individually and on behalf of all other similarly :
situated individuals,                      :
                              Plaintiffs,  :
                                           :
                -against-                  :
                                           :
INTERNATIONAL BUSINESS                     :
MACHINES CORP.,                            :
                                           :
                              Defendant.   :
-------------------------------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  5/24/22

18-CV-8434 (VEC)

MEMORANDUM
OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

This is a putative collective action against Plaintiffs' former employer, International Business Machines Corp. ("IBM"), alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Second Am. Compl., Dkt. 180 ¶¶ 1, 26–27. Plaintiffs allege that, since 2012, IBM has laid off or otherwise forced its older workers out of the company in a systematic effort to replace them with younger employees. *Id.* ¶ 22. IBM has moved for summary judgment as to a group of Opt-In Plaintiffs who waived their right to sue under the ADEA when terminated ("ADEA Waiver Opt-Ins")[1] and Opt-In Plaintiffs who, according to IBM, signed separation agreements that included an agreement to arbitrate ADEA

---

[1] This group is comprised of Anne Bellew, Steven Black, Demostenes Gonzalez, Mark Grill, Peter Kondis, Walter Artur Bayerle, Jr., Phillip Emma, Rose Kapor, Brian Schaaff, and Eric Selcov. Def. Mem., Dkt. 224 at 2–5 (citations omitted).

claims ("Arbitration Agreement Opt-Ins").[2]  Not. of Mot., Dkt. 222.  For the reasons that follow, IBM's motion is GRANTED.

## BACKGROUND

The Court assumes familiarity with the facts of the case, which were outlined in the Court's opinion on IBM's motions for judgment on the pleadings dated March 26, 2021.  *See* Op. & Order, Dkt. 156 at 2–5.  In brief, Named and Opt-In Plaintiffs are former IBM employees who separated from the company at age forty or older, and who allege that their terminations or separations violated the ADEA because they were part of a company-wide effort to oust older employees from IBM.  Second Am. Compl. ¶¶ 22–29.  Plaintiffs allege that IBM pursued this goal in several ways, such as: by engaging in mass layoffs known as "Resource Actions"; terminating older employees under pretextual reasons; constructively discharging older employees; and conditioning older employees' employment on requirements, such as relocation, that they were unlikely to accept.  *Id.* ¶¶ 19, 25.

IBM has filed three motions for non-merits summary judgment.  *See* Nots. of Mot., Dkts. 207, 215, 222.  This opinion deals only with IBM's motion as to ADEA Waiver Opt-Ins and Arbitration Agreement Opt-Ins.  *See* Dkt. 222.

## DISCUSSION

**I.     Legal Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[2]  This group is comprised of Robert Bees, David Cabassa, Dayle Feingold, Craig Feldhak, Michael Hamilton, Bryan Mitchell, Oscar Molina, Michael Morris, Mark Perillo, Torrey Price, Steven Richard, Rodney Sassaman, Robert West, and Yvette Wilson.  Def. Mem. at 7 (citations omitted).

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). To defeat summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). A party may not "rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). Summary judgment cannot be defeated by the presentation of "but a 'scintilla of evidence' supporting [plaintiffs'] claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

On a motion for summary judgment, courts "construe the facts in the light most favorable to the non-moving party and [] resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (internal quotation marks and citation omitted). A district court is not, however, under any "obligation to engage in an exhaustive search of the record" when considering a motion for summary judgment. *Jones v. Goord*, 435 F. Supp. 2d 221, 259 (S.D.N.Y. 2006) (citing *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470–71 (2d Cir. 2002)).

II. **IBM Is Entitled to Summary Judgment as to the ADEA Waiver Opt-Ins**

The first half of IBM's motion pertains to the ADEA Waiver Opt-Ins, who, IBM asserts, were separated on an individual basis. Def. Mem., Dkt. 224 at 10. IBM argues that the terminations of the ADEA Waiver Opt-In Plaintiffs complied with the seven requirements of the

3

Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f). Because those Plaintiffs properly waived any claim they had under the ADEA, IBM argues that it should be granted summary judgment as to their claims.[3] Plaintiffs argue that the ADEA Waiver Opt-Ins were, in fact, terminated as part of a Resource Action and that IBM's reason for each individual termination was pretextual. Pls. Opp., Dkt. 232 at 8–9. Plaintiffs contend that there is, therefore, a genuine dispute of material fact as to whether these individuals were terminated on an individual basis, so that their waivers were effective, or were terminated as part of a company-wide strategy necessitating additional steps and disclosures under the OWBPA for the waivers of ADEA claims to be effective. *Id.* at 9.

### A. The OWBPA Requirements

Under the OWBPA, a waiver of ADEA rights is only effective if the waiver is "knowing and voluntary". 29 U.S.C. § 626(f). To establish that a waiver was "knowing and voluntary," the employer must show, at a minimum, that: (1) the waiver was written so that it could be understood by the employee; (2) the waiver specifically referred to rights or claims arising under the ADEA; (3) the waiver did not include rights or claims arising in the future; (4) consideration was given for the waiver; (5) the individual was advised in writing to consult with an attorney; (6) the individual was given at least 21 days to consider the agreement; and (7) the agreement provided for a seven-day revocation window after its execution. *Id.* § 626(f)(1)(A)–(G); *see also Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427–28 (1998) (holding that an employee cannot waive ADEA claims unless the waiver or release satisfies the OWBPA's requirements).

---

[3] Although IBM initially sought summary judgment as to eleven ADEA Waiver Opt-Ins, Plaintiffs concede that one of the eleven, Nancy Odom, was terminated in a Resource Action and received the additional OWPBA disclosures required for group terminations. Plaintiffs have, therefore, withdrawn her from their case. Pls. Opp., Dkt. 232 at 8 n.5. As a result, this opinion addresses only the remaining ten ADEA Waiver Opt-Ins.

4

In contrast to an individual termination, for a waiver given as part of a group termination to be effective, the OWBPA requires the employer to give the employee forty-five days (rather than twenty-one days) to consider the agreement, 29 U.S.C. § 626(f)(1)(F)(ii), and requires the employer to provide the employee with certain details about the termination program, id. § 626(f)(1)(H).

There is no dispute that if the ADEA Waiver Opt-Ins were separated on an individual basis, their waivers would have met the OWBPA requirements; instead, Plaintiffs argue that the waivers did not comply with OWBPA because the employees were terminated as part of a group termination. Pls. Opp. at 7–9.

### B. There Is No Question of Fact that the Terminations Were Individual and that the ADEA Waivers Complied with the OWBPA

The facts surrounding each of the ten ADEA Waiver Opt-Ins' separations from IBM are not disputed. In roughly chronological order: (i) Rose Kapor was informed in 2014 that she was being terminated for failure to meet quotas, Def. Reply 56.1 Stmt., Dkt. 263 ¶¶ 35–37; (ii) Eric Selcov was placed on a performance improvement plan ("PIP") in 2014 and was terminated that same year for failing to meet expectations under the PIP, id. ¶¶ 41–44; (iii) Brian Schaaf was terminated in 2015 for failing to implement IBM Cloud, id. ¶¶ 38–40; (iv) Phillip Emma was terminated in 2016 when he failed to meet expectations after being placed on a PIP, id. ¶¶ 31–34; (v) although Walter Arthur Bayerle, Jr. was placed on a PIP in 2017, he requested severance instead of attempting to improve his performance in accordance with the terms of the PIP, id. ¶¶ 27–30; (vi) Demostenes Gonzalez was terminated when he failed to find a project on which to work, id. ¶¶ 9–13; (vii) Mark Grill was terminated in 2017 when he was unable to find a domestic position after returning from an international assignment, id. ¶¶ 14–20; (viii) Steven Black was terminated in 2017 when he failed to meet expectations after being placed on a PIP,

*id.* ¶¶ 5–8; (ix) Anne Bellew was terminated when she refused to relocate, *id.* ¶¶ 1–4; and (x) Peter Kondis was terminated in 2018 when he was unable to find a position when returning from leave, *id.* ¶¶ 21–26. Each ADEA Waiver Opt-In signed an agreement waiving any claim he or she had under the ADEA in exchange for a severance package. *Id.* ¶¶ 3–4, 7–8, 12–13, 19–20, 25–26, 29–30, 33–34, 36–37, 39–40, 43–44. None was given the additional time or disclosures required under the OWBPA for group terminations.

Plaintiffs assert that the reasons given for these terminations were all pretextual and that there is, therefore, a question of fact whether the waivers of ADEA rights complied with OWBPA.[4] Despite Plaintiffs' attempt to conflate these issues, the question whether the reasons given for the termination were pretextual is a distinct question from whether the termination was part of a group program of terminations. Def. Reply, Dkt. 262 at 3.

Neither the OWBPA nor its implementing regulations define "group termination." According to the legislative history of the OWBPA, indicia of "group" terminations include the use of a "standardized formula or package of employee benefits that is available to more than one employee"; lack of "negotiation between the parties"; and advisement from the employer

---

[4] The Court previously granted Plaintiffs' request for production of limited discovery related to individual terminations to determine whether they gave rise to an obligation to comply with the OWBPA requirements for group terminations. *See* Order, Dkt. 191 at 2. Plaintiffs now contend that they "have . . . evidence that merits the revisiting of this issue", *see* Pls. Opp. at 10, suggesting that these individual terminations were part of layoffs handed down from a higher level and requesting additional discovery to further explore this issue. *Id*. at 9–12.

Before the Court set the briefing schedule for this motion, Plaintiffs represented that they had completed discovery necessary to respond to Defendant's proposed non-merits summary judgment motions. Joint Letter, Dkt. 199 at 1. Plaintiffs have not been shy about bringing discovery disputes to the attention of the Court. *See*, *e.g.*, Order, Dkt. 163; Order, Dkt. 191; Order, Dkt. 204. In fact, the Court had a discovery conference with the parties less than two weeks before IBM's motions were due. *See generally* Tr., Dkt. 205 (Dec. 10, 2021). Although Plaintiffs continued to press for immediate, broad-ranging discovery, even though the Court had already ruled that such discovery would not proceed until the parameters of the case were better defined, *see id.* at 19–20, Plaintiffs never mentioned during that conference that they needed more discovery on these terminations to ascertain whether they were part of a group program of terminations. Such a request would have likely been denied, particularly because Plaintiffs had not taken advantage of the discovery the Court had previously authorized regarding these employees. Def. Reply at 6. Nevertheless, the failure even to make the request during that conference leaves the current request reeking of gamesmanship.

"that the termination is not a function of [the employee's] individual status". S. Rep. No. 101–263, at *1537–38 (1990). Although whether a "program" to eliminate a group of employees exists is a question of fact, normally one would expect to see a package of benefits being provided to two or more employees for the termination to be part of a "group termination" as that term is used in the statute. 29 C.F.R. § 1625.22(f)(1)(iii)(B).

Plaintiffs have not made a meaningful effort to demonstrate that there is a question of fact whether the ADEA Waiver Opt-Ins were part of a group termination, relying instead on generalized information that IBM wanted to reduce the number of older employees at IBM. Pls. Opp. at 8–9. Plaintiffs may ultimately be able to prove that IBM violated the ADEA in connection with certain terminations, but the issue as to these ten Plaintiffs is whether they were terminated as part of a "group" termination or whether their terminations were individual. Plaintiffs have presented no evidence to rebut IBM's evidence that these terminations were carried out on an individual basis. The timing of the terminations undermines Plaintiffs' insinuation that they were part of a group program. Here, the Plaintiffs were terminated, individually, over a period of years, "with no apparent groupings or waves of terminations or other unifying factors." *Barnes v. Hershey Co.*, No. 12-CV-01334, 2015 WL 4129573, at *11 (N.D. Cal. July 9, 2015).[5] Moreover, each Plaintiff was given a specific, individualized reason for his or her termination. *Id.*[6]

---

[5]     There is some evidence that, over a number of years, IBM made a concerted effort to reduce the number of older employees. *See, e.g.*, Liss-Riordan Decl., Ex. 1, Dkt. 234-1 (EEOC Determination Letter finding the relevant period to be between 2013 and 2018). But the question presented here is not whether the ADEA Waiver Opt-Ins may have had an ADEA claim because their termination was the result of a corporate policy of age discrimination; the question is whether their terminations were part of the termination of "a group or class of employees" as that phrase is used in the OWBPA. 29 U.S.C. §§ 626(f)(1)(F)(ii), (f)(1)(H). Plaintiffs have simply presented no evidence to create a question of fact on that point.

[6]     The Court also notes that, of the ADEA Waiver Opt-Ins, one, Mr. Bayerle, admits that he negotiated his severance package while represented by counsel. Def. Reply 56.1 Stmt. ¶ 30; *see* S. Rep. No. 101–263, at *1537 (noting that negotiation between the parties is a factor that suggests an individual, rather than group, termination).

7

Merely being given an individualized reason for termination does not, of course, eliminate the possibility that the termination was really part of a larger group termination and the reason given was pretextual. The goal of the OWBPA is to ensure that any employee who is being asked to waive his or her ADEA rights has enough information to make an informed decision whether he or she might *have* an age discrimination claim. In a group termination context, without the additional information the OWBPA requires, any given employee can only wonder whether he just happened to draw the short straw and was unlucky to be selected for a lay-off or whether the employer actually selected him because of his age. In contrast, where, as here, the employer gives the employee a specific reason for termination (such as the refusal to relocate; failing to meet expectations under a PIP; or failing to find a new position within the company), the employee has "the information he or she need[s] to evaluate whether the cited . . . reasons were a cover for age discrimination." *Id.*; *cf. Suhy v. AlliedSignal*, 44 F. Supp. 2d 432, 435 (D. Conn. 1999) (holding plaintiff was terminated as part of a "group termination" when he was told he was being terminated as part of reduction in force and had "no indication . . . that [he] was released because of his individual work performance."); *Burch v. Fluor Corp.*, 867 F. Supp. 873, 877 (E.D. Mo. 1994) (same); *Hankins v. Transcanada USA Servs., Inc.*, 22 F. Supp. 3d 844, 857 (M.D. Tenn. 2014) (same).[7]

---

[7] Plaintiffs do not cite a single case in which a court has found that an individual termination was actually part of a group termination, or a single case that stands for the proposition that the Court should evaluate allegations of pretext when considering OWBPA compliance. In fact, the only case they cite in support of their argument is one in which there was no dispute between the parties that the terminations were an "employment termination program" under the OWBPA, and in which the Defendant conceded that it had violated the OWBPA. *Butcher v. Gerber Prod. Co.*, 8 F. Supp. 2d 307, 315 (S.D.N.Y. 1998).

Each of the ADEA Waiver Opt-Ins was well-positioned to make a determination whether the reasons given for his or her termination was pretextual; armed with that knowledge, in exchange for severance benefits, each waived any ADEA claim he or she could bring.[8]

In short, Plaintiffs have presented no evidence to create a question of fact whether the ADEA Waiver Opt-Ins knowingly and voluntarily waived their rights to bring an ADEA claim. Accordingly, IBM's motion for summary judgment as to the claims of the ADEA Waiver Opt-Ins is GRANTED.

### III.   There Is No Question of Fact Whether the Arbitration Agreement Opt-Ins Agreed to Arbitrate Their Claims

Unlike the ADEA Waiver Opt-Ins, IBM admits that it terminated the Arbitration Agreement Opt-Ins as part of a Resource Action. Def. Reply 56.1 Stmt. ¶ 63. Because the separation agreements that the Arbitration Agreement Opt-Ins signed upon termination have been lost, the issue for the Court to decide is whether there is a question of fact that these Opt-In Plaintiffs signed arbitration agreements at the time of their terminations. Def. Mem. at 7–8.[9]

The burden of proving that the Plaintiffs signed an arbitration agreement falls on IBM. *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). Although IBM seeks to prove the contents of missing arbitration agreements through extrinsic evidence, it must first establish that there was an arbitration agreement and "establish a proper excuse for the non-production of the document." *Bandler v. BPCM NYC, Ltd.*, No. 12-CV-3512, 2014 WL 5038407, at *8

---

[8] Plaintiffs argue that, at a minimum, Ms. Bellew's termination, which followed her refusal to relocate, was part of a group action. Pls. Opp. at 9. Additional evidence that IBM lured older workers into leaving by offering the unattractive option of relocating does not change the OWBPA's disclosure requirements, nor their application to Ms. Bellew's claim. Similarly, even if there is (undisclosed) "evidence that IBM has considered employees who separated for other reasons to count toward its numerical goals of eliminating employees through Resource Actions," *id.* at 3 n.2, that would not change the Court's analysis of the definition of individual vs. group termination.

[9] IBM found the arbitration agreement signed by Opt-In Plaintiff Amelia Voglino; Plaintiffs have withdrawn her from their case. Pls. Opp. at 12 n.6.

9

(S.D.N.Y. Sept. 29, 2014), *aff'd sub nom. Michael Bandler, MB & Co. v. BPCM NYC, Ltd.*, 631 F. App'x 71 (2d Cir. 2016) (internal quotation marks and citation omitted). Loss of the documents, so long as the proponent did not act in bad faith, constitutes a satisfactory excuse for their non-production. *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 127 (2d Cir. 2016) (citing Fed. R. Ev. 1004(a)).

In this case, there is absolutely no evidence of bad faith on the part of IBM, and all of the Arbitration Agreement Opt-Ins admit that they signed separation agreements. Def. Reply 56.1 Stmt. ¶ 96 (citations omitted). Those admissions demonstrate that the missing documents existed at one point. The loss of the documents, coupled with the lack of evidence of bad faith on IBM's part, constitutes a proper excuse for their non-production. *Bandler*, 2014 WL 5038407, at *8.

IBM argues that all Arbitration Agreement Opt-Ins signed "standardized separation agreements with individual arbitration provisions and class and collective action waivers." Def. Mem. at 19 (citing Def. Rule 56.1 Stmt., Dkt. 223 ¶¶ 63–96); *see also* Kennedy Decl., Dkt. 227 ¶¶ 7–17, 19 (noting that every employee separated in each resource action was provided with a standardized form separation agreement).[10] IBM further identifies the particular standardized agreement applicable to each particular Resource Action implicated by these Opt-Ins. Kennedy Decl., Dkts. 227-2–6, Exs. B–F (standardized form separation agreements). Plaintiffs do not dispute that IBM has correctly identified the severance agreement that was used for each of the pertinent Resource Actions, nor that those severance agreements include arbitration agreements. Instead, reaching for a counterpoint, Plaintiffs argue that other Opt-In Plaintiffs who were

---

[10] One Arbitration Agreement Opt-In, Plaintiff Robert Bees, signed a Skills Transformation Plan Separation Agreement, the standardized version of which also included an arbitration provision. Def. Reply 56.1 Stmt. ¶¶ 88–91.

terminated in other Resource Actions signed separation agreements that did not contain arbitration agreements. *See* Pls. Mem. at 15 (citations omitted).

The Arbitration Agreement Opt-Ins admit signing separation agreements. Def. Reply 56.1 Stmt. ¶ 96 (citations omitted). Plaintiffs have not provided any evidence to rebut IBM's evidence that the standardized agreements utilized as part of these Plaintiffs' terminations included an arbitration agreement. Not a single one of the affected Opt-In Plaintiffs has submitted a declaration in which he or she denies that there was an arbitration provision in the severance agreement he or she signed. Put differently, Plaintiffs have provided no "hard evidence showing that [their] version of the events is not wholly fanciful." *D'Amico*, 132 F.3d at 149.

Construing the facts in the light most favorable to Plaintiffs and "resolv[ing] all ambiguities and draw[ing] all reasonable inferences against" IBM, *Delaney*, 766 F.3d at 167 (citation omitted), there is no genuine issue of material fact whether the Arbitration Agreement Opt-Ins signed contracts agreeing to arbitrate all ADEA claims. IBM's motion is therefore GRANTED as to the Arbitration Agreement Opt-Ins.

## CONCLUSION

For the foregoing reasons, IBM's motion is GRANTED in full. The Clerk of Court is respectfully directed to close the open motion at Docket 222.

**SO ORDERED.**

**Date: May 24, 2022**
**New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**